ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE RAVENS GROUP, INC. | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. 07-754 C |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**COMPLAINT**
**(Appeal of Contracting Officers Decision)**

NOW COMES Plaintiff The Ravens Group, Inc., by counsel, and appeals from the decision of William E. Campbell, Jr., the Contracting Officer, on behalf of The United States of America under Contract No. W91QV1-04-D-0013—the General and Flag Officers Quarters ("GFOQ") service and maintenance contract (the "Contract"). For its Complaint against Defendant, Plaintiff alleges as follows:

**PARTIES**

1. Plaintiff, The Ravens Group, Inc. ("The Ravens Group") is a corporation organized and existing under the laws of the State of Maryland, and at all times pertinent hereto was qualified to, and did conduct business as a construction and facilities management contractor.

2. The Ravens Group, a Service-Disabled, Veteran-Owned small business enterprise, was a party to the Contract at issue in this action with the United States.

3. The Ravens Group was founded by Lieutenant General (Retired) Joe N. Ballard, its sole owner, President and Chief Executive Officer. General Ballard served many years as a commissioned officer in the U.S. Army, including his final tour of duty as Commander of the U.S. Army Corps of Engineers, the Government's senior civil engineer and construction official, a position to which he was appointed by the President of the United States.

4. Defendant is the Government of The United States of America, which was a party to the Contract at issue, acting by and through the Department of the Army (the "Army").

**JURISDICTION**

5. This suit seeks *de novo* review of the contracting officer's final decision, dated December 21, 2006 (copy attached). This Court has jurisdiction over this action pursuant to section 10(a) of the Contract Disputes Act of 1978 as amended (41 U.S.C. Sections 601 – 613) and 28 U.S.C. § 1491(a)(2) (2007).

**THE CONTRACT**

6. The Executive Management Office ("EMO") was established to provide program management for the maintenance and repair of General and Flag Officers Quarters ("GFOQ").

7. The mission of the EMO, an organization within the Installation Management Agency ("IMA"), is to ensure that "responsive, professional, and quality services" are provided to General and Flag Officers, some of the most senior officers and leaders of the United States armed forces, and their families.

8. In the summer of 2004, the Capital District Contracting Center ("CDCC") and EMO initiated discussions with The Ravens Group that ultimately lead to the formation of the GFOQ Contract.

9. At the commencement of the Army's negotiations with The Ravens Group, Dee Spellman, EMO's sole staff member, lacked the knowledge or experience to prepare a scope of work. As a result, CDCC asked The Ravens Group to assist CDCC in preparing a statement of work for the GFOQ requirement, which CDCC would then award to The Ravens Group as a Veteran-Owned, Service Disabled, Small Business set aside.

10. During the negotiations, the Army advised The Ravens Group that the GFOQ housing units had not been properly maintained and had not been serviced for several months. The lack of proper maintenance adversely impacted the morale and quality of life of the families of some of the military's most senior leaders. Thus, the Army asked The Ravens Group to begin providing services at the GFOQ housing units prior to the execution of the Contract. Therefore, at the Contracting Officer's request, The Ravens Group began performing maintenance and other services in support of the GFOQ housing units and grounds on or about June 2, 2004, approximately two (2) months before execution of the Contract in question. This resulted in an unwritten contract separate from the Contract in question.

11. The Army initially paid The Ravens Group for the services it performed prior to the execution of the Contract at issue with government issued credit cards. It was subsequently determined that the government lacked the authority to use credit cards for the services rendered by The Ravens Group, because, among other things, the purchases exceeded the authorized funding limit of the credit cards. This in turn triggered an investigation pursuant to Army Regulation ("AR") 15-6 and a three (3) month delay of payment to The Ravens Group.

12. Prior to execution of the Contract, The Ravens Group requested an opportunity to inspect the GFOQ housing units. The Army rejected The Ravens Group's request.

13. The Ravens Group and the Army executed the GFOQ Contract effective August 16, 2004. As noted, the Contract was awarded to The Ravens Group as a Service-Disabled Veteran Owned Small Business procurement.

14. Section C.1.1 of the Contract states that the work will be performed pursuant to a "combination firm fixed-price and indefinite quantity contract."

15. Under the Contract, the Army agreed to procure all GFOQ services and maintenance from The Ravens Group.

16. The Contract Scope of Work required The Ravens Group to:

> Provide maintenance and repairs for 49 GFOQ[s] to include structures, equipment, appliances, land areas, paved areas, maintenance support buildings, playgrounds, and facilities provided for the Contractor's use, by means of a combination firm fixed-price and indefinite quantity contract . . .

17. Section C.1.2 of the Contract required The Ravens Group to "provide all labor, materials, supplies, tools, equipment, transportation, management, and supervision as necessary to meet contract requirements."

18. Section C.1.2 of the Contract also required The Ravens Group to "maintain and repair all replaced, improved, updated, modernized, or renovated facilities, equipment, systems and components . . . ."

19. Section C.1.2.1 of the Contract required The Ravens Group to "maintain a work site management office" at Fort Myer in Arlington, Virginia, and a "work reception office located with the GFOQ Executive Management Office that will receive and process work requests for all facilities maintained under this contract."

20. The Contract required the Army to produce for The Ravens Group several classifications of workload data, work estimates, preventive maintenance reports, and warranty information. The information the Army was required to provide The Ravens Group was critical to The Ravens Group's preparation to perform the work under the Contract, including the development of staff and staffing schedules, and the acquisition and safeguarding of supplies and equipment.

21. Section C.1.2.5 of the Contract, titled "Warranty Program," required the Army to produce "within fifteen (15) working days after contract award and as necessary thereafter, the existing warranty file showing equipment, components, and repairs installed . . ." The Army never produced the required information notwithstanding The Ravens Group's repeated requests to do so.

22. Section C.1.2.5 of the Contract also required the Army to produce an "Expiring Warranty" report showing warranties that will expire in the next two (2) months. Again, the Army never produced the required information notwithstanding The Ravens Group's repeated requests to do so.

23. Section C.1.2.5 further required the Army to produce information regarding "the quarters, appliance, component, serial numbers as applicable, date of purchase or completions or repair, date warranty expires, . . . and a description of warranty repairs that have been accomplished for each item reported." The Army never produced the required information notwithstanding The Ravens Group's repeated requests to do so.

24. Contract Section C.1.2.6 of the Contract, titled "Inventory of Household Equipment," required the Army to prepare a "detailed household appliance equipment list." The Army failed to provide the required inventory.

25. The Army also denied The Ravens Group repeated requests to physically inventory the housing units.

26. Contract Section C.1.2.9 of the Contract, titled "Asbestos, Lead Paint, and other Hazardous Materials," required the Army to produce asbestos, lead paint, and other information concerning the location of such hazardous materials prior to commencement of contract performance. Notwithstanding The Ravens Group's repeated requests for such information, the Army never provided the information and never provided The Ravens Group with an explanation regarding its failure or refusal to provide the required information.

27. The Army knew at the time it awarded the Contract, that the work required by the Contract had previously been performed by government employees, and that The Ravens Group was the first private contractor to perform the GFOQ requirement. Accordingly, the Army promised The Ravens Group that it would cooperate to address contract administration issues as they arose.

28. The Contract incorporated by reference FAR Section 52.212-4 (Contract Terms and Conditions—Commercial Items) (OCT 2006), which further incorporated by reference a Changes provision and FAR Section 52.233-1 (Disputes (JUL 2002).

29. The historical data and information the Contract required the Army to produce to The Ravens Group was essential to The Ravens Group's successful performance of the Contract. The Army assured The Ravens Group that the historical data and information existed and that the Army would produce the information and data as required. The Ravens Group relied upon these representations by the Army to its detriment because the Army never produced the required

information and data notwithstanding The Ravens Group's repeated requests for the information and data.

30. During the Contract negotiations, the Army told The Ravens Group that there would be approximately 50 service calls per month. Since the Army refused to provide The Ravens Group any of the historical data and information under the Contract, The Ravens Group relied upon the Army's estimate of 50 service calls per month. After The Ravens Group began performance of the Contract, it experienced an average of 93 service calls per month.

31. The Army also advised The Ravens Group during negotiations that The Ravens Group could expect to have to respond to approximately one (1) to two (2) emergency service calls **per year**. Due to the lack of promised historical data and information, and the Army's refusal to allow The Ravens Group to inspect the GFOQ housing units, The Ravens Group relied upon the Army's representation regarding the number of emergency service calls it could expect on an annual basis. Following The Ravens Group's commencement of performance of the Contract; however, The Ravens Group actually experienced ten (10) emergency service calls per month **(or approximately 6000 % to 12,000 % the original number provided by the Army)**.

32. In addition, The Ravens Group was required to respond to thirteen (13) urgent service calls per month.

33. Thus, after the commencement of performance, The Ravens Group was required to respond to twenty three (23) urgent and emergency service calls per month even though it had been misled by the Army to believe it would only have to respond to **only one (1) to two (2) per year**.

34. The Army also misled The Ravens Group regarding the number of GFOQ housing units The Ravens Group would be responsible for servicing. The Contract expressly provided that The Ravens Group would be responsible for maintaining a total of 49 GFOQ housing units; however, from the commencement of performance of the Contract and throughout The Ravens Group's performance of the Contract, The Ravens Group was required to service and maintain 53 GFOQ housing units. The Ravens Group notified the Army of the discrepancy and requested a contract price adjustment for the increased work on numerous occasions; however, the Army never compensated The Ravens Group for the increased work.

35. The Army also hindered The Ravens Group's performance by constantly changing the work, demanding work outside of the scope of the Contract, and delaying performance, among other interference.

36. The Army unlawfully assigned significant amounts of Contract work—work for which the Contract made The Ravens Group exclusively responsible—to third party contractors.

37. The Army terminated the Contract before the Contract expiration date in bad faith and in retaliation to The Ravens Group's attempt to exercise its rights and protect its interest under the Contract.

## CONTRACTING OFFICER'S FINAL DECISION

38. On December 19, 2006, the Army contracting officer issued a final decision partially approving The Ravens Group's claim, and agreeing to pay The Ravens Group $53,972.86 for work The Ravens Group had previously completed, and the Army had accepted, but which the Army had theretofore refused to pay. The contracting officer denied the remainder of The Ravens Group's claim. See copy of Contracting Officer's Decision, attached.

## COUNT I

### (Breach of Contract—Failure to Provide Historical Workload Data)

39. Plaintiff alleges paragraphs 1-38 of the Complaint as if set forth in their entirety, and further asserts that the Army breached its contract with The Ravens Group by failing to provide The Ravens Group vital workload data, GFOQ housing maintenance records and other essential historical data.

40. The Army had a contractual duty and an implied duty to disclose historical and workload data vital to The Ravens Group's preparation for contract performance.

41. The Army knew or should have known, among other things, that the number of service calls would substantially exceed the number the government provided to The Ravens Group.

42. The Army further knew that the GFOQ housing units had not been properly maintained for a substantial period of time and therefore required significant work.

43. The Army knew or should have known that The Ravens Group's ignorance of the true condition of the GFOQ housing units and the true number of service calls and other work necessary to perform this requirement, would substantially increase the cost of performance.

44. The Army denied The Ravens Group an opportunity to learn the true nature of the condition of the GFOQ housing units by refusing to allow The Ravens Group an opportunity to inspect the GFOQ housing units notwithstanding The Ravens Group's request to do so.

45. The Army's failure and/or refusal to produce the required information increased The Ravens Group's cost of performance.

## COUNT II

### (Breach of Contract—Misleading Estimates)

46. Plaintiff alleges paragraphs 1-45 of the Complaint as if set forth in their entirety, and further asserts that the Army breached its contract with The Ravens Group by providing The Ravens Group misleading workload estimates.

47. The government provided The Ravens Group certain workload estimates during the contract negotiations, including estimates regarding the number of service calls, number of emergency and urgent service calls, and the number of GFOQ housing units.

48. The estimates were material to the negotiations between the parties and The Ravens Group's proposal.

49. The Army impliedly warranted the reasonable accuracy of its estimates.

50. The Ravens Group relied upon the estimates provided by the Army in conducting its negotiations and preparing its proposal.

51. The estimates provided by the Army were negligently prepared. The Army did not use due care in gathering relevant information, and did not take into account all relevant factual data, among other omissions.

52. The negligent estimates provided by the Army increased The Ravens Group's cost of performance.

53. The Army therefore breached the Contract and the implied warranty of the estimates by providing unreliable, misleading, and negligently prepared estimates to The Ravens Group.

## COUNT III

**(Breach of Contract—Breach of Implied Duty of Good Faith and Fair Dealing)**

54. Plaintiff alleges paragraphs 1-53 of the Complaint as if set forth in their entirety, and further asserts that the Army breached its implied duty of good faith and fair dealing.

55. The Contract implied upon the Army a duty of good faith and fair dealing in its administration of the Contract, including the duty to cooperate and not to hinder The Ravens Group's performance.

56. The Army failed to cooperate by failing to provide workload data and historical information in its possession, and by denying The Ravens Group the opportunity to inspect the GFOQ housing units.

57. The Army hindered The Ravens Group's performance by refusing to allow The Ravens Group to perform work on GFOQ housing units for which the Contract specifically required The Ravens Group to perform, and by providing this work to third party contractors.

58. The Army coerced The Ravens Group to perform work beyond the scope of the Contract by threatening to terminate the Contract if The Ravens Group did not perform the extra-contractual work.

59. The Army improperly administered the Contract by failing to act promptly on claims of constructive changes to the Contract, failing to negotiate Contract modifications in good faith, among other acts of bad faith.

**COUNT IV**

**(Breach of Contract—Unlawful Assignment of Work to Third Party Contractors).**

60. Plaintiff alleges paragraphs 1-59 of the Complaint as if set forth in their entirety, and further asserts that the Army breached its contract with The Ravens Group by unlawfully assigning and transferring work under The Ravens Group's Contract to third party contractors.

61. The Contract made The Ravens Group the sole and exclusive contractor for providing certain services for the GFOQ housing units.

62. The Army unlawfully assigned work, including repair and renovation work from The Ravens Group's Contract and transferred that work to third party contractors.

**COUNT V**

**(Breach of Contract—Invalid Contract Termination)**

63. Plaintiff alleges paragraphs 1-62 of the Complaint as if set forth in their entirety, and further asserts that the Army breached its contract with The Ravens Group by unlawfully terminating The Ravens Group's Contract.

64. The Army and The Ravens Group had a valid contract.

65. The Army terminated The Ravens Group's contract before the expiration of the stated Contract expiration date.

66. The Army's termination of the Contract was in bad faith, and in retaliation for The Ravens Group's attempt to exercise its rights and protect its interests under the Contract and pursuant to law. The Army's also breached its Contract with The Ravens Group in order to obtain lower prices from third party contractors.

67. There were no changes in circumstances between the execution of the Contract and the Army's decision to terminate that allowed the Army to validly terminate the Contract.

**COUNT VI**

**(Constructive Changes)**

68. Plaintiff alleges paragraphs 1-67 of the Complaint as if set forth in their entirety, and further asserts that the Army made constructive changes to the Contract—which work The Ravens Group performed—for which the Army refused to adjust the Contract price.

69. The Army ordered The Ravens Group to perform changed work to the Contract.

70. The Ravens Group notified the Army of the changed nature of the work and its price to perform the changed work.

71. The Army knew that The Ravens Group considered the new work it ordered to be changed work. With this knowledge and notice of the amount of the changed work, the Army continued to insist that The Ravens Group perform the changed work.

72. The Ravens Group performed the changed work and the Army accepted it.

WHEREFORE, Plaintiff prays for the following relief:

A. That this Court enter judgment that Plaintiff is entitled to $315,676 for its claim under Count I.

B. That this Court enter judgment that Plaintiff is entitled to $315,676 for its claim under Count II.

C. That this Court enter judgment that Plaintiff is entitled to $123,289 for its claim under Count III.

D. That this Court enter judgment that Plaintiff is entitled to $161,700 for its claim under Count IV.

E. That this Court enter judgment that Plaintiff is entitled to $500,000 for its claim under Count V.

F. That this Court enter judgment that Plaintiff is entitled to $643,940 for its claim under Count VI.

G. That this Court enter judgment that Plaintiff is entitled to interest in accordance with the Contract Disputes Act.

H. That this Court award to Plaintiff such other and further relief as the Court deems appropriate.

Dated: October 26, 2007

Respectfully submitted,

By Counsel

PATRICK HENRY LLP

By: ______________________

Daryle A. Jordan
PATRICK HENRY LLP
7619 Little River Turnpike
Suite 340
Annandale, Virginia 22003
(703) 256-7754
(703) 256-7883-fax

**DEPARTMENT OF THE ARMY**
ARMY CONTRACTING AGENCY
HEADQUARTERS, NORTHERN REGION
CAPITAL DISTRICT CONTRACTING CENTER
9410 JACKSON LOOP, SUITE 101
FORT BELVOIR, VIRGINIA 22060-5134

REPLY TO
ATTENTION OF:

SFCA-NR-CDCC

December 21, 2006

Mr. Joe N. Ballard
President and CEO
The Ravens Group, Inc.
9901 Business Parkway Suite H
Lanham, MD 20706

SUBJECT: Contract W91QV1-04-D-0013; Claim and Request for Contracting Officer's Decision.

Dear Mr. Ballard:

This office is in receipt of your claim dated September 29, 2006 for **Remedies Requested** for the items listed below:

1. Partial Settlement in the amount of **$53,966.77** under exhibit A will be made by CDCC to the Ravens Group, Inc (TRG); claim in the amount of **$5,718.09, Exhibit A** under Purchase Order W91QV1-04-P-0436 will be resolved separately and is excluded from the resolution of this claim.
2. TRG's request for adjustment/remedy in the amount of **$631,354.30** under Exhibit B and C is denied for the following reasons:

   a. Service Call Overage and Service Call Response Overage (50 Service calls per month were never in the contract – see C.5.1, C.5.1.6, C.5.6.1, C 5.1.8.1 and C.5.8.2) in the amount of $116,400.00 and $67,050.00 respectively; lacking of documentation in accordance with (IAW) C.5.1.7 in support to alleged overage on Service Call Overage and Service Call Response Overage. Need specifics which items were not paid under monthly Service Calls.
   b. Personnel Modifications in the amount of $354,895.58 - this was a Firm Fixed Price contract; request that TRG refer to invoices paid by the Government under 002BF beginning 20 Sep 04 more or less $800K that some services under 0002BF invoices were part of Service Calls.
   c. Recap of Extenuated Costs for Quarters not under the contract in the amount of $93,008.72 is denied, it is vague and no specifics to detail in support of request for payment/remedy or entitlement of this amount by TRG.
   d. Equipment Loan in the amount of $123,289.99; "equipment purchased for this contract and although the Government's decision **to terminate for the convenience** of the government at 18 month," - the contract was never terminated, in fact it was extended for additional six months – see W91QV1-04-D-0013-P00004 and letter dated 15 Jun 05 signed and acknowledged by Gen Joe Ballard (R), on 16 Jun 05 stating that the US Government does not intend to

exercise its option year without prejudice to the incumbent contractor; also see TRG's revised proposal dated 09 Feb 05.

3. Request for additional payment of $12,587.00 under Exhibit D is denied for Ft Myer Qtrs 2 Bathroom - see W91QV1-04-D-0013- P00001 signed by Gen J. Ballard dated 9/30/2004 and see Section C.7.4 of this modification; insufficient documentation in support of request for remedy/payment or TRG's entitlement of this amount. There is no explanation as to how the additional $12,587.00 was incurred; two sets of invoice with the same number and date were submitted to CDCC, one in the amount of $24,833.30 which was marked void from Exhibit D, and the same invoice with the same description in the amount of $12,245.64 of which this amount was paid.
4. Payment in the amount of $123,289.09 under Exhibit E is denied for Contract Changes by the Gov't – inaccurate/insufficient documentation in support of request for remedy/payment or TRG's entitlement of this amount to include the following reasons below:

    a. 24-Hour answering services after 19 Apr 2005 Meeting in the amount of $1,518.00 - No invoice received.
    b. $33,071.99 50% of Service Administration Salary for 11 months (to include RG Burden) - no invoice and no backup documentation received for request for payment/remedy or entitlement of this amount by TRG, again this is a FFP contract..
    c. Deletion of $62,700.00 of FFP CLIN 0001AF – This was discussed in the 19 Apr 05 meeting and agreed that this would be deleted and funds shall be deobligated, this is **Contractor Occupied Space** and was **provided to Contractor free of charge**. Gen J. Ballard agreed to it by signing W91QV1-04-D-0013-P00003 dated 27 Apr 06.
    d. Termination for Convenience Costs incurred in the amount of $26,000.00 - the contract was never terminated, it was extended for additional six months which Gen J. Ballard agreed under W91QV1-04-D-0013-P00004 dated 12 Aug 05

5. Payment in the amount of $161,700.00 is denied for alleged Army's Breach of Contract under Exhibit E – insufficient documentation in support of request for remedy/payment or TRG's entitlement of this amount . This was a FFP contract with IDIQ CLINs; **minimum guarantee of work was the Firm Fixed Price portion of the contract** – see C.9.6 of the contract.
6. Payment in the amount of $500,000.00 for damages suffered by TRG as a result of the improper publication of false and misleading information regarding the TRG performance in violation of the contract and the FAR is found to be without merit and is denied.

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract

appeals and provide a copy to the Contracting Officer, Mr. William E. Campbell, from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract number W91QV1-04-D-0013.

Very Respectfully,

William E. Campbell Jr

WILLIAM E. CAMPBELL, JR.
Contracting Officer
Division Chief, Team 1
Capital District Contracting Center