## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

THE RAVENS GROUP, INC.   )
           )
    **Plaintiff,**   )
           )
    **v.**      )   **No. 07-754C**
           )   **(Judge Firestone)**
UNITED STATES ,    )
           )
    **Defendant.**   )


## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

STUART F. DELERY
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director


KIRK T. MANHARDT
Assistant Director

OF COUNSEL:

NATHAN J. BANKSON      JOSEPH A. PIXLEY
Major, U.S. Army        Attorney
Litigation Division        Commercial Litigation Branch
U.S. Army Legal Services Agency   Civil Division
Arlington, VA 22203       Department of Justice
Telephone: (703) 696-1618    P.O. Box 480
Facsimile: (703) 696-8178      Ben Franklin Station
              Washington, D.C. 20044
              Joe.pixley@usdoj.gov
              Telephone: (202) 307-0843
              Facsimile: (202) 307-0972


October 12, 2012        Attorneys for Defendant

**TABLE OF CONTENTS**

**PAGE(S)**

STATEMENT OF THE ISSUES...................................................................................1

STATEMENT OF THE CASE....................................................................................2

    I.      Nature Of The Case ........................................................................2

    II.     Statement of Facts ..........................................................................3

         A.     GFOQ Maintenance Services – Pre-Award .................................3

         B.     Discussions With Ravens Group .................................................4

         C.     Ravens Group Drafted Performance Work Statement .................5

         D.     Award Of Combination Fixed-Price Indefinite Quantity Contract.............6

         E.     Indefinite Delivery Indefinite Quantity (IDIQ) Tasks .................8

             i.      Ordering Clause ........................................................8

             ii.     Indefinite Quantity Clause .......................................8

             iii.    IDIQ Contract Expressly Permitted Use Of Other Contractors.......9

         F.     Firm Fixed-Price Requirements ..................................................9

             i.      Service Calls ............................................................9

             ii.     Routine And Urgent Service Call Scope - $2,000 Or Less............10

             iii.    Emergency Service Call Scope – Not Limited To $2,000.............11

             iv.    Documentation Required For Service Calls .................................11

             v.     Firm Fixed-Price For Service Calls ..............................12

             vi.    Price Adjustment For Service Calls ..............................12

             vii.   Formula For Additional Compensation – Labor Hors ..................13

i

| | | |
|---|---|---|
| | viii. | Materials Exceeding The 5% Variation Limitation ......................13 |
| | ix. | Compensation For Service Call Overage ......................................14 |
| H. | | Ravens Group Did Not Document Labor Hours.........................................14 |
| I. | | Meetings With The Government During Contract Performance ...............15 |
| J. | | Government Notified Ravens Group That It Will Not Exercise Option ...16 |
| K. | | Parties Agree To Six Month Extension Of Contract ................................17 |
| L. | | Ravens Group Earned A Profit On The Contract .....................................17 |
| M. | | Claim And Final Decision ........................................................................17 |
| N. | | Complaint..................................................................................................18 |
| O. | | DCAA Audit ..............................................................................................18 |
| | i. | Service Call Overage .....................................................................19 |
| | ii. | Claim For Distribution Of Work To Third Party Contractors .......20 |
| | iii. | Claim For Invalid Contract Termination ......................................20 |
| | iv. | Claim For Constructive Changes – Duplicate Claim....................21 |
| | v. | Claim For Additional Units ...........................................................21 |
| | vi. | Miscellaneous Claims ...................................................................21 |
| P. | | Ravens Group's Expert Report .................................................................22 |
| | i. | Claim For Constructive Changes – Duplicated Claim..................22 |
| | ii. | Claim For Invalid Contract Termination ......................................23 |
| | iii. | Service Calls .................................................................................23 |
| | iv. | Claim For Increased Personnel To Perform Urgent And Emergency Calls ...........................................................................24 |

SUMMARY OF THE ARGUMENT ....................................................................25

I.    The United States Is Entitled To Summary Judgment..........................27

    A.    Standard Of Review....................................................................27

    B.    Parties' Experts Agree That Count VI Duplicates Claimed Costs ............28

    C.    Contract Was Not Wrongfully Terminated................................................29

    D.    The Government Did Not Provide Negligent Estimates Of Service Calls ..............................................................................31

        i.    IDIQ Part Of Contract Is Not Subject To Negligent Estimate Claim..............................................................31

        ii.    Standard For Negligent Estimate Claims.......................................32

        iii.    The Contract Gave Notice Of Overage In Service Calls ..............34

    E.    The GFOQ Contract Is Not A Requirements Contract............................37

    F.    Ravens Group Performed Work On No More Than 49 Units ..................40

    G.    Ravens Group's Miscellaneous Claims Lack Merit ................................42

        i.    Answering Service ........................................................42

        ii.    Administrator's Salary ....................................................42

        iii.    Equipment Loan Loss ....................................................43

        iv.    Deletion Of Custodial Services........................................43

CONCLUSION.....................................................................................................44

# TABLE OF AUTHORITIES
## <u>CASES</u>

<u>PAGE(S)</u>

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................ 27

*Arinc Eng, Serv, LLC v. United States*,
    77 Fed. Cl. 196 (2007) ............................................................................ 6

*Celeotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................ 28

*Clearwater Forest Indus., Inc. v. United States*,
    650 F.2d 233 (Ct. Cl. 1981) .......................................................... 32, 33, 36, 37

*Coast Fed. Bank v. United States*
    323 F.3d 1035 (Fed. Cir. 2003) ...................................................... 34, 38, 43, 44

*J. Cooper & Assoc. Inc. v. United States*,
    53 Fed. Cl. 8 (2002) ............................................................................... 37

*Coyle's Pest Control, Inc. v. Cuomo*,
    154 F.3d 1302 (Fed. Cir. 1998) ............................................................... 38, 39

*Delhur Industries, Inc. v. United States*,
    95 Fed. Cl. 446 (2010) ........................................................................... 41

*Elden v. United States*,
    617 F.2d 254 (Ct.. Cl. 1980) ................................................................... 34

*Federal Group, Inc. v. United States*,
    67 Fed. Cl. 87 (2005) ............................................................................. 34

*Granite Constr. Co. v. United States*,
    962 F.2d 998 (Fed. Cir. 1992) .............................................................. 34, 38

*Hi-Shear Tech Corp. v. United States*,
    356 F.3d 1372 (Fed. Cir. 2004) ................................................................ 30

*Horn v. United States*,
    98 Fed. Cl. 500 (2011) ..................................................................... passim

*ITT Arctic Servs., Inc. v. United States*,
    524 F.2d 680 (Ct. Cl. 1975) .............................................................. 37, 43, 44

*Medart v. Austin*,
    967 F.2d 579 (Fed. Cir. 1992)...................................................................... 32, 33, 34, 37

*Mingus Constructors, Inc. v. United States*,
    812 F.2d 1387 (Fed. Cir. 1987)............................................................................ 28

*O'Connor v. United States*,
    308 F.3d 1233 (Fed. Cir. 2002)............................................................................ 28

*OK's Cascade Co. v. United States*,
    97 Fed. Cl. 635 (2011), *aff'd* 467 Fed. Appx. 888 (Fed. Cir. 2012). ............... 30

*Seal-Flex, Inc. v. Athletic Track & Court Constr.*,
    98 F.3d 1318 (Fed. Cir. 1996)............................................................................. 28

*Service Technicians, Inc. v. United States*,
    37 Fed. Cl. 383 (1997) ................................................................................... 32, 37

*Sweats Fashions, Inc. v. Pannill Knitting Co, Inc.*,
    833 F.2d 1560 (Fed. Cir. 1987)............................................................................ 28

*Timber Investors, Inc. v. United States*,
    587 F.2d 472 (Ct. Cl. 1978) ................................................................................. 31

*Travel Centre v. Barram*,
    236 F.3d 1316 (Fed. Cir. 2001).................................................................. 31, 37, 40

*Uniq Computer Corp. v. United States*,
    20 Cl. Ct. 222 (1990) ..................................................................................... 30, 31

*Valcon II, Inc. v. United States*,
    26 Cl. Ct. 39, 397 (1992) ..................................................................................... 30

*Varilease Tech. Group, Inc. v. United States*,
    289 F.3d 795 (Fed. Cir. 2002).......................................................................... 37, 38, 40

*Womack v. United States*,
    389 F.2d 793 (Ct. Cl. 1968) ........................................................................... 32, 33

## STATUTES AND REGULATIONS

28 U.S.C. § 1491(a)(2)............................................................................................. 2

41 U.S. C. § 7103.................................................................................................... 2

48 C.F.R. §  9.505.................................................................................................... 6

48 C.F.R. § 52.216-18.............................................................................................. 8

48 C.F.R. § 52.216-19.............................................................................................. 8

48 C.F.R. § 52.216-22.............................................................................................. 8

FAR 52.217-9..........................................................................................................30

FAR 52.216-18..........................................................................................................8

FAR 52.216-19..........................................................................................................8

FAR 52.216-21........................................................................................................38

FAR 52.216-22..........................................................................................................8

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE RAVENS GROUP, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-754C |
| | ) | (Judge Firestone) |
| UNITED STATES , | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court enter summary judgment in its favor and dismiss plaintiff The Ravens Group, Inc.'s (Ravens Group), complaint. In support of this motion, we rely upon the complaint and answer, the following memorandum of law, the proposed findings of uncontroverted fact, and the attached appendix.

## STATEMENT OF THE ISSUES

1.      Whether the United States is entitled to summary judgment with respect to Ravens Group's negligent estimate claims in Counts I, II, and III of the complaint, where the contract at issue (for housing maintenance services) put Ravens Group on notice that it could expect overage in the number of service calls, and the contract contained express provisions for seeking additional compensation, provided that Ravens Group document both the number of service calls *and* its labor hours in responding to the calls, which Ravens Group failed to do.

2.      Whether the United States is entitled to summary judgment with respect to Count IV of the complaint, which alleges that the Government improperly assigned work to third party

1

contractors, because the contract at issue is not a requirements contract that provided exclusivity to Ravens Group.

3.      Whether the United States is entitled to summary judgment with respect to Count V of the complaint, alleging wrongful termination of the contract, where the Government, in its discretion, decided not to exercise the contract option, and the contract, following a bilateral modification to extend the contract for six months, expired under its own terms.

4.      Whether the United States is entitled to summary judgment with respect to Count VI of the complaint, alleging constructive change, where the parties' experts agree that Count VI merely duplicates other parts of Ravens Group's complaint, and the contractor is not entitled to additional compensation under Count VI.

5.      Whether the United States is entitled to summary judgment with respect to Ravens Group's claim to performing work on more than 49 housing units (as stated in the contract), when the contractor's own records show that it performed service calls on no more than 49 different housing units, in compliance with the contract.

6.      Whether the United States is entitled to summary judgment with respect to Ravens Group's miscellaneous claims for answering service costs, for an administrator's salary, for equipment loan loss, and for the deletion of a contract line item, where the firm fixed-price portion of the contract makes that Ravens Group bears responsibility for such costs.

## STATEMENT OF THE CASE

### I.    Nature Of The Case

Ravens Group brings this action under the Contract Disputes Act (CDA), 41 U.S.C. § 7103 *et seq*, (formerly § 601 *et seq*.) and the Tucker Act, 28 U.S.C. § 1491(a)(2), alleging that

the United States Department of the Army (Army) provided Ravens Group with erroneous estimates for the number of service calls to be performed in a contract for housing maintenance services at Fort Myer, Virginia, and Fort McNair, Washington, D.C., in the National Capital Region. Additionally, Ravens Group alleges that the Army breached the contract by failing to provide historical data, for unlawfully assigning work to third party contractors, for breach of an implied duty of good faith and fair dealing, for constructive changes to the contract, and for wrongfully terminating the contract. *See* Compl. Counts I-VI. Ravens Group seeks damages in the amount of $2,066,281.00.

## II.     Statement Of Facts

### A.     GFOQ Maintenance Services -  Pre-Award

The General and Flag Officer Quarters (GFOQ) Executive Management Officer (EMO), an organization within the Army's Installation Management Agency (IMA), was established to provide program management for the maintenance and repair of GFOQ housing for general and senior officers of the United States military and their families, including at Fort Myer, Virginia, Fort McNair, Washington, D.C., and other facilities in the National Capital Region. A62.[1] The GFOQ units at Fort Myer and Fort McNair, which were built approximately the same time, are over 100 years old and are "historical homes." A252-53 (Deposition of Joe N. Ballard).

Prior to August 2004, EMO used "in-house," Government personnel to perform the majority of maintenance and repair services of GFOQ housing at Fort Myer and Fort McNair. A239 (Deposition of Dee Spellman at p. 16). In addition, EMO also used various "contract vendors," paid for by Government credit card, to provide maintenance and repair services when "in-house [personnel] was [sic] not available or could not perform." A239 (Spellman Deposition

---

[1] "A__" refers to the appendix attached to defendant's motion for summary judgment.

at p. 16).  Ravens Group was among the vendors that provided maintenance and repair services for GFOQ housing.

Beginning on or about June 2, 2004 and for the next two months, Ravens Group performed maintenance services of GFOQ housing at Fort Myer and Fort McNair, and was paid by Government credit card.  *See* Compl. ¶ 10.  During this period, the Government decided to contract out the GFOQ maintenance service on a permanent basis, thereby replacing the "in-house" Government personnel previously used, and entered into negotiations with Ravens Group A243 (Deposition of Lenora Clark-Evans at p. 8).

## B.  Discussions With Ravens Group

According to Lenora Clark-Evans, who was the Director of the Capital District Contracting Center in the summer of 2004, the Government, through its prior use of "in-house personnel," had "no historical data" with respect to the requirements of the GFOQ work to be performed by the contractor: "[i]t was a new requirement, and we had no historical data on what was necessary."  A243 (Clark-Evans Deposition at p. 8).   This was echoed by Dee Spellman, the director of EMO, who stated that, "we requested the previous housing office to supply us all the past, any records, historical data, whatever.  They had very little historical data, at least that was provided to us."  A241 (Spellman Deposition at p. 28).  Joe Ballard, Ravens Group's owner and chief executive officer, admits that the Government "told me" that "they didn't have the historical records" with respect to service calls.  A251 (Ballard Deposition).

Nevertheless, Mr. Ballard states that during the negotiations, the Government "orally" informed Ravens Group that it could expect to receive approximately 50 service calls per month in performing the GFOQ work.  A92 (Ballard Deposition).  Mr. Ballard further stated, in relevant

part that, "[t]he government gave us the detailed date to the best of their knowledge."  A250 (Ballard Deposition).

Mr. Ballard also concedes that during the pre-award negotiations, the Government told him that the GFOQ units were in "poor repair."  A255 (Ballard Deposition).  Mr. Ballard confirmed through visible observation that the GFOQ quarters were "old house[s]" and generally in "poor condition" with "outdated" floors and wiring. A253 (Ballard Deposition).

In a written discovery response dated August 5, 2010, the Government notified Ravens Group that it had confirmed with the Army's Department of Public Works (DPW) that no historical records exist pertaining to service calls and to the maintenance, repair, and costs associated with the GFOQ units at Fort Myer and Fort McNair.  A233.

### C.    Ravens Group Drafted Performance Work Statement

According to Mr. Ballard, Ravens Group's participation in the GFOQ program involved a "two-step process," in which his company assisted in "writing the performance work statement" for the contract that the Government then awarded, by sole-source, to Ravens Group.  A248 (Ballard Deposition).  Specifically, Ravens Group "prepared the master document" of the performance work statement, gave the document to the Government, and was paid for preparing it.  A258 (Ballard Deposition); *see slso* A244 (Clark-Evans Deposition at p. 12) ("the Ravens Group had to actually get in and develop [the statement of work]").

By letter dated July 1, 2004, Ravens Group submitted its performance work statement to the Government, pursuant to purchase request no. WT3RTQ-4182-0602.  A1.  The performance work statement included exhibits that priced various line items for a base year and two option years from August 1, 2004 to July 31, 2005.  A3-11.  Among the fixed-price line items, Ravens

Group submitted one for "service calls" which provided for a unit price of $15,000 per month for a twelve month period, for a total price of $180,000, pursuant to contract requirement no. C.5.1. A3.

The July 1, 2004 performance work statement, which included Ravens Group's price proposal, makes no mention of the number of service calls to be provided. A1-11. Indeed, Ravens Group concedes that "there are no pre-award bid preparation documents that expressly refer to an estimate of 50 service calls per month' or that expressly state the number of personnel" in Ravens Group's bid. A237.

**D.       Award Of Combination Fixed-Price Indefinite Quantity Contract**

On August 16, 2004, the United States Army (Army) Contracting Agency Capital District Contracting Center awarded Contract No. 291QV1-04-D-0013 (the contract) to Ravens Group as a sole-source, service-disabled, veteran-owned, small business procurement with an estimated amount of $1,585,210.00. A12, A248.[2] On September 30, 2004, the Army issued modification P00001 that adjusted the total estimated amount to $1,181,610.08. A91. The contract period of performance was for one year with four option years. The contract included a standard options clause from the Federal Acquisition Regulation (FAR), 52.217-9, stating in relevant part that, "[t]he Government may extend the term of this contract by written notice to the Contractor. . ." A56 (FAR 52.217-9, OPTION TO EXTEND THE TERM OF THE CONTRACT (MAR 2000), 48 C.F.R. § 52.217-9).

The contract was a combination firm fixed-price and indefinite quantity contract:

---

[2] Generally, a contractor's involvement in writing a statement of work for another contract that is then awarded to it would create an organizational conflict of interest that would be grounds for protesting such an award. *See*, e.g., *Arinc Eng, Serv, LLC v. United States*, 77 Fed. Cl. 196, 202 (2007) (citing, among other authority, 48 C.F.R. § 9.505). There is nothing to indicate, however, that another contractor protested the August 16, 2004 award of the GFOQ contract to Ravens Group.

> The GFOQ Management Office requires a Contractor to provide
> maintenance and repairs for 49 GFOQ to include structures,
> equipment, appliances, land areas, paved areas, maintenance
> support buildings, playgrounds, and facilities provided for the
> Contractor's use, by means of a *combination firm fixed-price and
> indefinite quantity contract.*

A62 (¶ C.1.1 "Scope of Work") (emphasis added).  The Government also provided Ravens

Group with a list of the 49 GFOQ units to be maintained.  The list includes the address for each

of the quarters, designating "MY" for Fort Myer and "MN" for Fort McNair.  A100-01.

The contract statement of work set forth the following general requirements, in relevant

part:

> Provide all labor, materials, supplies, tools, equipment,
> transportation, management, and supervision as necessary to meet
> contract requirements. . . The Government may remove, replace,
> renovate or improve facilities, equipment, systems, and
> components at the Government's expense . . . The Government
> reserves the right, at any time, to modify the contract to make
> adjustments in the scope of work needed at each site.  The
> Contractor shall not conduct any work under this contract that is
> part of an existing requirements contract already in-place at Fort
> Myer or Fort McNair.

A62 (¶ C.1.2).

The contract included the following relevant clause setting forth the "minimum"

guarantee of work:

> As referred to in 5252.216-9310, "Combination Firm Fixed-
> Price/Indefinite Quantity Contract" clause, the *minimum guarantee
> of work is the firm-fixed-price portion of the contract.*  The
> maximum dollar value of the contract is the total value dollar value
> of the fixed-price and indefinite quantity items.

A86 (¶ C.9.6 "Maximum Quantities") (emphasis added).

### E.    Indefinite Delivery Indefinite Quantity (IDIQ) Tasks

The IDIQ portion of the contract included section C.6, setting forth the "Indefinite Delivery Indefinite Quantity Work (IDIQ) Unit Priced Tasks," that included various items such as change of occupancy maintenance (¶ C.6.2),  interior painting of unoccupied and occupied quarters (¶¶ C.6.3, C.6.4), and fan coil units and duct work cleaning (¶ C.6.17).  A75-80.  The contract expressly stated that the contractor was to perform IDIQ work "only upon being issued a Task Order," issued by an authorized ordering official in accordance with the "Ordering of Work" clause.  A75 (¶ C.6.1).

### i)  Ordering Clause

The contract included a standard, FAR ordering clause, stating in relevant part:

> (a) Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders by the individuals designated in the schedule.

A54 (FAR 52.216-18, ORDERING (OCT 1995), 48 C.F.R. § 52.216-18).  The contract also included a standard FAR order limitations clause, 52.216-19, setting forth a minimum order of $2,000, and a maximum of $125,000 for any single item, and $500,000 for a combination of items.  A55 ((FAR 52.216-189 ORDER LIMITATIONS (OCT 1995), 48 C.F.R. § 52.216-19).

### ii)    Indefinite Quantity Clause

The contract included FAR 52.216-22, INDEFINITE QUANTITY (OCT 1995), 48 C.F.R. § 52.216-22, providing, in relevant part:

> (a) This is an indefinite-quantity contract for the supplies or services specified, and effective for the period stated, in the Schedule.  The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.
>
> (b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause.  The

Contractor shall furnish to the Government, when and if ordered, the supplies or services specified in the Schedule up to and including the quantity designated in the Schedule as the "maximum." The Government shall order at least the quantity of supplies or services designated in the Schedule as the "minimum."

A55.

### iii) <u>IDIQ Contract Expressly Permitted Use Of Other Contractors</u>

The IDIQ portion of the contract included the following general provision, which expressly permitted "housing work" to be completed by other contractors:

Perform effective and efficient specific work. Specific work is defined as maintenance repair, demolition, installation of equipment and miscellaneous items; relocation of equipment, materials, and devices; alteration; minor construction work requirements; and miscellaneous services which are not included in the Firm Fixed-Price portion of the contract or identified as fixed-unit price work. *Housing work may also be accomplished by other means including self-help by occupants, impact card purchases, and the use of other prime Contractors.*

A80 (¶ C.7.1) (emphasis added).

### F. <u>Firm Fixed-Price Requirements</u>

The contract included a section, C.5, setting forth the "Firm-Fixed Price Work Requirements" that included requirements for service call management and response (¶ C.5.1), preventative maintenance and inspection (¶ C.5.2), pest control services (¶ C.5.3), grounds maintenance service (¶ C.5.4), annual inspection of facilities, grounds, & pavements (¶ C.5.5) , custodial services (¶ C.5.6), warehouse (¶ C.5.7), and self-help store (¶ C.5.8). A69-75. The contract included a contract line item number (CLIN) for each type of supply or service designated in section C.5. A14-50(Section SF 1449 – continuation sheet).

### i). <u>Service Calls</u>

Section C.5.1, "Service Call Management and Response," established the requirements

for how service calls were to be handled under the firm fixed-price portion of the contract, but did *not* specify the number of calls that were to be performed each month. A69-73 (¶¶ C.5.1 – C.5.1.9.3). The contract required Ravens Group to receive calls, log the calls, and classify the calls as a routine, urgent, or emergency call, based upon definitions of those terms in the contract. The Government reserved the right to reclassify the service calls. A69(¶ C.5.1). The contract defined service calls, in relevant part, as follows:

> C.5.1.1. **Emergency.** Involves the correction of conditions that constitute an immediate danger to personnel, threaten property, or require action to restore essential services. Be at the site within one hour after receipt of an emergency service call and work continuously until the work is completed. . . Typical Emergency Service Calls include overflowing drains, roof leaks, broken water and/or frozen water pipes. . .

> C.5.1.2 **Urgent.** This requirement involves conditions that will not immediately endanger personnel or threaten property but, if not corrected, could lead to more serious adverse effects or unnecessary inconvenience to occupant. Urgent calls do not require continuous work until completed. Respond to urgent calls within four hours after receipt for calls received between the hours of 7:00 a.m. to 4:00 p.m. Respond to calls received between 4:00 p.m. and midnight the next calendar day. . . Typical Urgent Service calls include clogged tubs and toilets, inoperable water heaters, ranges, ranges, ovens . . .

> C.5.1.3 **Routine**. This requirement involves work that is not classified as emergency or urgent. Respond to and complete routine service calls within five (5) work days of receipt.

A69.

## ii) Routine And Urgent Service Call Scope- $2,000 Or Less

Paragraph C.5.1.6 further defined the scope of routine and urgent service calls as limited to those maintenance and repair functions "estimated by the Government to cost $2,000 or less." Paragraph C.5.1.6 states that "[r]outine and Urgent Service Calls are part of the Firm Fixed

Price Portion of the Contract subject to Service Contract Act Wages." A70 (¶ C.5.1.6).

### iii) <u>Emergency Service Call Scope- Not Limited To $2,000</u>

Paragraph C.5.1.9 further defined the scope of emergency service calls, in relevant part, as follows:

> Emergency service calls are also part of the Firm Fixed-Price Portion of the Contract and are subject to Service Contract Act Wages, but will not be limited to the $2,000 threshold as are routine and urgent service calls. However, the *Government will compensate the Contractor for the portion of each emergency call exceeding the $2,000 limitation by issuing a work order for the excess*.

A72 (¶ C.5.1.9) (emphasis added).

### iv) <u>Documentation Required For Service Calls</u>

Paragraph C.5.1.7 set forth the requirements for documenting service calls:

> At any given phase (start, during, and completion phases) of all work on a service call, enter all data in the appropriate Contractor work order system with work status, date and time started and completed; description of services performed - - including description and location, deficiencies/failure(s) found, corrected/repaired/replaced; actual craft hours expended; brief description of parts/materials utilized - - including quantities and material costs; and the name of the Contractor's employee(s) who performed the work, indicating that the work has been completed.

A70 (¶ C.5.1.7).

Paragraph C.5.1.9.1 specified that for emergency calls, the contractor is required to enter

"all data in the appropriate Contractor work order system *just as for any other service calls*,"

with the added requirement that for service calls exceeding the $2,000 threshold, the contractor is

required to "submit a report to the contracting officer." A72 (¶ C.5.1.9.1) (emphasis added).

### v) **Firm Fixed-Price For Service Calls**

The contract provided for a firm fixed-price payment of $15,000 each month to Ravens

Group for service calls, for a period of twelve months, to pursuant to CLIN 0001AA:

| Item No. | Supplies/Services | Quantity | Unit | Unit Price | Amount |
|----------|-------------------|----------|------|------------|--------|
| 0001AA | Service Calls FFP IAW C.5.1 | 12 | Months | $15,000 | $180,000 |

A14.

### vi) **Price Adjustment For Service Calls**

The contract included a provision, paragraph C.5.1.8.1, "Adjustments for Routine and

Urgent Service Calls," that permitted the contractor to seek an economic price adjustment to the

firm fixed-price for service calls, that exceed a five percent variation limitation for documented

labor hours:

> Respond to and complete all routine and urgent service calls
> *regardless of whether the cumulative labor-hours or materials
> exceed the estimated workload.* The parties also agree that the
> actual workload may exceed the cumulative labor hours,
> irrespective of the actual trade mix, and materials ranges by five
> (5) percent with no adjustment in compensation to the Contractor.
> The parties further agree that the Contractor *will be compensated
> for that portion of actual Routine and Urgent service call workload
> which exceeds the cumulative figures for the three (3) months
> period.* Measure charged labor hours in increments of 15 minutes.
> The amount of compensation will be determined as follows: [in
> section C.5.1.8.2].

A70-(¶ C.5.1.8.1) (emphasis added).

Paragraph C.5.1.9.2 contained a similar formulation to that in section C.5.1.8.1,

permitting the contractor to seek *additional* compensation for responding to emergency service

calls: "Compensation will be determined the same as for routine and urgent service calls except

that all work above the $2,000 threshold which the Contractor is compensated with Indefinite

12

Quantities orders will be excluded from the computation."  A72 (¶ C.5.1.9.2).

### vii) <u>Formula For Additional Compensation – Labor Hours</u>

Paragraph C.5.1.8.2 provided the formula for calculating the labor hours exceeding the

five percent variation limitation, as "described in the example below, to determine the

[additional] compensation to be provided the Contractor for the increased workload,"

summarized in relevant part:

> Example:
>
> (Average number of calls per month multiplied by average labor hours per call multiplied by number of months multiplied by 1.05) = (**85** x 2.0 x 3 x 1.05) *535.5 labor hours for 3 months*
>
> Actual hours worked after adjustment by the Government = *672.5 labor hours*
>
> Excess hours (actual hours of 672.5 minus estimated hours of 535.5 = excess of 137 hours)
>
> Contractor offered $15,000 per month to perform service calls
>
> (contractor's offered price minus cost of materials) = ($15,000 - $2,295) = *$12,705 Contractor's marked up labor costs*
>
> (marked up labor costs) divided by (average number of calls per months multiplied by average labor hours per call) = ($12,705/(85 x 2) = *$74.74 Marked Up Hourly Rate*
>
> The 137 excess hours are multiplied by $74.74 to yield $10,239.38 in additional compensation for all costs (except materials) and profit for the excess workload.

A71-72 (¶ C.5.1.8.2) (emphasis added); A73 (¶ C.5.1.9.3) (making formula in section C.5.1.8.2

applicable to emergency service calls).

### viii) <u>Materials Exceeding The 5% Variation Limitation</u>

Paragraph C.5.1.8.3 permitted the contractor to seek addition compensation for material

costs, as follows:

Actual material cost will be determined from the completed work authorization data submitted by the Contractor as prescribed in paragraph C.5.1.7 herein. The Contractor agrees that the Government has the right to assign actual material cost. After actual cumulative material costs have been determined, the estimated cumulative material costs shown above will be adjusted upward by five percent. This result (amount) will be subtracted from the actual cumulative material cost to determine the amount of additional compensation to be provided to the Contractor.

A72 (¶ C.5.1.8.3), A73 (¶ C.5.1.9.3) (making provision applicable to emergency service calls).

### ix) <u>Compensation For Service Call Overage</u>

Paragraph C.5.1.9.3 stated the requirements for calculating overage for service calls:

Compensation for service calls will be consolidated. Use the following formula to calculate any overage.

Total Routine Hours + Total Urgent Hours + Total Emergency Hours + 5% = Contract Hours

Total Hours Worked – Contract Hours = Billable Overage.

Refer to Paragraphs C.5.1.8.2 and C.5.1.8.3 for calculations of labor hours and materials costs.

A73 (¶ C.5.1.9.3).

### H. <u>Ravens Group Did Not Document Labor Hours</u>

Ravens Group tracked the number of service calls and the work performed on the GFOQ units using a document it prepared entitled "GFOQ Daily Status Report," reflecting work performed between August 20, 2004 to April 15, 2005. A102-40 (GFOQ Status Report), A257 (Ballard Depo at p. 112). The daily status report included information related to job type, quarters location, contract category, (*i.e.*, firm fixed-price or IDIQ, and the priority of service call, *i.e.*, emergency, urgent, or routine), with a list of abbreviations for job type. A102. For Job numbers 1150 and 1152, for example, Daily Status Report included the following representative

information:

| Job # | Qtrs | Identified | Type | Category | Priority | Job | Open | Status Detail | Completion |
|-------|------|-----------|------|----------|----------|-----|------|---------------|------------|
| 1150 | MY05 | 3/29/2005 | GM | IDIQ | U | Assemble and deliver 12 dining room chairs | N | CDCC Approved 3/29/05 | 3/30/2005 |
| 1152 | MY15B | 3/29/2009 | C | FF | R | Needs to have towel bar installed in 3rd floor bathroom | N | CDCC approved 3/30/05. EMO to provide towel bar | 3/30/2005 |

      C-Carpentry
      P/HVAC – Plumbing HVAC
      E-Electrical
      GM-General Maintenance
      LM-Lawn Maintenance
      PC-Pre-Contract
      FF-Firm Fixed Price

A135 (Daily Stats Report at p. 35 of 40).

In the daily status report, however, Ravens Group did *not* document labor hours expended, start and stop times, a description of parts and materials utilized, or the name of the employee who performed the work.  A102-40; *see also* A70, A72 (¶¶ C.5.1.7, C.5.1.9.1).

**I.**      **Meetings With The Government During Contract Performance**

During the performance of the contract, Ravens Group complained to the Government of the number of service calls as well as various concerns with the contract, payment, and other matters.  On February 9, 2005, Ravens Group met with  Government representatives in an attempt to resolve these concerns.  A141.

Following this meeting, on March 2, 2005, Ravens Group submitted a revised line item

proposal to the contracting officer, William Campbell, that increased the CLIN for service calls

from a unit price of $15,000 to $102,675 monthly; Ravens Group's proposal sought an increase

for all line items by $1,181,610.08 to a total of $3,059,761.56 for the year beginning August 1,

2005. A147, A154-55. The contracting officer, William Campbell, rejected Ravens Group's

proposal, characterizing the increased amount as "astronomical." A246 (Deposition of William

Campbell at p. 60).

On April 19, 2005, Ravens Group again met with Government representative to address

Ravens Group's concerns in performing the contract. A. The minutes of that meeting prepared

by Ravens Group stated, among other things:

> 1. The government will not terminate contract or exercise the year
> option to terminate for convenience.
>
> * * *
>
> 2.2 CDCC [Capital District Contracting Command] will be
> deleting Firm-Fixed CLIN for "Custodial Supplies" [0001AF] in
> the amount of $5,700 per month.

A156.

Following this meeting, on May 2, 2005, Ravens Group and the Government executed

bilateral modification P00003 to the contract, which de-obligated funding for CLIN 001AF for

custodial services for contractor occupied office spaces. A94-97; *see also* A (¶ C.5.6 "Custodial

Services").

### J.      Government Notified Ravens Group That It Will Not Exercise Option

By letter dated June 15, 2005, the contracting officer notified Ravens Group, in relevant

part, that the contract would "expire 15 August 2005. The US Government does not intend to

exercise its option years without prejudice to the incumbent contractor." A159.

### K.  Parties Agree To Six Month Extension Of Contract

On or about August 12, 2005, Ravens Group and the Government executed a bilateral modification, P00004, extending the contract for six months, and providing additional funding for six firm fixed-price CLINS, subject to available funding.  A98.  Modification P00004 included the following release:

> In consideration of the modification (s) agreed to herein as complete equitable adjustments for the Contractor's acceptance of sixth month extension of services required for GFOQ proposal (s) for adjustment, the Contractor hereby releases the Government from any and all liability under this contract for further equitable adjustments attributable to such facts or circumstances giving rise to the proposal (s) for adjustment.

A99.

By letter dated February 14, 2006, six months after modification P00004 was executed, the contracting officer notified Ravens Group that "[t]oday is the end date of your contract with Capital District Contracting Office (DCDD) under W91QV1-04-D-0013 on services provided to General Flag Officers' Quarters (GFOQ) in behalf of Executive Management Office (EMO)." A160.

### L.  Ravens Group Earned A Profit On The Contract

Ravens Group's profit and loss statements show that during the performance of the contract, the contractor earned a net income of $247,273.24 for 2004; $431,469.88 for 2005; and $516,909 for 2006.  A161-69.

### M.  Claim And Final Decision

On September 29, 2006, Ravens Group submitted a claim and request for a contracting officer's final decision, seeking $1,488,616.80 in damages.  A170 (excerpt from Sep. 29 2006

claim).

By letter dated December 21, 2006, the contracting officer issued it final decision, in which the Government agreed to pay $53,966.77 to Ravens Group for claims relating to garbage disposal, mulching, and snow removal. A183(Dec. 21 2006 final decision ¶ 1). The contracting officer denied the remainder of Ravens Group's claims. A183-85.

### N. Complaint

On October 29, 2007, Ravens Group filed a six count complaint, seeking a total of $2,066,281.00 in damages plus interest. Compl. ¶ 72 (prayer for relief). Counts I and II of the complaint allege, respectively, that the Government breached the contract for failing to provide historical workload data and for providing misleading estimates in the number of service calls, and seeks $631,352.00 for these two counts. Compl. ¶¶ 39-53, 72 (¶¶ A and B). Count III alleges that the Government breached an implied duty of good faith and fair dealing, and seeks $123,289 in damages. Compl. ¶¶ 54-59, 72 (¶ C). Count IV alleges that the Government breached the contract by unlawfully assigning work to third party contractors, and seeks $161,700 in damages. Compl. ¶¶ 60-62, 72 (¶ D). Count V alleges that the Government invalidly terminated the contract, and seeks $500,000 in damages. Compl. ¶¶ 63-66, 72 (¶ E). Count VI alleges constructive change to the contract, and seeks $643,940 in damages. Compl. ¶¶ 68-71, 72 (¶ F).

### O. DCAA Audit

In a report dated May 9, 2011, the Defense Contract Audit Agency (DCAA) audited Ravens Group's claim. DCAA made the following relevant findings:

i)    **Service Call Overage**

The DCAA audit questioned in its entirety Ravens Group's claims for service call overage in excess of 50 calls per month ($116,400 claimed for routine calls, $67,000 claimed for urgent and emergency calls), and for additional employees hired to respond to service calls ($354,995) (Counts I, II, and III in the complaint), because Ravens Group did not provide "adequate supporting documentation" for the claimed overage as required by Section C.5.1.7 of the contract. A191-94.

Specifically, the auditor questioned Ravens Group methodology for calculating overage, which was to divide the monthly unit price of $15,000 in CLIN 0001AA for service calls by 50 (based upon 50 service calls per month), to arrive at a rate of $300 per routine service call for *each* call in excess of 50 per month. A192-93. Ravens Group then applied markups of 25 percent and 50 percent, respectively, to compute rates for alleged excess urgent ($375 per call) and emergency ($450 per call) service calls per month. A194. Noting that the "number of service calls was not expressly provided in the basic contract or any modification," A192, the auditor concluded that Ravens Group's methodology for claiming service call overage was "not in accordance with the contract's required formula computations and data requirements" to compute any excess labor costs. A193.

The auditor determined that under the firm fixed-price portion of the contract, the contractor *could* seek additional compensation for routine, urgent, and emergency service calls that exceed a five percent variation limitation in labor hours, using the formula provided in section C.5.1.8.2, provided that the contractor properly document its labor hours as required by section C.5.1.7. A192. The auditor found that Ravens Group failed to provide such

19

documentation.  A193.

Specifically, with respect to Ravens Group's claim that it hired additional salaried and subcontractor employees to respond to the increased number of service calls, the auditor found "deficiencies" in the time sheets and form 1099s (for subcontractors) provided, including missing and unsigned time sheets.  A196-97.

The auditor concluded that,

> Without the identification of the employee who completed the service call and the actual hours worked, no audit trail exists to verify the actual quantity of hours incurred and by whom the hours were worked.  We were unable to verify to timesheets the hours worked.  The timesheets that were available could not be supported and verified back to the service logs.

A193.

### ii)        Claim For Distribution Of Work To Third Party Contractors

Noting Ravens Group's allegation that the "contract provided for them as the sole exclusive contractor for providing certain services for the housing units," the audit questioned Ravens Group's claim for alleged improper distribution of work to third party contractors ($161,700, Count IV in the complaint) in its entirety.  A203-04.

### iii)        Claim For Invalid Contract Termination

The audit questioned Ravens Group's claim for invalid contract termination ($500,000, Count V in the complaint) in its entirety, noting that the contractor and the Government executed bilateral modification P00004 to extended the contract for six months, and that the modification contained a statement of release clause, whereby Ravens Group agreed to release the Government "from any and all liability under the contract for further equitable adjustments." A204-05.

### iv)        **Claim For Constructive Changes – Duplicated Claim**

The audit questioned Ravens Group's claim for constructive changes ($643,940, Count VI in the complaint), finding that $631,345 of the claimed amount represented a duplication of costs already claimed in other parts of the complaint.  A205-06.  The audit further questioned the remaining $12,588, that related to costs for the renovation of a bathroom, as unsupported by Ravens Group's books and records.  A206-07.

With respect to the $12,588 claimed for the bathroom renovation, the audit found that Ravens Group had submitted invoice No. 04-899 on January 26, 2005 in the amount of $24,833.  A206, A213-16.  On January 26, 2005, the invoice was voided and then reissued in the amount of $12,245.  A206, A213-16.  The audit found that Ravens Group's own records demonstrated that that the actual cost of the renovation totaled only $12,245, and that Ravens Group had simply claimed "the net of the two invoices" for an additional $12,588, which was unsupported.  A206.

### v)        **Claim For Additional Units**

The audit questioned Ravens Group's claim in its entirety that it worked on four additional quarters, beyond the 49 specified in the contract, for a total of 53 ($93,000).  A198-99.  The audit found that the contract called for maintenance and repair of only 49 units and was not modified to include four additional units.  A198.  The audit also took exception to the claimed costs because "the contractor could not provide adequate support, including timesheets or other documentation in their books and records for the costs claimed for additional quarters."  A198.

### vi) **Miscellaneous Claims**

Related to the claims for constructive changes and contract termination, the audit also

questioned in their entirety Ravens Group's miscellaneous claims for answering service costs ($1,024), for an administrator's salary ($33,072), and for equipment loan loss ($26,000) , noting that the contract specifically required Ravens Group to bear such costs, and that Ravens Group failed to support its claims with proper documentation.  A199-203.  The audit also questioned Ravens Group's claim for the deletion of CLIN 0001AF for custodial services ($62,000), noting that under bilateral modification P00003, the requirement for custodial services went away.  A201-02.

### P.    Ravens Group's Expert Report

In a report dated February 6, 2012, Ravens Group's retained expert, Kenneth Dean Bricker, a certified public accountant, offered opinions on several of Ravens Group's claims that, either expressly agreed with the findings of the DCAA audit, or offered "no opinion" on particular claims.  A224, A226 .  Thus, of the $2,060,286 claimed by Ravens Group in the complaint, Mr. Bricker offered his opinion that the Government owes the Ravens Group $941,178 "related to those items which I have examined."  A226.

### i)    Claim For Constructive Changes – Duplicated Claim

Mr. Bricker opined that Count VI of the complaint in the amount of $634,940 "*duplicated* the excess costs included in Counts I and II.  Therefore, no additional claims are due [Ravens Group] based upon this count."  A231 (emphasis added); *see also*  A205-06 (DCAA audit at  p. 18-19, reaching the same conclusion).  With respect to the Ravens Group's claim of $12,588 for the bathroom renovation relating to invoice 04-899, Mr. Bricker did not "opine on the quantum for this matter."  A230.

ii)    **Claim For Invalid Contract Termination**

With respect to the $500,000 claimed by Ravens Group for an alleged invalid contract termination, Mr. Bricker declined to "opine[] on this matter." A231.

iii)    **Service Calls**

In his report, Mr. Bricker assumed that the Government provided an estimate of 50 calls per month to Ravens Group; and that the GFOQ Daily Status Report allegedly "show[ed] that actual [s]ervice [c]alls exceeded the estimate by 388 calls between August of 2004 and March of 2005." A228. Mr. Bricker then offered his opinion that Ravens Group's claim for routine service calls assumed an average cost of $300 per call, multiplied by the number of additional calls (388 X $300) to calculate an unpaid amount of $116,400 for excess routine service calls. A228.

For urgent service calls, Mr. Bricker stated in his report that Ravens Groups was required to respond to 126 urgent service calls, and then noted simply that "TRG marked up the urgent calls by 25% to $375" per call, resulting in an unpaid balance for urgent service calls of "$47,250 (126 X $375)." A228-29. Mr. Bricker then stated this his "opinion is based solely on the methodology used to calculate the $375 average price." A229.

For emergency calls, Mr. Bricker stated in his report that Ravens Groups was required to respond to 44 urgent service calls, and then noted simply that "TRG marked up the emergency calls by 50% to $450" per call, resulting in an unpaid balance for emergency service calls of "$19,800 (44 X $450). A229. Mr. Bricker then stated his "opinion is based solely on the methodology used to calculate the $450 average price." A229.

At a sworn deposition on March 21, 2012, Mr. Bricker explained that Ravens Group's

count of excess service calls, which it based upon the GFOQ Daily Status Report, excluded calls categorized as IDIQ. A260 (Bricker Deposition).

With respect to the cost of $300 per call that Ravens Group uses as the baseline for its claims, Mr. Bricker admitted that the $300 figure is not based upon the contract: "300 is not in the contract. That is - - because we're not utilizing the contract to estimate the damages that were done." A261 (Bricker Deposition). Mr. Bricker admitted that he did not make damage calculations based upon contract provisions. A261a (Bricker Deposition).

With respect to Ravens Group's 25 percent and 50 percent markups for urgent and emergency service calls in its claim, Mr. Bricker explained that Ravens Group came up with the percentages and that he "did not know" whether the percentage markups were correct: "Is 25 percent right? I don't know." A262-63 (Bricker Deposition); *see also* A264, A265-66 (Bricker Deposition).

### iv) Claim For Increased Personnel To Perform Urgent And Emergency Calls

In a section of his report entitled "Quantum Related to Increased Personnel to Perform Urgent and Emergency Calls," Mr. Bricker offered his opinion that the "unexpected number of urgent and emergency calls caused TRG to have to employ additional employees and as subcontractors," *i.e.*, specifically "three Carpenter Apprentices, an Electrician and a Carpenter as well as outsourcing six lawn care personnel for periods ranging from 3-13 months," and that "[a]ll of these position were in addition to the personnel bid" to perform service calls. A229. Mr. Bricker calculated costs of $250,669 for the salaried employees, and he calculated subcontractors costs of $104,227, for a total of $354,896 "related to increased personnel" for urgent and emergency calls. A229-30.

At his sworn deposition, Mr. Bricker admitted that he did not verify whether the additional salaried personnel actually performed extra work: "we couldn't do that because they weren't charging to the- - - they were charging to the contract not to specific service." A268 (Bricker Deposition). Mr. Bricker further admitted he did not try to match up the additional employees, such as a carpenter, to the jobs performed in the Daily Status Report: "No, because you can't tell from that status report what jobs are the extra jobs." A269 (Bricker Deposition).

Mr. Bricker admitted that Ravens Group's timesheets and invoices were not "up to date" and were missing: "the paperwork wasn't really up to date. There were a lot of timesheets missing." A270 (Bricker Deposition), A271 ("[m]y recollection is on everybody, I'd miss a timesheet").

With respect to the three lawn care subcontractors allegedly hired in response to the increased calls, Mr. Bricker conceded that Ravens Group did not hire such personnel to perform "emergency" lawn care. A271a. Mr. Bricker also could not identify the specific "additional work" that the lawn care subcontractors allegedly performed based upon the Daily Status Report: "matching them up one per one, it's never going to be done." A271b-c.

A review of the GFOQ Daily Status Report reveals a total of seven routine, firm fixed-price service calls for "LM," *i.e.*, lawn or grounds maintenance. A114-15, A118, A130, A133, A136-37 (Daily Status Report for Job Nos. 660, 705, 762, 1020, 1119, 1183, and 1192, respectively). Only one "LM" call, Job No. 62, was characterized as "urgent." A118 (Daily Status Report at17).

## SUMMARY OF THE ARGUMENT

Ravens Group entered into a combination firm fixed-price, IDIQ contract with the

Government to provide repair and maintenance services for GFOQ housing at Fort Myer and Fort McNair.  Ravens Group alleges in its complaint, among other things, that the Government provided  negligent estimates of the number of services calls it would perform each month (Counts I, II, and III), that the Government breached the contract by assigning work to third party contractors (Count IV), and that the Government wrongfully terminated the contract (Count V), and that the Government constructively changed the contract by requiring Ravens Group to work on more than 49 housing units as stated in the contract.  These allegations lack merit.

First, the Government did not provide negligent estimates of service calls.  To the contrary, the GFOQ contract (in which Ravens Group assisted in drafting the statement of work prior to contract award), put Ravens Group squarely on notice that it could expect overage in service calls and the contract contained express provisions for seeking additional compensation, provided that Ravens Group document both the number of calls *and* its labor hours incurred in responding to the calls.  Significantly, the contract's compensation adjustment formula for service call overage included the number "85" as an example of the average number of calls per month, a number which nearly matches Ravens Group claimed performance average of 93 calls per month.  Moreover, Ravens Group failed to track its labor hours as required by the contract, and thus cannot prove entitlement to additional compensation under the firm fixed-price portion of the contract for service calls.

As to Ravens Group's claim of improper assignment of work to third parties, the GFOQ contract was not a requirements contact.  Thus, the Government was free to assign work to other contractors without breaching the GFOQ contract.   Third, because Ravens Group and the

Government executed a bilateral modification to extend the contract for six months, and the Government, in its discretion, decided not to exercise the contract option, and the contract having thus expired under its own terms at the end of the six month extension period, Ravens Group's claim of "unlawful" contract termination is similarly unavailing.

Furthermore, both the DCAA audit and Ravens Group's own expert agreed that Count VI merely duplicates other parts of Ravens Group's complaint, and that the contractor is not entitled to additional compensation under Count VI.

Ravens Group's claim to performing work on more than 49 GFOQ units is undermined by its own records, which show that the contractor actually performed service calls on no more than 49 different housing units, in compliance with the contract, and is thus not entitled to additional compensation. Finally, Ravens Group's miscellaneous claims to additional compensation for answering service costs, for an administrator's salary, for equipment loan loss, and for the deletion of a CLIN for custodial services are unavailing, where the firm fixed-price contract makes clear that Ravens Group bears responsibility for such costs.

Under the plain terms of the GFOQ contract, Ravens Group cannot demonstrate that it is entitled to additional compensation. Accordingly, summary judgment in favor of the Government is appropriate in this case.

I.      **The United States Is Entitled To Summary Judgment**

   A.      **Standard Of Review**

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)); *accord Mingus Constructors, Inc. v. United States*, 812

F.2d 1387, 1390 (Fed. Cir. 1987). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *O'Connor v. United States*, 308 F.3d 1233, 1240 (Fed. Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "When the movant has met its initial burden, the non-movant must respond with sufficient evidence to show that there is a material factual dispute and that, on the non-movant's evidence, the movant is not entitled to judgment as a matter of law." *Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 98 F.3d 1318, 1321 (Fed. Cir. 1996) (citing *Celotex*, 477 U.S. at 322-24).

The non-movant "may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." RCFC 56(e). To survive a motion for summary judgment, the non-movant may not rely upon "mere assertions of counsel," "mere denials," or "conclusory statements." *Mingus Constructors*, 812 F.2d at 1390-91; *Sweats Fashions, Inc. v. Pannill Knitting Co, Inc.,* 833 F.2d 1560, 1562 (Fed. Cir. 1987).

## B.     Parties' Experts Agree That Count VI Duplicates Claimed Costs

The parties' respective experts agree that Count VI merely duplicates other parts of Ravens Group's complaint, and that the contractor is not entitled to additional compensation under Count VI. *See* A205-06 (DCAA audit), A231(Bricker report); *see* also, e.*g.*, *Mingus Constructors*, 812 F.2d at 1390. Specifically, the DCAA auditor questioned $643,942 in costs claimed in Count VI because "these costs are a duplication of costs that are included in this claim's total amount." A205. The audit further questioned the remaining $12,588 claimed (for Invoice 04-899), that relate to costs for the renovation of a bathroom. A205. The audit found that Ravens Group's own records demonstrated that the actual cost of the renovation totaled only

28

$12,245, and that Ravens Group had simply claimed "the net of the two invoices" (the difference between the $24,833 invoice which was voided, and the reissued invoice for $12,245) for an additional claimed amount of $12,588, which was unsupported. A206.

Ravens Group's expert, Mr. Bricker, agrees with DCAA that "Count VI [of the complaint] duplicated the excess costs included in Counts I and II" and he further admitted that "no additional claims are due TRG based upon" Count VI. A231. Moreover, with respect to the $12,588 claimed for the bathroom renovation, Mr. Bricker did "not opine on the quantum for this matter," thereby tacitly conceding that Ravens Group's claim was not meritorious. A230.

Accordingly, because there are no material facts in dispute regarding the duplicated costs in Count VI of the complaint, and plaintiff's own expert concedes that Ravens Group is not entitled to additional payment, the Government is entitled to summary judgment as to Count VI.

## C.    Contract Was Not Wrongfully Terminated

The DCAA auditor questioned Ravens Group's claim for invalid contract termination ($500,000, in Count V of the complaint) because "the contract was not terminated." A204. Ravens Group's expert, Mr. Bricker, did not "opine[] on this matter," regarding the $500,000 in claimed costs for Count V, thereby tacitly conceding that the claim was meritless. A231. The record fully supports this conclusion.

The GFOQ contract contained a standard options clause, FAR 52.217-9, stating that "[t]he Government may extend the term of this contract by written notice to the Contractor. . ." A56 (FAR 52.217-9). On June 15, 2005, the Government notified Ravens Group that the contract would expire on August 15, 2005, and that "the US Government does not intend to exercise its option years." A159. Three days before the contract expired, on August 12, 2005,

Ravens Group and the Government executed bilateral modification P00004, that extended the contract for six months, and also contained a statement of release clause, whereby Ravens Group agreed to release the Government "from any and all liability under the contract for further equitable adjustments." A98-99. The contract thereafter expired by its own terms on February 14, 2006. A160.

This Court has held that a contractor's argument "that it sustained injuries by not being able to compete for services beyond the period provided under the contract is . . .unavailing." *OK's Cascade Co. v. United States*, 97 Fed. Cl. 635, 646 (2011), *aff'd*, 467 Fed. Appx. 888 (Fed. Cir. 2012). Moreover, "contractors are not entitled to damages based upon the Government's failure to exercise options where the Government has the discretion to exercise options, such as here." *Id.* 646 (citing *Hi-Shear Tech. Corp. v. United States*, 356 F.3d 1372, 1380 (Fed. Cir. 2004)); *see also Uniq Computer Corp. v. United States*, 20 Cl. Ct. 222, 235 (1990) ("[h]aving expired by its own terms, there was no contract subject to 'termination' by the [agency]").

Thus, where the GFOQ contract expired by its own terms following the six-month extension, and where Ravens Group executed a release of further claims in modification P00004, A98-99, A159-60, Ravens Group has no entitlement to damages based upon the Government's discretionary decision not to exercise the option. *See Hi-Shear*, 356 F.3d at 1380; *see also*, *e.g.*, *Valcon II, Inc. v. United States*, 26 Cl. Ct. 393, 397 (1992) (holding that a release of claims clause in a contract modification barred further claims "arising out of the same incident that led to the modification[]"); *see also*, *Uniq Computer*, 20 Cl. Ct. at 235. Accordingly, the Government is entitled to summary judgment as to Count V.

**D.** **The Government Did Not Provide Negligent Estimates Of Service Calls**

Ravens Group's primary contention in this lawsuit is that prior to award of the contract, the Government provided a negligent estimate of the number of service calls it could expect to perform each month, *i.e.*, 50, but that after Ravens Group began performance, "it experienced an average of 93 service calls per month." Compl. ¶ 30. Even assuming that the Government provided a verbal estimate of 50 monthly service calls, as Mr. Ballard, Ravens Group's owner contends, *see* A92, Ravens Group cannot demonstrate that the estimate was negligent or that the Government acted in bad faith. That is especially so because the contract statement of work, which Ravens Group assisted in drafting prior to award, *see* A244, A248, A258, put the contractor on notice that it could expect service call overage. Indeed, the contract specifically included a formula to compensate Ravens Group for additional service calls, above the firm fixed-price CLIN of $15,000 per month, by tracking the average number of calls per month (for a three month period) and the *labor hours* incurred in responding to the calls, which Ravens Group failed to do. *See* A70-73 (¶¶ C.5.1.6, C5.1.6.1, C.5.1.7, C.5.1.8.1, C.5.1.8.2, C.5.1.8.3, C.5.1.9, C.5.1.9.1, C.5.1.9.3).

**i)** **IDIQ Part Of Contract Is Not Subject To Negligent Estimate Claim**

As an initial matter, not all types of contracts are subject to negligent estimate claims. *See*, *e.g.*, *Timber Investors, Inc. v. United States*, 587 F.2d 472 (Ct. Cl. 1978) (holding that requirement contracts are subject to negligent estimate claims). In particular, the Government generally cannot be held liable for breaching an IDIQ type contract on the basis of making negligent estimates, as long as the Government orders the guaranteed minimum. *See Travel Centre v. Barram*, 236 F.3d 1316 (Fed. Cir. 2001). On the other hand, firm fixed-price contracts

are generally subject to negligent estimate claims. *See*, *e.g.*, *Womack v. United States*, 389 F.2d 793, 801 (Ct. Cl. 1968); *see also Service Technicians, Inc. v. United States*, 37 Fed. Cl. 383 (1997).

The GFOQ contract here was a combination firm fixed-price indefinite quantity contract. A62, A86(¶¶ C.1.1, C.9.6). Ravens Group's expert, Mr. Bricker, admitted that in calculating the number of service calls for its claim from the Daily Status Report, Ravens Group excluded IDIQ items (which were awarded separately and priced separately from firm fixed-price CLIN) from its total count of service calls. A260. For this reason, and because IDIQ contracts are generally not subject to negligent estimate claims, only the firm fixed-price portion of the GFOQ contract is arguably subject to Ravens Group's negligent estimate claims, with the IDIQ portion of the contract (and IDIQ designated calls) being entirely excluded. *See*, *e.g.*, *Womack* 389 F.2d 801; *see also Travel Centre*, 236 F.3d 1316; *Service Technicians,* 37 Fed. Cl. 383. Nevertheless, Ravens Group cannot demonstrate that the Government breached the firm fixed-price contract with respect to the number of service calls to be performed.

### ii)      <u>Standard For Negligent Estimate Claims</u>

Estimated quantities provided by the Government are not guarantees. "[B]ecause actual purchases vary significantly from government estimates does not ordinarily give rise to liability on the part of the government." *Medart v. Austin*, 967 F.2d 579, 581 (Fed. Cir. 1992) (citing *Clearwater Forest Indus., Inc. v. United States*, 650 F.2d 233, 240 (Ct Cl. 1981)). To prevail on a negligent estimate claim, a contract must show by "preponderant evidence that estimates were 'inadequately or negligently prepared, not in good faith, or grossly or unreasonably inadequate at the time the estimate was made,' the government could be liable for appropriate damages

resulting." *Medart*, 967 F.2d at 581 (quoting *Clearwater Forest*, 650 F.2d at 239).

Nevertheless, in "promulgating an estimate for bidding purposes, defendant is not required to be clairvoyant." *Clearwater Forest*, 650 F.2d at 239 (citing *Womack*, 389 F.2d at 801). Rather, the Government "is obliged to base that estimate on all relevant information that is reasonably available to it." *Womack*, 389 F.2d at 801.

Here, the record shows that the Government did *not* have relevant information "reasonably available to it." *See id.*; *see also Clearwater Forest*, 650 F.2d at 239. Ms. Lenora Clark-Evans, who served as the Director of the Capital District Contracting Center in the summer of 2004 during pre-award negotiations with Ravens Group, explained that the Government, through its prior used of "in-house personnel," had "no historical data" with respect to the requirements of the GFOQ work to be performed by the contractor: "[i]t was a new requirement, and we had no historical data on what was necessary." A243 (Clark-Evans Deposition at p. 8). Ms. Dee Spellman, the director of EMO, testified at her deposition that "we requested the previous housing office to supply us all the past, any records, historical data, whatever. They had very little historical data, at least that was provided to us." A241 (Spellman Deposition at p. 28). Indeed, the Government confirmed that no historical data exists for the GFOQ units, including for service calls. A233.

More importantly, Mr. Ballard, Ravens Group's owner and chief executive officer, testified at his deposition that the Government "told me" during discussions that "they didn't have the historical records" for service calls. A251. Thus, Ravens Group knew or reasonably should have known, at the time it submitted its price proposal on July 1, 2004, *see* A1, that actual historical data for service calls was not available. *See e.g.*, Medart, 967 F.2d at 582.

33

Consequently, in the absence of negligence or bad faith, Ravens Group "bears the risk of variance between the estimated and actual contract quantities."  *See Federal Group, Inc. v. United States*, 67 Fed. Cl. 87, 97 (2005) (citing *Medart*, 967 F.2d at 581); *Womack*, 389 F.2d at 801.

### iii)　　The Contract Gave Notice Of Overage In Service Calls

Further undermining Ravens Group's negligent estimate claim, the contract, which did not provide a baseline estimate of the number of service calls, nevertheless put Ravens Group on notice that it could expect overage on service calls, and even provided a means for seeking additional compensation, based on a formula that required Ravens Group to track the average number of service calls and its labor hours to perform the calls (over a three month period).  *See* A70-73 (¶¶ C.5.1.8.1, C.5.1.8.2, C.5.1.9.2).  *See Coast Fed. Bank v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003); *see also Granite Constr. Co. v. United* States, 962 F.2d 998, 1003 (Fed. Cir. 1992) (a contract should be interpreted as a whole and in a manner which gives "reasonable meaning to all its parts and avoids conflict or surplusage of its provisions"); *Elden v. United States*, 617 F.2d 254, 260-61 (Ct. Cl. 1980) (the words of a contract "must be given their plain and ordinary meaning . . . in defining the rights and obligations of the parties"); *Horn v. United States*, 98 Fed. Cl. 500, 503 (2011) ("[i]f the terms of the contract are unambiguous . . . then summary judgment is a proper procedural method to adjudicate the claim").

Specifically, paragraph C.5.1.8.1 gave general notice to Ravens Group that the actual workload may exceed any estimate provided to the contractor:  "Respond to and complete all routine and urgent service calls regardless of whether the cumulative labor-hours or materials *exceed the estimated workload*.  The parties also agree that the actual workload may *exceed* the

cumulative labor hours . . . by five (5) percent with no adjustment in compensation to the contractor."  A70 (¶ C.5.1.8.1) (emphasis added).  Section C.5.1.9.1 contains virtually identical language for emergency calls.  A72 (¶ C.5.1.9.1).

Next, paragraph C.5.1.8.1 addressed how adjustments for increases in routine and urgent service calls should be calculated.  The contract states that "[t]he parties further agree that the Contractor will be compensated for the portion of actual Routine and Urgent service call workload which exceeds the cumulative figures for the three (3) month period.  Measure charged labor hours in increments of 15 minutes.  The amount of compensation will be determined [as set forth in section C.5.1.8.2]".  A70 (¶ C.5.1.8.1); *see* A72 (paragraph C.5.1.9.2 provides that compensation for emergency service calls "will be determined the same as for routine and urgent service calls," except that all work above the $2,000 threshold for which the contractor is compensated with IDIQ orders will be excluded from the computation).

Most importantly, paragraph C.5.1.8.2  provided a formula for calculating service call overage, based upon the contractor's *actual*, average number of calls per month and the average labor hours per call, as calculated over a three month period.  A71-72 (¶ C.5.1.8.2).

Of particular relevance, Ravens Group was involved in drafting the statement of work, and did not include a "50 call per month" requirement in the contract.  A257a (Ballard Deposition).  Instead, the parties inserted the number "85" as the average number of calls per month in the adjustment formula example in paragraph C.5.1.8.2., *e.g.*, "(**85** x 2.0 x 3 x 1.05)," a number that nearly matches Ravens Group's claimed performance average of 93 calls per month.  A71 (¶ C.5.1.8.2) (emphasis added); Compl. ¶ 30.  The inclusion of the number "85" in the contract was not intended to be an estimate or a limit on the number of service calls, but rather an

example of calculating work load overage, based upon the average number of calls per month (clearly in excess of 50) and documented labor hours.

In short, the Government did not promise or assure Ravens Group that number of service calls "would forever remain" at 50, or any other number. *See e.g.*, *Clearwater Forest*, 650 F.2d at 239. Rather, the contract stated Ravens Group would be compensated for the additional work for routine, urgent, and emergency calls, provided that Ravens Group *document* both the number of calls *and its labor hours* incurred in responding to the calls. A70 (¶ C.5.1.7 "Documentation" for routine and urgent calls), A72 (¶ C.5.1.9.1 "Documentation" for emergency calls).

In the GFOQ Daily Status Report, Ravens Group tracked the number of service calls, but completely failed to document labor hours, among other information, as expressly required by the contract. A70, 72 (¶¶ C.5.1.7, C.5.1.9.1), A102-40. Moreover, as the DCAA audit found, and as Ravens Group's expert, Mr. Bricker, admitted in his deposition, Ravens Group's payroll records, *e.g.*, "missing" timesheets and invoices, are inadequate to show the labor hours actually worked, including for the supposed "additional" employees that Ravens Group hired to respond to urgent and emergency calls. A196-97 (DCAA audit), A270-71 (Bricker Deposition).

Furthermore, Mr. Bricker admitted that Ravens Group did not "utilize the contract to estimate the damages that were done," and he further admitted that he "did not know" whether Ravens Group's unilateral markups of 25 percent and 50 percent, respectively, for urgency and emergency calls, was "correct." A261, A261a, A262-66).

Ravens Group's failure to track its labor hours and to pursue the remedies for additional compensation for service calls that were *provided for in the contract*, are failures of its own making. Thus, as a matter of law, Ravens Group cannot prove that the Government breached the

contract by providing an allegedly faulty pre-award estimate of the number of service calls, where the contract itself expressly provided for additional compensation for service calls (based upon the actual, average monthly number of calls and labor hours), above the firm fixed-price CLIN of $15,000 per month.  A70-(¶¶ C.5.1.8.1, C.5.1.8.2, C.5.1.9.2); *see also Medart*, 967 F.2d at 582; *Clearwater Forest*, 650 F.2d at 239; *Service Technicians*, 37 Fed. Cl. at 388.

Accordingly, summary judgment is appropriate for Ravens Group's negligent estimate claims under Counts I , II and III of the complaint, because Ravens Group has been fully paid according to the terms of firm fixed-price portion of the contract.  A160, 183; *see also ITT Arctic Servs., Inc. v. United States*, (524 F.2d 680, 691 (Ct. Cl. 1975) ("[w]e have consistently held that the contractor in a fixed-price contract assumes the risk of unexpected costs") (citations omitted).

### E.      The GFOQ Contract Is Not A Requirements Contract

 In Count IV of the complaint, Ravens Group alleges that the contract "made Ravens Group the sole and exclusive contractor for providing certain services for the GFOQ housing units," and that the Government breached to contract by assigning work to third party contractors.  *See* Compl. ¶¶ 60-61.  These allegations lack merit because the GFOQ contract is not a requirements contract.

The United States Court of Appeals for the Federal Circuit has held that "[a]n ID/IQ contract differs from a requirements contract in that the former does not oblige the buyer to purchase more from the seller that a stated minimum quantity, whereas the latter obliges the buyer to buy from the seller all of its requirements of the relevant goods and services." *Varilease Tech. Group, Inc. v. United States*, 289 F.3d 795, 799 (Fed. Cir. 2002) (citing *Travel Centre*, 236 F.3d at 1318-19); *see also J. Cooper & Assoc., Inc. v. United States*, 53 Fed. Cl. 8, 17 (2002)

("[a]n IDIQ contract does not provide any exclusivity to the contractor").

The GFOQ contract nowhere stated that it is a requirements contract, nor does the contract include a FAR requirements clause, *e.g.*, FAR § 216-21 (a requirements contract "calls for the government to fill all its actual requirements for specified supplies or services during the contract period by purchasing from the awardee. . . "). To the contrary, the GFOQ contract expressly stated that it was a "combination firm fixed-price indefinite quantity contract," with the IDIQ minimum quantity being the firm fixed-price portion of the contract. A62, A86 (¶¶ C.1.1, C.9.6).

Moreover, the contract included an entire section, C.6 "Indefinite Delivery Indefinite Quantity Work (IDIQ) United Priced Tasks," and included a standard FAR "Indefinite Quantity" clause, § 216-22, that unmistakably identify it as an IDIQ contract. A75 (¶ C.6), A55. The IDIQ portion of the GFOQ contract, therefore, is "plainly an ID/IQ contract." *See Varilease Tech.*, 289 F.3d at 799 (Fed. Cir. 2002); *see also Coast Fed. Bank*, 323 F.3d at 1038.

Nevertheless, the GFOQ contract included a single clause that suggests exclusivity, *e.g.*, that Ravens Group was to "[p]rovide all labor, materials, supplies, tools, equipment, transportation, management, and supervision as necessary to meet contract requirements." A62 (¶ C.1.2 "General Requirements"). A reasonable interpretation of this provision, however, is simply that Ravens Group was required to provide all labor, materials, and supplies, etc., as are "necessary to meet contract requirements," not that Ravens Group, exclusively, was to satisfy *all* of the Government's requirements on Fort Myer and Fort McNair. *See e.g.*, *Granite Constr.*, 962 F.2d at 1003. Moreover, in *Coyle's Pest Control, Inc. v. Cuomo*, which involved a contract that contained language similar to that in the GFOQ contract, *e.g.*, that Coyle was "to furnish all

labor, service, equipment [and pest control] . . . on assigned properties," the Federal Circuit held

that such language "falls short of the exclusivity language necessary for a requirements

contract," because the clause did not require the agency to assign "all properties in the region" to

Coyle.  *See* 154 F.3d 1302, 1305-06 (Fed. Cir. 1998).

Similarly, in the GFOQ contract the Government expressly reserved the right to perform

work in-house, *i.e.*, at its own expense:  "The Government may remove, replace, renovate or

improve facilities, equipment, systems, and components at the Government's expense."

A62 (¶ C.1.2).  In *Horn*, this Court held that where the Government reserved the right to perform

work "in-house," proved that a contract was not a requirements contract.  98 Fed. Cl. at 504-05

(holding that a Bureau of Prisons contract for dental hygienist services that gave the agency "the

unqualified discretion to fulfill its dental hygienist needs in-house," was not a requirements

contract).

Moreover, the GFOQ contract expressly cautioned Ravens Group against conducting

work at Fort Myer and Fort McNair that was being performed by *other* contractors:  "The

Contractor shall not conduct any work under this contract that is part of an existing requirements

contract already in-place at Fort Myer or Fort McNair."  A62 (¶ C.1.2).  Consistent with this

provision, requirements contractors provided painting and roofing services, and the utility Pepco

provided service on heating equipment that it owned in the GFOQ units.  A240 (Spellman

Deposition at p. 23-24).

The contract also contained a provision for "specific work," defined in relevant part as

"maintenance repair . . . alteration; minor construction work requirements; and miscellaneous

services which are not included in the Firm Fixed-Price portion of the contract," wherein it

states: "Housing work may also be accomplished by other means including self-help by occupants, *impact card purchases*, and the use of *other* prime Contractors." A80 (¶ C.7.1) (emphasis added). Thus, the contract's express allowance for "other" contractors to perform "housing work," further undermines Ravens Group's claim of exclusivity. *See e.g.*, *Horn*, 98 Fed. Cl. at 504-05.

In short, the GFOQ contract was not a requirements contract, and the Government was free to assign work to other contractors at Fort Myer and Fort McNair, without breaching the contract. *See Travel Centre*, 236 F.3d at1318-19; *Varilease Tech.*, 289 F.3d at 799; *Horn*, 98 Fed. Cl. at 504-05. Accordingly, the Government is entitled to summary judgment as to Count IV.

**F.      Ravens Group Performed Work On No More Than 49 Units**

Among the various allegations in the complaint, Ravens Group alleges that the contract required it to maintain 49 GFOQ housing units, but that it was actually "required to service and maintain 53 GFOQ housing units," *see* Compl. ¶ 34, and seeks $93,000 for the additional four units. A198. DCAA found, however, that Ravens Group "could not provide adequate support, including timesheets or other documentation in their books and records for the costs claimed for the additional quarters." A198. In short, Ravens Group's own records show that it performed service calls on no more than 49 different housing units, in compliance with the contract. A102-40 (Daily Status Report).

In order to establish a constructive change to a Government contract, a plaintiff "must show the performance of work in addition to or different from the work required under the contract, either by express or implied direction of the Government or by Government fault."

*Delhur Indus., Inc. v. United States*, 95 Fed. Cl. 446, 461 (2010) (citations omitted). With

respect to the number of GFOQ units it was required to service, Ravens Group cannot show that

the Government "expressly or impliedly" ordered it to perform work "that is not specified in the

contract." *See id*.

The contract scope of work required Ravens Group to provide "maintenance and repairs

for 49 GFOQ" units. A62 (¶ C.1.1). The Government provided Ravens Group with a list of the

49 GFOQ units at Fort Myer (34 units) and Fort McNair (15 units) to be maintained. A100-101.

Ravens Group tracked service calls for the specific quarters it worked upon using the Daily

Status Report. A102-40, A257 (Ballard Deposition).

A review of the Daily Status Report shows that Ravens Group responded to services

calls, and performed work at three units that were not identified on the Government list of 49

GFOQ units, *e.g.*, MY 24AU, MY25B, and MY26 B. *See* A106-107, A126 (Daily Status report,

job nos. 480 to 491 (MY 24AU), 512-13 (MY25B), and 943-45 (MY26B), respectively);

*compare* A100-101 (housing list). The Daily Status Report shows, however, that Ravens Group

did not document service calls, and did not perform work at three units that *were* identified in the

GFOQ housing list: MY22A, MY22B and MN09. A102-40 (Daily Status Report); *compare*

A100-101 (housing list). Furthermore, the Daily Status Report shows that Ravens Group

performed only IDIQ work on one of the units identified on the housing list, *e.g.*, MY 23BU, for

job no. 553. A109 (Daily Status Report); *compare* A100-101 (housing list).

In short, Ravens Group's own records show that it documented service calls, and

performed work on, no more than 49 *different quarters*, one of which was an IDIQ job no. 553

for MY23BU, for which Ravens Group was separately paid pursuant to an IDIQ task order. *See*

*e.g.*, A75 (¶ C.6.1).  Thus, Ravens Group's claim of performing "additional" work exceeding 49 units lacks merit.

### G.    Ravens Group's Miscellaneous Claims Lack Merit

The DCAA audit questioned Ravens Group's miscellaneous claims for answering service costs ($1,024), for an administrator's salary ($33,072), for equipment loan loss ($26,000), and for the deletion of CLIN 0001AF for custodial services ($62,000), noting that the contract specifically required Ravens Group to bear such costs, that Ravens Group failed to support its claims with proper documentation, and that under bilateral modification P00003, the requirement for custodial services went away.  A199-203.  A review of the contract supports the auditor's conclusions.

### i)    Answering Service

The contract, in paragraph C.1.2.1 "Management of Maintenance and Repair Services," stated that Ravens Group shall "[p]rovide for continuously attended service at all times" of a "24 hour per day," "Toll Free" answering service, and that "[t]he Contractor *shall pay for all expenses* related to the establishment and maintenance of the "Toll Free" telephone number." A62-63 (¶ C.1.2.1.) (emphasis added).  Because the contract plainly required Ravens Group to bear the cost of providing the answering service as part of the firm fixed-price contract, Ravens Group is not entitled to additional compensation for answering services.  *See Coast Fed. Bank*, 323 F.3d at 1038; *ITT Arctic*, 524 F.2d at 690-91; *Horn*, 98 Fed. Cl. at 503.

### ii)    Administrator's Salary

Paragraph C.1.1 of the contract required Ravens Group, in relevant part, to "[p]rovide all . . . . *management, and supervision* as necessary to meet contract requirements."  A62 (¶ C.1.2)

(emphasis added).  Paragraph C.4.1,"Contractor-Furnished Property," required Ravens Group, in

relevant part, to "[p]rovide all. . . *supervision* . . . administrative costs. . . to perform the

requirements of this contract."  A68 (¶ C.4.2) (emphasis added).  Thus, Ravens Group bore the

cost of its managers' and administrators' salaries as part of the firm fixed-price contract, and it is

not entitled to additional compensation. *See Coast Fed. Bank*, 323 F.3d at 1038; *ITT Arctic*, 524

F.2d at 690-91; *Horn v. United States*, 98 Fed. Cl. at 503.

### iii)      Equipment Loan Loss

Paragraph C.1.1 of the contract required Ravens Group, in relevant part, to "[p]rovide all

. . . . *materials, supplies, tools, equipment*. . . as necessary to meet contract requirements."

A62 (¶ C.1.2) (emphasis added).  Paragraph C.4.1 required Ravens Group, in relevant part, to

"[p]rovide all *equipment*, *tools*. . .to perform the requirements of this contract," as part of

contractor-furnished property.  A68  (¶ C.4.2) (emphasis added).  Thus, Ravens Group bore the

cost of its equipment and tools as part of the firm fixed-price contract, and it is not entitled to

additional compensation.  *See Coast Fed. Bank*, 323 F.3d at 1038; *ITT Arctic*, 524 F.2d at 690-

91; *Horn*, 98 Fed. Cl. at 503.

### iv)      Deletion Of Custodial Services

Among the firm fixed-price requirements in the contract, Ravens Group was to

"[p]rovide custodial services for Contractor occupied spaces."  A75 (¶ C.5.6).  CLIN 0001AF –

Custodial Services, provided reimbursement to Ravens Group of $5,700 per month for a total of

$68,400 for twelve months.  A16.  Paragraph C.1.2 stated that "[t]he Government reserves the

right, at any time, to modify the contract to make adjustments in the scope of work needed at

each site."  A62  (¶ C.1.2).

On or about April 18, 2005, Ravens Group and the Government executed bilateral modification P00003 that deleted the requirement for custodial services and reduced funding by $11,400, which represented the funding for the last four months of the contract. A94-97. Pursuant to the firm fixed-price contract, therefore, Ravens Group is not entitled to additional compensation for custodial services. *See Coast Fed. Bank*, 323 F.3d at 1038; *ITT Arctic*, 524 F.2d at 690-91; *Horn*, 98 Fed. Cl. at 503.

Under the plain and unambiguous terms of the GFOQ contract, Ravens Group cannot demonstrate that it is entitled to additional compensation. Accordingly, summary judgment in favor of the Government is appropriate.

## CONCLUSION

For these reasons, we respectfully request that the Court grant this motion and enter judgment in favor of the United States.

Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Kirk T. Manhardt
KIRK T. MANHARDT
Assistant Director

OF COUNSEL:

NATHAN J. BANKSON
Major, U.S. Army
Litigation Division
U.S. Army Legal Services Agency
Arlington, VA 22203
Telephone:  (703) 696-1618
Fax. (703) 696-8178

s/ Joseph A. Pixley
JOSEPH A. PIXLEY
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Joe.pixley@usdoj.gov
Telephone:  (202) 307-0843
Facsimile:   (202) 307-0972

October 12, 2012

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on the 12th day of October, 2012, a copy of the foregoing

"DEFENDANT'S MOTION FOR SUMMARY JUDGMENT" was filed electronically.  I

understand that notice of this filing will be sent to all parties by operation of the Court's

electronic filing system.  Parties may access this filing through the Court's system.


<u>s/Joseph A. Pixley</u>