**GFOQ DAILY SERVICE REPORT**

Monthly Service Report
Documented from 8/16/04 - 4/16/05

| Job# | Qtrs | Identified | Type | Category | Priority | Jobs | Open | Status Detail | Completion |
|------|------|-----------|------|----------|----------|------|------|---------------|------------|
| 771 | MY01 | 12/2/2004 | C | FF | R | The plexi glass blew out of the front storm door | N | scheduled 12/07 | 12/22/2004 |
| 772 | MY13B | 12/2/2004 | C | FF | E | There is a horrible smell coming from the radiator | N | No longer smells anything. Call back 1/03 to see if smell reoccurs. | 12/28/2004 |
| 773 | MY17 | 12/2/2004 | SUB | FF | C | Little black bugs all over kitchen | N | Completed | COMP |
| 774 | MN10 | 12/3/2004 | P/HVAC | FF | U | Heater on the 2nd floor is not working. Mice believes the heater needs to be bleed | N | COMPLETED | 12/7/2004 |
| 775 | MY06 | 12/3/2004 | P/HVAC | FF | R | Water faucet in kitchen sink is broken and needs replacement | N | Completed | COMP |
| 776 | MY24AU | 12/3/2004 | C | FF | R | Plaster is pealing off the wall in the 2nd living/sitting room | N | Kirk AFTER HOLIDAYS | 1/6/2005 |
| 777 | MY24AU | 12/3/2004 | GM | FF | R | Replace circuit board | N | SUB | 1/7/2005 |
| 778 | MY24AU | 12/3/2004 | E | FF | R | Casablanca ceiling fan in the kitchen is not working properly. The power button works but the light function button does not | N | In Progress | COMP |
| 779 | MN07 | 12/3/2004 | E | FF | R | Pull out trash can railing is sticking, WD40 did not work | N | Contractor's warranty DPW | COMP |
| 780 | MN07 | 12/6/2004 | GM | FF | R | Door that leads to 2nd floor staircase is missing an alien screw | N | Scheduled | 12/15/2004 |
| 781 | MN07 | 12/6/2004 | GM | FF | R | Dishwasher in kitchen does not work | N | Completed 10 Dec | COMP |
| 782 | MN08 | 12/6/2004 | GM | FF | R | Yard maintenance requested and Tree fungus reported | N | Fungus removed 12/8 | COMP |
| 784 | MN10 | 12/6/2004 | P/HVAC | FF | R | Filters need to be changed | N | Eugene scheduled 9 Dec | COMP |
| 785 | MN15 | 12/6/2004 | P/HVAC | FF | R | Filters need to be changed | N | | COMP |
| 786 | MY02 | 12/6/2004 | GM | DPW | R | Has some grease that needs to be disposed of. Garbage men won't pick up | N | EMO | COMP |
| 787 | MY20A | 12/6/2004 | P/HVAC | FF | R | Motor not working in 2nd floor (tan cold) | N | Eugene 12/06 (TBS) | 12/7/2004 |
| 788 | MY27B | 12/6/2004 | GM | FF | U | Pilot in the living room/fireplace wont light. Mrs. J believes the logs are clogged | N | Jack's Fireplace | COMP |
| 985 | MN10 | 12/6/04 | P/HVAC | FF | U | Pipe insulation saturated and water dripping by boiler | N | | 2/25/2005 |
| 789 | MN07 | 12/7/2004 | E | FF | R | A portion of qtrs sidewalk lights has stopped working | N | Bulbs In Schedule | COMP |
| 790 | MY07 | 12/7/2004 | E | FF | R | A portion of qtrs sidewalk lights has stopped working | N | | COMP |
| 791 | MY15A | 12/7/2004 | P/HVAC | FF | R | Replace pressure relief valve for hot water heater (150 PSI) | N | Eugene need to obtain part | 1/18/2005 |

C - Carpentry
P/HVAC - Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC - Pre-Contract
FF - Firm Fixed Price

Administrative errors in service call count deleted - Job no. not affected

18 of 40
Rev.3/9/05



# GFOQ DAILY REPORT

Monthly Services Report
Documented from 8/16/04 - 4/15/05

| Job# | Qtrs | Identified | Type | Category | Priority | Job | Open | Status Detail | Completion |
|---|---|---|---|---|---|---|---|---|---|
| 792 | MY13A | 12/8/2004 | GM | FF | R | Crickets in the basement | N | | COMP 1/5/2005 |
| 793 | MY20A | 12/8/2004 | P/HVAC / C | FF | R | Repair ceiling in 1st floor office that was caused by tub leak. | N | 1/5/2005 | |
| 794 | MY27B | 12/8/2004 | C | FF | R | The hydraulic pump on the front screen door does not work. The pump also needs to be renumered | N | | COMP |
| 795 | MN11 | 12/9/2004 | SUB P/HVAC | FF | R | Tree in front of qtrs needs branches cut. Mrs. Sharp feels this is a safety hazard | N | Vincent | COMP COMP |
| 796 | MN11 | 12/9/2004 | GM/C | FF | R | Toilet in guest bathroom does not flush | N | | COMP |
| 797 | MY14B | 12/9/2004 | C | FF | R | Back steps railing has rusted and fell off. Shutters are needed for attic windows | N | | 12/15/2004 |
| 798 | MY24AU | 12/9/2004 | C | FF | R | 3rd floor closet needs holes filled that lead to the attic | N | | 12/17/2004 |
| 799 | MY24AU | 12/9/2004 | C | FF | R | Front and Back screen doors are both scrubbing | N | | COMP |
| 800 | MY27B | 12/9/2004 | GM | FF | R | New name plate needed | N | | COMP |
| 801 | MY12B | 12/10/2004 | GM | FF | U | Puddle of water under the sink | N | | COMP |
| 802 | MY19A | 12/10/2004 | P/HVAC | FF | U | Tree limb is dangling over the sidewalk in front of the house | N | Email inquiring about status sent 1/7/05, awaiting response from Lisa/EMO | 12/29/2004 |
| 803 | MN13 | 12/13/2004 | GM | FF | R | Whole in the screen door on back porch | N | | 12/17/2004 |
| 804 | MY05 | 12/13/2004 | C | FF | R | Faucet over tub is still leaking | N | | 12/16/2004 |
| 805 | MY05 | 12/13/2004 | P/HVAC | FF | U | No heat on the 3rd floor | N | | 12/16/2004 |
| 806 | MY05 | 12/13/2004 | GM | | | Drilling in the walls and stopped a water | N | | |
| 807 | MY24B | 12/13/2004 | GM | FF | E | pipe in the basement and has a leak | N | sprayed by superior | COMP 12/20/2004 |
| 808 | MY26A | 12/13/2004 | SUB | FF | R | Bugs in kitchen and basement | N | Proposal resubmitted to EMO 3/17/05 | 3/17/2005 |
| 783 | MN10 | 12/14/04 | P/HVAC | IDIQ | R | Pipes in basement have built up mold on them | N | | COMP |
| 810 | MN1 | 12/14/2004 | E | FF | R | All the lights on the left side of the front walkway are out/not working | N | | COMP |
| 811 | MN1 | 12/14/2004 | P/HVAC | FF | R | 3rd floor shower has no water/pressure | N | | COMP |
| 812 | MN11 | 12/14/2004 | P/HVAC | FF | E | 1st, 2nd, and 3rd floor fan coil not heating working | N | Eugene completed 12/14 | COMP |
| 813 | MN15 | 12/14/2004 | P/HVAC | FF | U | No heat in the middle room on the 3rd floor | N | | COMP |
| 814 | MY20B | 12/14/2004 | GM | FF | R | Fancoil filters need to be changed | N | | COMP |
| 815 | MY21B | 12/14/2004 | P/HVAC | FF | U | Heater is blowing out cold air. This fluctuates from day to day between hot and cold | N | | COMP |

C - Carpentry
P/HVAC - Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC - Pre-Contract
FF- Firm Fixed Price

Administrative errors in service call count deleted - Job no. not affected

Monthly Service Report
Documented from 8/15/04 - 4/16/05

## GFOQ DAILY ... S REPORT

| Job# | Qtrs | Identified | Type | Category | Priority | Job | Open | Status Detail | Completion |
|---|---|---|---|---|---|---|---|---|---|
| 816 | MY26A | 12/14/2004 | P/HVAC | FF | E | Flood in the basement (Possible snake site) drains | N | Eugene completed 12/14 | COMP |
| 817 | MY07 | 12/15/2004 | P/HVAC/ C | FF | R | Tub in the attic still needs to be snaked properly | N | | 12/16/2004 |
| 818 | MY07 | 12/15/2004 | P/HVAC/ C | FF | R | Sink in master bathroom needs to be snaked also. Painted wood ceilings are coming through faucet | N | | 12/16/2004 |
| 819 | MY11A | 12/15/2004 | P/HVAC | FF | R | No heat in the Gen office (2nd fl) and in daughters room (3rd fl) | N | | 12/16/2004 |
| 820 | MY11A | 12/15/2004 | GM | FF | R | Remove branch across the roof of the front porch | N | | 12/16/2004 |
| 821 | MY21B | 12/15/2004 | P/HVAC | FF | R | Tub is still draining slow | N | Kirk  AWAITING APPROVAL | 12/20/2004 |
| 822 | MY26A | 12/15/2004 | C | FF | R | 2 windows in the basement need wiremesh or metal bars on windows | N | Kirk  AWAITING APPROVAL | 1/8/2005 |
| 823 | MY26A | 12/15/2004 | C | FF | R | A passenger lock is needed on basement door | N | Kirk  AWAITING APPROVAL | 1/8/2005 |
| 824 | MY26A | 12/15/2004 | C | FF | R | Needs a metal door installed in basement | N | Kirk  AWAITING APPROVAL | 1/8/2005 |
| 825 | MY27B | 12/15/2004 | E | FF | R | Fuses need to be replaced in the fuse box. Space heater keeps shutting them out (15 and 20) | N | | COMP |
| 826 | MY27B | 12/15/2004 | EXT | FF | R | Rodents found in the kitchen pantry | N | Traps laid by Superior 12/20 | 12/20/2004 |
| 827 | MY02 | 12/16/2004 | GM | FF | E | No water at all in the qtrs | N | | COMP |
| 828 | MY11A | 12/16/2004 | P/HVAC | FF | U | Master bedroom has no heat | N | | COMP |
| 829 | MY21A | 12/16/2004 | E | FF | R | Lights outside of the side porch are out | N | | COMP |
| 830 | MN10 | 12/20/2004 | P/HVAC | FF | U | study and sunporch on 2nd flr and 2 bedrooms on the 3rd flr do not have any heat | N | | 12/20/2004 |
| 831 | MN11 | 12/20/2004 | P/HVAC | FF | U | Basement pipe leaking badly | N | | COMP |
| 832 | MN11 | 12/20/2004 | P/HVAC | FF | U | No heat on the 3rd floor | N | All season control | COMP |
| 833 | MY02 | 12/20/2004 | P/HVAC | FF | U | Basement unit has a leak that is making a loud noise | N | | 12/21/2004 |
| 834 | MN04 | 12/21/2004 | P/HVAC | FF | U | 3 Feet of water flooding basement/water pipe burst | N | eugene/L&G 12/21 | COMP |
| 835 | MN07 | 12/21/2004 | C | FF | R | Repair storm door-spring/arm attachment | N | | COMP |
| 836 | MN10 | 12/21/2004 | P/HVAC | FF | U | Toilet not working in generals bathroom | N | | COMP |
| 837 | MY12B | 12/21/2004 | GM | FF | R | Front screen door handle is stuck/broken | N | | COMP |
| 838 | MY16A | 12/21/2004 | P/HVAC | FF | U | No heat. Units blowing cold air | N | | COMP |
| 839 | MY02 | 12/22/2004 | P/HVAC | FF | U | Boiler leaking on floor from overflow | N | | 12/22/2004 |
| 840 | MY11A | 12/22/2004 | P/HVAC | FF | U | No heat in the Gen office 3rd floor | N | | COMP |

C- Carpentry
P/HVAC - Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC - Pre-Contract
FF- Firm Fixed Price

Administrative errors in service call count deleted - Job no. not effaced

**GFOQ DAILY SERVICE REPORT**

Monthly Service Report
Documented from 8/16/04 - 4/16/05

| Job# | Qtrs | Identified | Type | Category | Priority | Job | Open | Status Detail | Completion |
|---|---|---|---|---|---|---|---|---|---|
| 841 | MY15B | 12/22/2004 | P/HVAC | FF | R | Boiler room thermometers needs replacing | N | COMP | COMP |
| 868 | MY05 | 12/22/2004 | P/HVAC | FF | U | No heat in the back of the qtrs. | N | COMP | COMP |
| 842 | MN15 | 12/23/2004 | E | IDIQ | R | Need ground rods for communication systems | N | EMO/DOIM revalidating AFH requirement | 12/22/2004 |
| 843 | MN10 | 12/27/2004 | E | IDIQ | R | Need ground rods for communication systems | N | EMO/DOIM revalidating AFH requirement | 12/27/2004 |
| 1066 | MY15A | 12/22/2004 | E | IDIQ | R | Kitchen fan coil motor not working | N | waiting for occupant to reschedule 4 hrs | 12/23/2005 |
| 1065 | MN14 | 12/22/2004 | E | IDIQ | R | 2nd floor study fan coil not heating | N | | 12/27/2004 |
| 844 | MY13B | 12/27/2004 | GM | FF | R | Dryer is not working. Fuses are not the issue | N | Doc | 1/10/2005 |
| 845 | MY13B | 12/28/2004 | E | FF | R | Please check dryer. It is not working | N | COMPLETE | 12/30/2004 |
| 846 | MY15B | 12/29/2004 | E | FF | R | Ground rod installation | N | | COMP |
| 847 | MN10 | 1/3/2005 | P/HVAC | FF | R | Heater in basement continuously runs and doesn't heat | N | Eugene scheduled on 2/3/05 | 2/3/2005 |
| 848 | MN10 | 1/3/2005 | P/HVAC | FF | R | Heater in basement continuously runs and doesn't heat | N | assessed 12/29/04 Parts on order Kirk assessing on 2/3/05 | COMP |
| 849 | MY06 | 1/3/2005 | C | FF | R | Check ceiling in laundry room for water damage | N | | 2/9/2005 |
| 850 | MY06 | 1/3/2005 | P/HVAC | FF | U | Repair the leak underneath the kitchen sink. | N | Eddie? | 1/6/2005 |
| 851 | MY07 | 1/3/2005 | P/HVAC | FF | U | Heat pump on 1st floor does not work. | N | Eugene | 1/3/2005 |
| 853 | MY25B | 1/3/2005 | E | FF | R | Move data com power supply to the opposite wall | N | | 1/4/2005 |
| 854 | MY27A | 1/3/2005 | C | FF | R | Front door, door knob keeps falling | N | Trying to match identical knob | 2/22/2005 |
| 855 | MY27B | 1/3/2005 | P/HVAC | FF | R | 1st floor toilet keeps running | N | ? | 1/21/2005 |
| 11063 | MY19A | 1/3/2005 | LM | IDIQ | R | Removal of the dead tree in the front yard | N | In progress 4/29/05 | 5/3/2005 |
| 856 | MN12 | 1/4/2005 | EMO | FF | R | Repair or replace triple track storm window in master bathroom | N | Duplicate | 1/4/2005 |
| 857 | MY01 | 1/4/2005 | GM | FF | R | Water filler needs to be replaced on the water line to the ice maker | N | Eddie | 1/5/2005 |
| 858 | MY01 | 1/4/2005 | EXT | FF | E | Mice running around on the 2nd floor and the kitchen counters | N | SUB | 1/4/2005 |
| 859 | MY02 | 1/4/2005 | C | FF | R | Front door knob is missing a screw. Have to dead bolt door in order for it to close | N | Eddie | 1/7/2005 |
| 860 | MY05 | 1/4/2005 | C | FF | R | Garage door opener does not work | N | | 1/7/2005 |
| 861 | MY08 | 1/4/2005 | P/HVAC | FF | R | Chain on toilet has broken. 2nd floor bathroom | N | Eddie | 1/8/2005 |

C- Carpentry
P/HVAC - Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC - Pre-Contract
FF- Firm Fixed Price

21 of 40
Rev.3/9/05

Administrative errors in service call count deleted - Job no. not affected

# GFOQ DAILY ... S REPORT

Monthly Service ... Report
Documented from 8/16/04 - 4/16/05

C - Carpentry
PIHVAC - Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC - Pre-Contract
FF- Firm Fixed Price

| Job# | Qtrs | Identified | Type | Category | Priority | Job | Open | Status Detail | Completion |
|---|---|---|---|---|---|---|---|---|---|
| 862 | MY02 | 1/5/2005 | C | FF | R | Electrical outlets on the wall with the sink do not work from time to time | N | Dan assessed and made recommendations 1/05/05 | 1/11/2005 |
| 863 | MY02 | 1/5/2005 | C | FF | R | Needs a new deep freezer | N | | 1/6/2005 |
| 864 | MY05 | 1/5/2005 | EXT | FF | U | Critters were heard running around the attic | N | SUB / COMP | 1/14/2005 |
| 865 | MY13A | 1/6/2005 | GM | FF | R | Front porch door knob is dysfunctional | N | Darrell/ Eddie | 1/14/2005 |
| 866 | MY13A | 1/6/2005 | PIHVAC | FF | R | Guest bathroom on the main floor flushes inconsistently | N | Darrell | 1/14/2005 |
| 867 | MY13A | 1/6/2005 | GM | FF | R | Back porch door broke at the wooden joint attaching it to the door closing mechanism | N | Darrell/ Eddie | 1/14/2005 |
| 869 | MY21A | 1/6/2005 | PIHVAC | FF | U | Heat pump went out | N | Eugene | 1/20/2005 |
| 870 | MY21B | 1/6/2005 | PIHVAC | FF | R | Down stairs toilet is leaking | N | Eugene | 1/19/2005 |
| 871 | MY24AU | 1/6/2005 | PIHVAC | FF | R | Heat pumps in the basement are making loud noises | N | Eugene | 1/10/2005 |
| 872 | MN06 | 1/7/2005 | E | FF | R | Lights outside of qtrs 60 not come on. Nor do they on MN06 | N | Doc | 1/19/2005 |
| 873 | MY27A | 1/7/2005 | LM | IDIQ | R | Extract two trees from quarters | N | Proposal submitted to EMO 1/7/05. Resubmitted 3/17/05 | 5/3/2005 |
| 875 | MY21A | 1/7/2005 | PIHVAC | FF | E | Heat is not working | N | Eugene | 1/20/2005 |
| 939 | MY06 | 1/7/2005 | ENV | IDIQ | R | Sewer line replacement | N | Detailed report received 4/1/05 | 4/1/2005 |
| 876 | MN05 | 1/7/2005 | C | FF | R | Kitchen window seals are cracking to the point that the windows may fall out | N | Darrell is scheduled on 2/7/05 | 2/7/2005 |
| 877 | MN06 | 1/7/2005 | E | FF | R | Door bell can not be heard on the 3rd floor | N | Doc scheduled on 2/3/05 | 2/4/2005 |
| 878 | MY13A | 1/10/2005 | C | FF | R | On the hydraulic pump the round piece that holds the door open is not there | N | Darrell | 1/14/2005 |
| 879 | MY20B | 1/10/2005 | PIHVAC | FF | U | No heat in her mother's room | N | Eugene | 1/10/2005 |
| 881 | MY24B | 1/10/2005 | E | FF | R | 3rd floor bathroom needs plugs for extra appliances | N | Doc | 2/28/2005 |
| 882 | MY24B | 1/10/2005 | E | FF | R | light fixture in bedroom needs a wall plug | N | Doc | 2/28/2005 |
| 883 | MY24B | 1/10/2005 | C | FF | R | kitchen window cracked and stuck from paint | N | Eddie | COMP |
| 884 | MY24B | 1/10/2005 | C | FF | R | window in master bath needs to be sealed | N | Kirk | COMP |
| 885 | MY24B | 1/10/2005 | E | FF | R | master bathroom needs an additional light plug/ light is falling from the ceiling | N | Doc (nice to have) | COMP |
| 886 | MY24B | 1/10/2005 | E | FF | R | Overhead light fixture needs to be installed in 3rd floor bedroom | N | Doc (nice to have) | COMP |

## GFOQ DAILY LOSS REPORT

| Job# | Qtrs | Identified | Type | Category | Priority | Job | Open | Status Detail | Completion |
|---|---|---|---|---|---|---|---|---|---|
| 887 | MY24B | 1/10/2005 | E | IDIQ | R | Dining room needs additional sockets | N | Submitting cost proposal 3/16/05 | COMP |
| 888 | MY24B | 1/10/2005 | E | FF | R | Master bedroom needs another room switch | N | Doc (nice to have) | COMP |
| 889 | MY24B | 1/10/2005 | GM | FF | R | Need to install and reinstall a new hydraulic pump- front | N | Kirk | 2/9/2005 |
| 889 | MY24B | 1/10/2005 | E | FF | R | Bathroom light is twisting/loose/ one light hanging out about 6 inches | N | Doc assessed 1/10/05 | 1/12/2005 |
| 890 | MY24B | 1/10/2005 | E | FF | R | keys needed for qtrs. garage, shed, trash room | N | | COMP |
| 891 | MY24B | 1/10/2005 | GM | FF | R | Metal bars needed for closets | N | Scheduled week of 3/25/05 @0900 | 3/25/2005 |
| 1068 | MY24B | 1/10/2005 | C | FF | R | Cabinets need to be installed (remaster) | N | Aide would like to schedule work for 1/14 @1000 | 1/14/2005 |
| 892 | MY01 | 1/11/2005 | C | FF | R | Cabinets need to be installed in the brown bathroom | N | Aide would like to schedule work for 1/14 @1000 | 1/14/2005 |
| 893 | MY01 | 1/11/2005 | C | FF | R | bathroom on the 2nd floor | N | Aide would like to schedule work for 1/14 @1000 | 1/14/2005 |
| 894 | MY01 | 1/11/2005 | C | FF | R | Cabinets need to be installed in the office bathroom | N | Aide would like to schedule work for 1/14 @1000 | 1/14/2005 |
| 895 | MY01 | 1/11/2005 | C | FF | R | Tea towel bar and Tea tip towel bar in the master bath | N | Aide would like to schedule work for 1/14 @1000 | 1/14/2005 |
| 896 | MY01 | 1/11/2005 | C | FF | R | Tea round towel bar in the library bathroom | N | Aide would like to schedule work for 1/14 @1000 | 1/14/2005 |
| 897 | MY01 | 1/12/2005 | C | FF | U | Basement door needs to be weather stripped. | N | assess 2/15/05 | 2/15/2005 |
| 898 | MY01 | 1/12/2005 | C | FF | R | Toilet in 2nd floor guest bathroom continuously runs | N | Aide would like to schedule work | 2/15/2005 |
| 899 | MY01 | 1/12/2005 | C | FF | R | Toilet in 1st floor library occasionally runs | N | Aide would like to schedule work for 1/14 @1000 | 1/14/2005 |
| 900 | MY01 | 1/12/2005 | GM | FF | U | Black foam to block holes | N | scheduled on 2/8/05 | COMP |
| 901 | MN10 | 1/13/2005 | C | FF | R | Wall on staircase 2nd flight of stairs the wall is bubbled up | N | Eugene scheduled on 2/3/05 | 2/9/2005 |
| 902 | MN10 | 1/13/2005 | P | FF | R | Heater in basement- the vents have leaked on dirt | N | waiting for occupant to reschedule | 2/3/2005 |
| 903 | MY20A | 1/13/2005 | GM | FF | R | Master bathroom door doesn't block | N | waiting for occupant to reschedule | 2/8/2005 |
| 904 | MY20A | 1/13/2005 | C | FF | R | Main floor guest bathroom door doesn't close correctly | N | | 2/8/2005 |
| 905 | MY20A | 1/13/2005 | C | FF | R | Door to the master bedroom does not lock | N | | COMP |
| 906 | MY01 | 1/14/2005 | C | FF | U | The exercise room has water running down the wall, from the ceiling and out of the light switch on the wall | N | | 2/8/2005 |

C - Carpentry
PH- HVAC- Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC - Pre-Contract
FF- Firm Fixed Price

Administrative errors in service call count deleted - Job no. not affected

**GFOQ DAILY ... REPORT**

Monthly Service ... Report
Documented from 8/16/04 - 4/15/05

| Job# | Qtrs | Identified | Type | Category | Priority | Job | Open | Status Detail | Completion |
|---|---|---|---|---|---|---|---|---|---|
| 907 | MY20B | 1/16/2005 | P/HVAC | FF | E | No heat in qtrs | N | EMO lead/RO PM completed/Awaiting trane | 1/16/2005 |
| 874 | MY06 | 1/18/2005 | P/HVAC | EMO | R | Thermostats for zones 1 & 2 of AHU #1 are not responding | N | Doc | 1/18/2005 |
| 908 | MN06 | 1/18/2005 | E | FF | U | Down to two lights in the kitchen | N | checking warranty | 1/19/2005 |
| 909 | MN07 | 1/18/2005 | GM | EMO | R | Trash drawer won't pullout | N | | COMP |
| 910 | MY02 | 1/18/2005 | P/HVAC | FF | U | No heat is coming through the 2nd floor guest room Zone 1 of AHU #2 and the master bedroom (zone 1 of AHU #3 | N | SUB | 1/24/2005 |
| 912 | MY06 | 1/18/2005 | P/HVAC | FF | R | Icemaker does not drain; the water has to be drained manually | N | | COMP |
| 913 | MY06 | 1/18/2005 | P/HVAC | FF | R | No heat in the basement, 1st and 2nd floor are lukewarm | N | Eugene | 1/18/2005 |
| 914 | MY02 | 1/19/2005 | P/HVAC | FF | U | Back door bell does not work | N | | COMP |
| 915 | MY24B | 1/19/2005 | E | FF | R | 1st floor bathroom sink doesn't drain properly | N | | 1/19/2005 |
| 916 | MY27B | 1/19/2005 | P | FF | R | Refrigerator water line busted | N | Gene | 1/21/2005 |
| 917 | MN04 | 1/20/2005 | P | FF | E | Master bathroom sink is leaking underneath | N | | 1/20/2005 |
| 918 | MN05 | 1/20/2005 | P | FF | R | No hot water in the qtrs | N | | 1/21/2005 |
| 919 | MY02 | 1/20/2005 | P/HVAC | FF | U | No heat in the qtrs | N | | 1/21/2005 |
| 920 | MY21A | 1/20/2005 | P/HVAC | FF | U | Needs a bag of salt | N | | 1/20/2005 |
| 921 | MY08 | 1/21/2005 | GM | FF | R | Sewer backup | N | Eugene | 1/21/2005 |
| 922 | MY19A | 1/22/2005 | P/HVAC | FF | E | Request for exterminator to come back out to qtrs | N | SUB traps placed and waiting to come back after 2/19/05 | 12/22/2005 |
| 880 | MY26A | 1/24/2005 | SUB | FF | R | Downstairs bathroom has no cold water | N | | 3/1/2005 |
| 923 | MN05 | 1/24/2005 | P/HVAC | FF | U | No heat in 3 of the bedrooms- also there is a faucet that is not working | N | gene @ 0200 | 1/24/2005 |
| 924 | MN10 | 1/24/2005 | P/HVAC | FF | U | Heaters are blowing out lukewarm air | N | | 1/24/2005 |
| 925 | MY02 | 1/24/2005 | HVAC | FF | U | GENS now has garages that need snow removal | N | | 1/24/2005 |
| 926 | MY11A | 1/24/2005 | GM | FF | R | Paint is pealing on ceiling in the 2nd floor bathroom | N | DPW concern | 1/24/2005 |
| 928 | MY26A | 1/24/2005 | C | FF | R | Paint is pealing on ceiling in the 2nd floor bathroom | N | Eddie | 2/7/2005 |
| 929 | MY26A | 1/24/2005 | C | FF | R | Water in bathroom is continuously running | N | Eddie | 2/7/2005 |
| 931 | MN06 | 1/25/2005 | P/HVAC | FF | E | Water is on the floor | N | | 1/25/2005 |
| 930 | MN05 | 1/25/2005 | E | FF | E | Back flood lights do not work | N | | 1/25/2005 |
| 932 | MN06 | 1/25/2005 | C | FF | R | Door is half painted as a result of prior work | N | | 12/7/2005 |

C- Carpentry
P/HVAC - Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC - Pre-Contract
FF- Firm Fixed Price

Administrative errors in service call count deleted - Job no. not affected

## GFOQ DAILY MIS REPORT

| Job# | Qtrs | Identified | Type | Category | Priority | Job? | Open | Status Detail | Completion |
|---|---|---|---|---|---|---|---|---|---|
| 933 | MY01 | 1/25/2005 | EMO | FF | U | The silver refrigerator in the kitchen, keeps dripping oil from the fan unit inside | N | Tide water to come out 2/3/05 | 2/10/2005 |
| 934 | MY13A | 1/25/2005 | P/HVAC | FF | R | There is no heat in the basement guest room | N | | 1/27/2005 |
| 935 | MY16A | 1/25/2005 | P/HVAC | FF | E | Pipe busted- the grounds are saturated outside of the qtrs. | N | Exterior work weather is key factor scheduled on 2/7/05 | 2/23/2005 |
| 936 | MY16A | 1/25/2005 | P/HVAC | FF | U | Water is coming up from the floor where through the floor | N | | 1/25/2005 |
| 940 | MY05 | 1/26/2005 | P/HVAC | FF | R | Faucet in tub is leaking | N | | 2/3/2005 |
| 941 | MY05 | 1/26/2005 | C | FF | R | Trim on window needs to be repaired | N | | 2/10/2005 |
| 1047 | MY05 | 1/26/2005 | P/HVAC | FF | R | Faucet in tub is leaking | N | | 3/4/2005 |
| 927 | MY26B | 1/27/2005 | E | FF | R | Requests to have some chandeliers that they would like to have moved | N | Occupant called private contractor Scheduled 3/18 @ 900 3/17/2005 | 3/17/2005 |
| 937 | MN12 | 1/27/2005 | GM | IDIQ | R | Replacement of missing storm and wire screen window panels in various areas | N | Proposal accepted 8/16/05 | 9/20/2005 |
| 938 | MN06 | 1/27/2005 | C | IDIQ | R | Refinish and sand front/door foyer floor | N | EMO approved proposal | 5/20/2005 |
| 943 | MY26B | 1/27/2005 | GM | FF | R | Fireplaces won't light | N | Jack's scheduled 1/28 @ 1000/ Assessed, waiting for a proposal | 1/28/2005 |
| 944 | MY26B | 1/27/2005 | P/HVAC | FF | U | shower is running cold/water master bedroom has no heat/ shower is lukewarm | N | Gene scheduled 1/28 10:00 | 1/28/2005 |
| 945 | MY26B | 1/27/2005 | P/HVAC | FF | U | No water in the kitchen/ DPW turned water off last night and when water was turned back on the kitchen water never came back on | N | Gene scheduled 1/28 10:00 | 1/28/2005 |
| 946 | MY25B | 1/28/2005 | P/HVAC | FF | U | Can there be a light installed on the outside of the qtrs to illuminate the flag at night | N | gene fixed | 1/28/2005 |
| 947 | MY14A | 1/31/2005 | E | IDIQ | R | Flagpole in front of the needs to be repaired as a result of the recent harsh weather conditions. | N | Forwarded to RO/EMO | 2/23/2005 |
| 948 | MY14A | 1/31/2005 | GM | FF | R | Replace thermostats | N | Grady | 2/11/2005 |
| 949 | MY07 | 2/1/2005 | P/HVAC | FF | R | Knob on fireplace is broken | N | | COMP |
| 950 | MY14A | 2/1/2005 | GM | FF | R | Fan coil in the dining rm & living room continue to heat even after they are turned off. | N | | COMP |
| 951 | MY14B | 2/1/2005 | P/HVAC | FF | R | | N | Eugene assessed on 2/1/05 and need to order parts | 2/18/2005 |
| 952 | MY14B | 2/2/2005 | GM | FF | R | Fireplace in the living room does not light | N | Jack's is scheduled 2/3/05 | 2/4/2005 |

C- Carpentry
P/HVAC - Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC - Pre-Contract
FF- Firm Fixed Price

Administrative errors in service call count deleted - Job no. not affected

**GFOQ DAILY SERVICE REPORT**

Monthly Service Support Report
Documented from 8/16/04 - 4/16/05

| Job# | Qtrs | Identified | Type | Category | Priority | Job | Open | Status Detail | Completion |
|---|---|---|---|---|---|---|---|---|---|
| 954 | MY15B | 2/2/2005 | C | FF | R | Reinstall the screen on the porch | N | Kirk | 2/11/2005 |
| 955 | MY15B | 2/2/2005 | C | FF | R | NO heat in basement | N | | 2/9/2005 |
| 956 | MY15B | 2/2/2005 | C | FF | R | Basement door needs 2 rveiled wood screws installed on the side; boat on inside of the door | N | | 2/6/2005 |
| 957 | MN12 | 2/3/2005 | | FF | R | Fix oven so convection fan operates | N | Peaco SUB Aide has requested the status whirpool gold convec oven- serial x93401086- model 68530?rdq | 3/4/2005 |
| 958 | MN12 | 2/3/2005 | C | FF | R | Rdbe hook in master bathroom | N | Technician needs to return to install hooks | 3/10/2005 |
| 959 | MN12 | 2/3/2005 | C | FF | R | Latch for screen door in basement | N | Aide has requested the status | 2/25/2005 |
| 960 | MN12 | 2/3/2005 | C | FF | R | Screen and storm window for master bath | N | Aide has requested the status | COMP |
| 961 | MN12 | 2/3/2005 | C | FF | R | Key for exterior furnace room door | N | Received cost proposal from Areas 4/11/05 | 3/25/2005 |
| 1045 | MY02 | 2/4/05 | GM | IDIQ | R | Need a 33(3/4) x 64" white shade for master bath | N | SUB Peaco appliance 2/9/05 @ 1400-1700 | 2/10/2005 |
| 962 | MY20A | 2/6/2005 | GM | FF | R | Oven is inop. Range is operable. | N | SUB | 2/16/2005 |
| 963 | MY13A | 2/7/2005 | GM | FF | R | Four broken shades -bedroom, dining room, hallway | N | Grady | 2/16/2005 |
| 964 | MY20A | 2/7/2005 | GM | FF | R | Bedroom doors needs a key | N | Rodney | COMP |
| 965 | MY26A | 2/7/2005 | LM | FF | R | deliver 3 (60 lbs) bags of fill dirt | N | Aide on leave/Need to install door moldings- scheduled 3/18/05 | COMP |
| 809 | MN10 | 2/8/05 | C | FF | R | 2 door frames have rotted in the basement | N | @1300 | 3/18/2005 |
| 967 | MN13 | 2/8/2005 | E | FF | R | Pole light in front of the qtrs is not working | N | | 2/9/2005 |
| 968 | MN13 | 2/8/2005 | E | FF | R | Security spot lights on the back side of the qtrs (the south pah) has burned out | N | | 2/9/2005 |
| 969 | MN13 | 2/8/2005 | E | FF | R | Recessed ceiling lights in the kitchen needs to be removed | N | | 2/9/2005 |
| 970 | MY11B | 2/8/2005 | E | FF | R | Kitchen sink is stopped up. The qtrs does not have any warm air coming through the registers | N | | 2/9/2005 |
| 971 | MY01 | 2/9/2005 | PHVAC | FF | U | Door knobs -3rd floor bedroom-door to rear stairs needs replacing | N | Kirk | 2/10/2005 |
| 973 | MY27B | 2/9/2005 | C | FF | R | Glass-3rd floor bathroom- needs replacing; woodwork- need a hole in 3rd floor bedroom covered; has oped vents | N | Kirk | 2/17/2005 |
| 974 | MY27B | 2/9/2005 | C | FF | R | | N | Darrell | 2/17/2005 |
| 976 | MY27B | 2/9/2005 | C | FF | R | | | | |

C- Carpentry
PHVAC - Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC - Pre-Contract
FF- Firm Fixed Price

Administrative errors in service call count deleted - Job no. not affected

# GFOQ DAILY STATUS REPORT

Monthly Service Call Report
Documented from 8/16/04 - 4/16/05

| Job# | Qtrs | Identified | Type | Category | Priority | Jobs | Open | Status Detail | Completion |
|---|---|---|---|---|---|---|---|---|---|
| 998 | MY07 | 2/18/2005 | P/HVAC | FF | R | Heating system needs water regularly. | N | | 2/22/2005 |
| 999 | MY07 | 2/18/2005 | P | FF | R | 2nd fl master bath needs new fill valve for toilet. | N | | 2/22/2005 |
| 1000 | MY07 | 2/18/2005 | P | FF | R | Toilet in the basement is continuously running. | N | | 2/22/2005 |
| 1001 | MY07 | 2/22/2005 | LM | FF | R | shrubs need to be pruned. | N | | 2/24/2005 |
| 1002 | MY15A | 2/22/2005 | GM | IDIQ | R | Empty boxes behind curb needs to be removed | N | | 2/23/2005 |
| 1003 | MY20A | 2/22/2005 | GM | FF | R | Fireplace won't light in the living room. | N | CDCC Approved | 2/22/2005 |
| 994 | MY01 | | C | IDIQ | R | Hang board in the hallway and install 5 or 6 brass hooks on it | N | EMO approved, Awaiting CDCC approval | 3/4/2005 |
| 1005 | MY14B | 2/23/2005 | P/HVAC | FF | R | Bath tub stoppers is broken | N | | 2/24/2005 |
| 1006 | MY15A | 2/23/2005 | E | FF | U | Overhead lights in the kitchen do not work. | N | | 2/23/2005 |
| 1053 | MY14B | 2/23/2005 | E | IDIQ | R | Wants a light installed over the flag | N | Proposal submitted 3/3/05, denied | 3/2/2005 |
| 1054 | MY14A | 2/23/2005 | E | IDIQ | R | Wants a light installed over the flag | N | Proposal submitted 3/3/05, CDCC | 2/23/2005 |
| 1055 | MY13A | 2/23/2005 | E | IDIQ | R | Wants a light installed to illuminate the flag | N | Proposal submitted 3/3/05, CDCC denied | 2/23/2005 |
| 1056 | MY13B | 2/23/2005 | E | IDIQ | R | Wants a light installed to illuminate the flag | N | Proposal submitted 3/3/05, CDCC denied | 2/23/2005 |
| 1057 | MY11A | 2/23/2005 | E | IDIQ | R | Wants a light installed to illuminate the flag | N | Proposal submitted 3/3/05, CDCC denied | 2/23/2005 |
| 1058 | MY16B | 2/23/2005 | E | IDIQ | R | Wants a light installed to illuminate the flag | N | Proposal submitted 3/3/05, CDCC denied | 2/23/2005 |
| 1059 | MY16A | 2/23/2005 | E | IDIQ | R | Wants a light installed to illuminate the flag | N | Proposal submitted 3/3/05, CDCC denied | 2/23/2005 |
| 1060 | MY15B | 2/23/2005 | E | IDIQ | R | Wants a light installed to illuminate the flag | N | Proposal submitted 3/3/05, CDCC denied | 2/23/2005 |
| 1061 | MY15A | 2/23/2005 | E | FF | R | Replace number sign (245) | N | denied | 2/23/2005 |
| 1007 | MN12 | 2/24/2005 | C | FF | R | Wants a light installed to illuminate the flag | N | Schedule 5/2/05 @ 1300 Work in progress 4/27/05 | 5/24/2005 |
| 1008 | MN12 | 2/24/2005 | C | FF | R | Repair top concrete step leading to basement | N | Scheduled for 3/22/05, Postponed by aide due to function at qtrs. (3/11/05) | 3/1/2005 |
| 1009 | MN12 | 2/24/2005 | C | FF | R | Caulk and paint exterior back door | N | Presented to EMO again 5/24/05, Requested 3/1/05, EMO lead/Under warranty | 5/24/2005 |
| 1010 | MN12 | 2/24/2005 | C | EMO | R | Shower door needs to be replaced | N | | 5/24/2005 |

C - Carpentry
P/HVAC - Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC - Pre-Contract
FF - Firm/Fixed Price

Administrative errors in service call count deleted - Job no. not affected

**GFOQ DAILY SERVICES REPORT**

Monthly Services Report
Documented from 8/16/04 - 4/16/05

C - Carpentry
P/HVAC - Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC - Pre-Contract
FF - Firm Fixed Price

| Job# | Qtrs | Identified | Type | Category | Priority | Job | Open | Status Detail | Completion |
|---|---|---|---|---|---|---|---|---|---|
| 1011 | MN12 | 2/24/2005 | C | FF | R | Filter for refrigerator | N | Maytag plus model mzd2768geb-serial 251623370n | 3/4/2005 |
| 1012 | MN12 | 2/24/2005 | GM | FF | R | Need a key for the door leading into the furnace | N | | COMP 2/25/2005 |
| 1013 | MN16A | 2/24/2005 | GM | FF | U | Rodents were seen in the quarters | N | | 2/25/2005 |
| 1026 | MN12 | 2/24/2005 | EMO | EMO | R | Area between kitchen & foyer need to be redone (floor) | N | EMO CANCELLED | 2/24/2005 |
| 1014 | MN11 | 2/25/2005 | P/HVAC | FF | R | No/ Low water pressure in the qtrs. There is a broken window pane on the 2nd flr | N | | 2/25/2005 |
| 1050 | MY07 | 2/25/05 | C | FF | R | Plaque on the front of the house needs to be relocated | N | EMO approved. Awaiting CDCC approval | 3/10/2005 |
| 1004 | MY01 | 2/28/2005 | C | IDIQ | R | Library bathroom toilet paper holder needs to be moved. | N | | 3/4/2005 |
| 1018 | MY01 | 2/28/2005 | C | FF | R | Guest bathroom toilet is not filling on its own- has to be done manually. | N | | 2/28/2005 |
| 1017 | MY14A | 2/28/2005 | P/HVAC | FF | R | Icemaker is not working - water line is still hooked up to the refrigerator; | N | Spoke to Wanda 3/15/05 Awaiting EMO response about contractor work | 2/28/2005 |
| 942 | MY26BU | 3/1/2005 | P/HVAC | FF | R | Upstairs landing carpet needs to be shampooed | N | Proposal approved 6/15/05 | 3/15/2005 |
| 966 | MN10 | 3/1/05 | GM | IDIQ | R | Kitchen light needs a new ballast | N | | 6/19/2005 |
| 1015 | MY01 | 3/1/2005 | E | FF | R | Basket in dishwasher won't come out. | N | | 3/9/2005 |
| 1018 | MN10 | 3/1/05 | GM | FF | R | Salt in grey pail needs to be refilled | N | | 3/2/2005 |
| 1019 | MN10 | 3/1/05 | GM | FF | R | Basement bathroom outside wall has a very hot moisture ring developing and spreading. There is a hole in the block wall that needs to be sealed. | N | Presented to EMO again 5/24/05. Need EMO to respond, 3/1/05. DPW assessed- waiting for status from John. DPW lead - status needed from EMO | 3/4/2005 |
| 1067 | MY23A | 3/1/2005 | C | FF | U | Door in the basement has fallen off its hinge. Bottom hinge is still in tact. | N | | 5/25/2005 |
| 911 | MY06 | 3/2/2005 | C | FF | R | A mirror needs to be hung on the 2nd floor hallway. | N | Awaiting proposal approval | 3/3/2005 |
| 1021 | MY01 | 3/2/2005 | C | IDIQ | E | No heat in the hallway | N | | 3/11/2005 |
| 1024 | MY01 | 3/3/2005 | P/HVAC | FF | R | | N | | 3/3/2005 |
| 1073 | MN11 | 3/3/2005 | P | FF | R: | Filter at the end of the faucet, kitchen sink. | N | Scheduled for 3/17/05 @ 900 | 3/17/2005 |

C - Carpentry
P/HVAC - Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC - Pre-Contract
FF - Firm Fixed Price

## GFOQ DAILY ... REPORT

Monthly Service Report
Documented from 8/16/04 - 4/16/05

| Job# | Qtrs | Identified | Type | Category | Priority | Job | Open | Status Detail | Completion |
|---|---|---|---|---|---|---|---|---|---|
| 953 | MY15B | 3/4/2005 | C | IDIQ | R | Need to reroute pipes to repair basement wall | N | CANCELLED-Solved by roof contractor. Steam pipes/IDIQ Carpentry FFP. Proposal submitted (as a part of proposal for job#160) to CD/CC/EMO on 4/13/05 | 3/4/2005 |
| 1020 | MN10 | 3/4/05 | LM | FF | R | We have leaves that need to be picked up | N | | 3/7/2005 |
| 1023 | MY27A | 3/4/2005 | E | FF | R | Light on the back porch is not working | N | | 3/7/2005 |
| 1027 | MY01 | 3/4/2005 | P/HVAC | IDIQ | R | Water / Steam pipes in the basement need to be re-wrapped | N | EMO contracted out | 3/4/2005 |
| 1029 | MY01 | 3/4/2005 | C | FF | R | Brass door covers are losing all their screws. At least 50 are needed. | N | | 3/10/2005 |
| 1032 | MY15B | 3/4/2005 | C | IDIQ | R | Broken window pane in kitchen storm door | N | | 6/15/2005 |
| 1033 | MY15B | 3/4/2005 | C | FF | R | Sliding shelf broke in a kitchen cabinet | N | | 3/10/2005 |
| 1034 | MY15B | 3/4/2005 | C/E | IDIQ | R | Need to replace dining room chandelier with residents chandelier | N | | 6/17/2005 |
| 1035 | MY15B | 3/4/2005 | C | FF | R | Need a flag and staff | N | | 3/11/2005 |
| 1036 | MY15B | 3/4/2005 | C | FF | R | Door inside of the qtrs will not close correctly | N | Resident request to have work commence on 3/23/05 | 3/23/2005 |
| 1025 | MY06 | 3/7/05 | C | FF | R | Master bedroom door does not close all the way | N | In the preparation process for cleaning the carpets the door was fixed. | 3/16/2005 |
| 1051 | MY07 | 3/4/2005 | C | FF | R | Sash for the window | N | | 3/10/2005 |
| 1041 | MN10 | 3/4/05 | C | FF | R | Doorbell switch does not work | N | | 3/9/2005 |
| 1042 | MN10 | 3/7/05 | P/HVAC | FF | R | Kitchen sink is leaking from the handle | N | | 3/14/2005 |
| 1043 | MN06 | 3/7/05 | LM | FF | R | Request for lawn maintenance/leaf removal | N | | 3/10/2005 |
| 1196 | MY01 | 3/7/05 | E | FF | R | Replace switch covers in bathroom | N | scheduled 4/8/05 @ 900 | 4/8/2005 |
| 1031 | MY07 | 3/8/2005 | GM | FF | R | Refrigerator is not cooling to the proper temperature | N | Scheduled 3/18/05 before noon. SUB True Refrigerator S#1-3594103, model tm24, EMO CANCELLED | 3/22/2005 |
| 972 | MY27B | 3/9/05 | C | IDIQ | R | Need knobs for kitchen cabinets | N | EMO CANCELLED | 3/9/2005 |
| 1022 | MY23A | 3/9/05 | C | IDIQ | R | Broken window pane in basement/storm door | N | | 6/16/2005 |
| 1030 | MY01 | 3/9/05 | E | FF | R | Remove ceiling fan from official guest room on 3rd flr. | N | | 3/10/2005 |
| 1037 | MY15B | 3/9/05 | P/HVAC | FF | R | Leak under the sink coming from around the garbage disposal | N | | 3/10/2005 |

Administrative errors in service call count detailed - Job no. not affected

A130

**GFOQ DAILY ... REPORT**

| Job# | Qtrs | Identified | Type | Category | Priority | Job | Open | Status Detail | Completion |
|---|---|---|---|---|---|---|---|---|---|
| 1039 | MY06 | 3/9/05 | P/HVAC | FF | R | Water leaking in basement from oredited sewer pipe coming from family bathroom toilet and sink | N | | 3/16/2005 |
| 1044 | MY01 | 3/9/05 | E | FF | R | Remove control switch from wall and install standard wall switch | N | | 3/10/2005 |
| 1046 | MY02 | 3/9/05 | E | FF | R | Light in the kitchen- while charging bulb broke- still in socket | | | 3/9/2005 |
| 1048 | MY02 | 3/9/05 | E | FF | R | Needs light bulbs for light in the kitchen | N | | 3/10/2005 |
| 1049 | MY06 | 3/9/05 | P/HVAC | FF | R | Need 4" plug to seal existing drain in basement floor | N | Part on back order/ Expected delivery TBD | 3/24/2005 |
| 1075 | MN10 | 3/9/05 | E | FF | R | Main bathroom - needs to have globe over light removed | N | | 3/10/2005 |
| 1076 | MN15 | 3/9/05 | E | FF | R | Lights on back porch bulbs broke while changing- still in socket | N | | 3/14/2005 |
| 852 | MY20A | 3/10/05 | EXT | FF | R | Need qtrs to be sprayed for ants- stings of them around sinks | N | Schedule 4/6/05 @ 1200 | 4/6/2005 |
| 1038 | MY27A | 3/10/05 | P/HVAC | FF | R | Sprayer head on kitchen faucet leaking on the inside causing water to run back down under the sink-cart be fixed, needs to be replaced | N | | 3/14/2005 |
| 1040 | MY11A | 3/10/05 | GM | FF | R | Need to have old washer/dryer picked up from outside of qtrs | N | | 3/11/2005 |
| 1052 | MY11A | 3/10/05 | PS | IDIQ | R | Gable around the qtrs needs to be painted | N | | 5/3/2005 |
| 1064 | MY20A | 3/10/05 | GM | FF | R | Flag pole is broken | N | Need to order flag equipment | 3/18/2005 |
| 1069 | MY27A | 3/10/05 | P/HVAC | FF | U | Kitchen sink is blocked, garbage disposal still workes | N | | 3/10/2005 |
| 1071 | MY27B | 3/10/05 | P/HVAC | FF | R | Heat is not working on the second floor | N | | 3/10/2005 |
| 1074 | MN10 | 3/10/05 | C | FF | R | Trim is missing from the stairwell out back | N | Proposal approved 6/13/05,  4 week lead on door | 3/14/2005 |
| 1079 | MY14B | 3/10/2005 | ENV | IDIQ | R | Replace kitchen door because of damages | N | Scheduled 3/16/05 cracked pipe was found. | 8/1/2005 |
| 1087 | MY06 | 3/10/2005 | | FF | R | Cracked pipe discovered | N | Need PO for door locks | 3/16/2005 |
| 1088 | MY14B | 3/10/2005 | PS | FF | R | Repair attic door | N | Need PO for door locks | 4/1/2005 |
| 1162 | MY14A | 3/10/2005 | PS | FF | R | Attic door repair | N | | 4/1/2005 |
| 1078 | MY01 | 3/11/2005 | C | FF | R | Bathroom and bedroom ceiling need to be painted | N | Proposal submitted 4/4/05, | 3/14/2005 |
| 1080 | MY27B | 3/14/2005 | GM | IDIQ | R | Carpets need to be cleaned (from stairwell and the 2nd floor hallway) | N | Awaiting approval | 4/4/2005 |
| 1081 | MY02 | 3/14/2005 | C | FF | R | Basement shower/knob has fallen off | N | Postponed by aide until 3/19-25 | 3/23/2005 |

C - Carpentry
P/HVAC - Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC - Pre-Contract
FF - Firm Fixed Price

Administrative errors in service call count deleted - Job no. not affected

## GFOQ DAILY SR REPORT

Monthly Service Call Report
Documented from 8/16/04 - 4/16/05

C- Carpentry
PHVAC - Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC - Pre-Contract
FF- Firm Fixed Price

| Job# | Qtrs | Identified | Type | Category | Priority | Job | Open | Status Detail | Completion |
|---|---|---|---|---|---|---|---|---|---|
| 1082 | MY02 | 3/14/2005 | PHVAC | FF | R | Toilet in basement bathroom-you have to hold the handle downtown everything has flushed | N | Postponed by aide until 3/19-25 | 3/23/2005 |
| 1083 | MN11 | 3/14/2005 | C | FF | R | Ceiling over the foyer needs to be repaired-result of leak in sink | N | In progress. 3/23/05 | 3/24/2005 |
| 1084 | MN11 | 3/14/2005 | C | FF | R | GEN's bathroom-paint is peeling and cracking | N | In progress. 3/23/05 | 3/25/2005 |
| 1085 | MY14B | 3/15/2005 | C | FF | R | Need shoe molding sanded and painted in dining room | N | Scheduled 3/18/05 @ 0900 | 3/18/2005 |
| 1086 | MY26BU | 3/15/2005 | GM | FF | R | Occupant needs a key for the back door. | N | | 3/15/2005 |
| 1089 | MY26A | 3/15/2005 | C | FF | R | Security light on back porch does not work anymore | N | Assessed 3/18/05 @1000 | 3/24/2005 |
| 1090 | MY19A | 3/16/2005 | E | FF | R | Brackets for shades need to be repainted to the wall in the 2nd floor bedroom | N | Postponed by aide. 3/18/05 | 3/16/2005 |
| 1091 | MN11 | 3/16/2005 | C | IDIQ | R | Requesting installation of exhaust fan for GEN' bathroom | N | Per aide on 3/24/05 the qtrs doesn't have enough funds in their account. | 3/24/2006 |
| 1092 | MY11B | 3/16/2005 | PHVAC | FF | R | Aide requesting hose for toilet. | N | | 3/16/2005 |
| 1093 | MN11 | 3/17/2005 | PHVAC | FF | R | 3rd flr bathroom has no water pressure | N | | 3/17/2005 |
| 1094 | MN10 | 3/17/2005 | E | FF | R | Need an oven light bulb cover | N | Aide needs to locate part for completion. Bulb was ordered 3/21. 7 days business. GE m# id67y3ww serial #-1z997933 | 4/22/2005 |
| 1095 | MN10 | 3/17/2005 | E | FF | R | The silverware tray in the dishwasher's broken | N | Part to arrive week of 3/28/05. Scheduled 3/18/05 GE profile quiet power 3   m# or serial #20cr1513p0002 | 3/22/2005 |
| 1096 | MY08 | 3/18/2005 | PS | IDIQ | R | Review for front porch repair. | N | Proposal submitted to CDCC in conjuction with all MY | 3/18/2004 |
| 1097 | MN10 | 3/17/2005 | C | FF | R | Hole in basement wall | N | scheduled 3/22/05 @1300 | 3/23/2005 |
| 1098 | MY14B | 3/17/2005 | EXT | FF | R | Needs to have qtrs sprayed for ants | N | scheduled 4/11/05 @1330 | 4/1/2005 |
| 1099 | MY21B | 3/18/2005 | C | FF | R | Downstairs bathroom coordinate- all the way due to accumulated paint | N | Assessment scheduled for 3/21 @0900 | 3/21/2005 |
| 1100 | MY21B | 3/18/2005 | PHVAC | FF | R | Kitchen sink nozzle needs to be replaced- it is spraying everywhere | N | | 3/18/2004 |
| 1101 | MY21B | 3/18/2005 | E | FF | R | Small room off of the dayroom needs to have a globe removed- trying to change light bulb | N | Assessment scheduled for 3/21 @0900 | 3/21/2005 |

Administrative errors in service call count deleted - Job no. not affected

A132

**GFOQ DAILY'S REPORT**

Monthly Service Report
Documented from 8/16/04 - 4/16/05

C - Carpentry
P/HVAC - Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC - Pre-Contract
FF - Firm Fixed Price

33 of 40
Rev.3/9/05

Administrative errors in service call count deleted - Job no. not affected

| Job# | Qtrs | Identified | Type | Category | Priority | Job | Open | Status Detail | Completion |
|---|---|---|---|---|---|---|---|---|---|
| 1102 | MY21B | 3/18/2005 | C | FF | R | Area around tub needs to be caulked, master bathroom | N | Assessment scheduled for 3/21 @0900 | 3/21/2005 |
| 1103 | MY24B | 3/18/2005 | e | FF | R | Needs a garage door opener - team door | N | Team door 3/25/05 @ 1030-1100 | 3/30/2005 |
| 1104 | MY24B | 3/18/2005 | e | FF | R | Back door bell does not work | N | Schedule for 3/25/05 @ 900 | 3/25/2005 |
| 1105 | MN07 | 3/18/2005 | E | FF | R | A new light switch needs to be installed in the basement | N | | 3/18/05B |
| 1106 | MY21B | 3/18/2005 | C | FF | R | Toilet paper roll is falling apart | N | | 3/21/2005 |
| 1107 | MY01 | 3/21/2005 | P/HVAC | FF | U | No heat in qtrs | N | All Season | 3/21/2005 |
| 1108 | MN13 | 3/21/2005 | C | FF | R | Outside screen door leading to the upper basement/ utility room is missing the screen- frame and all | N | Found screen under porch- installed | 3/21/2005 |
| 1109 | MN13 | 3/21/2005 | P/HVAC | FF | U | Water pump in utility room is making loud noises and leaking | N | Assess for completion. Schedule for 3/25/05 @ 1100 | 3/25/2005 |
| 1111 | MN13 | 3/21/2005 | P/HVAC | FF | R | Faucet on the Northside of the qtrs needs a new washer | N | scheduled 3/24/05 @1300 | 3/25/2005 |
| 1112 | MY21B | 3/21/2005 | GM | FF | R | Fireplace is making noises, maybe too much gas | N | Resident turned off-then back on anymore | 3/21/2005 |
| 1114 | MY23A | 3/21/2005 | C | FF | R | Front porch screen door drags at the bottom | N | and does not have problem work to commence on 4/11/05 @ 0930 | 4/11/2005 |
| 1115 | MY23A | 3/21/2005 | P/HVAC | FF | R | Upstairs bathroom sink does not drain- stopper is stuck | N | | 3/21/2005 |
| 1116 | MY23A | 3/21/2005 | E | FF | R | 2nd flr bath- one of the lights does not work | N | Assessed 3/21/05 @ 1000 | 3/21/2005 |
| 1117 | MY23A | 3/21/2005 | C | FF | R | Basement bedroom- would like to have closets painted to match the walls | N | work to commence on 4/11/05 @ 0930 | 4/13/2005 |
| 1118 | MY12B | 3/21/2005 | P/HVAC | FF | R | Toilet is leaking on the 2nd floor guest bathroom | N | Resident shut off water | 3/24/2005 |
| 1119 | MY05 | 3/22/2005 | LM | FF | R | Request grounds maintenance | N | In progress | 4/6/2005 |
| 1120 | MY06 | 3/22/2005 | EMO | FF | R | Icemaker underneath the counter produces little or no ice | N | Need EMO to respond, EMO Keith what is status as of 3/21 | 4/28/2005 |
| 1121 | MN10 | 3/23/2005 | C | FF | R | One of the guides is missing from the bottom track of the shower in the guest bathroom | N | EMO needs to check warranty. Assessed 3/23/05 | 4/19/2005 |
| 1122 | MY17 | 3/23/2005 | P/HVAC | FF | R | There is a leak coming from underneath the washer and dryer in the laundry room (Drain pipes under laundry tub are leaking) | N | Schedule 5/3/05 @ 1300 | 5/3/2005 |
| 1123 | MY02 | 3/23/2005 | GM | FF | R | Shade will not catch (Girls bathroom) | N | Occupant requested RG return 3/25/05, request invoice | 3/25/2005 |

# GFOQ DAILY SERVICE REPORT

Monthly Service Call Report
Documented on 8/16/04 - 4/16/05

C- Carpentry
P/HVAC - Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC - Pre-Contract
FF- Firm Fixed Price

| Job# | Qtrs | Identified | Type | Category | Priority | Job... | Open | Status Detail | Completion |
|---|---|---|---|---|---|---|---|---|---|
| 1124 | MN01 | 3/23/2005 | P/HVAC | FF | E | Circulating pump is leaking | N | Scheduled 3/25/05 @ 0900. Part ordered 3/23/05. 2 business days. In progress | 3/29/2005 |
| 1125 | MN10 | 3/23/2005 | P/HVAC | FF | R | 2 fan coils on the 3rd flr aerol heating | N | Scheduled 3/25/05 @ 1400 | 3/25/2005 |
| 1126 | MY02 | 3/23/2005 | P/HVAC | FF | R | 2nd flr bath- one of the lights does not work | N |  | 3/23/2005 |
| 1127 | MY02 | 3/23/2005 | P/HVAC | FF | R | Basement kitchen- kitchen faucet leaks around handle ( Delta Single Handle) | N | Waiting to pick up parts. P.O. in process | 3/31/2005 |
| 1128 | MN01 | 3/23/2005 | P/HVAC | FF | R | Circulating pump in basement is leaking, spraying profusely | N | Job # is voided. Admin error | 3/23/2005 |
| 1136 | MN10 | 3/23/2005 | E | FF. | R | Flourescant light in the basement went out. Requested to have the entire qtrs power washed | N | Scheduled 3/25/05 @ 1300 | 3/25/2005 |
| 1129 | MN06 | 3/24/2005 | GM | IDIQ | R | Sensor lights along the walkway do not come on | N | EMO approved proposal | 5/25/2005 |
| 1130 | MN06 | 3/24/2005 | E | FF | R | Front porch security lattice is falling off | N | scheduled 3/25/05 @1030 | 3/25/2005 |
| 1131 | MY11A | 3/24/2005 | C | FF | R | Front ( 3 windows and 1 door) and back ( 2 window and 1 door) porches need to have screens replaced | N | scheduled 4/1/05 @ 0900 | 4/5/2005 |
| 1132 | MY11A | 3/24/2005 | C | FF | R | Cracking on the first level stairwell molding needs to be sanded and painted | N | Scheduled 4/4/05 @ 1000 | 4/4/2005 |
| 1133 | MY11A | 3/24/2005 | C | FF | R | Window in the front of the qtrs has a bit of surrounding damage (molding and window) | N | Aide requested 4/15/05 @ 0900 for work to commence after company leaves. | 4/18/2005 |
| 1134 | MY11A | 3/24/2005 | C | FF | R | Guest bathroom toilet (1st flr) is leaking | N | Aide requested 4/15/05 @ 0900 for work to commence after company leaves. | 4/13/2005 |
| 1135 | MY02 | 3/24/2005 | C | FF | U | Two registers aren't working- master bedroom and kitchen. | N |  | 3/25/2005 |
| 1137 | MY15B | 3/25/2005 | P/HVAC | FF | U | Request for basement to be served for ants and other bugs | N |  | 3/25/2005 |
| 1138 | MY13A | 3/25/2005 | EXT | FF | R | North pair of security spot lights in the back of the qtrs have burned out. | N |  | 3/31/2005 |
| 1139 | MN13 | 3/25/2005 | E | FF | R | Make necessary repairs to possible water leaks through chimney | N |  | 3/30/2005 |
| 1160 | MY15B | 3/25/2005 | C | IDIQ | U | Circulating pump is making a very loud noise and vibrating through the pipes | N | CANCELLED - EMO Requirements contractor solved | 3/25/2005 |
| 1140 | MN10 | 3/27/2005 | P/HVAC | FF | E | The boiler is out for the fourth time. | N |  | 3/27/2005 |
| 1141 | MY01 | 3/28/2005 | P/HVAC | FF | E | lights on the top floor- miniature flourescant bulbs- need to be changed | N |  | 3/28/2005 |
| 1142 | MN10 | 3/28/2005 | E | FF | R | lights on the top floor miniature flourescant bulbs to be changed | N |  | 3/29/2005 |

Administrative errors in service call count deleted - Job no. not affected

34 of 40
Rev.3/3/05

GFOQ DAILY SERVICES REPORT

| Job# | Qtrs | Identified | Type | Category | Priority | Job | Open | Status Detail | Completion |
|---|---|---|---|---|---|---|---|---|---|
| 1143 | MY14A | 3/28/2005 | P/HVAC | FF | R | Toilet is still sticking in the back, a new replacement may be needed for under the | N | | 3/30/2005 |
| 1144 | MY27B | 3/28/2005 | E | FF | R | Replacement bulb is needed for under the kitchen counter | N | F13T5/CW 13W | 3/30/2005 |
| 1145 | MY01 | 3/28/2005 | IDIQ | R | Auto vent needs to be installed on the boiler and a new bearing assembly for circulating pump #2 | N | Proposal submitted, EMO contacted work to Spectrum | 8/3/2005 |
| 1146 | MY01 | 3/28/2005 | C | FF | R | Holes in brick still haven't been filled and painted to match from when the plaque was moved (on the front porch) | N | scheduled 4/6/05 | 4/6/2005 |
| 1147 | MY01 | 3/28/2005 | C | FF | R | When mailbox was hung, old holes where not filled correctly, need to be redone correctly | N | | 3/30/2005 |
| 1148 | MY25B | 3/29/2005 | P/HVAC | FF | U | Remove existing birds nest then cover opening with mesh screening | N | scheduled 4/8/05 @ 0900 | 4/14/2005 |
| 1149 | MN07 | 3/29/2005 | GM | IDIQ | U | A large amount of standing water in basement | N | | 3/30/2005 |
| 1150 | MY05 | 3/29/2005 | GM | IDIQ | R | Requested to have windows power washed on the exterior | N | | 5/25/2005 |
| 1151 | MY15B | 3/28/2005 | GM | FF | R | Assemble and deliver 12 dining room chairs | N | CDCC Approved 3/29/05 | 3/30/2005 |
| 1152 | MY15B | 3/29/2005 | C | FF | R | Needs to have towel bar installed in 3rd floor bathroom | N | CDCC approved 3/30/05, EMO to provide towel bar | 3/30/2005 |
| 1153 | MY24B | 3/30/2005 | C | FF | R | Need to have glass in garage door replaced and garage needs to be cleaned | N | | 3/30/2005 |
| 1154 | MY01 | 3/30/2005 | C | FF | R | Siding on the front of the qtrs needs to be painted to match result of mailbox removal | N | Retracted by aide 6/21/05, EMO approved 6/15/05, Scheduled 5/24/05 @ 1300, Work in progress 4/27/05 | 3/31/2005 |
| 1155 | MN10 | 3/30/2005 | C | IDIQ | R | Floor around HVAC area in 3rd floor bedroom needs to be repaired | N | approved 6/15/05. Scheduled 5/24/05 @ 1300. Work in progress 4/27/05 | 5/24/2005 |
| 1156 | MY11A | 3/30/2005 | P/HVAC | FF | E | Upstairs bathroom needs to have drains snaked- Toilet, sink and tub | N | | 3/31/2005 |
| 1157 | MY07 | 3/30/2005 | EXT | FF | R | Sunroom has an electrical outlet requesting for 1st floor to be sprayed for ants | N | scheduled 4/1/05 @ 1300 | 4/11/2005 |
| 1158 | MY02 | 3/30/2005 | E | FF | R | Light in oven keeps blowing out | N | | 3/31/2005 |
| 1159 | MN06 | 3/30/2005 | C | FF | E | 3rd floor bedroom wall/ceiling have reoccurring fungus/bubbling | N | Work in progress. 4/27/05, Aide requested for work to commence the week of 4/11/05 | 4/27/2005 |

C- Carpentry
P/HVAC - Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC- Pre-Contract
FF- Firm Fixed Price

Administrative errors in service call count deleted - Job no. not affected



## GFOQ DAILY ( ... ) REPORT

Monthly Service Report
Documented from 3/16/04 - 4/15/05

C- Carpentry
P/HVAC – Plumbing HVAC
E – Electrical
GM – General Maintenance
LM – Lawn Maintenance
PC- Pre-Contract
FF- Firm Fixed Price

| Job# | Qtrs | Identified | Type | Category | Priority | Job | Open | Status Detail | Completion |
|---|---|---|---|---|---|---|---|---|---|
| 1166 | MY01 | 3/30/2005 | C | FF | R | Storm window needs to be placed in the kitchen | N | | 4/1/2005 |
| 1161 | MY01 | 3/31/2005 | E | IDIQ | R | Outlet in guest bathroom needs to be rewired. Currently on exhaust fan switch. Would like outlet to work independently without switch. | N | Need EMO to respond. Awaiting EMO approval 3/31/05 | 3/31/2005 |
| 1163 | MY14B | 3/31/2005 | EXT | FF | N | Requesting to have kitchen sprayed for ants | N | Servicing this week | 4/14/2005 |
| 1164 | MY13A | 3/31/2005 | EXT | IDIQ | U | Termites discovered in the qtrs | N | Cost Proposal submitted | 4/27/2005 |
| 1165 | MY13B | 3/31/2005 | EXT | IDIQ | U | Termites discovered in the qtrs | N | Cost Proposal submitted | 4/27/2005 |
| 1167 | MY26A | 4/1/2005 | EXT | FF | R | Requesting to have qts sprayed for ants | N | Servicing this week | 4/7/2005 |
| 1176 | MY27B | 4/1/2005 | GM | IDIQ | R | Steam clean carpets in front stairwell and second floor hallway | N | Proposal submitted 4/4/05. Awaiting approval | 4/12/2005 |
| 1168 | MY14B | 4/2/2005 | P/HVAC | FF | E | Water leaking through ceiling in daughters room (2nd fl) | N | In progress | 4/7/2005 |
| 1169 | MY21A | 4/3/2005 | C/P/HVAC | FF | R | leaky side porch- the entry way off the kitchen | N | Sch 4/6/05 | 4/6/2005 |
| 1170 | MY01 | 4/4/2005 | EXT | FF | R | Ant invasion from dinning room to the kitchen | N | Servicing this week | 4/7/2005 |
| 1171 | MY07 | 4/4/2005 | P/HVAC | FF | R | The heat on the 2nd floor is not working | N | | 4/4/2005 |
| 1172 | MN01 | 4/4/2005 | C | FF | R | Kitchen storm window needs to be recalled | N | | 4/4/2005 |
| 1173 | MY26A | 4/4/2005 | C | FF | R | Slate roof tile is coming off over the kitchen window. | N | | 4/5/2005 |
| 1174 | MY14A | 4/4/2005 | EXT | FF | R | Request to have qts sprayed for ants | N | Servicing this week | 4/15/2005 |
| 1177 | MY10 | 4/4/2005 | C | FF | R | Screen door in basement- screen is torn | N | | 4/5/2005 |
| 1178 | MN10 | 4/4/2005 | LM | FF | R | Requesting to LM performed- in preparation of funtion Thursday night | N | | 4/5/2005 |
| 1179 | MN05 | 4/4/2005 | C | FF | R | Deadbolt is not secure on screen door that is connected to the patio | N | | 4/5/2005 |
| 1180 | MN10 | 4/4/2005 | C | FF | R | Paint back steps on patio | N | | 4/5/2005 |
| 1181 | MN07 | 4/4/2005 | P/HVAC | FF | R | Domestic water pipe is leaking in the boiler room | N | Work in progress 4/27/2005 | 4/26/2005 |
| 1255 | MY01 | 4/4/2005 | EXT | FF | U | Termites discovered in the qtrs | N | | 4/18/2005 |
| 1183 | MN06 | 4/5/2005 | LM | FF | N | Requesting lawn maintenance in preparation for a function Saturday | N | In progress as of 4/6/05 | 4/7/2005 |
| 1184 | MY01 | 4/5/2005 | P/HVAC | FF | R | Requesting 34 filters for fan coil units- measurements 8x20x1 ... | N | Parts on order 4/7/05. Proposal submitted 4/5/05 | 4/14/2005 |

38 of 40
Rev.3/9/05
Administrative errors in service call count deleted - Job no. not affected

**GFOQ DAILY REPORT**

Monthly Service Report
Documented from 8/16/04 - 4/16/05

C- Carpentry
P/HVAC - Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC - Pre-Contract
FF- Firm Fixed Price

| Job# | Qtrs | Identified | Type | Category | Priority | Job | Open | Status Detail | Completion |
|---|---|---|---|---|---|---|---|---|---|
| 1185 | MY15B | 4/5/2005 | P/HVAC | FF | R | Condensation tank is leaking and pipes are making knocking noise in the boiler | N | Submitted proposal 4/5/05. Awaiting approval From EMO | 4/5/2005 |
| 1186 | MY01 | 4/5/2005 | LM | IDIQ | R | Renovation of landscaping | N | EMO CANCELLED | 4/5/2005 |
| 1187 | MN06 | 4/5/2005 | LM | IDIQ | R | Renovation of landscaping | N | EMO CANCELLED | 4/5/2005 |
| 1188 | MN10 | 4/5/2005 | C | FF | R | Need to have railing painted black in the front of the qtrs | | Aide requested for work to commence the week of 4/11/05 | 4/12/2005 |
| 1189 | MN10 | 4/5/2005 | P/HVAC | FF | R | Shut off in basement to outside water close rib leaks when turned on | N | Scheduled 4/7/05 @ 1300 | 4/8/2005 |
| 1190 | MY11B | 4/6/2005 | P/HVAC | FF | U | Heating element in between 11A & B is leaking | N | Parts on order 8/16/05. Vendor misplaced original order. Reordered 8/15/05 | 8/30/2005 |
| 1191 | MN10 | 4/6/2005 | C | FF | R | Remove and replace weather stripping around the door (back) | N | Scheduled 4/8/05 @ 1300 | 4/8/2005 |
| 1192 | MN10 | 4/6/2005 | LM | FF | R | Requesting the grass nearest to the street be cut. In front of the qtrs | N | | 4/7/2005 |
| 1232 | MY14A | 4/6/2005 | GM | FF | R | Flag in the front of the qtrs - pole is broken | N | | 4/13/2005 |
| 1330 | MY20A | 4/6/2005 | EXT | IDIQ | R | Rodents were seen in qtrs | N | Recorded after the job was closed 5/12/2005 | |
| 1193 | MY27B | 4/7/2005 | P/HVAC | FF | U | Leak in the basement heating unit, circulating pump leaking | N | Sch 4/29/05 @0900. Parts received Scheduled 4/29/05 | 4/29/2005 |
| 1194 | MY08 | 4/7/2005 | C | FF | R | Leak in 1st level sunroom, window, puddle was seen after the rain | N | Assessment scheduled for 4/13/05 | 4/13/2005 |
| 1195 | MY20B | 4/7/2005 | EXT | FF | R | Ant problem in quarters | N | Servicing in progress | 4/15/2005 |
| 1197 | MN12 | 4/7/2005 | LM | FF | R | Remove existing flower beds on north side of house and fill with concrete. Beds are 43"x60" and 54"x60" | N | Weather permitting. Scheduled 4/11/05 | 4/15/2005 |
| 1198 | MY26BU | 4/7/2005 | C | FF | R | Basement window screen is torn-need to be replaced | N | Schedule 4/14/05 | 4/22/2005 |
| 1199 | MY07 | 4/7/2005 | GM | FF | R | Refrigerator is not cooling to the proper temperature | N | Scheduled 4/11/05 @ 8-11 | 4/11/2005 |
| 1200 | MY24AU | 4/8/2005 | E | FF | R | Light in upstairs bathroom (2 prong) is out | N | scheduled 4/8/05 @ 9:30 | 4/11/2005 |
| 1201 | MY24AU | 4/8/2005 | E | FF | R | Fire alarm needs to be replaced. Upstairs beeps even with a new battery | N | scheduled 4/8/05 @ 9:30 | 4/11/2005 |
| 1202 | MY24AU | 4/8/2005 | P/HVAC | FF | R | Tub in upstairs bathroom. Faucet needs to be tightened | N | scheduled 4/8/05 @ 9:30 | 4/11/2005 |

Administrative errors in service call count deleted - Job no. not affected

**GFOQ DAILY SERVICE REPORT**

Monthly Service Report
Documented from 8/16/04 - 4/16/05

C- Carpentry
P/HVAC - Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC - Pre-Contract
FF- Firm Fixed Price

| Job# | Qtrs | Identified | Type | Category | Priority | Job s | Open | Status Detail | Completion |
|---|---|---|---|---|---|---|---|---|---|
| 1203 | MY24AU | 4/8/2005 | C | FF | R | Birds are living in the exhaust fan in the bathroom on 2nd flr. Coming in through the part that leads in to the house from the outside | N | Scheduled 4/13/05 | 4/13/2005 |
| 1204 | MY24AU | 4/8/2005 | C | FF | R | Exhaust fan, 2nd flr upstairs can't outside is turned so that it bangs when it is windy outside. Needs to be turned... | N | Scheduled 4/13/05 | 4/13/2005 |
| 1205 | MY24AU | 4/8/2005 | EXT | FF | R | Recall on bug issue. Still seeing a heavy amount of bugs. Also saw a black roach | N | scheduled 4/12/05 @11:00 CANCELLED. Postponed by occupant. 8/5/05 Processing proposal | 4/12/2005 |
| 1206 | MY24AU | 4/8/2005 | GM | IDIQ | R | Request for carpets to be cleaned throughout quarters | N | scheduled 4/8/05 @ 12:30 | 4/8/2005 |
| 1207 | MN11 | 4/8/2005 | P/HVAC | FF | R | Huge leak under sink in kitchen. Water everywhere | N | Work in progress | 4/11/2005 |
| 1210 | MN10 | 4/8/2005 | C | FF | R | Need concrete steps repaired for back steps (top 2) | N | Scheduled 4/13/05 @1300 | 5/18/05 |
| 1211 | MN10 | 4/8/2005 | C | FF | R | Replace back storm door closure | N | CANCELLED/DEMO RESPONSIBLE | 4/13/2005 |
| 1212 | MN10 | 4/8/2005 | GM | FF | R | Replacement of damaged curtains (Sheers) | N | Part of change of season will be done once CDCC approves | 4/8/2005 |
| 1213 | MY07 | 4/8/2005 | P/HVAC | FF | R | Request for preventative maintenance on AC unit | N | Scheduled 4/11/05 @ 0900 | 5/13/2005 |
| 1214 | MY01 | 4/8/2005 | E | FF | R | Requesting to have two plastic switch covers returned to the qtrs | N | | 4/11/2005 |
| 1222 | MY24B | 4/8/2005 | GM | FF | R | Dishwasher will not drain. | N | Scheduled 4/11/05 @ 0900 | 4/9/2005 |
| 1215 | MY08 | 4/11/2005 | LM | FF | R | Requesting lawn maintenance in preparation for a furniture (4/12/05 @ noon) | N | | 4/11/2005 |
| 1216 | MN06 | 4/11/2005 | EXT | FF | R | Ants have been seen all over the qtrs | N | Servicing in progress | 5/3/2005 |
| 1217 | MY11A | 4/11/2005 | C | FF | R | Screen door (off the kitchen) needs to be shaved or have the hinges adjusted | N | Scheduled 4/15/05 @ 1300 | 4/14/2005 |
| 1218 | MY11A | 4/11/2005 | C | FF | R | Front porch screen door drags at the bottom | N | Scheduled 4/15/05 @ 1300 | 4/11/2005 |
| 1219 | MY11A | 4/11/2005 | C | FF | R | Front porch storm door is missing the door screen | N | Item does not exist in other qtrs | 4/11/2005 |
| 1220 | MN10 | 4/11/2005 | GM | MICRO | R | Requesting to have windows cleaned inside and out (entire qtrs) | N | EMO CANCELLED | 4/11/2005 |
| 1221 | MY23A | 4/11/2005 | C | FF | R | A piece of brick is missing from the back of the qtrs | N | Work in progress. Schedule 5/2/05 @ 0830 | 5/3/2005 |
| 1223 | MN12 | 4/11/2005 | EXT | FF | R | Requesting to have the interior of the qtrs sprayed for ants - 1st and 2nd floor | N | Servicing in progress | 5/3/2005 |

Administrative errors in service call count deleted - Job no. not affected

# GFOQ DAILY SERVICE REPORT

Monthly Service Report
Documented from 8/16/04 - 4/16/05

C - Carpentry
P/HVAC - Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC - Pre-Contract
FF- Firm Fixed Price

| Job# | Qtrs | Identified | Type | Category | Priority | Job | Open | Status Detail | Completion |
|---|---|---|---|---|---|---|---|---|---|
| 1233 | MN10 | 4/11/2005 | C | FF | R | Requesting to have new boxes to be painted on the front steps | N | | 3/12/2005 |
| 1224 | MN10 | 4/12/2005 | E | FF | R | Door bell on the front is not working | N | | 4/13/2005 |
| 1225 | MY20A | 4/12/2005 | EXT | FF | U | Ants have reappeared. Have spread from previous treated areas | N | Servicing in progress | 5/3/2005 |
| 1226 | MN12 | 4/12/2005 | E | FF | R | Repair or replace fluorescent light fixture in the basement- bulbs were replaced still not working. | N | sch 4/18/05 | 4/18/2005 |
| 1227 | MN07 | 4/12/2005 | EXT | FF | R | Ants have reappeared. | N | Servicing in progress | 5/3/2005 |
| 1228 | MN07 | 4/12/2005 | P/HVAC | FF | R | AC is not working- did a test run on the unit | N | | 4/15/2005 |
| 1229 | MN12 | 4/22/2005 | C | FF | R | Installation of door closure | N | | 4/13/2005 |
| 1230 | MN07 | 4/12/2005 | C | FF | R | Extermination of ants and bees | N | Work in progress | 5/3/2005 |
| 1231 | MN07 | 4/13/2005 | GM | FF | R | Icemaker not producing ice | N | | 4/15/2005 |
| 1234 | MY07 | 4/13/2005 | GM | FF | R | Requesting to have 3 brackets of toenail removed from the cots | N | Parts ordered 4/13/05, Occupant requested that these jobs be done at the same time | 4/15/2005 |
| 1235 | MY1B | 4/14/2005 | E | FF | R | Dining room dimmer switch inoperable | N | Parts ordered 4/13/05, Occupant requested that these jobs be done at the same time | 4/29/2005 |
| 1236 | MY1B | 4/14/2005 | E | FF | R | 2nd flr two bedrooms wall switches inoperable | N | | 4/29/2005 |
| 1237 | MY1A | 4/14/2005 | C | FF | R | painting the steps on the front and back porch | N | | 4/14/2005 |
| 1238 | MY27B | 4/14/2005 | E | FF | R | 3rd floor chandelier/fan is not working will not come on | N | scheduled 4/18/05 @ 0930 | 4/18/2005 |
| 1239 | MY27B | 4/14/2005 | GM | FF | R | Roller shade in the bathroom is not winding | N | Scheduled 4/28/05 | 5/18/2005 |
| 1240 | MY13A | 4/14/2005 | C | IDIQ | R | Requesting to have the hole in the roof patched up | N | Work began 6/6/05. Assessed 4/19/05 @ 0300 | 8/9/2005 |
| 1241 | MY13A | 4/14/2005 | C | FF | R | Requesting to have attic door replaced | N | Refer to #389 | 4/14/2005 |
| 1242 | MY11B | 4/14/2005 | P/HVAC | FF | E | Circulating pump thermostat is replaced, basement loop is locked up. | N | In progress 5/25/05. Parts ordered 4/28/05, 5 day lead. | 5/25/2005 |
| 1243 | MY11A | 4/14/2005 | C | EMO | R | Requesting to have microwave hood repaired- result of microwave fire. | N | Awaiting EMO response | 5/2/2005 |
| 1244 | MY02 | 4/14/2005 | P/HVAC | FF | R | Requesting to have Preventive maintenance performed on heating and cooling units | N | | 4/14/2005 |
| 1245 | MY08 | 4/14/2005 | GM | FF | R | Need to have recycling picked up | N | DPW concern | 4/22/2005 |
| 1246 | MY07 | 4/14/2005 | GM | FF | R | Need to have recycling picked up | N | DPW concern | 4/22/2005 |
| 1247 | MY20A | 4/14/2005 | E | FF | R | Kitchen overhead light does not work | N | DPW concern | 4/15/2005 |

38 of 40
Rev 3/9/05
Administrative errors in service call count deleted - Job no. not affected

# GFOQ DAILY SERVICE REPORT

Monthly Service Report
Documented from 8/16/04 - 4/16/05

| Job# | Qtrs | Identified | Type | Category | Priority | Job | Open | Status Detail | Completion |
|------|------|------------|------|----------|----------|-----|------|---------------|------------|
| 1248 | MN06 | 4/14/2005 | P/HVAC | FF | E | Requesting to have preventive maintenance performed on the gas stove | N | | 4/14/2005 |
| 1249 | MN06 | 4/15/2005 | E/GM | FF | U | Oven light is blinking and blue? (with the door closed) | N | | 4/26/2005 |
| 1292 | MY07 | 4/15/2005 | GM | FF | R | Icemaker is producing little or no ... | N | make- kitchen aid model - superba serial # E-L4430793 | 4/27/2005 |

C - Carpentry
P/HVAC - Plumbing HVAC
E - Electrical
GM - General Maintenance
LM - Lawn Maintenance
PC - Pre-Contract
FF - Firm Fixed Price

Administrative errors in service call count deleted - job no. not affected

40 of 40
Rev.3/9/05

# GFOQ Contract Renegotiation Meeting

Date: February 9, 2005
In Attendance: General Ballard, Ravens Group
           Dwayne Lacewell, Ravens Group
           Satoya Smith, Ravens Group
           Bill Campbell, Contracting Office
           Maria Bellino-Coffeen, Contracting Office
           Dee Spellman, EMO

## RAVENS GROUP ITEMS

### Firm-Fixed Price Service Calls

- RG has been losing money on Service Calls, Grounds Maintenance, and Preventative Maintenance by definition of the contract since initial startup of the contract. RG was unaware of the historical data for GFOQ during the development of the contract. Which resulted in a severe underestimation of number of service calls and a negotiated amount of $15,000 due to lack of information.
- Since the beginning of the contract we have only received one *true* emergency call (by Service Call definition in the contract -Routine, Urgent, and Emergency). Which was MN04's water main break.
- Most service calls received have been routine, yet RG has responded as if they were urgent because of the demands of the occupants and nature of calls.
- RG needs a clear understanding of what the true definition of what a service call by EMO. After previous talks with contracting office we reclassified time and materials as firm-fixed price. During contract modification there wasn't any money put towards the CLINS. Majority of monies were allotted to FFP and Project Work under the CLIN 0002BF. Calls that RG found were not IDIQ and not clearly related to FFP were agreed to bill under project work. But that was an interim solution as it is truly not consistent with the contract.

### Micro-purchasing Work Under IDIQ

- Concerns regarding micro-purchasing items for work identified as IDIQ. The EMO is choosing to micro-purchase rather than passing it on to the contractor

### Snow Removal

- Common area sidewalks (general pedestrian areas surrounding installation) are not a part of the scope of work. During the snow removal events we have removed snow because of demands placed by J. Russo and EMO. But we were not allotted monies to do so.
- 
- Certain quarters (for example MY01) want driveways to be included in the removal. By contract standards we are to do the parking areas but not the parking spots.
- EMO suggested that DPW should be held responsible to pay RG bill for areas done outside of contract

Bold comments - opposite parties comments regarding subject matter

# GFOQ Contract Renegotiation Meeting

Date: February 9, 2005
In Attendance: General Ballard, Ravens Group
　　　　　　　Dwayne Lacewell, Ravens Group
　　　　　　　Satoya Smith, Ravens Group
　　　　　　　Bill Campbell, Contracting Office
　　　　　　　Maria Bellino-Coffeen, Contracting Office
　　　　　　　Dee Spellman, EMO

## RAVENS GROUP ITEMS

### Firm-Fixed Price Service Calls

- o  RG has been losing money on Service Calls, Grounds Maintenance, and Preventative Maintenance by definition of the contract since initial startup of the contract. RG was unaware of the historical data for GFOQ during the development of the contract. Which resulted in a severe underestimation of number of service calls and a negotiated amount of $15,000 due to lack of information.
- o  Since the beginning of the contract we have only received one *true* emergency call (by Service Call definition in the contract -Routine, Urgent, and Emergency). Which was MN04's water main break.
- o  Most service calls received have been routine, yet RG has responded as if they were urgent because of the demands of the occupants and nature of calls.
- o  RG needs a clear understanding of what the true definition of what a service call by EMO. After previous talks with contracting office we reclassified time and materials as firm-fixed price. During contract modification there wasn't any money put towards the CLINS. Majority of monies were allotted to FFP and Project Work under the CLIN 0002BF. Calls that RG found were not IDIQ and not clearly related to FFP were agreed to bill under project work. But that was an interim solution as it is truly not consistent with the contract.

### Micro-purchasing Work Under IDIQ

- o  Concerns regarding micro-purchasing items for work identified as IDIQ. The EMO is choosing to micro-purchase rather than passing it on to the contractor

### Snow Removal

- o  Common area sidewalks (general pedestrian areas surrounding installation) are not a part of the scope of work. During the snow removal events we have removed snow because of demands placed by J. Russo and EMO. But we were not allotted monies to do so.
- o
- o  Certain quarters (for example MY01) want driveways to be included in the removal. By contract standards we are to do the parking areas but not the parking spots.
- o  EMO suggested that DPW should be held responsible to pay RG bill for areas done outside of contract

Bold comments - opposite parties comments regarding subject matter

# GFOQ Contract Renegotiation Meeting

- o Contracting needs to make sure that DPW does not have the common areas in their contract before modifying RG contract to include those areas.

## Grounds Maintenance
- o RG has exhausted a large amount of money in the waste disposal piece alone (i.e. leaves, debris, etc.)
- o During contract bidding, RG and EMO discussed possibilities of using the dumpster on post. Also talked about securing a dumpster and staging it on-site. Both did not happen due to restrictions made. Contractor currently on post is allowed however a dumpster.
- o RG has incurred an additional off-site dumping fee of $75-$100 per day (during grounds maintenance events) plus the man-hours and fuel losses as a result.

## Warehouse Requirements
- o Warehouse line item was previously removed from the contract and turned over to Self Help. That would need to be modified as RG has now gotten back into storing furnishings and bench stock. Need to adjust due to lack of space requirement. RG currently uses the space as workspace. EMO also concurs as they were directed to decrease the amount of furnishings they store.
- o RG needs to get approval to install meshing and locks that EMO would have access to only to prevent loss of merchandise
  *was this done ? if so why isn't it being utilized*
  *No it should be*

## HVAC Requirements (PM/AI)
- o HVAC impacts both preventative maintenance, annual inspections. Currently it is 24% of the workload. RG had to cut back on cost because a baseline would need to be established in order to adequately resolve the old and ongoing issues.
- o Current state of fan coil units and other HVAC components are in disrepair (in some cases dangerous disrepair due to environmental issues)
- o RG cannot continue to execute the contract requirements for HVAC by continuing to band-aid the problems as they appear. There is no true preventative maintenance as it concerns HVAC.
- o Preventative maintenance number (calls) should be in the hundreds at the least.
- o Need to be clear as to what is economically repairable versus replacement.
- o It is not conducive to spend the money up front to have RG do the HVAC remediation at this point in time because EMO is close to doing their 6-year plan. Replacements can be planned out and costed as a past of that.
  *CX own*

## Change of Occupancy
- o The governments' understanding is that RG should be only paid for $0.38 cents/per square foot of the quarters. [Agreed that was a misunderstanding of the contract. As the COM completed were never identified to contracting prior to executing the work]
- o Ravens Group should push forward to cost anything that exceeds the regular work under change of occupancy (i.e. major repairs and replacements) as a separate task order under project work by the following method only:

# GFOQ Contract Renegotiation Meeting

1. Submit a proposal to the contracting office for the additional work needed
2. EMO needs to provide an independent cost estimate to contracting
3. Contracting will negotiate amounts
4. Task order and Delivery Order is issued

o If there is a CLIN for the major work needed, RG does not need to provide a proposal to contracting for the work.
o RG is losing too much money because of the types of requests and the frequency of them (for example non-cost effective faucets, carpeting, etc.)
o GFOQ standards were never identified (as they have been raised because of previous housing allowing for costly purchasing)
o Going forward do not begin work on MN03 and MY12A change of occupancies until a delivery order is issued

## Firm-Fixed Adjustment Proposed Amount

o $1,098,171/per year to perform work adequately and to the contracts standards.

| $1,098,171 per year | $91,514.25/ monthly Rounded to $92,000.00 | Approximately $800/per service call |
|---|---|---|

o **Contracting contends that legally they cannot bring the contract up to that amount because we were set initially at a $3 mil threshold. Although it is definitely understood that RG is losing a huge sum of money as it stands on firm fixed.**
o **If Mr. Campbell does not exercise the option to raise the contract amount they can extend the contract.**



o RG would need to keep a close account of all firm-fixed dollars spent to include all salaries, vehicles, and other overages so that when it hits the $15,000, any amount over will have a claim processed to recoup the money

## CONTRACTING ITEMS

o RG needs to provide Contracting with proposals on the following:
1. Snow removal
2. Warehouse adjustments —
3. Service calls adjustments
4. Redefinition of service calls (need to come together with EMO to gain correct information as well)
   (a) Detail in modification a clarification on why the adjustment is needed (Based on history of service calls per month...)
   (b) Clearly define justification for mods. (Assumptions previously made need to be spelled out now)
o Hold on 27B bathroom reworking until EMO gets back to RG with new scope.
o Provide reports that include actual costs to include salary for all GFOQ, time, material, equipment, vehicles, travel time, etc.

# GFOQ Contract Renegotiation Meeting

- o Draw the line as of today on all calls previously defined as task orders. RG/EMO will treat as firm-fixed and any monies outside of the $15,000 will be processed in a claim.
- o Enlisted quarters bill for $14,678 need to be paid through Gay's office.

## Invoice Submissions

- o On invoicing, tasks need to be more descriptive. Include comments that discuss work being done according to standard.
- o **RG previously was paid through DFAS. Would like to return to that method of payment. Only concerns are that the payment is too slow (net 45-50 at the least). When payments were made through the credit card authorizations, we lost 3% from bank transaction fees. This method is only advantageous for a one-time basis because of costs involved.**
- o Invoice payment solutions (DFAS/electronic payment) will be emailed to RG at a later date (once resolved)
- o RG needs to billed for change of occupancies recently completed
- o RG has been paid twice on the following invoices. Please reconcile:

  04-420 – Sep 28, 04 – Fan coil maintenance mold – MN12 - $1500
  04-420 – Oct 21, 04 – Fan coil maintenance mold – MN12 - $1500
  04-419 - Sep 28, 04 – Fan coil maintenance mold – MN05 - $750
  04-419 – Oct 21, 04 – Fan coil maintenance mold – MN05 - $750

(Dates changed by Dan Musel and apparently submitted twice in error)

- o Send a new description of the fan coil maintenance issue for MN12 so that it is apparent (for auditing purposes) why that job was $1,500 while two others of the same variety were $750

## Reconcile Fireplace Events

- o Lisa mentioned that the following jobs were paid by credit card:

  MY01 - $621.88
  MY05 - $301.25
  MY07 - $1,089
  MY14B - $1219
  MY16A - $200
  MY26A - $627
  MY27B - $682.50

Both EMO and Ravens knows that is incorrect. Contractor was paid for these invoices by RG and then GFOQ was billed in turn

## Appliances

- o If over 52% of volume, a replacement should be considered. (RG is not to purchase)

# GFOQ Contract Renegotiation Meeting

### Firm-Fixed Reconciliation

- o Once FFP is renegotiated contracting does not need to see cost per service call only the service call detail. Although EMO still needs to see all cost incurred for their reporting
- o Track all pending and previously approved Time and Material bills since last invoice payment. Those will be paid.



**The Ravens Group, LLC**
*Consulting and Business Strategies that Win*

1101 Pennsylvania Avenue, NW • 6th Floor • Washington DC 20004
Tel: 202.756.4556 • Fax: 202.756.7441 • www.theravensgroup.com

March 2, 2005

Mr. William E. Campbell, Jr.
Contracting Officer
US Army Contracting Agency
Capital District Contracting Center
9410 Jackson Loop, Suite 101
Fort Belvoir, VA 22060-5134

Re: Contract #W91QV1-04-D-0013

Dear Mr. Campbell:

As discussed on our meeting of 9 February 2005, please find attached revised line item proposal, revised Section C write-up, and the rationale to support our request for modification of the above referenced contract.

I am confident that our proposal will bring this contract in line with the actual work that is currently being performed and its associated costs.

I certainly appreciate your immediate resolution to this request.

Sincerely,

Joe N. Ballard
President/CEO

3 ENCL as:
     1. Section C
     2. Bid Proposal
     3. Rationale

**RAV-0135**

A147

1.   Rationale for modification of Firm-Fixed Price portion of Contract #
W91QV1-04-D-0013

A. **CLIN A001 SERVICE CALLS**: Increase of unit price from $15,000 monthly
to $102,675 monthly.

1.  The current contract specifies the performance of all service calls are brief in
scope and requires not more than $2,000 in total labor plus material cost. During
the original discussion with the Government prior to final negotiation several
items of historical data were not available to the Contractor. This included the
historical data on the numbers and categories of service calls per unit. The
Government only provided its "best guess" at a level less than 50 calls per month.
This "best guess" was an understatement of the number of calls and resulted in a
rather severe under estimation in the workload and material requirements for this
particular CLIN. The Contractor has been suffering a monetary loss on this CLIN
since the beginning of the contract.

2.   Average number of service calls received per month was 93 versus an
estimated 45. Vast majority of the calls were HVAC tasks. HVAC currently
averages 24% of this work load and based on current state of the installed
equipment relative to age and condition, will likely increase in scope and cost.
This is obviously the most expensive part of the contract averaging approximately
at a range of $850 - $1,800 per service call. This does not include Seasonal
Changeover Cost. The contractor simply can not absorb these costs as currently
funded. Based on the average number of monthly service calls our rate per call
with a 10% margin should be $1,104.

3.   Standardization of installed equipment and furnishing was severely
understated. Inventory of installed equipment and appliances were requested;
promised and never received. This fact coupled with the ability of the residents to
dictate the quality of replacement items (MOEN faucets for example) has driven
up costs.

4.   Vast majority of the service calls received are routine in nature per the
definition in the existing contract. However, the Contractor was required to
respond under the definition and timeline of urgent per the demands of the
residents and the direction of the EMO. This has required additional staff and
equipment.

B. **CLIN A003 PEST CONTROL**: Reduction of unit price from $4,000 to $2,000
monthly based on Demand History over 6 months.

RAV-0136

A148

C. **CLIN A004 GROUNDS MAINTENANCE:** Increase unit Price from $10,500 to $ 25,000 monthly.

    1. During contract negotiation phase the Contractor and the Government discussed the use of the Government's on post dumpster or the ability to stage a dumpster on the installation. This would have afforded The Ravens Group the same rights as the current installation ground maintenance contractor. A verbal commitment was made by the EMO representative that one of the two options would occur. However, when the contract was negotiated and signed both options were denied. The other contractor is still allowed a dumpster. This denial has resulted in an unanticipated dumping fee of $75 - $100 per day (during the mowing/growing season) plus the increase in man-hours and fuel losses.

    2. Requirement to provide mulching services, twice a year, for all flowerbeds is not currently in the contract.

    3. Requirement to trim, cut and remove broken tree branches, trees blown down and shrubs is not in current contract.

D. **CLIN A005 ANNUAL INSPECTION:** Reduce unit price from $9,700 to $6,500. An estimated 30% of annual inspections can be performed during some preventive maintenance inspections.

E. **CLIN A006 CUSTODIAL SERVICES:** Delete currently performed as an IDIQ requirement.

2. Rationale for modification to Indefinite Quantity portion of Contract # W91QV1-04-D-0013

A. **CLIN B001 CHANGE OF OCCUPANCY:** Increase unit price from $0.38 to $4.20. This would bring cost in line with actual cost incurred over past 6 month period. Under this CLIN the Government has expectations of major repairs and replacements. This was clearly a misunderstanding.

B. **CLIN B007 WOOD FLOOR REFINISHING:** Increase unit price from $1.95 to $2.75. This would bring price in line with actual cost. The condition and age of the flooring were worse than anticipated.

C. **CLIN B008 WOOD FLOOR REPLACEMENT:** Increase unit price from $17.00 to $22.00. This would bring price in line with actual cost. The condition, age and requirement to stay within the historical period of the floors in terms of appearance have all served to drive up the cost.

RAV-0137

D. **CLIN B010 SHEET VINYL FLOORING REPLACEMENT:**  Increase unit price from $5.50 to $8.00.  This is due to tenant requirements for non-standard flooring and/or better quality.

E.  **CLIN B011 SHEET LINOLEUM FOORING REPLACEMENT:**  Increase unit price from $5.50 to $8.90.  This is due to tenant requirements for non-standard flooring and/or better quality.

F.  **CLIN B021 FAN COIL UNITS REPLACEMENT:**  Increase unit price from $2,500 to $5,000.  This price reflects actual cost.  The current units are very old and in poor condition.  Replacement with newer models will require improved electrical and piping.

G.  **CLIN B023/B024 SNOW & ICE REMOVAL:**  Change unit pricing to reflect cost of snow removal in 2" increments.  Current CLIN breakout was not workable.  The Contractor would have been required to be on site doing continuous snow removal operations.  This proposal reflects reality as to how the snow is actually removed.  During the early states of removal (under 2") the area is treated with ice melt and then removed in 2" increments thereafter.

H.  **CLIN B024-B026 SNOW & ICE REMOVAL** Delete.  See Rationale above at sub paragraph 2.G.

I.  **CLIN B027 VACANT UNIT CUSTODIAL:**  Increase unit price from $0.20 to $0.40 to reflect actual cost.

J.  **CLIN B028 VACANT UNIT MINI-CLEANING:**  Increase unit price from $0.12 to $0.24 to reflect actual cost.

K.  **CLIN B033 GUTTERS CLEANING:**  Add new requirement.

L.  **CLIN B034 POWER WASHING, VERTICAL:** Add new requirement.

M. **CLIN B0035 POWER WASHING, HORIZONTAL:** Add new   requirement.

RAV-0138

1.   Rationale. for modification of Firm-Fixed Price portion of Contract #
W91QV1-04-D-0013

A.  **CLIN A001 SERVICE CALLS**: Increase of unit price from $15,000 monthly
to $102,675 monthly.

1.  The current contract specifies the performance of all service calls are brief in
scope and requires not more than $2,000 in total labor plus material cost.  During
the original discussion with the Government prior to final negotiation several
items of historical data were not available to the Contractor.  This included the
historical data on the numbers and categories of service calls per unit.  The
Government only provided its "best guess" at a level less than 50 calls per month.
This "best guess" was an understatement of the number of calls and resulted in a
rather severe under estimation in the workload and material requirements for this
particular CLIN.  The Contractor has been suffering a monetary loss on this CLIN
since the beginning of the contract.

2.   Average number of service calls received per month was 93 versus an
estimated 45.  Vast majority of the calls were HVAC tasks.  HVAC currently
averages 24% of this work load and based on current state of the installed
equipment relative to age and condition, will likely increase in scope and cost.
This is obviously the most expensive part of the contract averaging approximately
at a range of $850 - $1,800 per service call.  This does not include Seasonal
Changeover Cost.  The contractor simply can not absorb these costs as currently
funded.  Based on the average number of monthly service calls our rate per call
with a 10% margin should be $1,104.

3.  Standardization of installed equipment and furnishing was severely
understated.  Inventory of installed equipment and appliances were requested;
promised and never received.  This fact coupled with the ability of the residents to
dictate the quality of replacement items (MOEN faucets for example) has driven
up costs.

4.  Vast majority of the service calls received are routine in nature per the
definition in the existing contract.  However, the Contractor was required to
respond under the definition and timeline of urgent per the demands of the
residents and the direction of the EMO.  This has required additional staff and
equipment.

B.  **CLIN A003 PEST CONTROL**: Reduction of unit price from $4,000 to $2,000
monthly based on Demand History over 6 months.

RAV-0139

A151

C. **CLIN A004 GROUNDS MAINTENANCE**: Increase unit Price from $10,500 to $ 25,000 monthly.

1. During contract negotiation phase the Contractor and the Government discussed the use of the Government's on post dumpster or the ability to stage a dumpster on the installation. This would have afforded The Ravens Group the same rights as the current installation ground maintenance contractor. A verbal commitment was made by the EMO representative that one of the two options would occur. However, when the contract was negotiated and signed both options were denied. The other contractor is still allowed a dumpster. This denial has resulted in an unanticipated dumping fee of $75 - $100 per day (during the mowing/growing season) plus the increase in man-hours and fuel losses.

2. Requirement to provide mulching services, twice a year, for all flowerbeds is not currently in the contract.

3. Requirement to trim, cut and remove broken tree branches, trees blown down and shrubs is not in current contract.

D. **CLIN A005 ANNUAL INSPECTION**: Reduce unit price from $9,700 to $6,500. An estimated 30% of annual inspections can be performed during some preventive maintenance inspections.

E. **CLIN A006 CUSTODIAL SERVICES**: Delete currently performed as an IDIQ requirement.

2. Rationale for modification to Indefinite Quantity portion of Contract # W91QV1-04-D-0013

A. **CLIN B001 CHANGE OF OCCUPANCY**: Increase unit price from $0.38 to $4.20. This would bring cost in line with actual cost incurred over past 6 month period. Under this CLIN the Government has expectations of major repairs and replacements. This was clearly a misunderstanding.

B. **CLIN B007 WOOD FLOOR REFINISHING**: Increase unit price from $1.95 to $2.75. This would bring price in line with actual cost. The condition and age of the flooring were worse than anticipated.

C. **CLIN B008 WOOD FLOOR REPLACEMENT**: Increase unit price from $17.00 to $22.00. This would bring price in line with actual cost. The condition, age and requirement to stay within the historical period of the floors in terms of appearance have all served to drive up the cost.

RAV-0140

A152

D. **CLIN B010 SHEET VINYL FLOORING REPLACEMENT**: Increase unit price from $5.50 to $8.00. This is due to tenant requirements for non-standard flooring and/or better quality.

E. **CLIN B011 SHEET LINOLEUM FOORING REPLACEMENT**: Increase unit price from $5.50 to $8.00. This is due to tenant requirements for non-standard flooring and/or better quality.

F. **CLIN B021 FAN COIL UNITS REPLACEMENT**: Increase unit price from $2,500 to $5,000. This price reflects actual cost. The current units are very old and in poor condition. Replacement with newer models will require improved electrical and piping.

G. **CLIN B023/B024 SNOW & ICE REMOVAL**: Change unit pricing to reflect cost of snow removal in 2" increments. Current CLIN breakout was not workable. The Contractor would have been required to be on site doing continuous snow removal operations. This proposal reflects reality as to how the snow is actually removed. During the early states of removal (under 2") the area is treated with ice melt and then removed in 2" increments thereafter.

H. **CLIN B024-B026 SNOW & ICE REMOVAL** Delete. See Rationale above at sub paragraph 2.G.

I. **CLIN B027 VACANT UNIT CUSTODIAL**: Increase unit price from $0.20 to $0.40 to reflect actual cost.

J. **CLIN B028 VACANT UNIT MINI-CLEANING**: Increase unit price from $0.12 to $0.24 to reflect actual cost.

K. **CLIN B033 GUTTERS CLEANING**: Add new requirement.

L. **CLIN B034 POWER WASHING, VERTICAL**: Add new requirement.

M. **CLIN B0035 POWER WASHING, HORIZONTAL**: Add new   requirement.

RAV-0141

RAV-0207

EXHIBIT A
SECTION B-SCHEDULE, CONTRACT
GROO EXECUTIVE MANAGEMENT OFFICE, FORT MYER, VA
SUPPORT ACTIVITY WASHINGTON, DC
1 AUGUST, 2005 - 31 JULY, 2006

| ELIN NUMBER | SUPPLIES/SERVICES | CONTRACT REQ. | ESTIMATED ANNUAL QTY | UNIT MEAS. | UNIT PRICE | TOTAL PRICE |
|---|---|---|---|---|---|---|
| | FIRM FIXED PRICE WORK | | | | | |
| A001 | SERVICE CALLS | C.5.1 | 12 | MO | $ 105,755.25 | $ 1,269,063.00 |
| A002 | PREVENTIVE MAINTENANCE | C.5.2 | 12 | MO | $ 10,300.00 | $ 123,600.00 |
| A003 | PEST CONTROL | C.5.3 | 12 | MO | $ 2,060.00 | $ 24,720.00 |
| A004 | GROUNDS MAINTENANCE | C.5.4 | 12 | MO | $ 25,750.00 | $ 309,000.00 |
| A005 | ANNUAL INSPECTIONS | C.5.5 | 12 | MO | $ 6,695.00 | $ 80,340.00 |
| A006 | CUSTODIAL SERVICES | C.5.6 | 12 | MO | $ - | $ - |
| A007 | SELF-HELP STORE | C.5.7 | 12 | MO | $ 7,210.00 | $ 86,520.00 |
| A008 | WAREHOUSE | C.5.8 | 12 | MO | $ 3,605.00 | $ 43,260.00 |
| | TOTAL FIRM FIXED PRICE WORK | | | | | |
| | INDEFINITE QUANTITY WORK | | | | | $ 1,936,503.00 |
| B001 | CHANGE OF OCCUPANCY | C.6.2 | 42,000 | SF | $ 4.64 | $ 194,670.00 |
| B002 | FURNITURE MOVING | C.6.20 | 1,000 | MH | $ 66.95 | $ 66,950.00 |
| B003 | INTERIOR PAINTING | C.6.3 | 36,000 | SF | $ 0.39 | $ 14,090.40 |
| B004 | INTERIOR PAINTING UNOCCUPIED QUARTERS | C.6.4 | 11,500 | SF | $ 0.57 | $ 6,514.75 |
| B005 | INTERIOR PAINTING OCCUPIED QUARTERS | C.6.5 | 12,000 | SF | $ 0.46 | $ 5,562.00 |
| B006 | EXTERIOR PAINTING | C.6.6 | 4,000 | SF | $ 0.62 | $ 2,472.00 |
| B007 | INTERIOR AND EXTERIOR TRIM PAINTING | C.6.7 | 8,000 | SF | $ 2.83 | $ 22,660.00 |
| B008 | WOOD FLOOR REFINISHING | C.6.7.1 | 5,000 | SF | $ 22.66 | $ 113,300.00 |
| B009 | WOOD FLOOR REPLACEMENT | C.6.8 | 8,000 | SF | $ 1.75 | $ 14,008.00 |
| B010 | RESILIENT TILE FLOORING REPLACEMENT | C.6.9 | 6,000 | SF | $ 8.24 | $ 49,440.00 |
| B011 | SHEET VINYL FLOORING REPLACEMENT | C.6.10 | 2,000 | SF | $ 8.24 | $ 16,480.00 |
| B012 | SHEET LINOLEUM FLOORING REPLACEMENT | C.6.11 | 2,000 | SF | $ 10.61 | $ 21,218.00 |
| B013 | CERAMIC TILE FLOORING REPLACEMENT CERAMIC TILE WALL REPLACEMENT | C.6.12 | 1,200 | SF | $ 8.19 | $ 9,826.20 |

RAV-0208

| | | | | | | |
|---|---|---|---|---|---|---|
| B014 | CARPET AND RUG CLEANING | C.6.13 | 18,000 | SF | $ 0.33 | $ 5,932.80 |
| B015 | CARPET STRETCHING | C.6.14.1 | 1,100 | SY | $ 4.53 | $ 4,985.20 |
| B016 | CARPET RELACMENT, INCLUDING PAD | C.6.14 | 2,600 | SY | $ 12.36 | $ 32,136.00 |
| B017 | STAIRWAY AND STEP CARPET REPLACEMENT, INCLUDING PAD | C.6.15 | 450 | SY | $ 19.06 | $ 8,574.75 |
| B018 | BRICK MASONRY REPOINTING | C.6.16 | 4,100 | SF | $ 4.94 | $ 20,270.40 |
| B019 | DUCT WORK CLEANING | C.6.17 | 2,000 | LF | $ 1.96 | $ 3,914.00 |
| B020 | FAN COIL UNITS SERVICES | C.6.18 | 100 | EA | $ 824.00 | $ 82,400.00 |
| B021 | FAN COIL UNITS REPLACE | C.6.18 | 50 | EA | $ 5,150.00 | $ 257,500.00 |
| B022 | SNOW & ICE REMOVAL - UNDER 2 INCHES | C.6.18 | 3 | EA | $ 2,575.00 | $ 7,725.00 |
| B023 | SNOW & ICE REMOVAL - 2 TO 6 INCHES | C.6.18 | 2 | EA | $ 12,875.00 | $ 25,750.00 |
| B024 | SNOW & ICE REMOVAL - 6 TO 12 INCHES | C.6.18 | 1 | EA | $ - | $ - |
| B025 | SNOW & ICE REMOVAL - 12 TO 18 INCHES | C.6.18 | 1 | EA | $ - | $ - |
| B026 | SNOW & ICE REMOVAL - OVER 18 INCHES | C.6.18 | 1 | EA | $ - | $ -- |
| B027 | VACANT UNIT CUSTODIAL | C.6.19.1 | 50,000 | SF | $ 0.41 | $ 20,600.00 |
| B028 | VACANT UNIT MINI-CLEANING | C.6.19.2 | 25,000 | SF | $ 0.25 | $ 6,180.00 |
| B029 | CHIMNEY CLEANING/REPAIR | C.6.21 | 50 | EA | $ 360.50 | $ 18,025.00 |
| B030 | ENGINEERING SERVICES/CONSTRUCTION | C.6.22 | | TO | | $ 51,500.00 |
| B031 | SKILLED LABOR | C.7 | 600 | CH | $ 36.05 | $ 21,630.00 |
| B032 | UNSKILLED LABOR | C.7 | 200 | CH | $ 23.69 | $ 4,738.00 |

**TOTAL INDEFINITE QUANTITY**  $ 1,123,258.26

**TOTAL INDEFINITE QUANTITY WORK**  $ 3,059,761.26



**The Ravens Group, LLC**
*Consulting and Business Strategies that Win*

## GFOQ CONTRACT NEGOTIATION MEETING

Date Held: April 19, 2005
Location: Fort Belvoir
In Attendance: Lenora Clark-Evans
  General Joe N. Ballard
  Bill Campbell
  Dwayne Lacewell
  Maria Belino-Coffeen
  Dee Spellman
  Lisa Barnes
  Satoya Smith
  (Unknown CDCC representative)

I. CDCC Change Answers

1. The government will not terminate contract or exercise the year option to terminate for convenience.
2. Modifications to the contract will be as follows:
   2.1. EMO will control service desk so the service calls do not exceed the contract requirements established when estimating the $15,000.
   2.1.2. Although triage of service calls will be done by EMO, there will be fair dealing with The Ravens Group as it concerns types of service calls received and use of outside vendors when the service calls exceed the 50 calls for the month.
   2.1.3. The residents will be notified of the changes to the service received prior to complaints on the work ethic and responsiveness of The Ravens Group
   2.2. CDCC will be deleting the Firm-Fixed CLIN for "Custodial Supplies" [000AF] in the amount of $5,700 per month
3. EMO will no longer verbally change the scope of work during project work. A clear scope of work will be provided and coordinated with The Ravens Group and EMO prior to work being done and "notice to proceed" received by CDCC.
4. Change of Occupancy CLIN [0002AA] for .38 cents will not be increased.
   4.1. COM should remain basic. Therefore the .38 cents is a fair amount. Basic COM standards are to stick to the post occupancy inspection (i.e. cleaning, re-key of doors, name plate change, pest control, spot painting, and minor repairs)
   4.2. Any work above and beyond initial inspection should be broken out to another project and not apart of the "Change of Occupancy" invoicing.



## GFOQ CONTRACT NEGOTIATION MEETING

    4.3.   Quarters painting as a part of change of occupancy in the future will no longer be awarded to The Ravens Group because there is an existing paint contract. But The Ravens Group will receive all other Change of Occupancy work.

5. CDCC will provide a write-up with "defined channels" of how the new changes with the service desk will work.

II.    CDCC Issues

1. Grounds maintenance issues concerning mulching is questionable [C.5.4.].
   1.1.   EMO stated that they have never requested to have mulching done; that The Ravens Group "just did it".
   1.2.   The Ravens Group stated that we were in fact requested to do mulching on several occasions and it is not a part of the Grounds Maintenance in the contract.
2. The Ravens Group has not submitted several reports required as per the contract. (Annual inspections, preventative maintenance used as examples)
   2.1.   EMO has also failed to submit reports required as per the contract necessary to complete The Ravens Groups reports requested.
   2.2.   Solution – Both parties will exchange a list of reports that have not been received.
3. The Ravens Group should no longer send proposals to CDCC before the requirement is received by EMO. (Recant prior request to send proposals during initial request for work).

III.    Upcoming Items (Projects)

1. "Change of Season"
   1.1.   Agreed that it will be done same as last year, as an IDIQ. EMO (Lisa) will provide a scope of work and a schedule for how the work is to commence once the heat is turned off.
   1.2.   Attic doors (confirmed but also upon fund availability)
2. There are approximately 12 change of occupancies projected.

IV.    Invoice Payments

1. The Ravens Group does not need to make a claim on the interest payment. It will be paid in full on all invoices paid after 30 days.



**The Ravens Group, LLC**
*Consulting and Business Strategies that Win*

## GFOQ CONTRACT NEGOTIATION MEETING

2. Annual inspection and Preventative maintenance that was not paid on last firm-fixed bills "will be discussed". Currently waiting on the funding. Also they are pending receipt of reports.

3. MN05 Change of occupancy outstanding amount is pending explanation of accused "double billing".

4. Snow removal bills that were not paid were held due to the areas being apart of DPW's contract. EMO confirmed that The Ravens Group was given the directive to complete those questioned areas due to a confusion of responsibilities with John Russo of DPW.

5. The Ravens Group has $99,802.44 outstanding (to include April firm fixed invoice).

V. Ravens Group Issues (not previously discussed)

1. Warehouse
   1.1. EMO architect and interior designer will be coming up with a design for the warehouse so that it will be possible for residents to walk through when items are needed and The Ravens Group office space will be upheld.
   1.2. Chandeliers that have been stored in the warehouse have been broken. (Parts will be the responsibility of The Ravens Group)

2. EMO will rectify the dumpster issue. As it stands The Ravens Group has incurred dumping costs that will be in the claim filed.

3. Fan coil servicing should be treated as project work. (Agreed). Offer to do the baseline assessment so that EMO can determine which units will be done on a case by case basis due to the lack of funding.

4. Pest control costs incurred may exceed the firm-fixed $4,000; due to the termite problem that has come up.
   4.1. The termites will be treated as project work because of the high cost and necessity to resolve issue.



Jun 17 05 04:39p     th   ravens group          202-756-7441          p.2



**DEPARTMENT OF THE ARMY**
ARMY CONTRACTING AGENCY
HEADQUARTERS, NORTHERN REGION
CAPITAL DISTRICT CONTRACTING CENTER
9410 JACKSON LOOP, SUITE 101
FORT BELVOIR, VIRGINIA 22060-5134

REPLY TO
ATTENTION OF:

SFCA-NR-CDCC                                    15 June 2005

GENERAL JOE N. BALLARD (Retired)
President & CEO
The Ravens Group, LLC
1101 Pennsylvania Avenue, NW Suite 706
Washington, DC 20004

Dear General Ballard:

The purpose of this correspondence is to inform you that the current contract W91QVJ-04-D-0013 for maintaining General Flag Officers Quarters (GFOQ) at Fort Myer and Ft McNair will expire 15 August 2005. The US Government does not intend to exercise its option years without prejudice to the incumbent contractor

This notice constitutes a preliminary notice to prepare your firm for phase out period beginning 15 July 2005. Request that a phase out meeting be conducted prior to 15 July 2005 to prepare requiring activity for inventory of government furnished items and any turnover required from the contractor to the government.

All outstanding invoices shall be paid to the contractor within the terms of the contract. All outstanding work orders shall be identified and contractor shall provide to the activity schedule of completion for open work orders.

The Ravens Group, LLC has been a working partner of the government in providing required services at GFOQ at Fort Myer and Fort McNair for over a year above and beyond of what was expected on services provided.

If you require additional information please contact the Contract Administrator, Marla Belino-Coffeen at (703) 806-3870.

Sincerely,

*William E. Campbell*
WILLIAM E. CAMPBELL
Contracting Officer
Chief, Contract Operations Division

Contractor Acknowledgement / Receipt of Notification

Joe N. Ballard, President/CEO                          6/17/2005
Print Name and Title              Signature             Date

02/14/2006  14:25    7038064013              CDCC                        PAGE  01


REPLY TO
ATTENTION OF:

**DEPARTMENT OF THE ARM f**
ARMY CONTRACTING AGENCY
HEADQUARTERS, NORTHERN REGION
CAPITAL DISTRICT CONTRACTING CENTE I
9410 JACKSON LOOP, SUITE 101
FORT BELVOIR, VIRGINIA 22060-5134

14 February 2006

SFCA-NR-CDCC

Mr. Joe N. Ballard
President/CEO
Ravens Group, LLC
1101 Pennsylvania Avenue
Washington, DC 20004-2514

Dear Mr. Ballard:

Today is the end date of your contract with Capital Distric Contracting Center (CDCC) under W91QV1-04-D-0013 on services provided to General Flag Officers' Quarters (GFOQ) in behalf of Executive Management Office (EMO). CDCC/EMO ex iess appreciation to all efforts extended by Ravens Group, LLC in the fulfillment of this contrac

In accordance with the terms and conditions of W91QV1-( 4-D-0013, Section C-2 of the contract, Ravens Group LLC should provide all and complete repr ing requirements under this contract - see Section C-2, paragraphs C.2.2 thru C.2.8 of the cont act under P00001; to include Technical Library (see C.9.17.1 and C.9.17.2) to be turned over t he Contracting Officer upon completion of the contract.

Request that all required documentation be submitted to th Contracting Officer prior to the release of final payment under this contract. Please advise your pe sonnel to turn in CAC cards issued to your staff under this contract to include vehicle decals or any key/s if issued by close of business today.

Outstanding invoices under this contract shall be settled am he paid in accordance with FAR Clause 52.212-4 paragraph I, 1) and 2) to include payment of intere t upon release of final payment to the Ravens Group, LLC.

Very Respectfully,

CC
EMO

WILLIAM E. CAMP ELL
Chief, Contract Oper ions Division

OPTIONAL FORM 99 (7-90)

**FAX TRANSMITTAL**    # of pages ►

To Glen J. Ballard    From Maria Dil ...

Dept./Agency Ravens Group    Phone # 703 806 3 ...

Fax # 301 577 9097    Fax # 703 806 90/3

NSN 7540-01-317-7308    5099-101    GENERAL SERVICES ADMINI RATION

# The Ravens Group, LLC
## Profit & Loss by Job
### January through December 2004

Accrual Basis

|  | Jan - Dec 04 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Commission - Consulting | 0.00 |
| Income - Building Services | 718,391.18 |
| Other Income/Loss | 839.51 |
| **Total Income** | 719,230.69 |
| **Cost of Goods Sold** | |
| **Direct Expenses - Building Serv** | |
| ANSWERING SERVICE | 464.07 |
| CONSULTING FEES | 227,358.70 |
| EQUIPMENT/TOOL RENTAL | 298.79 |
| FUEL | 4,012.71 |
| MATERIALS | 3,959.00 |
| OTHER DIRECT COST | 988.93 |
| PAYROLL EXPENSE - HOLIDAY PAY | 9,300.68 |
| PAYROLL EXPENSE - SALARY | 157,733.51 |
| PAYROLL EXPENSE - SICK PAY | 649.98 |
| PAYROLL EXPENSE - VACATION PAY | 2,122.76 |
| SUPPLIES | 41,364.75 |
| TELEPHONE (MOBILE) | 3,698.28 |
| TOOLS | 368.40 |
| Uniforms | 1,350.00 |
| Direct Expenses - Building Serv - Other | 18,286.87 |
| **Total Direct Expenses - Building Serv** | 471,957.43 |
| **Total COGS** | 471,957.43 |
| **Gross Profit** | 247,273.26 |
| **Net Ordinary Income** | 247,273.26 |
| **Net Income** | 247,273.26 |

A161

# The Ravens Group, LLC
## Profit & Loss by Job
### January through December 2005

Accrual Basis

| | Jan - Dec 05 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Income - Building Services | 1,052,999.71 |
| Other Income/Loss | 235.86 |
| **Total Income** | 1,053,235.57 |
| **Cost of Goods Sold** | |
| **Direct Expenses - Building Serv** | |
| ANSWERING SERVICE | 1,415.08 |
| CONSULTING FEES | 262,635.33 |
| EQUIPMENT/TOOL RENTAL | 1,002.30 |
| FUEL | 8,691.44 |
| MATERIALS | 18,893.95 |
| OTHER DIRECT COST | 6,062.68 |
| PAYROLL EXPENSE - HOLIDAY PAY | 13,757.92 |
| PAYROLL EXPENSE - SALARY | 381,554.36 |
| PAYROLL EXPENSE - SICK PAY | 4,920.67 |
| PAYROLL EXPENSE - VACATION PAY | 10,776.14 |
| SUPPLIES | 23,233.28 |
| SUPPLIES - O/H | 1,075.99 |
| TELEPHONE (MOBILE) | 14,533.21 |
| Direct Expenses - Building Serv - Other | 17,631.19 |
| **Total Direct Expenses - Building Serv** | 766,183.54 |
| **Total COGS** | 766,183.54 |
| **Gross Profit** | 287,052.03 |
| **Net Ordinary Income** | 287,052.03 |
| **Net Income** | 287,052.03 |

A162

# The Ravens Group, LLC
## Profit & Loss by Job
### January through December 2006

**Accrual Basis**

| | Jan - Dec 06 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Income - Building Services | 162,820.29 |
| Other Income/Loss | 238.90 |
| **Total Income** | 163,059.19 |
| **Cost of Goods Sold** | |
| Direct Exp - General Liability | 336.28 |
| Direct Exp - Health Insurance | 1,747.00 |
| Direct Exp - Life/Disability | 143.54 |
| **Direct Expenses - Building Serv** | |
| ANSWERING SERVICE | 193.21 |
| CONSULTING FEES | 26,712.20 |
| Depreciation Expense | 14,119.96 |
| FUEL | 1,293.11 |
| MATERIALS | 5,244.77 |
| OTHER DIRECT COST | 7,216.10 |
| PAYROLL EXPENSE - HOLIDAY PAY | 4,049.04 |
| PAYROLL EXPENSE - SALARY | 46,677.92 |
| PAYROLL EXPENSE - SICK PAY | 1,107.99 |
| PAYROLL EXPENSE - VACATION PAY | 2,636.26 |
| SUPPLIES | 486.20 |
| TELEPHONE (MOBILE) | 1,119.67 |
| **Total Direct Expenses - Building Serv** | 110,856.43 |
| **Total COGS** | 113,083.25 |
| **Gross Profit** | 49,975.94 |
| **Net Ordinary Income** | 49,975.94 |
| **Net Income** | 49,975.94 |

A163

# The Ravens Group, LLC
## Profit & Loss
### January through December 2005

Accrual Basis

| | Jan - Dec 05 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Client Occupancy Fees | 4,651.04 |
| Commission - Consulting | 77,771.00 |
| Health & Human Services | 52,954.50 |
| Hourly Billings | 145.83 |
| Income - Building Services | 3,406,920.68 |
| MOBIS CONTRACT | 909,829.57 |
| Other Income/Loss | 4,727.38 |
| Service Fees - Consulting | 64,585.15 |
| Uncategorized Income | 0.00 |
| **Total Income** | 4,521,585.15 |
| **Cost of Goods Sold** | |
| Direct Exp - General Liability | 11,848.00 |
| Direct Exp - Health Insurance | 38,248.00 |
| Direct Exp - Life/Disability | 12,189.00 |
| Direct Exp - Workers' Comp | 18,533.00 |
| **Direct Expenses - Building Serv** | |
| ANSWERING SERVICE | 1,415.08 |
| CONSULTING FEES | 651,357.21 |
| EQUIPMENT/TOOL RENTAL | 2,033.30 |
| FUEL | 11,680.95 |
| MATERIALS | 110,322.40 |
| OTHER DIRECT COST | 6,212.68 |
| PAYROLL EXPENSE - HOLIDAY PAY | 49,907.04 |
| PAYROLL EXPENSE - SALARY | 1,237,214.80 |
| PAYROLL EXPENSE - SICK PAY | 9,876.15 |
| PAYROLL EXPENSE - VACATION PAY | 33,722.29 |
| SUPPLIES | 24,600.30 |
| SUPPLIES - O/H | 1,075.99 |
| TELEPHONE (MOBILE) | 16,112.53 |
| Uniforms | 2,499.00 |
| Direct Expenses - Building Serv - Other | 20,537.25 |
| **Total Direct Expenses - Building Serv** | 2,178,567.01 |
| **Direct Expenses - CONSULTING** | |
| OTHER DIRECT COST | 4,734.32 |
| Payroll Expense - Holiday Pay | 17,524.18 |
| Payroll Expense - Salary | 527,135.58 |
| Payroll Expense - Sick Pay | 5,413.38 |
| Payroll Expense - Vacation Pay | 18,867.05 |
| Professional Fees | 66,213.63 |
| **Total Direct Exponses - CONSULTING** | 639,888.14 |
| **Direct Expenses - H & HS** | |
| COMMISSION | 3,601.40 |
| PAYROLL EXPENSE - HOLIDAY | 3,426.76 |
| PAYROLL EXPENSE - REGULAR PAY | 59,964.50 |
| PAYROLL EXPENSE - SICK PAY | 1,637.25 |
| PAYROLL EXPENSE - VACATION PAY | 2,903.30 |
| Direct Expenses - H & HS - Other | 4,816.00 |
| **Total Direct Expenses - H & HS** | 76,349.21 |
| **Total COGS** | 2,975,622.36 |
| **Gross Profit** | 1,545,962.79 |
| **Expense** | |
| Advertisement | 7,613.02 |
| AUTO REPAIRS | 1,752.19 |
| Bank Charges | 40,662.77 |
| BID & PROPOSAL | 25.00 |
| Business Gift | 64.10 |
| Conference/Seminar | 525.00 |
| Contribution | 100.00 |

A164

# The Ravens Group, LLC
## Profit & Loss
### January through December 2005

Accrual Basis

|  | Jan - Dec 05 |
|---|---|
| **Depreciation Expense** |  |
| Depreciation - Automobile | 13,069.60 |
| Depreciation - Machinery & Eqpt | 25,141.23 |
| **Total Depreciation Expense** | 38,210.83 |
| **Dues** |  |
| Membership Fee | 155.00 |
| Web/E-mail Maintenance Fee | 311.55 |
| **Total Dues** | 466.55 |
| Equipment Lease | 286.41 |
| EQUIPMENT REPAIRS & MAINTENANCE | 1,541.48 |
| Express Mail/Delivery | 313.66 |
| Finance Charges | 14,977.08 |
| **Insurance Expense** |  |
| AFLAC SUPPLEMENTAL INSURANCE | -1,832.70 |
| Automobile Insurance | 15,056.00 |
| DISABILITY INSURANCE | -4,169.05 |
| General & Liability | 2,426.45 |
| Health & Dental Insurance | 9,355.70 |
| LIFE INSURANCE | 6,786.35 |
| Workers' Compensation | 3,795.99 |
| **Total Insurance Expense** | 31,418.74 |
| Internet Connectivity - MD Offi | 11,217.22 |
| Licenses | 397.25 |
| LOSS (STOLEN ITEMS) | 415.82 |
| Meals & Entertainment | 3,114.29 |
| Miscellaneous Fees | 2,540.14 |
| **Office Lease - DC** |  |
| A la carte business service fee | -150.39 |
| Internet Connetivity | 855.00 |
| Occupancy related taxes | 92.98 |
| Office Rent | 8,353.07 |
| Telecommunication Connectivity | 393.16 |
| Office Lease - DC - Other | 8,590.94 |
| **Total Office Lease - DC** | 18,134.76 |
| **Office Lease - Lanham, MD** |  |
| Lease Operating Expenses | 9,408.57 |
| Office Rent | 34,489.15 |
| Real Estate Taxes | 4,959.86 |
| **Total Office Lease - Lanham, MD** | 48,857.58 |
| **OFFICE REPAIRS/MAINTENANCE** |  |
| OFFICE MAINTENANCE - MD OFFICE | 5,263.97 |
| Office Repairs | 488.00 |
| OFFICE REPAIRS/MAINTENANCE - Other | 32.03 |
| **Total OFFICE REPAIRS/MAINTENANCE** | 5,784.00 |
| Office Supplies | 20,561.83 |
| **Other Direct Costs** |  |
| Meal & Entertainment | 485.88 |
| Travel/Transportation | 1,441.62 |
| **Total Other Direct Costs** | 1,927.50 |
| **Payroll Expenses** |  |
| Bonus | 2,000.00 |
| Holiday Pay | 14,096.03 |
| Salary - General & Admn | 364,653.34 |
| Sick Pay | 6,141.62 |
| Vacation Pay | 12,568.20 |
| **Total Payroll Expenses** | 399,459.19 |

**The Ravens Group, LLC**
**Profit & Loss**
January through December 2005

Accrual Basis

| | Jan - Dec 05 |
|---|---|
| **Payroll Taxes** | |
| Federal Unemployment Tax | 7,691.82 |
| Medicare Expense | 35,150.12 |
| Social Security Expense | 150,032.79 |
| State Unemployment Tax | 31,856.00 |
| **Total Payroll Taxes** | 224,730.73 |
| | |
| PENALTY | 4,146.73 |
| Postage | 1,539.79 |
| Printing/Duplication | 1,252.09 |
| **Professional Fees** | |
| Accounting Fee | 7,762.50 |
| Commission | 231.02 |
| Consulting Fee | 117,045.77 |
| Miscellaneous Fees | 310.00 |
| **Total Professional Fees** | 125,349.29 |
| | |
| Security | 508.88 |
| Storage | 3,712.97 |
| Subscription | 1,075.12 |
| **Taxes** | |
| Other Taxes | 222.25 |
| Personal Property Tax | 775.99 |
| State Tax Expense - DC Current | 100.00 |
| Taxes - Other | 343.65 |
| **Total Taxes** | 1,441.89 |
| | |
| **Telephone** | |
| LONG DISTANCE CALLS | 1,563.18 |
| Mobile Telephone | 3,095.84 |
| Office Telephone - DC | 480.84 |
| OFFICE TELEPHONE - MD | 4,240.63 |
| Telephone - Other | 516.88 |
| **Total Telephone** | 9,897.37 |
| | |
| **Travel Expenses** | |
| Air Fare | 2,513.14 |
| Fuel | 163.74 |
| Lodging | 380.92 |
| Mileage Reimbursement | 520.00 |
| Other Transportation Costs | 1,043.66 |
| Parking/Toll Fees | 5,190.70 |
| Travel Expenses - Other | -793.31 |
| **Total Travel Expenses** | 9,018.85 |
| | |
| **UTILITIES - MD OFFICE** | |
| Electric | 5,423.02 |
| Heat | 904.99 |
| **Total UTILITIES - MD OFFICE** | 6,328.01 |
| | |
| **Total Expense** | 1,039,368.13 |
| | |
| **Net Ordinary Income** | 506,594.66 |
| | |
| **Other Income/Expense** | |
| **Other Income** | |
| Interest Income | 21.22 |
| **Total Other Income** | 21.22 |
| | |
| **Other Expense** | |
| Interest Expense | 75,146.00 |
| **Total Other Expense** | 75,146.00 |
| | |
| **Net Other Income** | -75,124.78 |
| | |
| **Net Income** | 431,469.88 |

A166

# The Ravens Group, LLC
# Profit & Loss

Accrual Basis

## January through December 2006

| | Jan - Dec 06 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Health & Human Services | 8,064.00 |
| Income - Building Services | 5,088,858.35 |
| MOBIS CONTRACT | 788,589.97 |
| Other Income/Loss | 1,145.19 |
| Service Fees - Consulting | 25,542.00 |
| TAPS CONTRACT | 90,183.30 |
| **Total Income** | 6,002,382.81 |
| **Cost of Goods Sold** | |
| Direct Exp - General Liability | 28,598.30 |
| Direct Exp - Health Insurance | 54,663.87 |
| Direct Exp - Life/Disability | 6,344.50 |
| Direct Exp - Payroll Taxes | 203,267.80 |
| Direct Exp - Workers' Comp | 32,899.98 |
| **Direct Expenses - Building Serv** | |
| ANSWERING SERVICE | 193.21 |
| CONSULTING FEES | 586,777.63 |
| Depreciation Expense | 30,785.29 |
| FUEL | 1,368.53 |
| MATERIALS | 208,724.99 |
| OTHER DIRECT COST | 10,424.55 |
| PAYROLL EXP - HEALTH & WELFARE | 43,164.00 |
| PAYROLL EXPENSE - HOLIDAY PAY | 82,072.42 |
| PAYROLL EXPENSE - SALARY | 1,817,817.92 |
| PAYROLL EXPENSE - SICK PAY | 37,688.89 |
| PAYROLL EXPENSE - VACATION PAY | 99,820.82 |
| SUPPLIES | 1,742.57 |
| TELEPHONE (MOBILE) | 1,277.66 |
| Uniforms | 2,107.98 |
| **Total Direct Expenses - Building Serv** | 2,923,966.46 |
| **Direct Expenses - CONSULTING** | |
| OTHER DIRECT COST | 48,143.88 |
| Payroll Expense - Holiday Pay | 11,156.28 |
| Payroll Expense - Salary | 257,955.33 |
| Payroll Expense - Sick Pay | 2,643.68 |
| Payroll Expense - Vacation Pay | 6,052.04 |
| Professional Fees | 171,630.78 |
| **Total Direct Expenses - CONSULTING** | 497,581.99 |
| **Direct Expenses - H & HS** | |
| PAYROLL EXPENSE - HOLIDAY | 0.00 |
| PAYROLL EXPENSE - REGULAR PAY | 0.00 |
| PAYROLL EXPENSE - SICK PAY | 0.00 |
| PAYROLL EXPENSE - VACATION PAY | 0.00 |
| Direct Expenses - H & HS - Other | 3,963.00 |
| **Total Direct Expenses - H & HS** | 3,963.00 |
| **Total COGS** | 3,751,285.90 |
| **Gross Profit** | 2,251,096.91 |
| **Expense** | |
| Advertisement | 21,884.55 |
| AUTO REPAIRS | 1,585.59 |
| BAD DEBT | 238,798.64 |
| Bank Charges | 14,214.66 |
| Business Gift | 8,356.92 |
| Conference/Seminar | 0.00 |
| Contribution | 375.00 |
| **Depreciation Expense** | |
| Depreciation - Machinery & Eqpt | 10,167.51 |
| **Total Depreciation Expense** | 10,167.51 |

# The Ravens Group, LLC
## Profit & Loss
### January through December 2006

Accrual Basis

| | Jan - Dec 06 |
|---|---|
| **Dues** | |
| Membership Fee | 160.00 |
| Web/E-mail Maintenance Fee | 0.00 |
| **Total Dues** | 160.00 |
| | |
| Equipment Lease | 381.54 |
| EQUIPMENT LEASE - PHONE SYSTEM | 549.04 |
| EQUIPMENT REPAIRS & MAINTENANCE | 905.28 |
| Express Mail/Delivery | 1,261.40 |
| Finance Charges | 440.75 |
| **Insurance Expense** | |
| AFLAC SUPPLEMENTAL INSURANCE | -1,360.33 |
| Automobile Insurance | 4,092.00 |
| DISABILITY INSURANCE | 2,104.21 |
| Health & Dental Insurance | 2,190.44 |
| LIFE INSURANCE | 2,755.00 |
| Workers' Compensation | 615.78 |
| **Total Insurance Expense** | 10,397.10 |
| | |
| Internet Connectivity - MD Offi | 8,412.13 |
| Legal Fee | 96,081.48 |
| Licenses | 775.25 |
| Meals & Entertainment | 5,869.95 |
| Miscellaneous Fees | 6,659.70 |
| Office Lease - Baltimore, MD | 5,650.39 |
| **Office Lease - DC** | |
| A la carte business service fee | 796.03 |
| Internet Connetivity | 1,103.14 |
| Occupancy related taxes | 235.26 |
| Office Rent | 22,350.00 |
| Telecommunication Connectivity | 2,714.62 |
| **Total Office Lease - DC** | 27,199.05 |
| | |
| **Office Lease - Lanham, MD** | |
| Lease Operating Expenses | 47.77 |
| Office Rent | 15,769.63 |
| Real Estate Taxes | 2,746.03 |
| **Total Office Lease - Lanham, MD** | 18,563.43 |
| | |
| **OFFICE REPAIRS/MAINTENANCE** | |
| OFFICE MAINTENANCE - MD OFFICE | 11,215.85 |
| **Total OFFICE REPAIRS/MAINTENANCE** | 11,215.85 |
| | |
| Office Supplies | 15,179.09 |
| **Payroll Expenses** | |
| Bonus | 12,721.80 |
| Holiday Pay | 14,827.43 |
| Salary - General & Admn | 471,946.70 |
| Sick Pay | 6,540.99 |
| Vacation Pay | 16,252.03 |
| Payroll Expenses - Other | 1,450.00 |
| **Total Payroll Expenses** | 523,738.95 |
| | |
| **Payroll Taxes** | |
| Federal Unemployment Tax | 697.08 |
| Medicare Expense | 8,434.21 |
| Social Security Expense | 35,703.58 |
| State Unemployment Tax | 1,334.66 |
| **Total Payroll Taxes** | 46,169.53 |
| | |
| PENALTY | 5,059.56 |
| Postage | 956.85 |
| Printing/Duplication | 0.00 |

A168

# The Ravens Group, LLC
## Profit & Loss
### January through December 2006

Accrual Basis

|  | Jan - Dec 06 |
|---|---|
| **Professional Fees** | |
| Accounting Fee | 53,642.71 |
| Consulting Fee | 121,279.50 |
| Management Fees | 342,000.00 |
| **Total Professional Fees** | 516,922.21 |
| Security | 279.15 |
| Storage | 7,140.20 |
| Subscription | 407.77 |
| **Taxes** | |
| Other Taxes | 475.29 |
| Personal Property Tax | 1,407.48 |
| State Tax Expense - DC Current | 100.00 |
| State Tax Expense - Deferred | 31,170.00 |
| **Total Taxes** | 33,152.77 |
| **Telephone** | |
| LONG DISTANCE CALLS | 1,875.79 |
| Mobile Telephone | 7,679.36 |
| Office Telephone - DC | 267.51 |
| OFFICE TELEPHONE - MD | 3,859.15 |
| **Total Telephone** | 13,681.81 |
| **Travel Expenses** | |
| Air Fare | 3,393.59 |
| Fuel | 1,231.35 |
| Lodging | 1,355.24 |
| Mileage Reimbursement | 104.57 |
| Other Transportation Costs | 1,015.45 |
| Parking/Toll Fees | 4,272.00 |
| **Total Travel Expenses** | 11,372.20 |
| **UTILITIES - MD OFFICE** | |
| Electric | 15,463.07 |
| Heat | 1,418.40 |
| **Total UTILITIES - MD OFFICE** | 16,881.47 |
| **Total Expense** | 1,680,846.77 |
| **Net Ordinary Income** | 570,250.14 |
| **Other Income/Expense** | |
| **Other Expense** | |
| Interest Expense | 53,341.06 |
| **Total Other Expense** | 53,341.06 |
| **Net Other Income** | -53,341.06 |
| **Net Income** | 516,909.08 |

# PATRICK HENRY⹇
attorneys and counselors at law

7619 Little River Turnpike
Suite 340
Annandale, VA 22003
Tel: 703.256.7754
Fax: 703.256.7883


RICHARD E. PATRICK
admitted in VA, DC

MAYNARD M. HENRY, SR.
admitted in VA, DC, PA, MI

SHARON I. THEODORE-LEWIS
admitted in MD, DC, NY, OH

DARYLE A. JORDAN
admitted in VA, DC, PA


Of Counsel

YUVORA NONG
admitted in VA, DC, FL

ETHEL MITCHELL
admitted in MD, DC, TX
US Virgin Islands, Ghana

MALIK N. DRAKE
admitted in VA, DC
USPTO Registration

FELTON F. NORMAN
admitted in DC, NY, GA

September 29, 2006

<u>Via Federal Express</u>
Ms. Christine Thompson
Chief of Contracting
Capital District Contracting Center
U.S. Army Contracting Agency
9410 Jackson Loop—Suite 101
Fort Belvoir, Virginia 22060-5134

Re:   **Contract No. W91QV1-04-D-0013**
      **General and Flag Officers Quarters Maintenance Contract**
      **Claim and Request for Contracting Officer's Final Decision**

Dear Ms. Thompson:

On behalf of The Ravens Group, Inc. (or "Contractor"), we hereby file this claim in the amount of $1,488,616.80, plus interest, and request a contracting officer's final decision regarding The Ravens Group's dispute with the Department of the Army ("Army") in connection with The Ravens Group's performance of Contract No. W19QV1-04-D-0013, the General and Flag Officers Quarters ("GFOQ") Maintenance Contract (hereinafter the "Contract"). As detailed below and in the supporting documents, The Ravens Group is entitled to an equitable adjustment in the amount stated, due to the Army's improper administration of the Contract. Among other things, the Army: unreasonably withheld payments for work the Contractor completed and the Army accepted; failed to disclose essential workload data and estimates; provided inaccurate and misleading estimates to the Contractor; interfered with the Contractor's performance; induced the Contractor to perform extra-contractual work for which the Contractor has not been paid; and breached the Contract by issuing Contract work to third party contractors.

## I.   INTRODUCTION

This claim is submitted pursuant to the Contract Disputes Act of 1978, as amended (41 U.S.C. §§ 601-613) (the "Act"), and Federal Acquisition Regulation ("FAR") § 52.233-1 (Disputes) (July 2002), incorporated by reference via FAR § 52.212-3 (Contract Terms and Conditions—Commercial Items) (January 2004). This claim is cognizable under the Act and the Disputes clause of the Contract because it is a "written demand . . . seeking, as

MARYLAND OFFICE
5900 Princess Garden Parkway
Suite 640
Lanham, MD 20706
Tel: 240.296.3488
Fax: 240.296.3487



Ms. Christine Thompson
September 29, 2006
Page 2

a matter of right, the payment of money in a sum certain, the adjustment or interpretation of Contract terms, and other relief arising under or related to the Contract.

Prior to this claim, The Ravens Group submitted a request for an equitable adjustment ("REA") to the Army in the amount of $1,488,616.80. The Ravens Group filed the REA by letter dated May 10, 2006. Regrettably, the Army's handling of the REA, like its prior administration of the Contract, has been shameful. By email dated May 22, 2006, the Army acknowledged its receipt of the REA. The Army's response, however, has been inexplicably and unjustifiably dilatory. The Army has broken numerous promises to The Ravens Group regarding the anticipated date of completion of its review of the REA and response to The Ravens Group. Based on the Army's failure (or refusal) to respond within the 120 days since it acknowledged receipt of The Ravens Group's REA, the Army is deemed to have denied the REA. Thus, the matters herein are disputed because the Army has not acted upon the REA in a reasonable time.

## II.    BACKGROUND

### A.    The Ravens Group

The Ravens Group is a Service Disabled, Minority-Owned Small Business with its corporate headquarters located at 1101 Pennsylvania Avenue, N.W.—6th Floor, Washington, D.C. 20004.

The Ravens Group was founded by Lieutenant General (Retired) Joe N. Ballard, its sole owner, President and Chief Executive Officer. It is an experienced facilities management and building services contractor. General Ballard served many years as a commissioned officer in the U.S. Army Corps of Engineers, including a tour of duty as Commander of the Corps of Engineers, the Government's senior civil engineer and construction official, a position to which he was appointed by the President of the United States.

### B.    GFOQ—Pre-Award

"The General and Flag Officers Quarters (GFOQs) Executive Management Office ("EMO") was established to provide program management for the maintenance and repair of General and Flag Officers Quarters." See Contract, Section C.1. The mission of the EMO, an organization within the Installation Management Agency ("IMA"), is to ensure that "responsive, professional, and quality services" are provided to General and Flag Officers and their families. Id.

In the summer of 2004, the Capital District Contracting Center ("CDCC") and EMO initiated discussions with The Ravens Group that ultimately lead to the formation of the GFOQ Contract. At the commencement of negotiations, Dee Spellman was the sole member of EMO's staff. She did not possess the knowledge or experience to prepare a scope of work; thus, the



PATRICK HENRY
attorneys and counselors at law

Ms. Christine Thompson
September 29, 2006
Page 3

CDCC engaged The Ravens Group to assist CDCC in preparing a statement of work for the GFOQ requirement.

Because EMO did not have adequate staff to perform the required maintenance and support services, and because the GFOQ housing units had not been serviced for several months, the Government asked The Ravens Group to begin performance of the maintenance and other services pending the parties' completion of negotiations and execution of a contract. Accordingly, at the Army's request, The Ravens Group began performance of maintenance and other services in support of the GFOQ housing units and grounds on or about June 2, 2004, approximately two (2) months before the execution of the GFOQ Contract. The Army paid for these services with credit cards. Later, it was determined that the Government lacked the authority to use credit cards for these acquisitions because the purchases exceeded the authorized funding limits of the cards. This triggered an Army Regulation ("AR") 15-6 investigation and a three (3) month delay of payment to The Ravens Group.

The Army did not allow The Ravens Group to conduct an inspection of the GFOQ housing units before or after execution of the Contract even though The Ravens Group specifically requested such an opportunity. As discussed below, the Army's refusal of The Ravens Group's reasonable request substantially increased The Ravens Group's cost to perform.

## III.   DISCUSSION

### A.    GFOQ Contract

#### 1.    Contract Type

The GFOQ Contract was executed August 16, 2004. It was awarded as a sole-source, Service Disabled Veteran Owned Small Business procurement.

Section C.1.1. of the Contract states that the work will be performed pursuant to a "combination firm fixed-price and indefinite quantity contract;" however, the Contract also made it clear that the Army intended to procure **all** GFOQ services and maintenance from The Ravens Group.

#### 2.    Scope of Work

The Contract Scope of Work required The Ravens Group to:

> Provide maintenance and repairs for **49 GFOQ[s]** to
> include structures, equipment, appliances, land areas, paved areas,
> maintenance support buildings, playgrounds, and facilities



PATRICK HENRY

Ms. Christine Thompson
September 29, 2006
Page 4

> provided for the Contractor's use, by means of a combination firm
> fixed-price and indefinite quantity contract . . . (emphasis added)
>
> Work locations are Army and non-Army Government
> facilities. Except as noted below, all property is Government
> owned.

See Contract, C.1.1

Section C.1.2 of the Contract also required The Ravens Group to: "provide all labor, materials, supplies, tools, equipment, transportation, management, and supervision as necessary to meet contract requirements." Id. In addition, Section C.1.2 required The Ravens Group to "maintain and repair all replaced, improved, updated, modernized, or renovated facilities, equipment, systems and components at no additional cost to the Government **unless such changes result in an increase or decrease in contract requirements** (emphasis added)." Id.

Section C.1.2.1 of the Contract required The Ravens Group to "maintain a work site management office" at Fort Myer and a "work reception office located with the GFOQ Executive Management Office that will receive and process work requests for all facilities maintained under this contract."

3.   Historical Government Data and Workload Estimates

The Contract required the Army to produce for the Contractor several classifications of workload data, work estimates, preventive maintenance reports, and warranty information. This information was critical to The Ravens Group's preparation and fulfillment of staffing, supplies, and equipment requirements. Among other data, the Contract required the Army to deliver the following to The Ravens Group:

Contract Section C.1.2.5—Warranty Program, required the Army to produce **"within fifteen (15)" working days after contract award** and as necessary thereafter, the existing warranty file showing equipment, components, and repairs installed . . .(emphasis added)." In addition, this provision required the Army to produce at the end of each month an "Expiring Warranty" report showing warranties that will expire in the next two months. Finally, the Contract required the Army to produce information regarding "the quarters, appliance, component, serial numbers as applicable, date of purchase or completions of repair, date warranty expires, . . . and a description of warranty repairs that have been accomplished for each item reported."

Contract Section C.1.2.6—Inventory of Household Equipment, required the Army to work with The Ravens Group to prepare a "detailed household appliance equipment list." The Ravens Group was not allowed to physically inventory the housing units, and the Army never



PATRICK HENRY
attorneys and counselors at law

Ms. Christine Thompson
September 29, 2006
Page 5

provided the required information even though the Contract required the Army to develop the list at contract award.

Contract Section C.1.2.9—Asbestos, Lead Paint, and other Hazardous Materials, required the Army to produce asbestos, lead paint, and other hazardous materials information and the location of such hazardous materials prior to commencement of performance.

Finally Contract Section C.5.1.8—Workload, provided that "the historical number and scope of service calls by month of the year are maintained within the GFOQ office and shall be made available to Contractor for review upon request." The Ravens Group requested this information, but to date the Army has never made the information available.

Although The Ravens Group requested the Army to produce the above-referenced information on many occasions and the requested information was critical to The Ravens Group performance, the Army never produced the required information and never advised The Ravens Group regarding the reason for its failure to produce the required information.

4.    Agreement to Cooperate

It is undisputed and was well understood by the parties before and incident to Contract execution, that The Ravens Group is the first private contractor to perform the GFOQ requirement. Thus, both parties understood and agreed that there would be a learning curve for performance of this requirement and that they would need to cooperate with each other to address contract administration issues as they arose. In recognition of the parties' need to cooperate in the performance of this requirement, they agreed to work with each other in good faith to properly execute the letter and intent of the GFOQ Contract.

Section C.8—Partnering, of the Contract required the parties to execute a partnering agreement "to ensure joint cooperation and a sound partnership of all parties involved in the execution of the contract."

5.    Contract Clauses

The Contract incorporated by reference FAR § 52.212-4 (Contract Terms and Conditions—Commercial Items) (OCT 2003), which further incorporated by reference a Changes provision and FAR 52.233-1 (Disputes) (JUL 2002).

B.    Impediments to Contract Performance

1.    Nondisclosure of Required (and Requested) Historical Data



Ms. Christine Thompson
September 29, 2006
Page 6

The Army failed to produce required (and requested) historical information and data it knew would be critical to The Ravens Group's performance. Government liability for nondisclosure of information is based on an implied duty to disclose information that is vital for the preparation of estimates or for contract performance. This implied duty is consistent with the general contract law concepts of good faith and fair dealing. See Restatement Second, Contracts Section 205 and U.C.C. Section 1-202. See also Dygert., "Implied Warranties in Government Contracts," 53 Mil. L. Rev. 39 (1971).

In Helene Curtis Indus., Inc. v. United States, 160 Ct. Cl. 437, 312 F.2d 774 (1963), the Court stated:

> In this situation the Government, possessing vital information which it was aware the bidders needed but would not have, could not properly let them flounder on their own. Although it is not a fiduciary toward its contractors, the Government – where the balance of knowledge is so clearly on its side – can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word.

In this instance, the Army told the Contractor that the critical information existed and that the Army would produce this information. The Army assured the Contractor of the existence of the promised information and data, and of the Army's willingness and intent to produce the essential information. See LBM, Inc. ASBCA No. 39606, 91-2 BCA (CCH) ¶ 24,016 (customary practice for the government to provide historical data).

Yet, as discussed above, the Army did not produce any historical workload data and work estimates. The Army's omission had a very serious and adverse impact on The Ravens Group's performance and caused the company substantial financial damage. For example, the Army told The Ravens Group that there would be approximately 50 service calls per month. In actuality, The Ravens Group answered an average of 93 service calls per month. Further, the Army advised the Contractor that it would need to respond to approximately **one to two** emergency service calls per year. The actual number of emergency service calls to which The Ravens Group was required to respond was **10 per month**. In addition, The Ravens Group was required to **respond to 13 urgent service calls per month**. Thus, The Ravens Group was required to respond to 23 urgent or emergency service calls per month when it had been lead by the Army to believe it would only have to respond to **one to two per year**. The Ravens Group relied on the Army's estimates and representations to its detriment.

2.    Incorrect and Misleading Workload Estimates

The Army also may be held liable if its statements to the contractor are not correct, and it is not necessary for contractor recovery that there be an intent to deceive. See Applied



Ms. Christine Thompson
September 29, 2006
Page 7

Companies, Inc., ASBCA Nos. 50749, 51662, 2001-2 BCA (CCH) ¶ 31430, *citing* Womack v. United States, 182 Ct. Cl. 399, 389 F.2d. 793 (1968). Moreover, contractors are not required to conduct investigations to determine whether the Army's statements are correct. Hollerbach v. United States, 233 U.S. 165 (1914).

In addition to the lack of historical workload data, the Army seriously misled The Ravens Group regarding the work it would be required to perform. As discussed above, the Army misled The Ravens Group regarding the number of service calls it would be required to make each month, the number of emergency service calls per month, and the number of urgent service calls per month.

The Army also misled The Ravens Group regarding the number of housing units for which The Ravens Group would be responsible. The Contract provided that the Contractor would be responsible for maintaining a total of 49 GFOQ housing units; however, from the commencement of performance of the Contract and throughout its performance, The Ravens Group was required to service and maintain 53 GFOQ housing units. The Ravens Group has never been compensated for servicing and maintaining the additional housing units.

3.      Breach of Implied Duty of Good Faith and Fair Dealing

The implied duty of good faith and fair dealing is a well-established procurement principal. See Mechanical Enterprises, Inc. ASBCA No. 31998, 88-2 (CCH) BCA ¶ 20,794, *citing* United States v. Smith, 94 U.S. 214 (1876). The theory has played a regular and integral part in the resolution of Government contract disputes. The duty manifests itself in two forms: 1) it is a duty not to act in a way that will hinder performance and 2) it is a duty to cooperate by taking affirmative action. In this instance, the Army violated both aspects of this well-established procurement principal.

The Army hindered The Ravens Group's performance in several important ways. As discussed above, the Army failed to disclose vital historical workload data. In addition, the Army issued a significant amount of the Contract work—work for which the Contract made The Ravens Group exclusively responsible—to third party contractors in violation of the Contract and Federal procurement law. In addition, the Army forbade The Ravens Group from working on some of the GFOQ quarters for which it had contracted. Finally, Army representatives on numerous occasions induced The Ravens Group into performing work over and beyond the Contract by threatening to terminate the work altogether.

The Army also failed to cooperate. Both before and following execution of the Contract, The Ravens Group requested critical workload data. The Army told The Ravens Group that the Army's DPW possessed the information, yet the Army failed to cooperate and produce the information. The Army also acted in bad faith by ignoring The Ravens Group's proposals to resolve the parties' differences.



Ms. Christine Thompson
September 29, 2006
Page 8

    4.    Improper Contract Administration

       The Government also improperly administered the GFOQ Contract. In <u>Mutual Maintenance Co.</u>, GSBCA 7492, 85-2 BCA ¶ 17,944, the Government improperly administered the contract by failing to promptly issue a "forward-priced change order." Likewise, in <u>Nash Janitorial Serv., Inc.</u>, GSBCA 6390, 84-1 BCA ¶ 17,135, *recons. denied*, 84-2 BCA ¶ 17,355, the contracting officer breached its duty to properly administer the Contract by not acting promptly on claims for constructive changes and a request for a change that would have made the work more efficient.

       In this case, the Army refused to produce essential data, refused to negotiate constructive changes, and unreasonably delayed paying The Ravens Group for work completed and accepted by the Army.

       Following a February 2005 meeting, the contracting officer specifically requested The Ravens Group to produce a proposal to address the significantly changed work. After The Ravens Group produced the requested information, the contracting officer unreasonably rejected the proposal.

    5.    Constructive Changes

       The Government makes a constructive change to a Contract that entitles the contractor to relief when the government's action or communication forces or induces the contractor to undertake extra work. <u>See Quality Plus Equipment, Inc.</u>, ASBCA No. 46932, 96-2 (CCH) BCA ¶ 28,595. In <u>Emerson-Sack-Warner Corp.</u>, ASBCA 6004, 61-2 BCA ¶ 3248, the Board stated:

> Where as a result of the Government's misinterpretation of a contract provision a contractor is required to perform more or different work, or to higher standards, not called for under its terms, the contractor is entitled to equitable adjustments pursuant to the Changes Article, including extensions of time.

       The Ravens Group early and consistently advised the Army that it was being required to perform significantly more work than the Contract had anticipated and that in the case of service calls, it was being required to perform to a much higher standard. As a result of the increased work, The Ravens Group was forced to purchase substantially more supplies and equipment, and to more than double its workforce.


PATRICK HENRY
attorneys and counselors at law

Ms. Christine Thompson
September 29, 2006
Page 9

### C.  Government Contract Breach

The Army also fundamentally altered the Contract by unilaterally, unreasonably and materially changing the terms and conditions of the Contract, including directing "cardinal changes" to the Contract, unreasonably failing to pay The Ravens Group, issuing Contract work to third parties, and partially terminating the Contract in bad faith knowing that the Army still had a need for the services provided by the Contractor.  In General Dynamics Corp., DOTCAB 1232, 83-1 BCA ¶ 16,386, the Board held that the Government's failure to pay five invoices under a cost-reimbursement contract constituted a material breach.  Similarly, in Northern Helex Co. v. United States, 197 Ct. Cl. 118, F.2d 546 (1972), the Court determined that a serious breach had occurred because of the Government's "total failure to pay over many months."

Similarly, the Army unreasonably refused to pay The Ravens Group for work The Ravens Group performed and the Army accepted.

### D.  February 2005 Meeting

As a result of numerous contract administration issues raised by The Ravens Group, the parties met in February 2002.  As a result of that meeting, the parties agreed as follows:

- The Ravens Group was losing money on service calls, grounds maintenance, and preventive maintenance because of the Army's failure to produce historical workload data as required by the Contract
- The Army was using credit card purchases to acquire Contract services from third party contractors
- The Army was requiring the Contractor to perform extra-contractual work such as snow removal on common area sidewalks and driveways
- The Ravens Group would prepare and submit a proposal at the Contracting Officer's request, for the additional work the Contractor was experiencing, including snow removal, warehouse, and service calls.

Regrettably, the Army unreasonably refused the Contractor's good faith proposal without reviewing it.

### E.  April 2005 Meeting

The parties met again April 19, 2005, to attempt to address ongoing contract administration matters.  Among other items, the parties agreed to the following:

- The Army would not terminate the Contract



Ms. Christine Thompson
September 29, 2006
Page 10

- The Contract would be modified to limit service calls to $15,000, but that the Army would act fairly and in good faith regarding the types of service calls The Ravens Group received versus the use of outside contractors
- The Army would notify the housing unit residents of the changes to preclude unfair complaints to The Ravens Group
- EMO would cease changing the scope of work during project performance
- The Ravens Group would not have to make prompt payment claims for interest on overdue invoices
- The Ravens Group had outstanding invoices at the time in the amount of $99,802.44

The Army inexplicably failed to comply with the agreements it reached with The Ravens Group at this meeting.

    F.  Dee Spellman Email

    Dee Spellman was initially introduced to The Ravens Group as the head government official at EMO. She later advised The Ravens Group that she had been appointed as the Army COTR for the GFOQ Contract. In this position, Ms. Spellman, with the approval of William Campbell, the Contracting Officer, made numerous demands to The Ravens Group to perform work beyond the scope of the Contract.

    By email dated December 19, 2005, Ms. Spellman, under Mr. Campbell's direction, distributed an email to all of the occupants of the GFOQ housing units, as well as other Army officials. The email unfairly and erroneously suggested that The Ravens Group's performance of services and maintenance under the GFOQ Contract, was defective even though it is undisputed that the Army had not at the time of Ms. Spellman's email (and has not to this date), conducted an evaluation of The Ravens Group's work performance. Moreover, The Ravens Group has **never** in its five (5) year history received a cure notice, notice of defect, or adverse performance rating on this or any other contract.

    The suggestions in Ms. Spellman's email were false, misleading, and extremely unfair. For example, the email accused The Ravens Group of not responding to service call requests, responding in an untimely manner, and providing defective services. Ms. Spellman knew or should have known when she issued the December 19th email, that pursuant to the Army's unilateral restructuring of service calls, service calls were being answered by three different sources: 1) Ms. Spellman and Ms. Spellman alone received and answered service calls for certain specified GFOQ housing units; 2) for other units, service calls were screened and handled by a service call center staffed by Army civilian personnel; and 3) finally, only some of the calls were being handled by the Ravens Group


PATRICK HENRY
attorneys and counselors at law

Ms. Christine Thompson
September 29, 2006
Page 11

Mr. Campbell and Ms. Spellman also knew that The Ravens Group had requested EMO and the Army to notify GFOQ occupants of the changes to the service call program before the changes were implemented, and that no EMO official nor any other Army official had notified the GFOQ occupants of the changes.

Based on the re-organization of the service call program, Mr. Campbell and Ms. Spellman knew or should have known that there were numerous service call requests from GFOQ occupants that were not going directly to The Ravens Group and were not being passed on to The Ravens Group by Army personnel. The Army could not hold The Ravens Group responsible for calls the Army diverted or mishandled. Nor could the Army properly accuse The Ravens Group of poor performance without conducting an evaluation of The Ravens Group's performance against the Contract requirements and other stated evaluation criteria. Accordingly, it was irresponsible as well as improper for Ms. Spellman to have issued such a misleading and false communication to senior and influential Army leaders and officials.

Ms. Spellman's unjustified and improper issuance of this email, caused incalculable damage to The Ravens Group's reputation. It is well-established that the Army can consider tort claims such as the one alleged here if the tort relates to or arises out of an express or implied contractual obligation. <u>Chain Belt Co. v. United States,</u> 115 F. Supp. 701 (Ct. Cl. 1953); <u>Asfaltos Panamernos, S.A.,</u> ASBCA No. 39425, 91-1 BCA ¶ 23,315. In this case, the Army had a contractual obligation under FAR Part 42.15, to allow The Ravens Group "a minimum of 30 days to submit comments, rebutting statements, or additional information" in connection with any evaluation of The Ravens Group's performance. FAR § 42.1503 recognizes that disclosure of performance information "could cause harm . . . to the competitive position of the contractor." In this case, Mr. Campbell permitted Ms. Spellman to distribute false information in violation of the FAR, to some of the most senior and influential individuals in the Army—the Agency in which The Ravens Group performed substantial contracts. Undoubtedly, Ms. Spellman's wrongful actions have severely affected The Ravens Group's ability to obtain other contracts.

## IV.   CONCLUSION

Based on the above, The Ravens Group is entitled to the following relief.

## V.   REMEDIES REQUESTED

1.   Payment in the amount of $59,684.86 for work performed by the Contractor and accepted by the Army for which the Army has unreasonably withheld payment. <u>See</u> Exhibit A.

2.   Payment in the amount of $631,354.30 for damages caused the Contractor due to the Army's failure to disclose essential workload data and estimates, and the Contractor's reliance on inaccurate and misleading government estimates.



Ms. Christine Thompson
September 29, 2006
Page 12

See Exhibits B and C.

3.  Payment in the amount of $12,587.66 for damages caused the Contractor resulting from the Army's interference with Contractor's performance. See Exhibit D.

4.  Payment in the amount of $123,289.99 for damages suffered by Contractor as a result of numerous and costly Army directed changes to the Contract work. See Exhibit E.

5.  Payment in the amount of $161,700.00 for the Army's breach of contract, including its improper, unlawful, and unjustified termination of major portions of the Contract work and issuance of Contract work to third party contractors. See Exhibit F.

6.  Payment in the amount of $500,000.00 for damages suffered by The Ravens Group as a result of the improper publication of false and misleading information regarding The Ravens Group's performance in violation of the Contract and the FAR.

TOTAL AMOUNT OF CLAIM $1,488,616.80

PATRICK HENRY LLP

Respectfully submitted,

Daryle A. Jordan

Enclosure

**CONTRACT NO. W91QV1-04-D-0013**
**GENERAL AND FLAG OFFICERS QUARTERS MAINTENANCE CONTRACT**
**CLAIM AND REQUEST FOR CONTRACTING OFFICER'S FINAL DECISION**

### CERTIFICATION OF CLAIM

I CERTIFY THAT THE ABOVE CLAIM IS MADE IN GOOD FAITH; THAT THE
SUPPORTING DATA ARE ACCURATE AND COMPLETE TO THE BEST OF MY
KNOWLEDGE AND BELIEF; THAT THE AMOUNT REQUESTED ACCURATELY
REFLECTS THE CONTRACT ADJUSTMENT FOR WHICH THE CONTRACTOR
BELIEVES THE GOVERNMENT IS LIABLE; AND THAT I AM DULY AUTHORIZED TO
CERTIFY THE CLAIM ON BEHALF OF THE CONTRACTOR.

_____  9/28/06
Joe N. Ballard                     Date
President and CEO
The Ravens Group, Inc.



REPLY TO
ATTENTION OF:

**DEPARTMENT OF THE ARMY**
ARMY CONTRACTING AGENCY
HEADQUARTERS, NORTHERN REGION
CAPITAL DISTRICT CONTRACTING CENTER
9410 JACKSON LOOP, SUITE 101
FORT BELVOIR, VIRGINIA 22060-5134

SFCA-NR-CDCC                                           December 21, 2006

Mr. Joe N. Ballard
President and CEO
The Ravens Group, Inc.
9901 Business Parkway Suite H
Lanham, MD 20706

SUBJECT: Contract W91QV1-04-D-0013; Claim and Request for Contracting Officer's Decision.

Dear Mr. Ballard:

This office is in receipt of your claim dated September 29, 2006 for **Remedies Requested** for the items listed below:

1. Partial Settlement in the amount of **$53,966.77** under exhibit A will be made by CDCC to the Ravens Group, Inc (TRG); claim in the amount of **$5,718.09, Exhibit A** under Purchase Order W91QV1-04-P-0436 will be resolved separately and is excluded from the resolution of this claim.

2. TRG's request for adjustment/remedy in the amount of **$631,354.30** under Exhibit B and C is denied for the following reasons:

    a. Service Call Overage and Service Call Response Overage (50 Service calls per month were never in the contract – see C.5.1, C.5.1.6, C.5.6.1, C 5.1.8.1 and C.5.8.2) in the amount of $116,400.00 and $67,050.00 respectively; lacking of documentation in accordance with (IAW) C.5.1.7 in support to alleged overage on Service Call Overage and Service Call Response Overage. Need specifics which items were not paid under monthly Service Calls.

    b. Personnel Modifications in the amount of $354,895.58 - this was a Firm Fixed Price contract; request that TRG refer to invoices paid by the Government under 002BF beginning 20 Sep 04 more or less $800K that some services under 0002BF invoices were part of Service Calls.

    c. Recap of Extenuated Costs for Quarters not under the contract in the amount of $93,008.72 is denied, it is vague and no specifics to detail in support of request for payment/remedy or entitlement of this amount by TRG.

    d. Equipment Loan in the amount of $123,289.99; "equipment purchased for this contract and although the Government's decision **to terminate for the convenience** of the government at 18 month," – the contract was never terminated, in fact it was extended for additional six months – see W91QV1-04-D-0013-P00004 and letter dated 15 Jun 05 signed and acknowledged by Gen Joe Ballard (R), on 16 Jun 05 stating that the US Government does not intend to

exercise its option year without prejudice to the incumbent contractor; also see TRG's revised proposal dated 09 Feb 05.

3. Request for additional payment of $12,587.00 under Exhibit D is denied for Ft Myer Qtrs 2 Bathroom - see W91QV1-04-D-0013- P00001 signed by Gen J. Ballard dated 9/30/2004 and see Section C.7.4 of this modification; insufficient documentation in support of request for remedy/payment or TRG's entitlement of this amount. There is no explanation as to how the additional $12,587.00 was incurred; two sets of invoice with the same number and date were submitted to CDCC, one in the amount of $24,833.30 which was marked void from Exhibit D, and the same invoice with the same description in the amount of $12,245.64 of which this amount was paid.

4. Payment in the amount of $123,289.09 under Exhibit E is denied for Contract Changes by the Gov't – inaccurate/insufficient documentation in support of request for remedy/payment or TRG's entitlement of this amount to include the following reasons below:

   a. 24-Hour answering services after 19 Apr 2005 Meeting in the amount of $1,518.00 -- No invoice received.
   b. $33,071.99 50% of Service Administration Salary for 11 months (to include RG Burden) -- no invoice and no backup documentation received for request for payment/remedy or entitlement of this amount by TRG, again this is a FFP contract..
   c. Deletion of $62,700.00 of FFP CLIN 0001AF -- This was discussed in the 19 Apr 05 meeting and agreed that this would be deleted and funds shall be deobligated, this is **Contractor Occupied Space** and was **provided to Contractor free of charge**. Gen J. Ballard agreed to it by signing W91QV1-04-D-0013-P00003 dated 27 Apr 06.
   d. Termination for Convenience Costs incurred in the amount of $26,000.00 -- the contract was never terminated, it was extended for additional six months which Gen J. Ballard agreed under W91QV1-04-D-0013-P00004 dated 12 Aug 05

5. Payment in the amount of $161,700.00 is denied for alleged Army's Breach of Contract under Exhibit E – insufficient documentation in support of request for remedy/payment or TRG's entitlement of this amount . This was a FFP contract with IDIQ CLINs; **minimum guarantee of work was the Firm Fixed Price portion of the contract** – see C.9.6 of the contract.

6. Payment in the amount of $500,000.00 for damages suffered by TRG as a result of the improper publication of false and misleading information regarding the TRG performance in violation of the contract and the FAR is found to be without merit and is denied.

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract

2

appeals and provide a copy to the Contracting Officer, Mr. William E. Campbell, from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract number W91QV1-04-D-0013.

Very Respectfully,

WILLIAM E. CAMPBELL, JR.
Contracting Officer
Division Chief, Team 1
Capital District Contracting Center

3

# Defense Contract Audit Agency



### United States
### Department of Defense



### May 9, 2011

## Independent Audit of The Ravens Group's
## Claim Under
## Contract No. W91QV1-04-D-0013

## AUDIT REPORT NO. 6431-2010C17200002-R1

### RESTRICTIONS

1. The contents of this report should not be released or disclosed, other than to those persons whose official duties require access in accordance with DoD 5200.1-R, Information Security, January 1997, Appendix 3, paragraph AP3.2.3. This document may contain information exempt from mandatory disclosure under the Freedom of Information Act. Exemption 4, of the Freedom of Information Act, which addresses proprietary information, may apply.

   It is not practical to identify during the conduct of the evaluation those elements of the data which are proprietary. Proprietary determinations should be made in the event of an external request for access. Unauthorized disclosure of proprietary information violates 18 U.S.C. 1905 and, if the information is contractor bid or proposal or source selection information, 41 U.S.C. 423. Any person who unlawfully discloses such information is subject to penalties such as fines, imprisonment, and/or removal from office or employment.

2. Under the provisions of Title 32, Code of Federal Regulations, Part 290.7(b), DCAA will refer any Freedom of Information Act requests for reports received to the cognizant contracting agency for determination as to releasability and a direct response to the requestor.

3. Do not use the information contained in this report for purposes other than action on the subject of this report without first discussing its applicability with the auditor.

**FOR OFFICIAL USE ONLY**

**Report No. 6431-2010C17200002-R1**

# DEFENSE CONTRACT AUDIT AGENCY

**PREPARED FOR:**   U.S. Army Contracting Agency
Attn: Maria Belino-Coffeen, Contracting Officer
Army Contracting Command
Mission & Installation Contracting Command
Directorate of Contracting Belvoir
9410 Jackson Loop Road, Suite 101
Fort Belvoir, VA  22060-5134

**PREPARED BY:**   DCAA Southeastern Maryland Branch Office
10025 Governor Warfield Parkway, Suite 200
Columbia, MD  21044-3329

| | |
|---|---|
| Telephone No. | (410) 964-2060 |
| FAX No. | (410) 997-3237 |
| E-mail Address | dcaa-fao6431@dcaa.mil |

**REFERENCES:**   Contract No. W91QV1-04-D-0013
Relevant Dates:  See Page 22
6431/820.5/ehb

**CONTRACTOR:**   The Ravens Group, Inc.
4640 Forbes Boulevard, Suite 300
Lanham, MD  20706-1894

| **CONTENTS:** | | Page |
|---|---|---|
| | Subject of Audit | 1 |
| | Executive Summary | 1 |
| | Scope of Audit | 1 |
| | Results of Audit | 2 |
| | Contractor Organization and Systems | 21 |
| | DCAA Personnel and Report Authorization | 22 |
| | Audit Report Distribution | 23 |
| | Appendices | 24 |

**FOR OFFICIAL USE ONLY**

## SUBJECT OF AUDIT

As your office requested on May 14, 2010, we commenced our examination of The Ravens Group, Inc. (TRG) $1,488,616.80 price adjustment for services provided for in the maintenance contract with the Department of the Army to determine if the claimed costs are acceptable as a basis for settlement. The Ravens Group submitted the claim, dated April 12, 2010, under the combination Firm Fixed Price/IDIQ Contract No. W91QV1-04-D-0013 to provide regular maintenance services for forty-nine General Flag Officers Quarters. The claim was submitted pursuant to the Contract Disputes Act of 1978, 41 U.S.C. 601-613.

On August 23, 2010, your request was revised for a review of the contractor's increased claim amount to $2,060,286. The amount was based on the contractor's submitted complaint to the United States Court of Federal Claims: Case No. 07-754C filed on October 29, 2007 and included damages of $500,000. Our examination is based on the amount of $2,060,286.

The price adjustment claim and related information other than cost or pricing data are the responsibility of the contractor. Our responsibility is to express an opinion on the proposal based on our examination.

## EXECUTIVE SUMMARY

We have questioned the contractor's claimed amount of $2,060,286 in its entirety.

SIGNIFICANT ISSUE:

- We questioned the claimed costs in their entirety due to the lack of adequate, verifiable supporting documentation in accordance with FAR Subpart 4.7 and the contract terms.

Because the contractor contested certain significant issues raised in our recommendation, we recommend that you invite a DCAA representative to attend the negotiation/settlement conference.

## SCOPE OF AUDIT

We conducted our examination in accordance with generally accepted government auditing standards (GAGAS), except DCAA does not currently have an external opinion on its quality control system as required by GAGAS 3.55. The most recent external quality control review opinion expired on August 26, 2009. GAGAS require that we plan and perform the examination to obtain reasonable assurance that the price adjustment claim is free of material misstatement. An examination includes:

- evaluating the contractor's internal controls, assessing control risk, and determining the extent of audit testing needed based on the control risk assessment;

FOR OFFICIAL USE ONLY

**Report No. 6431-2010C17200002-R1**

- examining, on a test basis, evidence supporting the amounts and disclosures in the price adjustment claim;
- assessing the accounting principles used and significant estimates made by the contractor;
- evaluating the overall price adjustment claim presentation; and
- determining the need for technical specialist assistance.

We evaluated the claimed costs using the applicable requirements contained in the:

- Federal Acquisition Regulation (FAR) Subpart 4.7; and
- Contract Terms.

During our examination, the contractor was unable to provide adequate, verifiable supporting documentation for the claimed costs. Such adequate support would have been timesheets signed by the employee and approved by the supervisor, accounting books and records and other adequate supporting documentation such as log books and other records. During the course of the audit, we held conversations with the Contracting Officer regarding the lack of adequate support. At your request, we have nevertheless evaluated the claimed costs to the extent possible in the circumstances.

The scope of our examination reflects our assessment of control risk and includes audit tests designed to provide a reasonable basis for our opinion.

The contractor claims exemption under 48 CFR 9903.201-1(b) (3) from the practices required by the Cost Accounting Standards Board rules and regulations because it considers itself a small business concern.

## RESULTS OF AUDIT

In our opinion, the information other than cost or pricing data submitted by The Ravens Group, Inc. is not adequate. The proposal was not prepared in all respects in accordance with appropriate provisions of FAR Subpart 4.7 and contract terms. Because the noncompliance with FAR Subpart 4.7 and inadequacies are considered to have a significant impact on the claim taken as a whole; we do not believe the claim is an acceptable basis for negotiation of a fair and reasonable settlement. In order to make the information other than cost or pricing data adequate, the contractor should provide adequate, verifiable supporting documentation for the claimed costs. The contractor must provide detailed supporting documentation, such as accounting books and records and other documentation needed to support their claimed costs. Specifically, adequate support would include timesheets signed by the employee and approved by the supervisor, accounting books and records, and other supporting documentation such as adequate log books and other records as required by the contract. During the course of the audit, we held conversations with the Contracting Officer on numerous occasions regarding the lack of adequate support. At your request, we have nevertheless evaluated the claimed costs to the extent possible in the circumstances.

2

**FOR OFFICIAL USE ONLY**

**Report No. 6431-2010C17200002-R1**

We have questioned the claimed amount of $2,060,286 in its entirety. Refer to the Exhibit of this report for details of the results of audit.

We discussed the results of our examination with Irma Hilario, Chief Financial Officer, in an exit conference held on March 14, 2011. We did not provide the dollar impact of our findings. We advised Ms. Hilario of those areas of the proposal that were not adequately supported. Ms. Hilario reserved comment pending discussion with the Contracting Officer.

The results of our examination are based on the contracting officer's determination that the contractor's submission is a claim appropriate for consideration under the Contract Disputes Act of 1978 (41 U.S.C. 601-613). Should the basis for this determination or the contracting officer's decision be changed, we recommend that the auditor be notified so the impact of the change on the results of our examination can be considered.

**3**

**FOR OFFICIAL USE ONLY**

Report No. 6431-2010C17200002-R1                                    **EXHIBIT**

## SUMMARY OF CLAIM COSTS AND RESULTS OF AUDIT

| Cost Element | Claimed | Questioned | Difference (Note 1) | Note |
|---|---|---|---|---|
| Service Call Overage | $116,400 | $116,400 | $- | 2 |
| Priority Service Calls | 67,050 | 67,050 | - | 3 |
| Additional Employees | 354,895 | 354,895 | - | 4 |
| Additional Quarters | 93,009 | 93,009 | - | 5 |
| Answering Service | 1,518 | 1,518 | - | 6 |
| Administrator's Salary | 33,072 | 33,072 | - | 7 |
| Deletion of CLIN | 62,700 | 62,700 | - | 8 |
| Equipment Loan Loss | 26,000 | 26,000 | - | 9 |
| Distribution of Work | 161.700 | 161.700 | - | 10 |
| Invalid Contract Termination | 500,000 | 500,000 | - | 11 |
| Constructive Changes | 643,942 | 643,942 | - | 12 |
| Total | $2,060,286 | $2,060,286 | $- | |

EXPLANATORY NOTES

1.     The differences in this column are presented solely for the convenience of the procurement activity in developing its negotiation objective. They represent only the arithmetic difference between the amounts claimed and the related questioned costs. You should not consider the amounts to be audit approved or recommended amounts. DCAA does not approve or recommend prospective costs because the amounts depend partly on factors outside the realm of accounting expertise, such as opinions on technical and production matters.

2.     Service Call Overage

       a.  Summary of Conclusions:

       We questioned the claimed amount of $116,400 for Service Call Overage in its entirety based on the terms of the contract and FAR Subpart 4.7. The contractor did not provide adequate supporting documentation for the claimed service call overage for routine service calls as disclosed and required in Section C.5.1.7, Documentation, of the contract. The contract indicates that routine calls were part of the Firm Fixed Price portion of the contract. These calls represent those service calls estimated by the Government to cost $2,000 or less. The contract further indicates in Section C.5.1.8.1, Adjustments for Routine and Urgent Calls, no adjustments in compensation will be made to the contractor for labor hours that do not exceed 5% of the actual cumulative hours for a three (3) month period and in accordance with the terms of the contract formula and criteria. Since the contractor has not provided data that either adequately supports the completion of service calls or supports the computation of compensation for any excess workload for routine service calls in accordance with the contract terms, we have questioned the claimed costs in its entirety.

4

b. Basis of Contractor's Cost:

The contractor has claimed costs in excess of 50 routine service calls a month as service call overage. The contractor applied a rate of $300 per service call to each service call in excess of 50. A $300 rate/service call was based on using the unit price of $15,000 (as provided in CLIN 0001AA, Service Calls, of the contract) and dividing the unit price by 50 service calls per month. A summary of the contractor's claimed amount is as follows:

| Period of Time | No. of Routine Calls over 50 | Claimed Amount |
|---|---|---|
| August 2004 | 67 | $20,100 |
| September 2004 | 45 | 13,500 |
| October 2004 | 53 | 15,900 |
| November 2004 | 59 | 17,700 |
| December 2004 | 25 | 7,500 |
| January 2005 | 30 | 9,000 |
| February 2005 | 19 | 5,700 |
| March 2005 | 90 | 27,000 |
| **Total** | **388** | **$116,400** |

c. Audit Evaluation:

We reviewed the contract to determine the terms of the Firm-Fixed Price portion of the contract. The contract has a Contract Line Item Number (CLIN) for each type of Supplies/Services to be rendered. CLIN 0001AA for Service Calls was estimated for a quantity of 12 months at $15,000 unit price totaling $180,000. The number of service calls per month was not expressly provided in the basic contract or any modifications.

Based on the contract, The Ravens Group could be compensated for routine service calls if certain criteria were met. The actual workload could exceed the cumulative labor hours, irrespective of actual trade mix, by five percent with no adjustment in compensation to the contractor. The contractor was to be compensated for that portion of the actual routine service call workload that exceeded the cumulative hours for the three (3) month period. Specifically, contract section C.5.1.8.2, Labor Hours - Exceeding the 5% Variation Limitation, states that labor hours will be determined from completed work authorization data submitted by the contractor and that the Government reserved the right to adjust the contractor's reported, completed work order hours if those hours exceeded the current R.S. Means cost data or other estimating system. Once the adjusted actual cumulative labor hours were determined by the Government, the estimated cumulative labor hours would be adjusted upward by 5 % and the contractor would be compensated for the difference between the workload estimate for 3 months and the actual hours based on adjustments by the Government. The excess hours worked would be multiplied by the contractor's marked up hourly rate to yield the additional compensation for all costs (except materials) and profit for the excess workload. The parties agreed that the actual workload may exceed the cumulative labor hours by 5% with no adjustments in compensation to the contractor.

5

FOR OFFICIAL USE ONLY

In order for the Government to assess workload and any excess hours, the contractor was required to include specific information in the completed work authorization data documentation, such as the given phase of the service call (start, during and completion dates and times), description of repair, name of the contractor's employee who performed the work, an indication that work was completed, etc. Examples of the computations to derive the compensation for excess routine and urgent service call labor hours and compensation were provided in the contract for illustrative purposes.

We requested and reviewed the contractor's routine call service logs. The contractor could not provide adequate supporting documentation for the claimed overage for service calls. The service logs submitted did not include a start/stop time, actual hours expended, description of parts/materials utilized, or the name of the contractor's employee(s) who performed the work or any indication that the job was completed and the job tickets were not signed. The occupant of the unit also did not sign that the work was completed. Without the identification of the employee who completed the service call and the actual hours worked, no audit trail exists to verify the actual quantity of hours incurred and by whom the hours were worked. We were unable to verify to timesheets the hours worked. The timesheets that were available could not be supported and verified back to the service logs. Therefore, the service call overage could not be verified to the contractor's job cost ledger (i.e. that the costs claimed were recorded in the contractor's accounting books and records).

Instead of the above computations for any adjustments due to workload and the supporting data as required in the contract to amend the contact for any adjustments for routine, urgent and emergency service calls, the contractor based the claim for service call overage on an "agreed 50 service calls per month" and applied a service call rate of $300 to compute a total claimed amount. The contractor's methodology is not in accordance with the contract's requirements to compute any excess labor costs. Further, even if they did use the correct methodology, their service logs do not contain adequate documentation in accordance with the contract that would support the service call overages. In order to support that the estimated workload in the firm fixed price contract should be adjusted or warranted, the contractor should provide adequate and supportable documentation required by the contract and the required computations for any service call overage.

Finally, the 50 service calls per month used by the contractor in their computations is not expressly stated or stipulated in the contract or contract modifications. The contractor stated that the 50 service calls per month was agreed to with the Government based on meeting minutes from April 19, 2005. We reviewed the minutes of the meeting which identified attendees but there is no indication that the Government accepted the minutes generated by the contractor.

    d.  Contractor's Reaction:

The contractor reserved comment pending discussion with the Contracting Officer.

6

FOR OFFICIAL USE ONLY

3.      Priority Service Calls

        a.  Summary of Conclusions:

        We questioned the claimed amount of $67,050 for priority service calls in its entirety
because the contractor did not provide adequate supporting documentation in accordance with
Section C.5.1.7, Documentation, of the contract to support the claimed priority service calls. The
contractor's claimed priority service calls includes emergency and urgent service calls. The
contract specified the criteria and formulas to be utilized in order to claim compensation for
workloads that exceed urgent and emergency service calls.

        Compensation for excessive workload for urgent and emergency calls was to be
determined in the same manner as the routine service calls, except that emergency calls were not
limited to a $2,000 threshold as were the routine and urgent service calls. The contractor would
be compensated for the portion of each emergency call exceeding the $2,000 limitation by
issuing a work order for the excess. The documentation requirements, in relation to labor hours,
in the contract for each type of service call were the same. The parties agreed that the actual
workload may exceed the cumulative labor hours by 5% with no adjustments in compensation to
the contractor for urgent calls.

        Our examination disclosed that the contractor did not maintain adequate documentation
in the service logs as required in Section C.5.1.7 of the contract in order to adequately document
and support their overage of estimated workload in their accounting books and records. The
contractor's method to compute their claimed compensation for priority calls was not in
accordance with the contract's required formula computations and data requirements. Further,
we take exception to the contractor's use of their computed $300 as a per service call rate for
routine calls and the application of a 25% markup and 50% markup to compute an urgent call
and emergency call rate, respectively. The contractor believed that the rate of $300 per routine
service call was based on an agreed-to 50 service calls per month for an estimated price with the
Government for CLIN 0001AA. However, the 50 service calls per month is not expressed in the
contract and the contractor has not supported the percentages used to mark up the $300 rate.

        As explained in Note 2 above for service overage for routine calls, the contractor lacked
adequate supporting documentation for priority calls that were above the estimated workload and
required for compensation in the contract. Although the contractor had service logs that
indicated the level of service call (routine, urgent or emergency) assigned by the contractor, the
data for the calls were inadequate to support any overage of the estimated workload. Therefore,
we have questioned the claimed amount in its entirety.

        b.  Basis of Contractor's Cost:

        The contractor has claimed priority (urgent and emergency service calls) separate from
service call overage for routine calls. The contractor maintained service logs in which each type
of service call was recorded. The contractor applied a per service call rate of $375 for each
urgent service call and $450 for each emergency service call identified in their service log. The
contractor used a $300 per routine service call rate (based on CLIN 0001AA's item estimated

7

**FOR OFFICIAL USE ONLY**

cost) and applied a 25% markup to derive an urgent per call rate and a 50% markup to derive an emergency per call rate.

The contractor's basis is summarized as follows:

| Period of Time | Emergency Calls | Urgent Calls | Emergency 50% | Urgent 25% |
|---|---|---|---|---|
| August 2004 | 11 | 36 | $4,950 | $13,500 |
| September 2004 | 4 | 9 | 1,800 | 3,375 |
| October 2004 | 3 | 17 | 1,350 | 6,375 |
| November 2004 | 5 | 18 | 2,250 | 6,750 |
| December 2004 | 3 | 17 | 1,350 | 6,375 |
| January 2005 | 9 | 12 | 4,050 | 4,500 |
| February 2005 | 2 | 4 | 900 | 1,500 |
| March 2005 | 7 | 13 | 3,150 | 4,875 |
| **Total** | **44** | **126** | **$19,800** | **$47,250** |

c.  Audit Evaluation:

We examined the Firm Fixed Price terms of the subject contract. The contract indicated that urgent and emergency service calls were part of the fixed price contract. Section C.5.1.7, Documentation, of the contract stipulated the degree of documentation needed at any given phase of all work on a service call. Included in the required data was information on the employee who performed the work, actual hours expended, material costs, date and time started and completed, indication that work was completed, etc.

The contract provided the methodology to be used by the contractor to compute hours in excess of the estimated workload for urgent and emergency calls. Emergency calls required additional documentation, including a task order for all costs in excess of $2,000. Based on an example provided in the contract, the computations required and data needed to compute the contractor's marked up hourly labor rate to be applied to any excessive labor hours for service calls were provided.

The contractor maintained a service log for the urgent and emergency service calls. We reviewed the service logs that were provided by the contractor. As explained in Note 2c above, the service logs provided for our review did not contain adequate supporting documentation as required in the contract. Without the identification of the employee who completed the service call or the actual hours worked, no audit trail exists to verify the quantity of hours incurred and by whom the hours were worked. The timesheets that were available could not be supported and verified back to the service logs. Therefore, the claimed service call overage could not be verified to the contractor's job cost ledger (i.e. that the costs claimed were recorded in the contractor's accounting books and records).

Additionally, the contractor applied a markup of 25% to compute the per call rate for urgent calls and 50% to compute the per call rate for emergency calls. The markup was applied to the contractor's computed $300 per routine service call rate. This rate was derived from an agreement the contractor believed it had with the Government for an agreed-to 50 routine service calls per month for an estimated price of $180,000 for CLIN 0001AA. However, per the contract's illustrative computations, the contractor was required to use their marked up labor

8

**FOR OFFICIAL USE ONLY**

Case 1:07-cv-00754-NBF  Document 70-2  Filed 10/12/12  Page 78 of 98
EXHIBIT

rate, their average number of calls per month and average labor hours per call, excluding materials, to compute the marked up hourly labor rate which was to be applied to any excess hours (as computed per the contract formula) to compute the compensation due to the contractor for excessive workload. Documentation to support the contractor's actual hourly rate was not provided for review.

Emergency and urgent calls were considered part of the Firm Fixed Price portion of the contract. The contract indicated the Government would compensate the contractor for any emergency call exceeding a $2,000 limitation by issuing a work order for the excess. We requested the contractor to provide any task orders for the emergency calls that may have exceeded $2,000. The contractor indicated they did not have such task orders and if a service call would result in an expensive repair they would issue an IDIQ (indefinite delivery, indefinite quantity) modification to the contract.

Although the contractor's service logs did identify and segregate the type of service call based on the contractor's assessment of the call, this log alone is not sufficient according to the contract for compensation of any overage of the estimated workload. The service log must be adequate with sufficient data to analyze and compute any compensation for excessive workload in accordance with the terms of the contract. Our examination disclosed that the contractor's documentation and support for their claim for priority calls does not meet the contracts requirements or criteria and therefore we have questioned the claimed amount in its entirety.

    d.  Contractor's Reaction:

The contractor reserved comment pending discussions with the Contracting Officer.

4.    <u>Additional Employees</u>

    a.  Summary of Conclusions:

We questioned the claimed amount of $354,895 for additional personnel in its entirety based on the terms of the contract and the inadequacy of the documentation provided to support the claimed additional employee costs. Of the claimed amount; $250,668 relates to salaried employees and $104,227 relates to 1099 employees.

The Firm Fixed Price portion of the contract and Section C.1.2, General Requirements, indicates that the contractor would provide all labor, materials, management, supervision etc., as necessary to meet contract requirements. The contract also provided for a methodology for the contractor to be compensated for any adjustments due to cumulative labor hours or materials that exceeded the estimated workload in the contract. The contractor has not adequately supported their claimed costs for additional employee labor. We found deficiencies in the timesheets and 1099s provided to us by the contractor for examination to support the claimed additional employees.

9

FOR OFFICIAL USE ONLY

b. Basis of Contractor's Cost:

The contractor based their claimed costs for the additional employees on a spreadsheet provided that identified employee title for salaried and 1099 employees and their labor rate. The pay rates for the salaried employees have the company's burden rate of 30.15% included, which is inclusive of payroll taxes, liability, dental, health insurance, and worker's compensation. The 1099 employee rates have the burden rate of 8.83%, which is inclusive of worker's compensation and liability insurance.

c. Audit Evaluation:

We reviewed the contract and determined the contract provided a methodology for the contractor to be compensated for any adjustments due to cumulative labor hours or materials that exceeded the estimated workload in the contract. All labor was to be provided based on the terms of the fixed price contract and any adjustments and computation methodology required due to actual work in excess of the estimated workload were detailed in the contract.

Notwithstanding that the Firm Fixed Price portion of the contract required the contractor to provide: all labor for the supplies/services and the methodology (including required data documentation and computations) required for any adjustments due to workload excesses above the estimated workload which the contractor did not provide, the contractor's support for the costs claimed for the additional employees is not adequate. All timesheets requested could not be provided and costs on invoices for a company, TRG, listed under a salaried employee could not be adequately supported.

The contractor provided a spreadsheet with salaried and 1099 employees identified. We judgmentally selected timesheets for both salaried and 1099 types of employees. The universe for the W-2 employees was 48. Of the 13 timesheets judgmentally selected for W-2 employees (salaried), the contractor was unable to provide 3 timesheets and 9 timesheets either were missing an employee's signature, a supervisor's signature or both. An employee's signature would indicate and support that they worked the hours and are certifying to such. A supervisor's signature would indicate that a level of management review and certification had taken place to validate that the claimed hours were worked. The universe for the 1099 employees was 48. We selected 10 timesheets to review for the 1099 employees. Of the 10 timesheets, 8 were missing an employee's signature, supervisor's signature or both.

We inquired why the timesheets were missing and the contractor indicated that the documentation was at the Government site and they did not have time to provide. However, we provided ample time for the contractor to provide the requested timesheets. Without a timesheet, we are not able to determine if and what hours were worked and if the employee and supervisor provided some degree of concurrence that such hours were performed. We requested the payroll records to verify the hourly rate of contractor identified employees to their paychecks.

We also take exception to the costs claimed for the company TRG (which was under a salaried employee's name for additional employee claimed costs) because the contractor was unable to provide a requested copy of the basis for the costs claimed. The invoices stated that the costs were based on an "agreed upon contract fee" but the contractor was unable to provide

10

**Report No. 6431-2010C17200002-R1**                                     **EXHIBIT**

such a document and indicated that it probably did not exist. Both TRG and Ravens Group are owned by the same individual (Joseph Ballard).

    d. Contractor's Reaction:

The contractor reserved comment pending discussion with the Contracting Officer.

5.    <u>Additional Quarters</u>

    a. Summary of Conclusions:

We questioned $93,009 for the four (4) additional quarters in its entirety based on the terms of the contract. The contract is a combination Firm-Fixed price and IDIQ and the additional quarters work was performed as if these four units were a part of the initial contract. The scope of work was for the contractor to provide maintenance and repairs for 49 General and Flag Officers Quarters (GFOQ). The contract further stipulates that the Government reserved the right, at any time, to modify the contract to make adjustments in the scope of work at each site. Our examination of the contract and modifications indicate that the Government did not modify the contract to include the four (4) additional quarters. We also take exception to the claimed amount because the contractor could not provide adequate support, including timesheets or other documentation in their books and records for the costs claimed for the additional quarters.

    b. Basis of Contractor's Cost:

The contractor provided the following chart to support their claim amount of $93,009:

| Monthly Rate (a) | Duration (b) | Monthly Cost Per Unit/ 49 = (c) | Monthly Cost for Addl. Units (d) = (c) * 4 | Total 4 Units (b) * (d) |
|---|---|---|---|---|
| $61,900.00 | 1 | $1,263.27 | $5,053.06 | $5,053 |
| 67,114.29 | 7 | 1,369.68 | 5,478.72 | 38,351 |
| 61,414.29 | 4 | 1,253.35 | 5,013.41 | 20,054 |
| 51,714.29 | 7 | 1,055.39 | 4,221.57 | 29,551 |
| | | | | $93,009 |

The above costs are based on the monthly rate divided by the number units in the contract (49) to arrive at an average cost per resident. The monthly rate was derived from the original contract and subsequent modifications for CLINs 001AA through 001AG. The average cost per resident was multiplied by the additional 4 residents that was serviced and multiplied by the duration of the months.

    c. Audit Evaluation:

We reviewed the Contract to determine the terms of the Firm-Fixed Price and IDIQ portions of the contract. The contract has a Contract Line Item Number (CLIN) for each type of

11

**FOR OFFICIAL USE ONLY**

Supplies/Services as well as a CLIN for any IDIQ tasking at an undefined price. The IDQ taskings were to be accomplished only by an issued task order by an authorized Ordering Official in accordance with the "Ordering of Work" clause of the contract. The Government provided the contractor a list of the 49 General and Flag Officers Quarters that were to be maintained by the contractor. This list detailed each of the 49 residents providing the square footage and the interior features of the residents. Each resident was identified with a unique number. For quarters at Fort Myer, the quarters were identified with a MY prefix. For the quarters at Fort McNair, the quarters were identified with a MN prefix.

Section C.1.1 – Scope of Work, of the contract required the contractor to provide maintenance and repairs for 49 GFOQ to include structures, equipment, appliances, land areas, etc. by means of a combination firm fixed-price and indefinite quantity contract. We have questioned the claimed costs for the additional quarters because the contractor was not authorized to perform work on the additional units not listed in the contract. The contract further stipulated that the Government reserved the right, at any time, to modify the contract to make adjustments in the scope of work at each site. Our examination of the contract and modifications indicate that the Government did not modify the contract to include the four (4) additional quarters and the documentation was not provided to indicate that the work was performed under the IDIQ requirements of the contract.

    d. Contractor's Reaction:

The contractor reserved comment pending discussions with the Contracting Officer.

6.   <u>Answering Services</u>

    a. Summary of Conclusions:

We questioned the $1,518 for the cost of the answering service in its entirety based on the terms of the contract. Section C.1.2.1 – Management of Maintenance and Repair Services, of the contract states that the contractor shall pay for all expenses related to the establishment and maintenance of the "Toll Free" telephone number. These costs were part of the Firm Fixed Price portion of the contract.

We questioned the claimed cost of answering service costs after the April 19, 2005 date because the answering service was transferred over to the Executive Management Office, which is a part of the Government. The questioned amount includes $1,024 for calls after April 2005 and the remaining balance of $494 is due to interest and late fees on past due invoices.

    b. Basis of Contractor's Cost:

The contractor based their claimed costs for the answering service on their books and records.

12

**FOR OFFICIAL USE ONLY**

c. Audit Evaluation:

We reviewed the contract to determine the terms of the Firm-Fixed Price Contract. The contract has a Contract Line Item Number (CLIN) for each type of Supplies/Services. Section C.1.2.1 – Management of Maintenance and Repair Services, of the contract, states that the contractor must "provide for continuously attended service at all times when the management office is closed or not otherwise staffed for any reason to receive all service calls and respond to emergency or urgent service calls. The same telephone number must be usable 24 hours per day, throughout the term of the contract and be "Toll Free" to callers. The contractor shall pay for all expenses related to the establishment and maintenance of the "Toll Free" telephone number."

The contractor stated they continued to pay for the 24-hour answering service for the service call administration as well as monitored and responded to the after-hour calls after the April 19, 2005 meeting removing service call intake from the contract and turning it over to the Executive Management Office.

Based on discussions with the Contracting Officer, the Government removed service calls from TRG based on Modification No. 3 of the contract, dated April 18, 2005. We reviewed Modification No. 3 and the contractor's service log book and noted that TRG discontinued recording any service calls as of April 15, 2005. Therefore, based on Modification No 3, which removed the service call scope of work there was not a need for the answering services because no service calls were going to TRG and their log book supports that they did not receive any calls as of April 15, 2005. The contractor's claim included service call costs from April 2005 through January 2006 for a total of $1,024, which we have questioned in their entirety. We also questioned any related interest and past due costs of $494 related to these costs.

d. Contractor's Reaction:

The Contractor reserved comment pending discussion with the Contracting Officer.

7.    Administrator's Salary

a. Summary of Conclusions:

We questioned the claimed amount of $33,072 in its entirety based on the terms of the contract. The contractor was to provide all labor necessary to meet the contract requirements. The original contract did not provide for the Administrator. Furthermore, there were no contract modifications which provided for the Administrator over and above the labor the contractor was to provide as part of the performance of the contract. Therefore, we have questioned the claimed amount in its entirety.

There may have been a need for an Administrator to perform on the contract and maybe have been included in the labor provided by the contractor to perform the services; however, the contractor was unable to provide adequate documentation to support the claimed costs. We requested the timesheets for the claimed employee. We judgmentally selected timesheets to review as well as payroll data. Of the four (4) timesheets we selected to review, one timesheet was missing and the contractor did not provide and the remaining three (3) either had no

13

FOR OFFICIAL USE ONLY

employee signature certifying that the time was worked or a supervisor's signature that management approved the time or lacked both an employee and supervisor's signature. The timesheets with proper certification and approval would provide support that the hours were worked and incurred.

b.  Basis of Contractor's Cost:

The contractor based their claimed costs for the Administrator's Salary on their books and records. The salaried staff's pay rate include s the company's burden rate of 30.15%, which is inclusive of payroll taxes, liability, dental, health insurance, and worker's compensation.

c.  Audit Evaluation:

The Ravens Group, Inc. indicated that a Service Administrator employee needed to be hired in order to accommodate the needs of the contract. Our review of the firm fixed price contract indicated that the contractor was to provide all labor, materials and any other necessary supplies and services to perform the contract.

Notwithstanding that we believe the Administrator's salary was to be provided as part of the terms of the Fixed Price Contract and no contract modification was executed to allow for such labor costs, the contractor's supporting documentation for the Administrator's costs was inadequate. We requested the timesheets and pay checks for the Service Administrator. We randomly selected four timesheets to review. We were able to verify the hourly rate claimed by the contractor for the employee from copies of the paychecks. However, of the four (4) timesheets requested, the contractor was unable to provide one timesheet and the remaining three (3) either had no employee signature certifying that the hours were worked or no supervisor signature to indicate that management had reviewed and approved the timesheets or in one instance the timesheet did not contain either signatures. We inquired why the one timesheet was missing the employee/supervisor's signatures and we were told that the original timesheets were maintained by the operations department at the Government site and that the contractor did not have the time to dig through the storage room for the files. However, we provided ample time for the contractor to produce the timesheets. Timesheets are an important part of any timekeeping system and used to validate that employees exist, that the hours worked were incurred and certified by the employee and that management approved such hours. Based on FAR Subpart 4.7, Record Retention, the contractor is required to provide adequate documentation, including accounting books and records for costs claimed.

d.  Contractor's Reaction:

The contractor reserved comment pending discussion with the Contracting Officer.

8.  Deletion of CLIN

a.  Summary of Conclusions:

We questioned $62,700 for the cost of the Custodial Services in its entirety. Based on the review of the contractor's books and records, no documentation in the service log exists to

**FOR OFFICIAL USE ONLY**

**Report No. 6431-2010C17200002-R1** **EXHIBIT**

support that the contractor incurred any custodial costs after April 15, 2005. Contract Modification No. 3 was issued effective April 18, 2005, which reduced CLIN 001AF for custodial services after April 15, 2005. Modification No. 4, effective August 15, 2005 extended the contract for six months, but did not include CLIN 001AF for custodial services. Based on the contract modifications which removed the custodial services, we have questioned the claimed costs in their entirety.

    b.  Basis of Contractor's Cost:

The contractor arrived at the $62,700 by multiplying the monthly Custodial Service fee of $5,700 by 11 months.

    c.  Audit Evaluation:

We reviewed the contract to determine the terms of the Firm-Fixed Price/IDIQ contract. The original contract had a Contract Line Item Number (CLIN) 0001AF – Custodial Services for 12 months at $5,700 per month for a total of $68,400. On April 18, 2005, the contract was modified (Mod 3) reducing the funding by $11,400, which represented the funding for the last four months of the contract.

We reviewed the contractor's service log that was provided in the claim. The contractor's log stops as of April 15, 2005. There is no work recorded on the service log after the contract was modified.

The Ravens Group, Inc. has claimed that CLIN 0001AF – Custodial Services was removed from the contract but the requirement never went away and that the Executive Management Office (EMO) contracted third-party contractors for various duties that would have normally fallen under this portion of the contract and performed by the contractor.

We have questioned the entire claimed amount because based on the terms of the contract in Section C.1.2, General Requirements; the Government reserved the right, at any time, to modify the contract to make adjustments in the scope of work. Additionally, the contractor's service logs indicate that service calls were not logged after April 15, 2005 and the contractor performed no work for the claimed amount.

    d.  Contractor's Reaction:

The contractor reserved comment pending discussion with the Contracting Officer.

9.    <u>Equipment Loan Loss</u>

    a.  Summary of Conclusions:

We questioned $26,000 for the equipment loan losses in their entirety because these costs are normally part of the contractor's overhead pool. The contract required TRG to provide the material and equipment needed to perform the contract.

15

**FOR OFFICIAL USE ONLY**

The contractor based the equipment loss on their monthly installment payments for the loan that they initiated to purchase additional equipment needed to perform on the contract. The equipment purchased included computers, time clocks, blackberry cell phones, shelving, etc. which would be used in a normal business' day-to-day operations. We believe the monthly payments are not a loss for the equipment loan and any costs associated with the purchase of the equipment should have been either expensed or capitalized and was already recorded in their books and records as an expense. To recoup the costs via an asserted claim would provide a duplication of costs to the contractor. Also, the equipment, including vehicles, tools and other equipment not only would benefit this contract but any subsequent contracts of TRG and be purchased in the normal course of business operations.

   b.  Basis of Contractor's Cost:

The claimed cost is based on the contractor's asserted monthly installments on their equipment loan for $4,333 a month for 6 months.

   c.  Audit Evaluation:

The Ravens Group has stated that, at the inception of the contract, they obtained an equipment loan in the amount of $104,000 (financing charges inclusive) in order to facilitate the needs of the contract. The loan was for one year for the tools, equipment, and vehicles. The equipment was to last for a minimal of 24 months. The contractor has asserted that the Government terminated the contract for convenience at 18 months, and their monthly installments of $4,333 continued until August 2006.

The contractor was provided with a notice and modification that the contract would be extended for 6 months. The contractor signed the modification in which the Contractor's Statement of Release stated "In consideration of the modification (s) agreed to herein as complete equitable adjustments for the Contractor's acceptance of six month extension of services required for GFOQ proposals for adjustment. The Contractor hereby releases the Government from any and all liability under this contract for further equitable adjustments attributable to such facts or circumstances giving rise to the proposal (s) for adjustment". Therefore, based on the signed release statement the contractor released the Government from any liability for the six month extension.

   d.  Contractor's Reaction:

The contractor reserved comment pending discussion with the Contracting Officer.

10.   Distribution of Work

   a.  Summary of Conclusions:

We questioned the claimed of $161,700 in its entirety based on the terms of the contract. The contractor claimed the amount for distribution of work based on their assertion that the Government removed the CLIN 001AF (Service Calls) and the service calls were now handled by a third party.

16

FOR OFFICIAL USE ONLY

b.  Basis of Contractor's Cost:

The contractor based the cost on $300 per service call multiplied by 49 service calls per month times 11 months remaining on the contract.

c.  Audit Evaluation:

The Ravens Group, Inc. has asserted that the contract provided for them as the sole and exclusive contractor for providing certain services for the housing units and that the Government unlawfully assigned work and transferred the work to third party contractors.

Based on our review of the contract, Section C.1.2, General Requirements, the Government reserved the right to modify the contract or make adjustments to the scope of work. Therefore, the Government was within their right to remove CLIN 001AF based on the terms of the contract, which the contractor agreed.  We have questioned the claimed amount in its entirety.

Notwithstanding that the terms of the contract permitted the Government to adjust the scope of work, the contractor has not adequately supported the basis of their claimed amount. We requested the contractor to provide support for the 49 service calls per month.  They indicated that it was based on a verbal discussion with the Government but was unable to provide a name of that person.  Also, the $300 per service call amount has not been adequately supported as discussed in Note 2(c) of this report.

d.  Contractor's Reaction:

The contractor reserved comment pending discussion with the Contracting Officer.

11.   Invalid Contract Termination

a.  Summary of Conclusions:

We questioned $500,000 for Count IV – Breach of Contract – Unlawful Assignment of Work to Third Party Contractors in its entirety based on the terms of the contract.  The contract was initiated as a one year contract with four option years.  The contract was not terminated. The contractor was provided with a modification that the contract would be extended for 6 months.  Additionally, the contractor indicated that the claimed amount represents anticipated profit.  However, the contractor was unable to provide adequate data to support that TRG would have experienced this amount of profit for the work lost.  Finally, the contractor signed a Statement of Release based on Modification No.4, which released the Government from any and all liability under the contract for further equitable adjustments.  Therefore, we have questioned the claimed amount in its entirety.

17

**FOR OFFICIAL USE ONLY**

b. Basis of Contractor's Cost:

The contractor is claiming $500,000 in damages based on their assertion that the contract was terminated. The $500,000 is based on The Ravens Group, Inc.'s anticipated profit on work that was lost as a result of what was asserted to have been a wrongful termination in breach of the contract.

c. Audit Evaluation:

We reviewed the letter, Notification of the Government Not Exercising the Option on the Contract, dated June 15, 2005. The letter was addressed to General Joe Ballard (retired) who is the CEO of The Ravens Group, Inc. The letter notified the contractor that the contract would expire on August 15, 2005 and that "The Government does not intend to exercise its option years without prejudice to the incumbent contractor." The letter was signed by Mr. William E. Campbell, Contracting Officer and Chief of Contract Operation Division. General Joe Ballard signed and acknowledged the letter on June 17, 2005. The letter was faxed back to Mr. Campbell on June 17, 2005 as evidenced by the fax information at the top of the letter.

Based on the review of the contract and other documentation, the Government provided notice to TRG that the contract option years would not be exercised. This does not constitute a termination of the contract. Additionally, the Government requested TRG to perform an additional six months in the interim until a new contract was awarded. TRG agreed to the six months extension and contract Modification No. 4 was executed on August 15, 2005 through February 14, 2006. TRG signed a statement of release that in consideration of the Modification No. 4 the contractor released the Government from any and all liability under the contract for further equitable adjustments attributable to facts or circumstances giving rise to the proposal for adjustment. Therefore, we questioned the claimed amount it its entirety.

d. Contractor's Reaction:

The contractor reserved comment pending discussion with the Contracting Officer.

12. Constructive Changes

a. Summary of Conclusions:

We questioned the total claimed amount of $643,942 in its entirety. Of the total questioned amount; $631,354 relates to Count VI – Constructive Changes and these costs are a duplication of costs that are included in this claim's total amount. The remaining $12,588 relates to costs for the renovation of a bathroom, which is not supported in the contractor's books and records. The details of the $631,354 are provided below.

b. Basis of Contractor's Cost:

In Count VI of the claim, the contractor alleges that the Government made constructive changes to the contract and The Ravens Group performed the work for which the Government

**18**

**FOR OFFICIAL USE ONLY**

refused to adjust the Contract price. The contractor is claiming a total of $643,942 for the changes.

A summary of the costs are as follows:

|  | Claimed Costs |
|---|---|
| Recap of Exhibits B and C | $631,354 |
| Exhibit D – Invoice 04-899 Dispute | 12,588 |
| Total | $643,942 |

c. Audit Evaluation:

We reviewed the contractor's claim under Count VI. We reviewed the costs claimed in Exhibits B and C. Below is a list of the contractor's work papers for the recap of Exhibits B and C:

| Exhibit B and C | Claimed Costs |
|---|---|
| Service call overage from August 16, 2004 through April 19, 2005 | $116,400 |
| Priority level adjustments on service call response | 67,050 |
| Additional employees hired to accommodate for workload | 354,895 |
| Additional four quarters service (added to the original 49 quarters per month) | 93,009 |
| Total | $631,354 |

The cost claimed in Exhibits B and C as part of the Count IV, Constructive Changes are also included and claimed separately as part of this total claim. These costs are discussed in Notes 2 through 5 of this report. Consequently, the cost of $631,354 is a duplicate cost and we have questioned it in its entirety.

We reviewed the contractor's invoices and documentation and have questioned the $12,588 for the bathroom renovation in its entirety. The contractor claimed the $12,588 based on the difference between a voided invoice and a re-issued invoice, as detailed below.

Invoice 04-899 – Renovation of Bathroom for MY02:

| Invoice No. | Amount |
|---|---|
| 04-899 (VOIDED) | $24,833 |
| 04-899 (Reissued) | 12,245 |
| Net | $12,588 |

The contractor initially issued Invoice No. 04-899 on January 26, 2005 in the amount of $24,833. The invoice was voided and reissued on January 26, 2005 in the amount of $12,245. The contractor is requesting the net of the two invoices in the amount of $12,588. We requested and reviewed the details of the invoices. Our review of the invoices and the supporting documents indicate that the contractor's summary of costs for the bathroom renovation totaled only $12,245, which includes G&A and profit. Since the contractor has invoiced for its costs

19

FOR OFFICIAL USE ONLY

**Report No.  6431-2010C17200002-R1**                              **EXHIBIT**

under reissued Invoice No. 04-899, the additional cost of $12,588 is not due or supported by the contractor's books and records and we have questioned in its entirety.

    d.  Contractor's Reaction:

The contractor reserved comment pending discussion with the Contracting Officer.

**20**

**FOR OFFICIAL USE ONLY**

### CONTRACTOR ORGANIZATION AND SYSTEMS

1.    Organization

The Ravens Group, Inc. is a Service Disabled Veteran Owned, certified Small Disadvantaged Business (SDB) providing business and management support to the Federal Government and private sector clients. The company was organized in 2001. The Ravens Group, Inc. presently has 110 employees.

2.    Accounting System

In our opinion, the design of The Ravens Group, Inc.'s accounting system is, in all material respects, considered acceptable for award of a prospective contract in accordance with the criteria contained in FAR 53.209-1(f). The Ravens Group, Inc.'s accounting period is from January 1 to December 31. The Ravens Group, Inc. maintains a job cost accounting system wherein contracts are assigned individual project numbers that are used to accumulate associated direct costs. Indirect costs are identified with and accumulated under individual departments.

3.    Estimating System

An estimating system audit has not been performed at The Ravens Group, Inc.

4.    Purchasing System

A purchasing system review has not been performed at The Ravens Group, Inc.

21

FOR OFFICIAL USE ONLY

**Report No.  6431-2010C17200002-R1**

## DCAA PERSONNEL

Telephone No.

Primary contacts regarding this audit:
    Barbara L. McCormick, Auditor          (410) 573-3127
    Pedro H. Fuertes, Supervisory Auditor    (410) 715-7152

Other contact regarding this audit report:
    Sheila L. East, Branch Manager        (410) 964-2060

FAX No.
(410) 997-3237

E-mail Address
dcaa-fao6431@dcaa.mil

General information on audit matters is available at http://www.dcaa.mil.

## RELEVANT DATES

Request for Audit Date:  May 14, 2010
Acknowledgement Date:  August 13, 2010
Revised Report Due Date:  May 9, 2011

## AUDIT REPORT AUTHORIZED BY:

/signed/
SHEILA L. EAST
Branch Manager
DCAA Southeastern Maryland Branch Office

22

FOR OFFICIAL USE ONLY

**Report No. 6431-2010C17200002-R1**

## AUDIT REPORT DISTRIBUTION AND RESTRICTIONS

DISTRIBUTION

U.S. Army Contracting Agency
ATTN: Maria Belino-Coffeen, Contracting Officer
Army Contracting Command
Mission & Installation Contracting Command
Directorate of Contracting Belvoir
9410 Jackson Loop Road, Suite 101
Fort Belvoir, VA 22060-5134

E-mail Address
maria.belinocoffeen@us.army.mil

The Ravens Group, Inc.
4640 Forbes Boulevard, Suite 300
Lanham, MD 20706-1894

(Copy furnished thru ACO)

23

FOR OFFICIAL USE ONLY

## CHRONOLOGY OF SIGNIFICANT EVENTS

| Description or Reference to Pertinent Government or Contractor Action: | Date |
|---|---|
| - Prepared Performance Work Statement to the Government by The Ravens Group (TRG) under PR No. WT3RTQ-4182-0602 | 1 Jul 04 |
| - GFOQ contract awarded as a sole source, Service Disabled Veteran Owned Small Business Procurement with an estimated amount of $1,585,210.00 | 16 Aug 04 |
| - Modification P00001 issued; increase contract amount by $230,370.00 to a total estimated amount of $1,878,151.48 | 30 Sep 04 |
| - Meeting with TRG @ CDCC in reference to Qtrs 2 | 04 Jan 05 |
| - Meeting with Ravens Group to address several issues with the contract, payment, IDIQ DO's; workmanship, open DO's etc. | 09 Feb 05 |
| - Receipt of revised line item proposal from TRG in the amount of $3,059,761.56; an increase of $1,181610.08 | 02 Mar 05 |
| - Modification P00002 issued; increase funding. | 21 Mar 05 |
| - Clarification/Negotiation meeting at CDCC | 19 Apr 05 |
| - Modification P00003 increase funding and delete CLIN 0001AF for Custodial Services -- this is TRG occupied office space that the Government is paying TRG; discussed and agreed by both parties to be deleted via modification of the contract in 09 Feb 05 meeting. | 02 May 05 |
| - Notified TRG in writing not to accept direction other than contracting staff unless it is an emergency on existing DOs or contracts; emergency direction should be received from Ms. Spellman and Mr. King only to be confirmed in writing by contracting the next business day. | 17 May 05 |
| - Notified TRG that the contract will expire 15 Aug 05 and that the option will not be exercised. | 15 Jun 05 |
| - Modification P00004 to extend contract for six months from 15 Aug 05 thru 14 Feb 06 | 12 Aug 05 |
| - Modification P00005 funding mod (administrative) | 16 Sep 05 |
| - Notification to TRG of contract completion | 14 Feb 06 |
| - Turnover of Keys, pass and Government Decal | 15 Feb 06 |
| - Receipt of Request for Equitable Adjustment | 10 May 06 |
| - General Flag Officers Quarters and Maintenance Contract Claim And Request for Contracting Officer's Final Decision | 29 Sep 06 |
| - Contracting Officer's Decision response to TRG's Contract Claim and Request for final decision | 21 Dec 06 |
| - Government Credit Card Charges to pay TRG $59,690.95 to include interest owed to TRG as payment to the submitted General Flag Officers Quarters and Maintenance Contract  Claim And Request | 03 Mar 07 |

24

FOR OFFICIAL USE ONLY

**Audit Report No. 6431-2010C17200002-R1**                    **APPENDIX 2**

## EQUITABLE ADJUSTMENT CLAIM

Filed Under the:             *Changes Clause*   x         Disputes Clause

Board of Appeals Case No:   07-754-C

<u>CLAIM Data</u>

Contractor Name:      The Ravens Group             Phone:    301 577-8585

Outside Preparer:      N/A                          Phone:

Trial Attorney Name:   Daryle A. Jordan             Phone:    703-256-7754

Date of Contract Award:    August 16, 2004       Contract Price:    $ 1,519,210.00

Modifications: 5      (Refer to Contract Brief)

Date(s) of alleged abnormal condition(s):
          From:      2004                To:      2006

Description:   (Append (Scan) a copy of concise written description, preferably from the claim;
               alternatively prepare a summary.)

Performance dates per contract:
          From:      August 16, 2004        To:      February 14, 2006

Actual performance dates:
          From:      August 16, 2004        To:      February 14, 2006

Date entitlement determined or contracting officer decision rendered:      March 3, 2007

Date of certification of the claim:      October 29, 2007

Date audit request received:      May 19, 2010

25

**FOR OFFICIAL USE ONLY**

 Uth Floor
Washington, DC 20004

| Date | Invoice # |
|------|-----------|
| 1/16/06 | 4899 |

<table>
<tr><td colspan="2"><strong>Bill To</strong></td></tr>
<tr><td colspan="2">
US ARMY CONTRACTING AGENCY<br>
CAPITAL DISTRICT CONTRACTING CENTER<br>
DENESE HENSON<br>
9410 JACKSON LOOP SUITE 101 BLDG 1425<br>
FORT BELVOIR, VA 22060-5134
</td></tr>
</table>

| | | | | Terms |
|--|--|--|--|-------|
| | | | | Upon Receipt |

| Item | Description | Rate | Qty | Amount |
|------|-------------|------|-----|--------|
| 0002BF | PROJECT WORK<br>CONTRACT NO: W91QV1-04-D-0013<br>FFP<br>PURCHASE REQUEST NO: W73R7Q-4214-0605<br><br>LOCATION: FORT MYER QUARTERS 2<br><br>2ND FLOOR BATHROOM RENOVATION<br><br>REMOVE EXISTING TILE FLOOR REPAIR<br>EXISTING SUB FLOOR (*CHANGE ORDER -<br>APPLIED DUROCK PER  INSTRUCTION)<br>REMOVE AND NEW TOILET<br>INSTALL NEW FLOOR TILE<br>REMOVE EXISTING BASE, INSTALL NEW BASE<br>REMOVE SHOWER STALL<br>REMOVE WALL PAPER<br>REMOVE LIGHT FIXTURE<br>RELOCATE FOR NEW LIGHT FIXTURE<br>RELOCATE LIGHT SWITCH<br>REMOVE EXISTING MIRROR/MEDICINE CABINET<br>INSTALL NEW SHOWER<br>INSTALL NEW MIRROR AND MEDICINE CABINET<br>INSTALL NEW LIGHT FIXTURE<br>PREPARE WALLS FOR PAINTING<br>REPAINT WALLS AND TRIM<br>REMOVE SINK BASE, COUNTERTOP AND<br>FAUCETS<br>INSTALL NEW SINK BASE, COUNTERTOP AND | 33.30 | | 24,833.30 |

| | Balance Due |
|--|-------------|
| | |

| Phone # | Fax # |
|---------|-------|
| (202) 756-4556 | (202) 756-7441 |

Page 1

| Date | Invoice # |
|---|---|
| 1/26/2005 | 04-899 |

**Bill To**

US ARMY CONTRACTING AGENCY
CAPITAL DISTRICT CONTRACTING CENTER
DENESE HENSON
9410 JACKSON LOOP SUITE 101 BLDG 1425
FORT BELVOIR, VA 22060-5134

| | Terms |
|---|---|
| | Upon Receipt |

| Item | Description | Rate | Qty | Amount |
|---|---|---|---|---|
| | FAUCETS | | | |
| | JOB DATES COMPLETED: DECEMBER 2004 | | | |
| | | | | |

| | **Balance Due** | | |
|---|---|---|---|

| Phone # | Fax # |
|---|---|
| (202) 756-4556 | (202) 756-7441 |

Page 2

A214

**Bill To**

US ARMY CONTRACTING AGENCY
CAPITAL DISTRICT CONTRACTING CENTER
DENESE HENSON
9410 JACKSON LOOP SUITE 101 BLDG 1425
FORT BELVOIR, VA 22060-5134

| | Terms |
|---|---|
| | Upon Receipt |

| Item | Description | Rate | Qty | Amount |
|---|---|---|---|---|
| 0002BF | PROJECT WORK<br>CONTRACT NO: W91QV1-04-D-0013<br>FFP<br>PURCHASE REQUEST NO: W73R7Q-4214-0605<br><br>LOCATION: FORT MYER QUARTERS 2<br><br>2ND FLOOR BATHROOM RENOVATION<br><br>REMOVE EXISTING TILE FLOOR REPAIR<br>EXISTING SUB FLOOR (*CHANGE ORDER -<br>APPLIED DUROCK PER INSTRUCTION)<br>REMOVE AND NEW TOILET<br>INSTALL NEW FLOOR TILE<br>REMOVE EXISTING BASE, INSTALL NEW BASE<br>REMOVE SHOWER STALL<br>REMOVE WALL PAPER<br>REMOVE LIGHT FIXTURE<br>RELOCATE FOR NEW LIGHT FIXTURE<br>RELOCATE LIGHT SWITCH<br>REMOVE EXISTING MIRROR/MEDICINE CABINET<br>INSTALL NEW SHOWER<br>INSTALL NEW MIRROR AND MEDICINE CABINET<br>INSTALL NEW LIGHT FIXTURE<br>PREPARE WALLS FOR PAINTING<br>REPAINT WALLS AND TRIM<br>REMOVE SINK BASE, COUNTERTOP AND<br>FAUCETS<br>INSTALL NEW SINK BASE, COUNTERTOP AND | 12,245.64 | | 12,245.64 |

| | **Balance Due** |
|---|---|

| Phone # | Fax # |
|---|---|
| (202) 756-4556 | (202) 756-7441 |

## Myer 2 (Master bath upgrade)

| Description | Crew | Labor | Unit | Bare Mat. | Bare Labor | Bare Equip. | Total |
|---|---|---|---|---|---|---|---|
| ork and trim demolition, cabinets, wood | 2 Clab | 0.2 | L.F. | 0.00 | 50.80 | 0.00 | 86.40 |
| ork and trim demolition | 1 Clab | 2 | Job | 0.00 | 25.50 | 0.00 | 43.00 |
| oors, Plywood, CDX, 3/4" thick | 2 Carp | 0.013 | SF Flr. | 78.00 | 34.50 | 0.00 | 144.00 |
| ies, vanity bases, 2 door, 30" h x 21" d x 30" | 2 Carp | 1 | Ea. | 183.00 | 17.25 | 0.00 | 232.00 |
| ing demolition, tile, ceramic, thin set | 2 Clab | 0.024 | S.F. | 0.00 | 45.00 | 0.00 | 78.50 |
| ing demolition, wood, subfloor, tongue and | 1 Carp | 0.025 | S.F. | 0.00 | 63.00 | 0.00 | 108.00 |
| um wallboard, on walls, standard, | 2 Carp | 0.021 | S.F. | 40.60 | 50.40 | 0.00 | 128.80 |
| mic tile, sanitary cove base, thin set, 6" x 4- | D7 | 0.129 | L.F. | 116.55 | 58.50 | 0.00 | 224.00 |
| mic tile, for floors, specialty type, decorator | D7 | 0.087 | S.F. | 412.50 | 57.50 | 0.00 | 545.00 |
| mic tile, walls, interior, thin set, decorated | D7 | 0.089 | S.F. | 1,800.00 | 58.50 | 0.00 | 2,050.00 |
| s & Coatings, int. latex, doors, flush, both | 1 Pord | 1.143 | Ea. | 16.50 | 43.00 | 0.00 | 88.00 |
| s & Coatings, misc. int. trim, wood, paint 2 | 1 Pord | 0.02 | L.F. | 2.40 | 14.80 | 0.00 | 27.20 |
| s & Coatings, walls & ceilings, interior, | 1 Pord | 0.01 | L.F. | 26.40 | 45.60 | 0.00 | 103.20 |
| ice Preparation, interior, walls, sand, | 1 Pord | 0.009 | S.F. | 0.00 | 83.20 | 0.00 | 140.40 |
| ver doors, deluxe, tempered glass, chrome | 1 Shee | 8 | Ea. | 665.00 | 157.00 | 0.00 | 995.00 |
| accessories, towel bar, stainless steel, 30" | 1 Carp | 0.381 | Ea. | 76.50 | 10.13 | 0.00 | 101.25 |
| cine Cabinets, unlighted, plywood body, | 1 Carp | 1.143 | Ea. | 214.00 | 20.50 | 0.00 | 271.00 |
| re, Plumbing, remove and reset, maximum | 1 Plum | 2 | Ea. | 0.00 | 40.50 | 0.00 | 66.50 |
| bing Demolition, minimum labor/equipment | 1 Plum | 4 | Job | 0.00 | 244.50 | 0.00 | 399.00 |
| ets/fittings, bath, faucets, diverter spout | 1 Plum | 1 | Ea. | 139.00 | 40.00 | 0.00 | 220.00 |
| ets/fittings, bath, faucets, diverter spout | Q1 | 2.5 | Ea. | 146.00 | 46.00 | 0.00 | 181.00 |
| tory, vanity top, cultured marble, white, | Q1 | 2.5 | Ea. | 188.00 | 46.00 | 0.00 | 282.00 |
| rical Demolition, minimum labor/equipment | 1 Elec | 2 | Job | 0.00 | 142.50 | 0.00 | 231.00 |
| ndescent fixture, residential, interior, pendent | 1 Elec | 0.4 | Ea. | 110.00 | 9.45 | 0.00 | 137.00 |
| s and partitions demolition, metal or wood | B1 | 0.092 | S.F. | 0.00 | 72.00 | 0.00 | 122.40 |
| osal, trash removal | | | | | | | 1,200.00 |
| o ceramic base | | | | | | | 88.00 |
| ove wallpaper | | | | | | | 396.00 |
| o medicine cabinet | | | | | | | 83.00 |
| ver pan | | | | | | | 125.00 |
| **Subtotal** | | | | **$4,214.45** | **$1,431.13** | **$0.00** | **$8,873.65** |
| itions (10%) | | | | | | | $ 887.37 |
| (10%) | | | | | | | $ 887.37 |
| luding Gen Conditions and contingency | | | | | | | $10,648.38 |
| Profit (15%) | | | | | | | $ 1,597.26 |
| (15%) | | | | | | | $12,245.64 |

A216