# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $135,000.00 | 07-29-2004 | 08-01-2005 | 812087336 | | 522360182 | AMS | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** The Ravens Group, LLC
1101 Pennsylvania Avenue, NW., 6th Floor
Washington, DC 20004

**Lender:** Acacia Federal Savings Bank
Main
7600 Leesburg Pike
Falls Church, VA 22043
(703) 506-8100

**THIS BUSINESS LOAN AGREEMENT dated July 29, 2004, is made and executed between The Ravens Group, LLC ("Borrower") and Acacia Federal Savings Bank ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement ("Loan"). Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.**

**TERM.** This Agreement shall be effective as of July 29, 2004, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until August 1, 2005.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) guaranties; (3) subordinations; (4) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the District of Columbia. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 1101 Pennsylvania Avenue, NW., 6th Floor, Washington, DC 20004. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: **None.**

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of Borrower's Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or

permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than one-hundred-twenty (120) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, reviewed by a certified public accountant satisfactory to Lender.

**Interim Statements.** As soon as available, but in no event later than thirty (30) days after the end of each month, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower.

**Tax Returns.** As soon as available, but in no event later than 15 days after the applicable filing date for the tax reporting period ended. Federal and other governmental tax returns, prepared by a certified public accountant satisfactory to Lender.

**Additional Requirements.** Borrowing Base Certificate - monthly within 15 days of month end. A/R Aging (by invoice date) - monthly within 15 days of month end. A/P Aging (by invoice date) - monthly within 15 days of month end. Backlog report - quarterly within 15 days of month end. Field examination frequency will be at Bank's discretion as relationship grows. Business Tax returns for TRG Construction annually within 120 days of 12/31 FYE. Reviewed Financial Statements for TRG Construction - annually within 120 days of 12/31 FYE. Business Plan with projections - annually within 45 days of FYE. .

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Financial Covenants and Ratios.** Comply with the following covenants and ratios:

**Working Capital Requirements.** Borrower shall comply with the following working capital ratio requirements:

**Current Ratio.** Maintain a Current Ratio in excess of 1.500 to 1.000. The term "Current Ratio" means Borrower's total Current Assets divided by Borrower's total Current Liabilities. This liquidity ratio will be evaluated as of quarter-end.

**Other Requirements.** Minimum Interest Coverage Ratio (EBIDTA/Interest Expense) shall be 2.50 to 1.00-tested quarterly. Maximum Leverage Ratio (Total Debt/equity) shall be 3.00 to 1.00 - tested quarterly. Minimum Tangible Net Worth Plus 50% of Quarterly Net Income (to include subordinated debt as equity) shall be $700,000 - tested quarterly.

Except as provided above, all computations made to determine compliance with the requirements contained in this paragraph shall be made in accordance with generally accepted accounting principles, applied on a consistent basis, and certified by Borrower as being true and correct.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantor named below, on Lender's forms, and in the amount and under the conditions set forth in those guaranties.

| Name of Guarantor | Amount |
|---|---|
| Joe N Ballard | Unlimited |

**Subordination.** Prior to disbursement of any Loan proceeds, deliver to Lender a subordination agreement on Lender's forms, executed by Borrower's creditor named below, subordinating all of Borrower's indebtedness to such creditor, or such lesser amount as may be agreed to by Lender in writing, and any security interests in collateral securing that indebtedness to the Loans and security interests of Lender.

| Name of Creditor | Total Amount of Debt |
|---|---|
| Joe N Ballard | $150,000.00  $ 155,000 |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized Lender may require Borrower to post adequate security or a surety bond, satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall

A218

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $200,000.00 | 05-20-2005 | 06-01-2010 | 81-2087534 | | 522360182 | *** | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** The Ravens Group, LLC
1101 Pennsylvania Avenue, NW., 6th Floor
Washington, DC 20004

**Lender:** Acacia Federal Savings Bank
Main
7600 Leesburg Pike
Falls Church, VA 22043
(703) 506-8100

THIS BUSINESS LOAN AGREEMENT dated May 20, 2005, is made and executed between The Ravens Group, LLC ("Borrower") and Acacia Federal Savings Bank ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement ("Loan"). Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of May 20, 2005, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until June 1, 2010.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) guaranties; (3) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the District of Columbia. Borrower is duly authorized to transact business in the Commonwealth of Virginia and all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 1101 Pennsylvania Avenue, NW., 6th Floor, Washington, DC 20004. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: **None.**

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of Borrower's Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws.

BUSINESS LOAN AGREEMENT

**Loan No: 81-2087534**        (Continued)        Page 2

Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than one-hundred-twenty (120) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, reviewed by a certified public accountant satisfactory to Lender.

**Interim Statements.** As soon as available, but in no event later than thirty (30) days after the end of each fiscal quarter, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower.

**Tax Returns.** As soon as available, but in no event later than 15 days after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by a certified public accountant satisfactory to Lender.

**Additional Requirements.** Contract Backlog Report due 15 days after each Quarters end.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Financial Covenants and Ratios.** Comply with the following covenants and ratios:

**Tangible Net Worth Requirements.** Maintain a minimum Tangible Net Worth of not less than: $900,000.00. Other Net Worth requirements are as follows: **Minimum Current Ratio (Current Assets/Current Liabilities) 1.1:1,** tested quarterly. In addition, Borrower shall comply with the following net worth ratio requirements:

**Debt / Worth Ratio.** Maintain a ratio of Debt / Worth not in excess of **4.000 to 1.000.** The ratio "Debt / Worth" means Borrower's Total Liabilities divided by Borrower's Tangible Net Worth. This leverage ratio will be evaluated as of quarter-end.

**Operating Ratio Requirements.** Borrower shall comply with the following operating ratio requirements:

**Expense Ratio Requirements.** Borrower shall comply with the following expense ratio requirements:

**Other Requirements.** Minimum Debt Coverage Ratio (EBITDA/Principal and Interest Expense) 1.2:1, tested quarterly. An Origination Fee of $1,500.00 (Fifteen Hundred Dollars and no Cents) will be collected at closing.

Except as provided above, all computations made to determine compliance with the requirements contained in this paragraph shall be made in accordance with generally accepted accounting principles, applied on a consistent basis, and certified by Borrower as being true and correct.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Joe N Ballard | Unlimited |
| Tessie Ballard | Unlimited |
| TRG Construction, Inc. | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation or guideline, or the interpretation or application of any thereof by any court or administrative or governmental authority (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (A) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (B) reduce the amounts payable to Lender under this Agreement or the Related Documents, or (C) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of Borrower's stock, or purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Borrower will not enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the debt against any and all such accounts.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, or a trustee or receiver is appointed for Borrower or for all or a substantial portion of the assets of Borrower, or Borrower makes a general assignment for the benefit of Borrower's creditors,

performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all sums owing in connection with the Loans, including all principal, interest, and all other fees, costs and charges, if any, will become immediately due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees that if Lender hires an attorney to help enforce this Agreement, Borrower will pay, subject to any limits under applicable law, Lender's attorneys' fees and all of Lender's other collection expenses, whether or not there is a lawsuit and including without limitation additional legal expenses for bankruptcy proceedings.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by, construed and enforced in accordance with federal law and the laws of the Commonwealth of Virginia. This Agreement has been accepted by Lender in the Commonwealth of Virginia.

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the applicable courts for the City of Falls Church, Commonwealth of Virginia.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, if hand delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

## BUSINESS LOAN AGREEMENT
(Continued)

**Loan No: 81-2087534**                                                                                           **Page 5**

equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, and their personal representatives, successors and assigns.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Acacia Federal Savings Bank, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note executed by The Ravens Group, LLC in the principal amount of $200,000.00 dated May 20, 2005, together with all modifications and of renewals, replacements, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**Tangible Net Worth.** The words "Tangible Net Worth" mean Borrower's total assets excluding all intangible assets (i.e., goodwill, trademarks, patents, copyrights, organizational expenses, and similar intangible items, but including leaseholds and leasehold improvements) less total debt.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED MAY 20, 2005.

THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

**BORROWER:**

**THE RAVENS GROUP, LLC**

By: _____ (Seal)
Joe N. Ballard, President & CEO of The Ravens
Group, LLC

**LENDER:**

**ACACIA FEDERAL SAVINGS BANK**

By: _____ (Seal)
Authorized Signer

UNITED STATES COURT
OF FEDERAL CLAIMS
CASE NUMBER 07-754 C

THE RAVENS GROUP, INC.    )
    )
        Plaintiff,    )
    )
v.    )
    )
THE UNITED STATES OF AMERICA )
    )
        Defendant    )

### Affidavit of K. D. "Ken" Bricker, CPA, DABFA

Now comes the Affiant, who upon being duly sworn and upon personal knowledge states as follows: I am a Certified Public Accountant and a member of the American Institute of Certified Public Accountants as well as the Virginia Society of Certified Public Accountants. I am also a Diplomat of the American Board of Forensic Accounting. I have practiced from 1986 until the present in the accounting profession specifically as it relates to entities involved in providing products and services to the United States government. I have qualified and served as an expert witness in numerous cases. In connection with this matter, I had occasion to analyze certain information and records produced by The Ravens Group, Inc. (TRG), including but not limited to: 1. Contract documents (including solicitation, amendments, contract communications, work orders, timesheets, etc.). 2. Claim documents (including request for equitable adjustment and the government's response, the claim and the contracting officer's final decision, the lawsuit pleadings (complaint and answer), depositions, etc. 3. Government audit report.

4. Government audit report documents, including e-mails between the government auditor and plaintiff regarding the audit.    5. The Ravens Group financial information for the period of the contract, including financial statements, invoices, receipts, etc.    TRG and Ronald L. Hyde, Contracting Officer for U.S. Army Contracting Agency, Capital District Contracting Center on behalf of the United States of America (the Government) together, "the parties" entered into contract W91QV1-04-D-0013 executed on August 16th, 2004 for TRG to perform services for General and Flag Officers Quarters Executive Management Office (EMO).

**Executive Summary**    TRG provided a Request for Equitable Adjustment (REA) to the Government on May 10, 2006 in the amount of $1,488,617 providing six general exhibits, which identified nine specific complaints of government action or inaction that caused TRG to incur costs in excess of the bid costs.  On September 29, 2006 after not receiving any reply to the initial request, TRG re-sent the request with the initial exhibits and requested a Contracting Officer's Final Decision (COFD).  On December 21, 2006 a COFD signed by William E. Campbell was sent to TRG denying all of the requests except for one in the amount of $59,688.  On October 29, 2007 TRG filed an appeal of the COFD in the United States Court of Federal Claims (Case No. 07-754).  The filing included six counts of a general nature, in the amount of $2,060,286.  On May 14th, 2010 Maria Belino-Coffeen, Contracting Officer, Army Contracting Command requested the Defense Contract Audit Agency (DCAA) audit the original REA.  On August 23, 2010, the government amended the audit request to include increased costs identified in the court filing.  An audit report was issued

by DCAA on May 9th, 2011 which questioned the claim in its entirety. Based upon my analysis of the six counts included in the federal claim and the documentation provided by TRG in the detailed support of the specific complaints, it is my opinion that the government owes TRG no less than $941,178 related to those items which I have examined. TRG also requested $500,000 in non cost related damages to which I have not opined. My opinion is upon the amount (quantum) owed only and does not cover the entitlement to such costs. If the court determines that the actions or inactions by the government entitles TRG only upon the items which I have opined.

**Background** The contract awarded to TRG by the Government is an Indefinite Delivery, Indefinite Quantity (IDIQ) firm-fixed-unit-price contract. The contract included multiple Contract Line Items (CLIN) funded and identified separately and proposed / awarded at a specific unit price. Correspondence between the parties between August 2nd, 2004 (pre-award) and December 16th, 2005 (post-award) shows that the parties agreed that certain issues existed in the Statement of Work (primarily, number of service calls) that would have to be defined in the contract at a later date. A meeting was held on February 9th, 2005 in which Mr. William Campbell, Contracting Officer, requested a revised line item proposal. The revised proposal was submitted to the Government by TRG on March 18th, 2005. A contract negotiation meeting was held on April 19, 2005 with both parties in attendance. The contract was never amended to provide more definition in the contract, specifically on the numbers of calls and the numbers of units, even though the minutes of the meetings indicate that both parties concurred that the initial

estimates were flawed. Because the parties were unable to reach an agreement and the contract was not modified to identify a corrected estimate of the number of service calls, TRG was not able to provide me with updated costs per service call or personnel required. Accordingly, my opinion as it relates to quantity of work is based upon the actual work performed. My opinion is upon quantum only and does not cover entitlement.

Methodology I analyzed all of the amounts in the REA's (May 10, 2006 and September 29, 2006) as well as the six counts that were filed by TRG in the court on October 26th, 2007. I was unable to reconcile the six general counts in the court filing to the six exhibits in the REAs. All six counts in the filing were previously identified in the REA, however certain costs may have been duplicated. My methodology assures that costs are identified only once. I therefore analyzed the methodology used by TRG in estimating the costs associated with each of the nine complaints explained in detail in the REAs and I also analyzed Count VI of the claim. I reviewed the supporting documentation provided to the Government in the two REAs submitted to the Government on May 10th and September 29th, 2006 as well as all additional support provided to the DCAA auditor. When necessary I requested and was provided additional support to assure that the claims met the requirements of the contract and the Federal Acquisition Regulation (FAR).

<u>Quantum Related to Unpaid Completed Work at Contract Price</u>    TRG    requested $59,686 in unpaid work at the contract value. The government concurred in the COFD. I have not opined on this matter.

<u>Quantum Related to Excessive Service Calls</u>    The firm fixed unit price of CLIN 0001AA (Service Calls) is $15,000 per month. Correspondence between the parties as well as depositions given by government personnel show that the parties agreed that TRG's bid, which was based on an average of 50 service calls per month (provided by the government) for an average cost of $300 per calls was appropriate for that quantity, but that in fact the quantity was not a reasonable estimate of the actual experienced number of service calls. The Daily Status Report provided by TRG shows that actual Service Calls exceeded the estimate by 388 calls between August of 2004 and March of 2005. Accordingly, the unfunded, unpaid amount of the contract for routine service calls is $116,400 (388 X $300). My opinion is based on the methodology used to calculate the $300 average price. I was also able to identify that the service calls exceeded 50 as a baseline by 388 from the documentation provided by TRG to me as well as included in the REA's and the DCAA auditor.

<u>Quantum Related to Urgent Service Calls</u>    TRG was required to respond to 126 urgent service calls during the same time period, which were included in the total service call bid. TRG deemed the number of urgent calls to be excessive in addition to exceeding the targeted total. Because of the timeframe required to respond to these calls, TRG marked up the urgent calls by 25% to $375 ($300 X

1.25). Accordingly, the unfunded, unpaid amount of the contract for urgent service calls is $47,250 (126 X $375). My opinion is based solely on the methodology used to calculate the $375 average price.

<u>Quantum Related to Emergency Service Call</u>        TRG was required to respond to 44 emergency calls during the period in question. TRG marked up emergency calls by 50% to $450 ($300 X 1.5) for a total unfunded and unpaid amount related to emergency calls is $19,800 (44 X $450).   My opinion is based solely on the methodology used to calculate the $450 average price.

<u>Quantum Related to Increased Personnel to Perform Urgent and Emergency Calls</u>

The increased workload and unexpected number of urgent and emergency calls caused TRG to have to employ additional personnel as employees and as subcontractors (on 1099).     After reviewing the support for these additional employees and TRG's initial proposal on the contract, I have determined that TRG hired three Carpenter Apprentices, an Electrician and a Carpenter as well as outsourcing six lawn care personnel for periods ranging from 3 – 13 months. All of these positions were in addition to the personnel bid based upon the workload (service calls) identified by the government in the solicitation and the contract which the parties determined was not accurately defined. Taking into consideration the periods worked at the actual rates paid to these additional employees I calculated costs equal to $250,669 (Actual additional employee rates X months per hour worked. I also determined that TRG engaged subcontractors personnel valued

at \$104,227 for the same period. The total costs related to increased personnel is therefore \$354,896.

**Quantum Related to Increased Number of Quarters Under Contract**     TRG's claim specifies that they were contracted to perform work on 49 quarters. TRG's technical representation shows that they provided maintenance on 4 additional quarters. I did not determine, nor opine on the number of quarters on which work performed was contractually obligated. However, if it is determined that TRG is entitled to payment for additional quarters, I have reviewed the calculation performed by TRG and believe the total quantum to be \$93,009.

**Quantum on Dispute on Payment for Invoice 04-899**          TRG disputes a payment made in the amount of \$12,285.64 for a second floor bathroom renovation project on quarters 2 at Fort Myer. TRG alleges that additional work related to change orders caused the price to increase to \$24,833.30 and that the government agreed with this change. Accordingly I do not opine on the quantum for this matter.

**Quantum on Contract Changes by the Government**        TRG  included  in  this complaint multiple costs incurred in excess of the initial bid related to out of scope work on the contract as well as costs associated with the effective partial termination of the contract. I analyzed the costs related to each of these additional costs. I concur with the proposed costs of \$123,290.     If TRG is determined to be entitled to costs related to effective changes and effective termination, the following costs would be pertinent to the allegations. \$1,558 paid to 24 hour answering service, fifty percent of Service Administrator's salary (\$33,072) that would have

been indirect costs, custodial supplies related to CLIN 000AF which was deleted. I do not opine on entitlement for each of the alleged changes to the contract.

**Quantum on Illegal Disbursement of Work**          TRG    alleges    that    the government distributed work to other contractors once the service desk duties were turned back over to the government. This action had the opposite impact of the previous complaint of service calls in excess of the contracted amount. In this complaint, the action caused the price per call to increase. In my opinion TRG has potentially understated the related costs as they may not have identified all work awarded to other contractors that should have gone through their contract. The $161,700, (based upon the $300 per call previously discussed X calls awarded to other contractors) is a conservative estimate of quantum. Because TRG was unable to identify the total number of jobs given to competitors, I was unable to provide a more accurate estimate. I do not opine on entitlement for work provided to other contractors.

**Quantum for Damages**    TRG requested $500,000 for damages suffered by TRG as a result of the improper publication of false and misleading information regarding TRG's performance in violation of the Contract and the FAR. I have not opined on this matter.

**Quantum for Count VI of the Court Filing**          It is my opinion that in the court filing TRG identified six counts of action and inaction by the government. However, Count VI duplicated the excess costs included in Counts I and II. Therefore, no additional claims are due TRG based upon this count.

Analysis of the DCAA Auditor's Report        In the Executive Summary the auditor

claims that "We questioned the claimed costs in their entirely due to the lack of

adequate, verifiable supporting documentation in accordance with FAR Subpart 4.7

and the contract terms.   The auditor does not identify the documentation not

provided by TRG.   Documented correspondence between the auditor and TRG

personnel shows that TRG provided all of the information requested by the auditor.

In the Results of Audit, the auditor does not state, nor does she identify any

supporting information that was not provided by TRG.   In fact in each of the

individual conclusions on the elements of cost, the auditor speculates on the legal

and / or technical entitlement of TRG to recoup the claimed amounts as opposed to

opining on the quantum.

I am being compensated at a rate of $325 per hour for work performed on this
engagement.

K. D. "Ken" Bricker, CPA, DABFA

STATE OF VIRGINIA
City / County of _Newport News_                    , to-wit:  Sworn to and subscribed
before me this 6th day of ~~November, 2011.~~
           VCm   February, 2012

V.C. McBride
Notary Public

My Commission Expires:   3/31/2014

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

THE RAVENS GROUP, INC.,                )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )     No. 07-754C
                                        )     (Judge Firestone)
UNITED STATES,                          )
                                        )
          Defendant.                    )

### DEFENDANT'S FIRST SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Rule 34 of the Rules of the United States Court of Federal Claims, defendant, United States, responds and objects to plaintiff The Ravens Group, Inc.'s First Request for Production of Documents as set forth below. The following supplemental responses are based upon defendant's current knowledge, information, and belief after making reasonable inquiry. Defendant expressly reserves the right to modify or to supplement its responses as it discovers additional information relevant to these requests.

### SUPPLEMENTAL RESPONSE TO PLAINTIFF'S DOCUMENT REQUESTS

A.    Request For Historical Records

Defendant renews its objections and responses previously asserted in response to plaintiff's First Request for Production of Documents Nos. 27-35. Subject to and without waiving our previous objections, defendant responds as follows:

With respect to the request for production of "historical documents" pertaining to the maintenance, repair, and costs associated with General Flag Officer Quarters ("GFOQ") residences relating to the Contract No. W91QV1-04-D-0013, and with the request for historical records pertaining to "service calls," we have confirmed with the agency's Department of Public Works ("DPW") that no such records exist. Consequently, there are no documents responsive to these requests.

1

B.      Request For Third Party Contractor Records

        Subject to and without waiving objections previously asserted, defendant hereby produces documents that are responsive to plaintiff's first Request for Production of Documents, No. 42, i.e., third party contractor invoices.

2

TONY WEST
Assistant Attorney General

JEANNE E. DAVIDSON
Director

*for G. A. P*

KIRK T. MANHARDT
Assistant Director

OF COUNSEL:

JOSEPH KRILL
Major, U.S. Army
Litigation Division
U.S. Army Legal Services Agency
Arlington, VA 22203
Telephone: (703) 696-1564

JOSEPH A. PIXLEY
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 307-0843
Facsimile: (202) 307-0972

August 5, 2010

Attorneys for Defendant

3

A235

<u>Certificate of Filing</u>

I hereby certify under penalty of perjury that on this 6th day of August, 2010, I caused to be delivered by FedEx copies of "DEFENDANT'S FIRST SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS" to the following address:

Daryle A. Jordan
Patrick Henry LLP
7619 Little River Turnpike, Suite 340
Annandale, Virginia 22003

Joseph A. Pixley

4

A236



PATRICK HENRY
attorneys and counselors at law

**VA Office**

7619 Little River Turnpike
Suite 340
Annandale, VA 22003
Tel: 703.256.7754
Fax: 703.256.7883
Toll Free: 866.816.0140

RICHARD E. PATRICK
*admitted in VA, DC, WV*

MAYNARD M. HENRY, SR.
*admitted in VA, DC, PA, MI*

SHARON I. THEODORE-LEWIS
*admitted in MD, DC, NY, OH*

DARYLE A. JORDAN
*admitted in VA, DC, PA*

HOWARD G. COOLEY
*admitted in VA*

EDSEL J. GUYDON
*admitted in DC, VA*

**Of Counsel**

JESSE A. FENTY
*admitted in DC, VA*

MALIK N. DRAKE
*admitted in VA, DC
USPTO Registration*

LAWRENCE B. MANLEY
*admitted in MD, DC*

ETHEL MITCHELL
*admitted in MD, DC, TX, VA
US Virgin Islands, Ghana*

YUVORA NONG
*admitted in VA, DC, FL*

MAYO J. WILSON
*admitted in VA, DC, NJ*

FRANTZ JACQUES
*admitted in DC*

July 24, 2012

**Via Email**
Mr. Joe A. Pixley
Trial Attorney
Department of Justice
Commercial Litigation Branch—Civil Division
Attn: Classification Unit—8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

　　　　Re:　　**The Ravens Group v U.S.**
　　　　　　　**CFC Case No. 07-754C**
　　　　　　　**Reply to Order of Court, Dated July 16, 2012**

Dear Mr. Pixley:

　　　　By Order of the Court, dated July 16, 2012, Judge Firestone directed the following:

> Plaintiff shall produce any additional pre-award bid preparation documents that refer to an estimate of the number of service calls per month and the number of personnel that plaintiff identified in its bid by **July 27, 2012,** or otherwise concede by that same date that no such documents exist.

　　　　We have provided to the government all pre-award bid preparation documents, and to the best of our knowledge there are no pre-award bid preparation documents that expressly refer to an estimate of "50 service calls per month" or that expressly state the number of personnel in plaintiff's bid. Please note, however, that plaintiff does not hereby concede that there that is no evidence to support plaintiff's claims. To the contrary, plaintiff maintains that there is substantial evidence that supports its contentions, including but not limited to communications between the par ties (previously produced to the government), admissions by defendant witnesses, deposition testimony of the parties witnesses and other testimonial evidence.

　　　　　　　Sincerely,

　　　　　　　Daryle A. Jordan

**MARYLAND OFFICE**

9470 Annapolis Road
Suite 312
Lanham, MD 20706
Tel: 240.296.3488
Fax: 240.296.3487

**1**

```
2            IN THE UNITED STATES COURT
2               OF FEDERAL CLAIMS
3
4   THE RAVENS GROUP, INC.        :
5         Plaintiff,
6   V.                           :   Case No:07-754-C
7   THE UNITED STATES OF AMERICA
8         Defendant.             :
9
10  ----------------------------------------------------
11
12          Pursuant to Notice, the deposition of
13  DEE SPELLMAN, was held on Tuesday, January 19, 2010,
14  commencing at 10:00 a.m., at the offices of The Ravens
15  Group, Inc., 4640 Forbes Boulevard, Suite 300, Lanham,
16  Maryland 20706, before Stayce Lawson, Notary Public.
17
18
19
20          Stayce Lawson, Court Reporter
21              (703) 853-4068
22              staydlaw@aol.com
```

**2**

1  APPEARANCES:
2  ON BEHALF OF THE PLAINTIFF:
3  DARYLE A. JORDAN, ESQUIRE
4  Patrick Henry, LLP
5  7619 Little River Turnpike
6  Suite 340
7  Annandale, Virginia 22003
8  (703) 256-7554
9
10  ON BEHALF OF THE DEFENDANT:
11  JOSEPH A. PIXLEY, ESQUIRE
12  Department of Justice
13  Civil Division
14  1100 L Street, N.W.
15  8th Floor
16  Washington, D.C. 20430
17  (202) 307-0843
18
19  Also Present:  General Joe N. Ballard
20        Major Toshene C. Fletcher,
21        US Army Legal Services Agency
22

**3**

I N D E X

WITNESS: Dee Spellman                    PAGE
By Mr. Jordan                    5


E X H I B I T S
SPELLMAN DEPOSITION EXHIBITS            PAGE
No. 1 E-mail Dated November 15, 2005      77
No. 2 E-mail Dated November 18, 2004     103
No. 3 E-mail Dated December 17, 2004     111
No. 4 E-mail Dated January 3, 2005       117
No. 5 E-mail Dated January 25, 2005      121
No. 6 E-mail Dated March 30, 2005        134
No. 7 E-mail Dated March 31, 2005        140
No. 8 E-mail Dated April 6, 2005        147
No. 9 E-mail Dated April 7, 2005        148
No. 10 GFOQ Contract Negotiation Meeting   152
No. 11 E-mail Dated April 27 2005        171
No. 12 E-mail Dated June 7, 2005         172
No. 13 E-mail Dated June 15, 2005        190
No. 14 E-mail Dated June 16, 2005        196

**4**

I N D E X   C O N T I N U E D

SPELLMAN DEPOSITION EXHIBITS            PAGE
No. 15 E-mail Dated September 20, 2005    202
No. 16 E-mail Dated June 21, 2006        204
No. 17 December 16, 2005 Weekly Residential   205
    Update from GFOQ EMO

COPY

A238

13

```
1      Q   I would ask that you not confer with counsel
2   while I'm asking you questions.  If you would like to
3   stop --
4      A   I'm just questioning why you would need to
5   know my home address instead of my business address.
6      Q   Could I get the address, please?
7      A   Sure.  It's 2600 Crystal Drive, Arlington,
8   Virginia 22202.
9      Q   Could you describe your education, please,
10  high school going forward?
11     A   I have some college.  Public administration,
12  business.
13     Q   What college?
14     A   I went to Fayetteville Technical Institute,
15  and I went to James Cook University in North Carolina.
16     Q   Did you earn a degree at either one of those
17  schools?
18     A   No.  I just had my credits.
19     Q   And what did you study at that institutions?
20     A   Public administration and business.
21     Q   Prior to assuming your current role and your
22  current position, could you describe your prior
```

14

```
1   employment, please?
2      A   I worked for the federal government for three
3   years.  I've been in housing for 25, over 25 years.
4      Before that, I was in protocol.  I worked at
5   Fort Bragg for over 25 years.  I worked in Europe for
6   over six years.  I work at the DA Army housing
7   headquarters prior to coming with this position in 2004.
8      Q   Let's get a little more detail.  Just prior
9   to your current position, where were you?
10     First of all, were you in the government?
11     A   Oh, yes.  I worked for the government.
12     Q   And just prior to your position as a director
13  of EMO, what your position in the government?
14     A   I worked at Army headquarters housing, and I
15  was the GFOQ, general and flag officer quarters policy
16  manager.
17     Q   What did you do in that capacity?
18     A   I dealt with all the Army installations
19  worldwide, general and flag officers quarters worldwide.
20     I was in charge of policy for the Army,
21  resolving any installation issues.  I worked very
22  closely with all the general and flag officer managers
```

15

```
1   throughout Army-wide.
2      Q   And how long were you in that position?
3      A   I was there a year, then I got the call to go
4   to Fort Myer to help in Fort Myer.
5      Q   And just prior to that position.  Which you
6   held for one year, where were you?
7      A   I was in Germany for six years.  And I was a
8   housing manager in Germany.
9      Q   Now, did you apply for a position now, or
10  were you appointed to this position?
11     A   Originally, because this was a brand new
12  office being set up at Fort Myer, and it was actually at
13  the regional level to manage the general and flag
14  officer housing, I was called by the Director of Army
15  Staff to resolve what they considered were problems at
16  Fort Myer housing.
17     And so I was detailed for about six months
18  before they set up a new organization.  I then I had to
19  apply for the position to be selected.  So it was a
20  competitive position.
21     Q   Now, you stated that you were asked to
22  address problems within the GFOQ houses.  What types of
```

16

```
1   problems?
2      A   They felt that there was lack of customer
3   service for the general and flag officer housing
4   residents.
5      Q   Who was performing those services at the
6   time?
7      A   There was, there is or was a housing office
8   at that time that had a housing manager, like myself.
9   And that person was working with the housing and did
10  that job.
11     Q   Were those government employees?
12     A   Yes, sir.
13     Q   And, to the best of your knowledge, prior to
14  the award of the GFOQ contract to The Ravens Group, had
15  those services always been performed by in-house
16  government personnel, to the best of your knowledge?
17     A   They did use in-house personnel, but they
18  also used other contract vendors.  So they used our
19  credit cards in the same manner.  Then they would hire
20  -- just call up different vendors, different vendors and
21  use their credit card when the in-house was not
22  available or could not perform.
```

A239

21

1   with any of the people living in the quarters?

2        A   Oh, yes.  Absolutely.

3        Q   On a daily basis?

         A   It would be daily.  It depends, you know.

5        Q   And how would that contact come about?

6        A   If they had any concerns or issues, if they

7   were not happy with something, or had concerns about

8   something, they would call me to express their concerns.

9        Q   And were you, to the best of your knowledge,

10  were you the first call if something went wrong --

11       A   Pretty much.

12       Q   -- or if they were not happy?

13       A   Yes, sir.

14       Q   And you're still responsible for those same

15  GFOQ quarters?

16       A   Yes, sir.

17       Q   Now, with respect to the GFOQ contract that

18  The Ravens Group performed, are you aware of,

19  mechanically, how that contract was supposed to work?

20       This is how The Ravens Group was supposed to

21  perform services and the types of services?

22       A   Yes, sir.

22

1        Q   Could you describe, please, of your

2   knowledge.

3        A   It was a service performance contract to

4   perform maintenances and repair work to include

5   carpentry, plumbing, electrical, whatever needed to be

6   maintained and repaired.

7        The residents, if something breaks, they

8   would call our number, and they would put in a service

9   order and request whatever needed to be done.

10       Q   Was this made known to The Ravens Group

11  during the negotiations, what their responsibilities

12  would be?

13       A   Oh, absolutely.

14       Q   And were you present during those

15  negotiations at all times?

16       A   I don't know if they had any negotiations

17  without me, but I did attend some.

18       Q   Did anyone else on your staff ever, to the

19  best of your knowledge, participate in those

20  negotiations?

21       A   No, sir.

22       Q   Do you know who else was present during those

23

1   negotiations for the government?

2        A   The contracting officer and contracting

3   personnel.

4        Q   Now, you indicated that The Ravens Group was

5   responsible for all of the maintenance services provided

6   to GFOQ contract; is that correct?

7        A   With the exception of heating and air.  The

8   heating, HVAC heating and air services, the equipment is

9   owned by Pepco government service, ESPC, so there was a

10  dual.

11       If it was their equipment, then they had to

12  be called in.  But if we got the original call, we had

13  to go check it out to see who owned the problem.  It was

14  a terrible situation; Pepco owned part of the equipment.

15       Q   What part?

16       A   They owned the pipes and lines and some of

17  the parts that run air and heating boilers.

18       But at the time, the installation was on a

19  steam line, so that ran from a boiler plant to provide

20  the steam for the heat.

21       So if the heat or air went out, when the

22  residents would call, we had to send a tech out to

24

1   determine what the problem was, and whether we were

2   fixing it, or we had to -- or they had to call people

3   out.

4        Q   But other than HVAC, the contract that the

5   government entered into with The Ravens Group gave, The

6   Ravens Group had the responsibility for all other

7   maintenance with respect to the GFOQ?

8        A   There were two other exceptions:  There was

9   also the requirements contract for painting, so we had

10  to use the requirement contract for all the major

11  painting.

12       There was also a requirements contract for

13  roofing.  So all roof replacements and gutter repairs

14  had to be done by the requirements contract.  So were

15  only allowed to do minor painting touch-ups.

16       Q   One moment, please.  Who is responsible for

17  fan coil units?

18       A   Pepco.

19       Q   I just want to make sure that I'm clear.

20       Other than these items, The Ravens Group,

21  the contract that you entered into with The Ravens

22  Group, gave The Ravens Group the responsibility for all

25

1  of the maintenance of the GFOQs?

2      A   Correct.

3      Q   And the exceptions being painting, major

painting, roof and gutters, and HVAC?

5      A   Part of the HVAC.

6      Q   Part of the HVAC?

7      A   We were allowed to change filters and do some

8  servicing on it.

9      Q   Was there ever an engineer assigned to your

10  staff?

11      A   Yes, sir.

12      Q   At the beginning or during the negotiations

13  with The Ravens Group?

14      A   We did have a couple temporary engineers that

15  the region had sent us until we had a permanent engineer

16  on staff.

17      Q   Do you recall their names?

18      A   Dan Musel, M-U-S-E-L. John Trawer,

19  T-R-A-W-E-R, I believe.

20      Q   You said these were both temps, temporaries?

21      A   Yes.

22      Q   And do you recall when you found a permanent

26

1  hire for the engineering position.

2      A   I think it was probably at least a year later

3  that we got the permanent engineer.

4      Q   Now, did. Mr. Musel or Mr. Trawer come on

5  board at about the same time?

6      A   No. They were separate. One was there for a

7  period of time. And then when, I think, Mr. Musel left,

8  I think we got Mr. Trawer.

9      Q   So who was first?

10      A   Mr. Musel.

11      Q   When did he come on board, if you recall?

12      A   I don't remember the exact day, but it seems

13  like it was early, fairly early on.

14      Q   Let's see if I can help with that.

15      Do you recall if he were on board during the

16  negotiations with The Ravens Group?

17      A   I don't think he was. I don't recall that he

18  was.

19      Q   At the time of the execution of the contract

20  with The Ravens Group, was he on board as your engineer?

21      A   I believe he was.

22      Q   Ms. Spellman, what was your role in the

27

1  solicitation award of the contract to The Ravens Group?

2      A   I discussed with the contracting officer

3  services that we needed, and that we needed a scope of

4  work in order to proceed with the contract. I had asked

5  them to guide me on how we could proceed to make this --

6  get a contract as soon as possible.

7      Q   When you say "them"?

8      A   The contracting officer.

9      Q   Okay. Now, would it have been, typically

10  would have been your role to put together the scope of

11  work?

12      A   Well, in the government, it can go either

13  way. You can ask someone to write the scope of work, or

14  the government can write the scope of work.

15      At the time, because I didn't I have an

16  engineer, when we were trying to get this contract

17  awarded as quickly as possible, the contracting officer

18  said that the contractor that we were pursuing could

19  write the scope of work.

20      Q   Could you distinguish your role in the award

21  of the contract versus that of the contracting officer?

22      A   Once I had received the presentation from The

28

1  Ravens Group, I met with the contracting officer, and we

2  discussed how to proceed to get a contract awarded. And

3  I depended on their expertise to make this happen.

4      My role was, basically, I was satisfied with

5  the presentation, and I thought they could perform the

6  work requirements that were needed within the contract,

7  what we perceived would be the contract.

8      Q   Now, in your role as director of EMO, did you

9  have access to the historical data regarding the

10  maintenance of the GFOQ units?

11      A   When I started this office, we requested the

12  previous housing office to supply us all the past, any

13  records, historical data, whatever. They had very

14  little historical data, at least that was provided to

15  us.

16      But, in reality, it didn't really make any

17  difference because what they had done up to that point

18  was irrelevant in some degree because we knew that we

19  had to just take it from that day forward and improve on

20  anything that they may have already done or attempted to

21  do.

22      And, from the comments from the residents

A241

**1**

IN THE U.S. COURT OF FEDERAL CLAIMS

THE RAVENS GROUP INC.,           :

    Plaintiff,

v.                               :  Case No.:07-75-C

The UNITED STATES OF AMERICA,

    Defendant.               :

------------------------------------------------

      Pursuant to Notice, the deposition of LENORA CLARK-EVANS, was taken on Thursday, September 17, 2009, commencing at 12:00 p.m., at the offices of The Ravens Group, Inc., 9901 Business Parkway, Suite K, Lanham, Maryland, before Stayce Lawson, a Notary Public in and for the State of Maryland.

Reported by: Stayce D. Lawson

(703) 853-4069  staydlaw@aol.com

---

**2**

**A P P E A R A N C E S:**

ON BEHALF OF THE PLAINTIFF:

DARYLE A. JORDAN, ESQUIRE

HOWARD G. COOLEY, ESQUIRE

Patrick Henry, LLP

7619 Little River Turnpike

Suite 340

Annandale, VA 22003

(703) 256-7754

ON BEHALF OF THE UNITED STATES OF AMERICA

JOSEPH PIXLEY, ESQUIRE

U.S. Department of Justice

1100 L Street, NW

Room 7042

Washington, DC 20530

(202) 307-0843

Also Present: Joe Ballard, The Ravens Group Inc.

---

**3**

I N D E X

WITNESS: LENORA CLARK-EVANS      PAGE

Examination by Mr. Jordan.............  4

E X H I B I T S

(Atttached to the Transcript)

NO. 1 Statement of Work...................  28

COPY

---

**4**

P R O C E E D I N G S

Whereupon,

    LENORA CLARK-EVANS,

a witness herein, having been first duly sworn, was examined and testified upon her oath as follows:

    DIRECT EXAMINATION

BY MR. JORDAN:

    Q   Good afternoon, Ms. Clark-Evans.  Can I refer to you as Ms. Evans?

    A   **Ms. Evans is easier.**

    Q   I'm Daryle Jordan.  I'm a lawyer at Patrick Henry, LLP.  And in my capacity, I am serving as counsel to The Ravens Group for this lawsuit, The Ravens Group, Inc., versus United States of America.  I will be asking you some questions today.  I understand, Ms. Evans, you're under a doctor's care.

    A   **Not -- yes.  I'm under a doctor's care, but not where I'm, you know --**

    MR. PIXLEY:  What I wanted to tell you is she may have to take a break for a minute.

BY MR. JORDAN:

    Q   That's what I was about to say.  If you need

5

1  time during these questions, if you would like a break,
2  just let us know, and we will stop.
3      A  Okay.
    Q  Ms. Evans, are you on any medication today?
5      A  Yes.
6      Q  Okay. Can you tell us what that is?
7      A  I can't tell you what I took today because I
8  didn't take one because, you know, I couldn't drive.
9  But I take Glyburide, is what I took this morning.
10  Cozaar for glucose. It's for my diabetes. And I just
11  took some acetaminophen. That's all I took today.
12      Q  And, to the best of your knowledge, do you
13  that would have any affect on your ability to
14  participate in these proceedings today?
15      A  No. If I feel like my sugar -- I just need
16  to -- but it will not affect my ability at all to do
17  whatever has to be done today.
18      Q  Ms. Evans, are currently employed?
19      A  Yes.
20      Q  Can you tell me where?
21      A  I retired from the federal government on the
22  2nd of May.

6

1      Q  Of this year?
2      A  Yes. I returned on the 8th of August
3  part-time with the Army working on special assignment.
4      Q  Could you give us your current address,
5  please?
6      A  It's 107 -- my home address?
7      Q  Yes, please.
8      A  107 Beechdale Court, Accokeek, Maryland,
9  20607.
10      Q  Ms. Evans, could you describe briefly your
11  educational background?
12      A  I have a master's degree in business. I
13  worked towards credits for my Ph.D, but I never
14  finished. But I do have a master's degree in business.
15      Q  And what was your position at the time you
16  retired?
17      A  I was -- at the time I retired, I was a
18  procurement analysis with the Army Contracting Command.
    Q  And, for clarification, is that the Capital
20  District Contracting Center?
21      A  No. It has nothing to do with that office.
22      Q  Were you ever employed with the Capital

7

1  District Contracting Center?
2      A  Yes. I was director of contracting from May
3  of 2002 to August of 2005.
4      Q  And what was your position there?
5      A  I was director of contracting.
6      Q  Was that your only position that you held?
7      A  At that office, yes.
8      Q  And so you would have been serving in that
9  capacity in the summer of 2004?
10      A  Yes.
11      Q  What were your duties and responsibilities at
12  the time?
13      A  My duties and responsibilities were oversight
14  of contracting functioning at Fort Belvoir, including
15  preawarding postaward government purchase kind of
16  program. I managed -- I had 45 employees.
17      Q  Who succeeded you in that position, if you
18  know?
19      A  I think her name is Christine. I don't know
20  whether it's Thomson or Thompson. Christine Thompson.
21      Q  Ms. Evans, are you familiar with the General
22  and Flag Officers Quarters procurement?

8

1      A  I know back in -- this is when I will have to
2  look at things -- back in 2004 there were some problems
3  with the GFOQ quarters at Fort Belvoir. They approached
4  me to award a contract to service those quarters. So it
5  was a new initiative, and we selected The Ravens Group.
6      I can't remember. I can't remember whether it
7  was competitive or if it was sole source because it
8  started out as a small initiative, yeah. And we worked
9  with The Ravens Group to actually, basically set up the
10  criteria for what should be done because. It was a new
11  requirement, and we had no historical data on what was
12  necessary.
13      Q  Who was performing this work prior to the
14  contract with The Ravens Group? Who provided services
15  to those GFOQs?
16      A  I think it was in-house. I think it was
17  in-house personnel because -- I knew it wasn't a
18  contractor because this was the first time it was done
19  on contract.
20      Q  This was the first time it was ever
21  contracted out?
22      A  Yes.

9

1    Q    You indicated a moment ago that you received

2   a request from Fort Belvoir?

3    A    Fort Myer. It should have been Fort Myer.

     Q    So the work that was to be performed, was to

5   be performed on the quarters at Fort Myer?

6    A    Right.

7    Q    Any other place? Any other facility?

8    A    You're testing my memory now. Let me see.

9   Was the same thing something supposed to be at

10  Fort McNair? I think we were looking at -- yes.

11  Because the Fort Myer Contracting Office supported Fort

12  McNair, I think. And, my memory tells me five years ago

13  because Fort Myer contracting supported Fort McNair. I

14  believe the group included quarters, GFOQ quarters

15  at Fort McNair.

16    Q    It assumes your memory -- certainly, at

17  least, based on what I've seen, that would be correct.

18       Now, to the best of your knowledge, can you

19  describe, generally, the services that you sought to

20  procure for these quarters?

21    A    Actually, it was the -- and the only reason I

22  know this is because in my days as a contract

10

1   specialist, I had to do the same thing at Hickam Air

2   Force Base -- it was maintenance of, overall

3   maintenances of repairs of the GFOQ quarters.

4        And it was the same thing that's being done on

5   all quarters, the General and Flag Officers Quarters on

6   all installation. They always have separate branch, a

7   separate branch to handle those general officers

8   quarters.

9        It's just going in and painting when occupants

10  moved out, painting of things that -- anything that

11  needed to be repaired while the occupants were there.

12  Generally, that's what it was.

13       And it's the same almost anywhere you go in

14  general officers on any installation, whether it's on

15  the Air Force General Officers Quarters, because there's

16  a ceiling, a wall ceiling in general officers quarters.

17  They always had a special branch or whatever to handle

18  those quarters.

19    Q    I believe you indicated a moment ago that you

20  believe that contract was awarded on the sole source

21  basis. Is that your recollection?

22    A    That's my recollection. I won't jump off the

11

1   bridge on it.

2    Q    Okay.

3    A    But, yes, it was. And it was one of the

4   reasons why we selected The Ravens Group.

5        When I say "sole source," I should correct it.

6   We don't do anything just sole source. We do a mock

7   research. We look at least three firms to see which is

8   the best suit to do what is necessary.

9        The Ravens Group was in the -- and the customer

10  -- it was more not my decision as much as it was a

11  customer decision to select The Ravens Group.

12    Q    Who is the customer here?

13    A    I don't know. You are really going to make

14  me go back. The customer would have been -- because

15  it's the same everywhere. It would have been the

16  housing department -- I mean Division of Housing on the

17  installation. But as far as the particular customer

18  goes, I can't remember. I should remember her name, but

19  I really, really can't.

20    Q    Do you recall if the award of this contract

21  had anything to do with the service disabled

22  veteran-owned small business?

12

1    A    I think that was one of the reasons that we

2   were looking at The Ravens Group because of services

3   disability vet program. There were some other

4   initiatives that were being pushed. We looked at

5   services disabled vet. I just don't remember it exactly

6   if that was the case.

7    Q    At the time the contract was awarded to The

8   Ravens Group, do you recall whether or not the

9   Government had developed a statement of work?

10    A    No. It was almost, it was a generic

11  statement of work. And The Ravens Group had to actually

12  get in and develop it. It was almost like a design

13  team. They had to get in and come out with what was

14  required to do on there. So it was not a customer --

15  because it was a new to customer, the customer didn't

16  have historical data to come up with the specific

17  statement of work. We had something, but it was very,

18  it was generic.

19    Q    So, to the best of your knowledge, is it true

20  that The Ravens Group, once after the contract was

21  awarded to The Ravens Group, actually participated with

22  government employees to develop the statement of work?

1

```
     IN THE UNITED STATES COURT OF FEDERAL CLAIMS


---------------------------------:            COPY

THE RAVENS GROUP, INC.,               :

          Plaintiff,                  :

     v.                               :    Case No.

THE UNITED STATES OF AMERICA,         :    07-754-C

          Defendant.                  :

---------------------------------:
```

Annandale, Virginia

Wednesday, August 25, 2010

Deposition of:

WILLIAM CAMPBELL

called for oral examination by counsel for Plaintiff,

pursuant to notice, at the Law Offices of Patrick

Henry, LLP, 7619 Little River Turnpike, Suite 340

Annandale, Virginia, before Rhonda R. Harris RPR/CSR,

of Capital Reporting Company, a Notary Public in and

for the Commonwealth of Virginia, beginning at 10:30

a.m., when were present on behalf of the respective

parties:

Capital Reporting Company
Campbell, William 08-25-2010

60

1      A      That they could not do that.

2      Q      Okay.  First of all, this proposal, did you

3   request a proposal from The Ravens Group?

4      A      I did not.  To my knowledge, I did not.

5      Q      Okay.  So I want to be clear.  Is it you did

6   not, or you really don't recall who --

7      A      I don't recall.

8      Q      So it is possible that you requested a

9   proposal for the increased workload?

10     A      It is possible.

11     Q      Because at the time -- I don't want -- The

12  Ravens Group and General Ballard, they were making a

13  lot of complaints about an increased workload; is that

14  accurate?

15     A      That's accurate.

16     Q      Okay.  And but you did receive a proposal?

17     A      We did.

18     Q      And do you recall any specifics regarding

19  that proposal?

20     A      Other than the amount was "astronomical,"

21  no.

22     Q      You said the amount was astronomical?

Case 1:07-cv-00754-NBF   Document 70-3   Filed 10/12/12   Page 31 of 62

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - x
THE RAVENS GROUP, INC.,            :
                Plaintiff,         :
        vs.                        :    No. 07-54C
THE UNITED STATES OF AMERICA,      :    (Judge Firestone)
                Defendant.         :
- - - - - - - - - - - - - - - x

**Certified Copy**

Washington, D.C.

Tuesday, June 8, 2010

        Deposition of JOE N. BALLARD, a witness

herein, called for examination by counsel for

Defendant in the above-entitled matter, pursuant

to notice, the witness being duly sworn by KAREN

YOUNG, a Notary Public in and for the District of

Columbia, taken at the offices of the U.S.

Department of Justice, 1100 L Street, Northwest,

Washington, D.C., at 9:43 a.m. on Tuesday, June

8, 2010, and the proceedings being taken down by

stenotype by KAREN YOUNG, and transcribed under

her direction.

1    Corps of Engineers, but I was head of the

2    contracting agency.

3        Q.    Okay.  So fair to say you're pretty

4    familiar with the government contracting process.

5        A.    I'm not an expert, but I'm familiar with

6    it.

7        Q.    Right, okay.  All right.  Now, I want to

8    focus on this -- on the Ravens Group lawsuit.  Can

9    you describe just how it began that Ravens Group

10   became involved in performing this contract for the

11   flag officer quarters?

12       A.    What's the question?

13       Q.    Just describe how Ravens Group, how your

14   company became involved.

15       A.    It was a two-step process.  I was -- I was

16   offered an opportunity -- I was asked at least to --

17   to help the agency in writing the performance work

18   statement --

19       Q.    Right.

20       A.    -- which we did, and the job was then

21   awarded to me as part of the service-disabled

22   veteran at that time, sole source.

Ballard, Joe N.                                              June 8, 2010
Washington, DC

22

1    Q.    Well, let me -- let me ask you about -- if

2    you look at -- take Exhibit B, and you just

3    testified, for example, on the third page of the

4    document, there's a reference to an Exhibit A,

5    section B, schedule.

6    A.    Uh-huh.

7    Q.    And as you testified, these are contract

8    line item pricing.

9    A.    Yes.

10   Q.    Who -- who prepared this pricing data?  Do

11   you know?

12   A.    The same group.

13   Q.    The same group.

14   A.    The same group of folks, and when we

15   talked about what would be involved in the number of

16   service calls, the government gave me an estimate of

17   the number of service calls that they would expect,

18   three types of service call -- I'm just giving you

19   that for an example, and then I'm going to say

20   something else about this document.  The service

21   call, routine, urgent and emergency, and we

22   discussed the frequency of work, how long, what

Ballard, Joe N.

June 8, 2010

Washington, DC

23

1   would be involved, what types of service calls, so

2   it was all of that data together, and this wasn't --

3   we didn't sit in a room and make this stuff up.

4       Q.    Okay.

5       A.    The government gave us the detailed data

6   to the best of their knowledge and we requested a

7   lot of other data, which is not -- so that's how we

8   came up with these numbers and went back and -- went

9   back and -- my correct English, we used those --

10  that information and then prepared our estimates.

11  You know, we prepared several of these things and

12  worked with the government, so I don't know which

13  one this is.

14      Q.    Okay.  And really, just trying to get some

15  general information, is what I'm asking about.  You

16  mentioned that the government provided some

17  estimates, and we'll talk more about that in terms

18  of emergency, urgent, routine calls.  How did they

19  actually present that information?  Do you recall?

20      A.    Most of it was verbal.

21      Q.    Verbal.

22      A.    Yes.

Ballard, Joe N.                                    June 8, 2010
                    Washington, DC

                                                        27

1      A.      Uh-huh.

2      Q.      -- for example, like floor plans and the

3  like, what information -- I think you testified to,

4  but just to be clear on this, what information was

5  unwritten, was oral, simply provided by word of

6  mouth?

7      A.      I couldn't tell you that.  I mean, it was

8  a lot.  You know, for me to go back five years and

9  say he said this, this and that and gave me this in

10  writing, I'm good but not that good.  All I can tell

11  you is we had stacks of written material and we

12  showed up and we discussed it on each one of these

13  categories.

14      Q.      Well, let's say, for example, the service

15  calls.

16      A.      Service calls.

17      Q.      I think you testified that that

18  information was presented orally.

19      A.      That's right, they didn't have it.  They

20  didn't have the historical records.

21      Q.      They told you that.

22      A.      They told me.  Plus, we requested it.

39

1    Q.    The house had a problem, okay.

2    **A.    Yeah.**

3    Q.    I haven't been to Fort McNair or seen the

4    quarters.  Are these similar to Fort Myer, old nice

5    brick structures?

6    **A.    They're similar in the fact that they're**

7    **old.  Some of them are brick, some of them are wood.**

8    Q.    Well, your quarters --

9    **A.    Brick.**

10    Q.    Brick.  Do you know when the house was

11    built?

12    **A.    I have no idea.  Long time ago.  It was**

13    **during the -- before Lincoln was president.**

14    Q.    Before -- okay.  And what's your

15    understanding of the age of the quarters at Fort

16    Myer?

17    **A.    I would assume they're probably the same**

18    **era.  All those posts were built about the same**

19    **time.**

20    Q.    And with respect to your own quarters,

21    what was the general condition other than this

22    incident with the fire?

40

1    A.    They were fairly well maintained, given

2    the amount of money that you could put into them

3    every year, but fair.  If it was my own quarters, I

4    would have said they were in poor condition.

5    Q.    They were in poor condition.

6    A.    Yeah.  I mean, floors, wiring outdated.

7    Q.    Okay.

8    A.    I mean, they're not a modern house.  It's

9    an old house.  It's a historical home.

10   Q.    Uh-huh.  Had you had opportunity when you

11   were living in those quarters at Fort McNair to

12   visit other quarters of other flag officers?

13   A.    I went in them but I sure was not checking

14   on the condition of them.  I went there to eat and

15   drink and socialize, not to play DPW.

16   Q.    Okay.  Did you ever learn of the

17   conditions of other quarters in terms of

18   socializing?  Did people complain or did you ever

19   hear about other incidents or other people had fires

20   or -- in other words, did you learn in general about

21   the condition of other quarters when you were a

22   resident?

1    **A.    Uh-huh.**

2    Q.    Performing work based upon credit card

3    purchases?

4    **A.    Uh-huh.**

5    Q.    Okay.

6    **A.    As stated here, they asked us to start**

7    **performing maintenance prior to the execution of the**

8    **contract.  Don't know how many different ways we can**

9    **say that the work started prior, at the same time we**

10    **were preparing the PWS.**

11    Q.    All right, I'm going to show you another

12    document, and we'll mark this as Defendant's Exhibit

13    D.

14                              (Defendant's Exhibit D

15                               was marked for

16                               identification.)

17            BY MR. PIXLEY:

18    Q.    And if you could take a look at that,

19    General Ballard?

20    **A.    That's my signature.**

21    Q.    And do you recognize this document?

22    **A.    I recognize this, yes.**

Ballard, Joe N.                                          June 8, 2010

Washington, DC

60

1    I received from Dee Spellman and the post, yeah.   I

2    didn't make this up.

3         Q.    So did Dee Spellman tell you that -- is

4    what this is alleging here, that essentially they

5    had not been maintained for several months?   That's

6    correct?

7         A.    Yeah.

8         Q.    Did she tell you they were in poor repair?

9         A.    Yes.

10        Q.    She did.

11        A.    Yes, and she was absolutely correct.

12        Q.    And was this at the initial meeting that

13   you had with her or some of the early --

14        A.    I don't know exactly when it was.

15        Q.    Okay.  So she didn't provide the records,

16   but she said these are in poor repair.

17        A.    Poor repairs.

18        Q.    And when you're --

19        A.    And I'll tell you how that conversation

20   came up.  I have nothing to hide.  I'm here to try

21   to get you squared away, okay?  The way that

22   question came -- came up was because I was curious

Ballard, Joe N.                                    June 8, 2010

Washington, DC

92

1    A.    And I'm also testifying to you that I have

2  not seen this -- the contract.  I don't have the

3  contract here.

4    Q.    Tell you what.  Let me ask about the

5  service calls.

6    A.    Okay.

7    Q.    And if you look at paragraph 30 of the

8  complaint, just take a look at that quickly.  The

9  allegation is that the Army told Ravens Group there

10  would be -- they could expect approximately 50

11  service calls per month.

12    A.    That's right.

13    Q.    Who told you that?

14    A.    Dee Spellman and Dan Mussel, because that

15  was crucial, but that's who told us that.

16    Q.    Did they show you anything in writing?

17    A.    No, they just told me.  I said how many

18  service calls are we talking about, and we discussed

19  that.  We spent a lot of time talking about that,

20  and they came up with the number 50 and that's what

21  we priced it off of.

22    Q.    And if you look at paragraph 31 --

112

1    the IDIQ provision of the contract; is that right?

2    Or what does that mean, IDIQ, on this?

3        A.    What do you mean, what does it mean?  Do

4    you want me to tell you what an IDIQ is?

5        Q.    No, I don't want you to tell me.  I'm just

6    trying to understand this report.

7        A.    Well, let me tell you, the purpose of this

8    report, and this is going to come up later on.  I'll

9    wait until you ask the question.  The purpose of

10   this report was to track everything that was done to

11   a set of quarters, IDIQ, firm fixed price, the whole

12   bit.

13       Q.    Was that for billing purposes then?

14       A.    Not only for billing purposes, but it was

15   also for Mrs. Spellman to track her statutory

16   requirements of how much money she was spending on

17   individual quarters.  She still had that same

18   requirement for general officer, flag officer

19   quarters.  So you can take and go to that job

20   number, that set of quarters and pull out all the

21   forms that was in the file that says for quarters

22   NY23BL, and I didn't name these quarters, they did,

Ballard, Joe N.                                    June 8, 2010

Washington, DC

128

1      A.    Well, it sounds like we're getting into an

2   argument here so let me just put it this way.  I

3   read this as an example.  I don't know why 85 is not

4   there rather than 50.  It is not my concern.  It

5   says example.  That's what it said, example.

6      Q.    When you were negotiating and working with

7   your government counterparts in putting together

8   this -- this statement of work, did you ever tell

9   them or insist or say let's document this, let's

10  make it 50, let's make sure -- this is what you're

11  telling me.  Just want to know if you made that

12  effort.

13     A.    No, because here's the problem.  This

14  performance work statement was written.  We sat down

15  and talked about what had to be done and how it

16  needs to be done.  Doesn't mean that simultaneously

17  we're going through and doing the calculation and

18  putting in CLINs in there.  It just doesn't happen,

19  well, let's write this and then let's go over here

20  and work out the numbers.  It doesn't work out that

21  way and it didn't work out that way.  So I can't

22  answer your question is 85 was in the contract, I

129

1    **was told 50, so you can make what you want to out of**

2    **that.**

3    Q.    In terms of preparing this statement of

4    work, I understand what your testimony is, is that

5    it was a process with the Ravens Group and the

6    government.  Who actually typed it up or prepared it

7    on the computer?  Who had the master document?  Do

8    you know?

9    **A.    We prepared the master document and gave**

10   **them -- gave the government the document and the --**

11   **the electronics.**

12   Q.    Okay, and Ravens Group -- the government

13   paid Ravens Group for preparing that statement of

14   work?

15   **A.    For my work, of course, I'm going to get**

16   **paid if I'm down there working.**

17   Q.    All right.  Okay, I'll ask you to take a

18   look at the complaint again, and if you could,

19   General Ballard, if you could look at paragraph 34

20   of the complaint?

21   **A.    Yeah.**

22   Q.    And the allegation is that contract

1

1        UNITED STATES COURT OF FEDERAL CLAIMS

2

3    ------------------------x

4    THE RAVENS GROUP, INC.,    :

5            Plaintiff,         :

6        v.                     : No. 07-754C

7    UNITED STATES,             :

8            Defendant.         :

9    ------------------------x                **Certified Copy**

10

11                DEPOSITION OF:

12            KENNETH DEAN BRICKER

13

14        Wednesday, March 21, 2012

15            Washington, D.C.

16

17

18

19

20

21   Reported by:  Cheryl A. Lord, RPR, CRR

22

Bricker, Kenneth Dean                                    March 21, 2012

80

1    this -- well, let me -- let me back up -- back up
2    a second.
3            The service calls identified as IDIQ,
4    were those subtracted from the count?
5        A.    Yes, they were.
6        Q.    They were.  And you're aware of that?
7        A.    Yes.
8        Q.    And how do you know that?
9        A.    I verified The Ravens Group's
10   calculations, the methodology that they used,
11   identified which of these they had included in
12   there.  As I said before, they selected -- they
13   left off some of them, and that would have been
14   one of the criteria for leaving them out of the
15   calculation.
16       Q.    So you're aware they did leave off some
17   of them?
18       A.    Yes.
19       Q.    And what is your understanding of what
20   they left off in relation to IDIQ?
21       A.    I believe also -- my recollection is
22   that there were some canceled where the job was

Bricker, Kenneth Dean                                  March 21, 2012

1      A.     The 300 dollars?

2      Q.     Yes.

3      A.     300 dollars is not in the contract.

4   That is -- because we're not utilizing the

5   contract to estimate the damages that were done.

6   The damages that were done were based upon the

7   contractor's knowledge at the time of proposal and

8   the factual what actually happened -- versus what

9   actually happened.

10     Q.     Well, in other words, the contract has a

11  mechanism for requesting additional compensation

12  for additional work.

13     A.     Yes.

14     Q.     Do you know why Ravens Group chose to

15  ignore that or not base a claim on that?

16     A.     Well, in fact, they basically used that.

17  It's -- but because -- my understanding was

18  because of the amount that it was gone over, it

19  exceeded any -- anyone's expectations, so --

20     Q.     You're saying they did use this.

21     A.     Yeah, mathematically, it averaged out,

22  it's about -- it does basically the same thing --

89

1    Q.    Really?

2    A.    -- the method they used.  Yeah.

3    Q.    Did you make calculations based on the

4  contract provisions?

5    A.    I did not.

6    Q.    So how --

7    A.    I only reviewed their -- what they

8  already had.

9    Q.    Well, how can you possibly say that it

10 averages out about the same?

11   A.    Because I looked at the methodology,

12 which is what my statement is about on the

13 methodology used.

14   Q.    Okay.  Well, let's look at that.  Look

15 at C.5.1.8.1.

16        Okay?

17   A.    M-hm.

18   Q.    Look at the second-to-the-last sentence.

19 And again, this talks -- the provision is for

20 adjustments for routine and urgent service calls,

21 additional compensation.

22   A.    Right.

102

1   calls during the period, and I could see how

2   they -- they did document that, so there was a

3   document, but I didn't see anything prior to

4   contract award where that information was --

5        Q.    Okay.

6        A.    -- supplied.

7        Q.    And then you say:  Because of the time

8   frame required to respond to these calls, Ravens

9   Group marked up the urgent calls by 25 percent.

10       A.    Yes.

11       Q.    What do you mean -- what's your

12  assumption here with reference to the time frame?

13       A.    This is again a technical portion of it

14  that where they say, look, we had a certain amount

15  of time to respond to urgent calls.  We determined

16  that because of that timing, there was -- it was

17  more costly because we had to get people out

18  there.

19            They used 25 percent, which is a number

20  that I signed off on merely for the purposes --

21  and I think I -- my opinion is based merely on the

22  methodology used to calculate the 375.  In other

103

1   words, I agree, it makes sense that there should

2   be some markup because of the expeditious nature.

3           Is 25 percent right?

4           I don't know.

5       Q.    Okay.  So it's not the number of calls,

6   then, because you said that was part of what they

7   estimated.

8           Right?

9       A.    I'm not sure what you're asking.

10      Q.    In other words, the markup is not due to

11  the number of urgent calls.

12          It's due to the time frame of doing it?

13      A.    The urgency of the calls.

14      Q.    Okay.

15      A.    And in this particular case, they are

16  saying that the number of urgent calls exceeded

17  what they had anticipated, but that's where I said

18  to you also, I didn't see any preaward

19  documentation that said -- or any back-and-forth

20  that talked specifically about urgent calls, only

21  talked about service calls, the documentation that

22  we spoke about earlier.

Bricker, Kenneth Dean                                    March 21, 2012

104

1      Q.    Okay.  Now, in terms of the time frame

2    to respond to the calls, did you basically just

3    accept their representation that there's

4    additional time, or did you see any documentation

5    that indicated?

6      A.    No.  I accepted their evaluation because

7    that's a technical issue, not really on quantum.

8    They explained in a very cursory way why it

9    takes -- you know, they got to get people out

10   there and there's quicker turnaround.  I'm not a

11   technical person.  I relied upon that.

12        And I believe there was some information

13   in the DCAA audit report that also spoke to that

14   and talked about a technical qualification on

15   that, so I made that assumption.

16     Q.    But in terms of the 25 percent, that was

17   Ravens Group's markup?

18     A.    That's their number.

19     Q.    Yes.  Okay.  And you don't know whether

20   that's correct or not in terms of --

21     A.    No.

22     Q.    All right.

108

1    are subject to the Service Contract Act wages but

2    will not be limited to a 300 -- 300 -- 200 --

3    2,000-dollar threshold as are routine and urgent

4    service calls.

5              And if you look at C.5.1.9.2,

6    adjustments, and then the following paragraph,

7    compensation.  In other words, there appears to be

8    a formula in the contract for emergency service

9    calls for additional compensation.

10       A.    Right.

11       Q.    Again, based on labor hours expended.

12   But it appears that in your report, the markup of

13   the 50 percent didn't use this formula.

14       A.    It did not.

15       Q.    Where did the 50 percent markup come

16   from?

17       A.    Again from the Ravens technical

18   personnel.

19       Q.    Okay.  Did you see anything to verify

20   that number?

21       A.    There's -- no.

22       Q.    That's simply a representation?

109

1      A.      Yep.

2      Q.      And your opinion is based solely on

3    multiplying the 300 routine call by 50 percent to

4    get the 450?

5      A.      Yes.

6      Q.      Okay.  All right.  Next we'll go to next

7    portion of your report where it says:  Quantum

8    related to increased personnel to perform urgent

9    and emergency calls.

10          And just to paraphrase here, what it

11   looks like is that -- and I'll have you talk,

12   but -- that you -- there are identified salaried

13   personnel that were hired to perform this

14   additional work, 3 carpenter apprentices, an

15   electrician and a carpenter, as well as

16   outsourcing 6 lawn care personnel.

17          These are the 1099 employees.

18     A.      M-hm.

19     Q.      Okay?

20     A.      Yes.

21     Q.      Let me start off by asking you about the

22   salaried employees.

116

1            MR. PIXLEY:  Yeah, right here.

2            51 of 115, section C.1.2.

3            MR. JORDAN:  Okay.  I see what you mean.

4            MR. PIXLEY:  Like the performance work

5     statement, there's duplicated parts that repeat.

6            MR. JORDAN:  Okay.

7            MR. PIXLEY:  With different page

8     numbering.  That's how they did it, so --

9            BY MR. PIXLEY:

10       Q.   Okay.  Just the question is, the general

11    requirements is to provide all labor, material,

12    supplies, and so on and so forth.

13            Okay?

14            So in other words, the baseline as part

15    of the firm, fixed price --

16       A.   M-hm.

17       Q.   -- is that the contractor was to provide

18    all the labor and personnel to perform the job.

19    So to understand what this claim is, is that these

20    additional personnel represented work beyond the

21    estimated 50 calls per month.

22            Is that a fair estimation --

117

1      A.     That is correct.

2      Q.     -- of what we're talking about?

3             Okay.  And then let me ask you:  Did --

4    what steps did you take to verify whether these

5    salaried personnel actually performed extra --

6    worked on this extra work?

7             Do you understand my question?

8      A.     I do understand the question, but again,

9    we couldn't do that because they weren't charging

10   to the -- they were charging to the contract not

11   to specific service.  So what we had to do was --

12   what they did and what I say is the only way you

13   can get anywhere near the actual number on this

14   is, determine that they did -- based upon what

15   they anticipated to be the statement of work and

16   the number of service calls, they had to hire

17   these people in excess of what they had initially

18   bid.

19            So, no, that does not necessarily mean

20   they worked on this job, because the job -- the

21   firm, fixed price portion is firm, fixed price for

22   everything, but if you don't have an adequate

Bricker, Kenneth Dean                                    March 21, 2012

                                                                   118

1   description upfront of what you're going to be

2   doing, it's very difficult to bid a contract.

3        Q.     In other words like for the daily status

4   report, did you look at and compare, like try to

5   match up, okay, this hired carpenter worked, just

6   for example, 30 extra jobs?

7              I mean, did you try to match that up

8   here?

9        A.     No, because you can't tell from that

10  status report what jobs are the extra jobs.

11  There's no check marks next to them that say,

12  okay, here is our 50 for August, and here is the

13  35 that were extra.  You know, it could have been

14  August 1st, could have been a job that wasn't

15  anticipated.  If you've got 80 jobs in a month,

16  and there's no way to say, okay, this one is the

17  job that was in excess.  There's just 30 extra

18  service calls.

19       Q.     All right.  Did you review like

20  timesheets to verify whether these salaried

21  personnel actually performed additional work?

22       A.     Worked on this job, not additional work,

119

1    because that's impossible, but I verified that

2    they were working on this contract.

3         Q.    Okay.  And you reviewed their

4    timesheets?

5         A.    I did.

6         Q.    And they -- any questions about those

7    that you saw?

8         A.    There were a lot of questions as I went

9    through that -- both on timesheets and on

10   invoices, there were a lot of questions, because

11   the administration, the paperwork wasn't really up

12   to date.  There were a lot of timesheets

13   missing --

14        Q.    M-hm.

15        A.    -- but that's where we have to make the

16   assumption, if they worked this week and they

17   worked this week, they were probably working in

18   the middle.  I didn't verify -- didn't go back to

19   check if they were on vacation that week or

20   anything, but there should have been a timesheet

21   even if they were on vacation.

22              So I did verify, but there was missing

120

1    documentation.  Again, by the time I got in there,
2    this thing was 3 years old maybe?
3         Q.    Okay.  So even for these salaried folks,
4    there was missing documentation.
5         A.    My recollection is on everybody, I'd
6    miss a timesheet.  I'd ask for -- because the way
7    I would do it, in order to make sure that I stayed
8    independent is, I would go in and say, give me
9    this, this, and this timesheet with whatever pay
10   period.
11        Q.    Well, for the salaried personnel -- and
12   again I'm on your report -- you calculated cost
13   equal to 250,669, which you state represents the
14   actual additional employee rates per month per
15   hour worked.
16              With the missing documentation, did you
17   take that into account in estimating these
18   additional costs?
19        A.    No, because that's what DCAA used to do.
20   They don't do it any longer.  There's -- there's
21   exposure -- there's -- missing documentation is
22   one thing, but you don't automatically assume --

Bricker, Kenneth Dean                                    March 21, 2012

126

```
 1    available.  That's what you're saying.
 2              MR. JORDAN:  Objection.
 3        A.    Well, the records show that there was
 4    work in excess of 50 a month.
 5              BY MR. PIXLEY:
 6        Q.    All right.  Let's move on to the other
 7    personnel, the 1099 subcontractors.
 8        A.    M-hm.
 9        Q.    Lawn care personnel.  What you're saying
10    is -- again your title -- subtitle here is,
11    quantum related to increased personnel to perform
12    urgent and emergency calls.
13              Are you saying that they hired lawn care
14    personnel to perform emergency lawn care?
15        A.    No.  I'm saying that they had a group to
16    do the work that they thought they were going to
17    get, but they had people -- some of those people
18    out doing lawn care-type things, and because they
19    had these other emergency and urgent calls, they
20    had to call them off to do something else.
21              Not all these people -- you know, we're
22    talking very blue-collar level here, and not all
```

Bricker, Kenneth Dean                              March 21, 2012

128

1   right now, you say, hey, go over and help Joe cut

2   grass, you're saving the taxpayers money because

3   you don't have that additional personnel there.

4          Then when the work escalates to such a

5   degree, then you say, well, I got to keep the

6   electrician on the emergency jobs all the time, so

7   I need to get somebody in here to do this other

8   work.

9      Q.    Are you speculating that's what they

10  did?

11     A.    No.   That -- I am speculating -- I'm --

12  as far as this person on this type of job.

13     Q.    Okay.   Well, I guess -- in other words,

14  you've got the daily status report.

15          Is there anything matching up these

16  additional lawn care workers with performing

17  additional work on service calls?

18     A.    Yes.   The work was done, and there are

19  lawn care -- routine lawn care calls on that

20  service call list.

21     Q.    All right.

22     A.    Yeah, matching them up one per one, it's

Bricker, Kenneth Dean                                    March 21, 2012

129

1    never going to be done.

2         Q.    Well, let me ask a question.

3               If we could look at the contract again.

4         A.    M-hm.

5         Q.    And give me your portion -- it might be

6    easier for me just to find it for you.  Actually,

7    give me both sections.

8               If you look at page 22 of 39, and it's

9    section C.5.4, grounds maintenance services.  So

10   in other words, there's a separate CLIN for Ravens

11   Group to do grounds maintenance.

12        A.    Yes.

13        Q.    So does it make sense to include them as

14   an additional cost for routine service calls, a

15   different CLIN?

16              This is work they were required to do

17   anyway.

18        A.    Yes.  Common sense would dictate that if

19   you anticipated 50 calls per month, that work like

20   this type of grounds maintenance can be done by

21   pretty much anybody, so rather than hire pay grade

22   people to sit and wait for the jobs to come, if

Bricker, Kenneth Dean                                    March 21, 2012

132

1          MR. JORDAN:   Which exhibit?

2          MR. PIXLEY:   It's I, is it?

3          THE WITNESS:   I.

4          BY MR. PIXLEY:

5      Q.    Yeah.   Page 22 of 40.   Look at job 873.

6      A.    Okay.

7      Q.    And it looks like the type of job is LM,

8  which stands for lawn maintenance, and it's an

9  IDIQ, extract 2 trees from quarters.   I went

10 through this log and I found very few lawn

11 maintenance calls.   Some were IDIQ.

12          If you look at page 37 of 40, jobs 1186

13 and 1187, they're lawn maintenance IDIQ.   They

14 were canceled.   I don't really see a lot of lawn

15 maintenance calls, and I'm wondering where these

16 additional subcontractors --

17     A.    M-hm.

18     Q.    -- the basis --

19     A.    As part of the firm, fixed price, there

20 was just a routine lawn maintenance.   It wouldn't

21 be calls.   You know, it has to be done, regular

22 lawn maintenance.

Bricker, Kenneth Dean                    March 21, 2012

140

1    have that calculation in here, so I would have to
2    go back and look and see what they calculated.
3    That's unusual that I don't have it in there, but
4    it was their number.  I looked at the methodology
5    that they used and --
6        Q.    But you're not prepared to talk about
7    the methodology just now?
8        A.    Apparently I did not put that in my
9    report, so, no, I'm not.  That's unusual but --
10       Q.    Okay.  Just make a note of that one.
11             Moving on, quantum on payment for
12   invoice 04, dash, 899, bathroom renovation.  And
13   you state you do not opine on quantum.
14       A.    Yes, I couldn't figure out what the
15   situation was, how they came up with the number,
16   couldn't get back to their number, couldn't figure
17   out how I -- what was a valid methodology of
18   coming up with it, so I just declined to opine on
19   it.  I don't know the answer to this question.
20       Q.    I mean, is that something you questioned
21   them?
22       A.    I typically wouldn't use that term in