# In the United States Court of Federal Claims

No. 07-754C
(Filed: July 26, 2013)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |  |
|---|---|---|
| | \* | |
| THE RAVENS GROUP, INC., | \* | |
| | \* | |
| Plaintiff, | \* | Breach of Contract for Negligent, Bad Faith, |
| | \* | or Misleading Estimates; Jury Verdict |
| v. | \* | Method; Demonstrating Injury as Part of |
| | \* | Breach Claim |
| THE UNITED STATES, | \* | |
| | \* | |
| Defendant. | \* | |
| | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Daryle A. Jordon,* Fairfax, VA, for plaintiff.

*Joseph A. Pixley*, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Stuart F. Delery*, Principal Assistant Deputy Attorney General, and *Jeanne E. Davidson*, Director, and *Kirk T. Manhardt*, Assistant Director, Commercial Litigation Branch, for defendant.  *Major Nathan J. Bankson*, U.S. Army, Litigation Division, Arlington, VA, of counsel.

## O P I N I O N

**FIRESTONE**, *Judge*

Pending before the court is the United States' ("the government" or "the

defendant") motion for summary judgment in this action brought by The Ravens Group,

Inc. ("the plaintiff" or "TRG"), for breach of contract in connection with a contract

between TRG and the U.S. Army ("Army") to provide housing maintenance services at

Fort Myer, Virginia and Fort McNair, Washington, D.C.  The contract, which was

awarded to TRG on August 16, 2004, is identified as a "combined Fixed Price Indefinite

Delivery Indefinite Quantity Contract."  TRG filed a six-count complaint under the

Contract Disputes Act ("CDA"), 41 U.S.C. § 7103 et seq., and the Tucker Act, 28 U.S.C.

§ 1491(a)(2), in 2007, alleging various claims for payment of additional work.  TRG has

agreed to dismiss two of the counts.[1]  Three of the remaining four counts—Counts I, II,

and III—relate primarily to the plaintiff's contention that the government breached the

contract by failing to provide historical workload data and for providing misleading

estimates of the number of monthly service calls TRG could expect under the contract.

See Compl. 9-11.  Specifically, TRG claims that, prior to contract formation, the Army

told TRG that it could expect to receive 50 routine service calls per month and one to two

non-routine calls per year, and that the plaintiff reasonably relied on these estimates in

preparing its bid of $15,000 per month for service calls under the firm fixed price

("FFP")  portion of the contract.  Moreover, TRG claims that in addition to requiring it to

respond to more calls than it was told to expect, the government also required TRG to

provide services to three more units than the 49 units identified in the contract.

    The undisputed facts show that that estimate of the number of calls was not correct

and that TRG began responding to over 90 service calls per month shortly after the

contract was awarded.[2]  In Count III, the plaintiff alleges that these facts give rise to a

---

[1] The plaintiff has agreed to dismiss its claims for unlawful assignment of work to third party contractors (Count IV) and for wrongful termination (Count V).  Pl.'s Resp. 4.  Those claims are hereby **DISMISSED**.

[2] It is not disputed that over the life of its contract, TRG exceeded the 50 calls per month estimate by at least a total of 388 calls between August 2004 and March 2005.  DCAA Report 5, Pl.'s Appx. 3138.

claim for breach of the implied duty of good faith and fair dealing. In Count VI the plaintiff alleges, in the alternative, that the government constructively changed the contract without payment.

The government seeks summary judgment as to all of plaintiff's claims. The government argues that the undisputed facts establish that the Army did not provide negligent or misleading estimates to TRG and that the plaintiff's claim for additional payment associated with responding to more than 50 service calls per month must be rejected on the grounds that TRG failed to keep proper labor hour records to support a claim for additional payment under the terms of the contract. The government also argues that it did not breach the contract by requiring TRG to perform work at certain units not listed in the contract on the grounds that TRG in fact never provided services to more than 49 units as required by the contract.[3]

In the alternative, the government seeks summary judgment on the plaintiff's methodology for establishing damages. Assuming TRG can establish that the government breached the contract regarding its estimate in the first instance, the

[3] The plaintiff has not responded to the government's arguments for summary judgment associated with certain miscellaneous claims asserted by the plaintiff. Def.'s Mot. 42-43. Specifically, TRG does not address the government's arguments regarding TRG's claims for compensation for an answering service, administrator's salary, equipment loan loss, and for the deletion of a contract line item number ("CLIN") for custodial services. Under Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), the court may consider a fact undisputed and grant summary judgment where the opposing party fails to respond or to properly address the moving party's assertion of fact if that fact is supported by the record. RCFC 56(e)(2)-(3); see also Anaheim Gardens v. United States, 109 Fed. Cl. 33, 37-38 (2013). Since the court finds that the government's argument that TRG bore the risk of additional costs associated with the first three miscellaneous claims and further agreed to resolve the fourth with a contract modification is supported by the factual record, the government's motion for summary judgment is **GRANTED** with regard to these claims.

government argues, the plaintiff has nonetheless wrongly assumed it was injured solely for having had to respond to additional calls.  Rather, the government argues, where the contract required TRG to maintain records of its service call labor hours, damages may only be established with evidence of excess hours worked.

For the reasons set forth below, the court finds that disputed issues of fact preclude summary judgment with regard to the plaintiff's claim that the government breached the contract by providing negligent or misleading estimates.  The court finds that the government is entitled to summary judgment with regard to the plaintiff's claim for breach of contract based on having to provide services at more than 49 units.  The court also finds that the government is entitled to summary judgment regarding plaintiff's improper reliance on the jury verdict method in this case.

## I.      Factual Background[4]

### A.      Maintenance of the GFOQ prior to contract award

General and Flag Officers Quarters ("GFOQ") is military housing specifically designated for senior officers of the United States military and their families.  The GFOQ Executive Management Office ("EMO") was established to provide program management for the maintenance and repair of GFOQ housing.  The GFOQ units at Fort Myer and Fort McNair, which are the subject of this litigation, were each built roughly a century ago.  Prior to August 2004 and the establishment of the EMO, they used "in-house" personnel to respond to the majority of the maintenance and repair service calls at

---

[4] The facts are taken from the parties' briefing and associated exhibits and are not in dispute unless otherwise noted.

GFOQ housing.  Spellman Dep. 16, Def.'s Appx. 239.  The housing office at the time also used private contractors to provide certain maintenance and repair services in cases where the in-house government personnel were unavailable or unable to perform the required services.  TRG, a service disabled, veteran owned small business, was one of the private vendors that serviced GFOQ housing at Fort Myer and Fort McNair prior to the contract award at issue in this litigation.  TRG was founded by Lieutenant General (Retired) Joe Ballard, who previously served as Commander of the United States Army Corps of Engineers and had lived in GFOQ housing at Fort McNair.

The EMO was established in response to criticism by senior officers and their families regarding the failings of this patchwork of private vendors and government personnel.  Spellman Dep. 16, Def.'s Appx. 239.  Specifically, there were complaints related to the "lag time" between placing service call requests and the completion of maintenance.  Clark-Evans Dep. 8, Pl.'s Appx. 2729.  In addition, despite their age, GFOQ housing units did not receive "much maintenance" prior to the contract award. Spellman Dep. 29, Pl.'s Appx. 3441-42.

### B.   The decision to contract out the GFOQ maintenance work and pre-contract communications with TRG

In response to the poor reviews and housing conditions at Fort Myer and Fort McNair, Ms. Dee Spellman, who previously served as the GFOQ policy manager at Army headquarters, was hired to start the EMO and to serve as its first director.  In her previous position as the GFOQ policy manager at Army Headquarters for housing, Ms. Spellman "worked very closely with all the general and flag officer managers throughout

Army-wide." Spellman Dep. 14-15, Pl.'s Appx. 3435-36. Once created, the EMO tasked

Ms. Lenora Clark-Evans, the director of contracting at the United States Army

Contracting Agency at the Capital District Contracting Center ("CDCC"),[5] with drafting

a contract for housing maintenance work at the Fort Myer and Fort McNair GFOQ

facilities. Ms. Clark-Evans previously worked as a contract specialist at Hickam Air

Force Base, where she gained experience with GFOQ housing maintenance and repair.

Clark-Evans Dep. 9-10, Pl.'s Appx. 2730-31.

Because this contract was a new initiative, the CDCC sought the assistance of

TRG to help draft the performance work statement ("PWS") in the early summer of 2004.

The plaintiff's work on the GFOQ PWS was performed under purchase request No.

WT3RTQ-4182-0602. Beginning with only a "generic" statement of work, TRG worked

with the government to develop a more robust and specific scope for the contract work.

Clark-Evans Dep. 12, Pl.'s Appx. 2733. TRG prepared the PWS along with the CDCC

and provided the CDCC and the EMO with a "master document." Ballard Dep. 129, Pl.'s

Appx. 2880.

Early in developing the PWS, TRG specifically asked Mr. William Campbell, a

division chief for contract administration at the CDCC, for access to the military service

call records for GFOQ housing at both bases. TRG wanted historical service data to

prepare the PWS as well as its own bid proposal. Mr. Campbell requested the

information through Ms. Spellman, who in turn relayed the request to the Army's

Department of Public Works ("DPW").

---

[5] The CDCC has since been renamed the Missions and Installation Contracting Command.

According to Mr. Campbell and Ms. Spellman, the DPW had little or no historical data.[6] Ms. Spellman requested "the previous housing office to supply [the EMO] all the past, any records, historical data, whatever."  Spellman Dep. 28, Pl.'s Appx. 3441.  Ms. Spellman noted that "they had very little historical data, at least that was provided to us." Id.  Ms. Clark-Evans of the CDCC recalled that there was "no historical data on what was necessary" for performance of the contract.  Clark-Evans Dep. 8, Pl.'s Appx. 2729; see also id. 11-12, Pl.'s Appx. 2732-33 (stating that TRG was engaged to create the statement of work because "the customer didn't have historical data to come up with the specific statement of work").  Ms. Clark-Evans recalled, however, that the help desk responsible for service calls prior to the establishment of the EMO "used to get calls all the time." Clark-Evans Dep. 16, Pl.'s Appx. 2737.  Nonetheless, Ms. Spellman considered the lack of historical data to be "irrelevant" to developing the solicitation and contract requirements:

> But, in reality, [the lack of historical data] didn't really make any difference because what they had done up to that point was irrelevant in some degree because we knew that we had to just take it from that day forward and improve on anything that they may have already done or attempted to do. And, from the comments from the residents that there really had not been that much maintenance anyway, it just made better sense not to worry about past history, and just do [our] own assessments from this date forward, as we continued to do.

---

[6] The plaintiff contests the government's assertion that "service call" and other "historical" data for the Fort Myer and Fort McNair GFOQ was unavailable or did not exist.  During fact discovery, the government contacted the agency's DPW, which should have had the data if they existed and "confirmed . . . that no such records exist."  Def.'s First Suppl. Resp. Pl.'s First Request for Prod. of Docs., Def.'s Appx. 233.

Spellman Dep. 28, Pl.'s Appx. 3441.  In contrast to Ms. Spellman's views, Gen. Ballard,

on behalf of TRG, stated that he believed that the historical record was not only relevant

but also essential to preparing the scope of work and preparing a bid.  Ballard Dep. 218,

Pl.'s Appx. 2928.  Without available data, TRG requested access to the GFOQ units to

run inspections and to get a better sense of their condition.  Gen. Ballard stated that the

EMO denied TRG's request to enter the housing units to conduct inspections.  Ms.

Spellman maintains, however, that the EMO never denied TRG access.  Spellman Dep.

41, Pl.'s Appx. 3452.

In recognition of the need for some number to use in preparing the PWS, the EMO

and CDCC decided that they "would come up with a number as far as service calls to be

performed."  Campbell Dep. 25, Pl.'s Appx. 3012.  Although Ms. Spellman knew that

"the number of service calls was unknown to either [the EMO or TRG]," Spellman Dep.

43, Pl.'s Appx. 3454, she orally informed TRG during pre-contract discussions that the

contractor could expect 50 monthly service calls and one to two emergency calls per

year.[7]  Mr. Campbell recalled that the estimate of 50 calls was not based on any particular

data or that there was any "rhyme or reason" to the estimate.  Campbell Dep. 25, Pl.'s

Appx. 3012.  Mr. Campbell recalled that Ms. Spellman "just picked a number."  Id.

Neither Mr. Campbell nor anyone else at either the CDCC or the EMO investigated

whether Ms. Spellman's estimate was accurate or what—if any—information was used to

determine the estimate.  The estimate was not included in any written communication to

TRG.  Similarly, the estimates were not incorporated into the statement of work prepared

---

[7] The difference among the classification of calls will be discussed more fully in the next section.

by TRG.  Ballard Dep. 128, Pl.'s Appx. 2879.  Gen. Ballard further indicated his belief

that the estimates were based on some modicum of data and represented something other

than a mere guess.  Id. 22, Pl.'s Appx. 2811-12.  The government does not dispute, for

purposes of this motion, that TRG was given the estimate of 50 routine service calls per

month.  Def.'s Reply 11-12.

### C.   The contract award to TRG

TRG submitted the PWS to the EMO in July 2004.  The plaintiff included in the

PWS a line item for "service calls" which provided for a unit price of $15,000 per month

for a twelve month period, totaling $180,000.  According to plaintiff, this number was

computed by assuming 50 service calls per month, at an average of $300 per call.[8]  As

noted above, the CDCC awarded contract No. W91QV1-04-D-0013 ("GFOQ contract")

to the plaintiff with an estimated value of $1,585,210.00.  The contract was subsequently

modified on September 30, 2004 to reflect an adjusted total estimated amount of

$1,181,610.08.  The contract period performance was for one year with four option years.

The contract work was expressly split into two sections—an FFP component and a

separate indefinite delivery/indefinite quantity ("IDIQ") component.  The IDIQ portion

of the contract provided for a range of specific work including change of occupancy

maintenance (C.6.2) and spot painting (C.6.2.3).  In regard to specific work performed

under the IDIQ portion, the contract provided:

> Specific work is defined as maintenance repair, demolition, installation of
> equipment and miscellaneous items; relocation of equipment, materials, and
> devices; alteration; minor construction work requirements; and

---

[8] The plaintiff has not submitted evidence indicating how it arrived at the rate of $300 per call.

miscellaneous services which are not included in the Firm Fixed Price portion of the contract or identified as fixed-unit price work.  Housing work may also be accomplished by other means including self-help by occupants, impact card purchases, and the use of other prime contractors.

GFOQ contract C.7.1.  The contract further included a "maximum quantities" clause, which provided:

> As referred to in 5252.216-9319, "COMBINATION FIRM FIXED-PRICE/INDEFINITE-QUANTITY CONTRACT" clause, the minimum guarantee of work is the firm-fixed-price portion of the contract.  The maximum dollar value of the contract is the total dollar value of the fixed-price and indefinite quantity items.  The maximum shall not be exceeded except as may be provided for by formal modification to the contract.

GFOQ contract C.9.6.

With regard to the FFP component of the contract, TRG was responsible for a preventative maintenance and inspection program (C.5.2), pest control services (C.5), grounds maintenance service (C.5.4), annual inspection of facilities, grounds, and pavements (C.5.5), custodial services (C.5.6), and warehouse operation (C.5.7).  The FFP component of the contract also included the contract's service call management provisions.

### 1.    Classification of GFOQ service calls

With regard to service calls, as noted above, TRG agreed to a monthly FFP of $15,000 for all service calls.  Under the terms of the contract, the plaintiff was required to "[r]eceive, classify and respond to service calls for military family housing units and related support facilities."  GFOQ contract ¶ C.5.1.  TRG or the government could classify each service call into one of three categories: "emergency," "urgent," or "routine."  The Army reserved the right to reclassify service calls.  Id.

"Emergency" calls involved "the correction of conditions that constitute an immediate danger to personnel, threaten property, or require action to restore essential services."[9]  GFOQ contract ¶ C.5.1.1.  Among the requirements, TRG had to arrive at the site within an hour after the receipt of an emergency call and work continuously until the issue was addressed.  Id.  If TRG could not complete the work upon its first visit to the GFOQ unit, then it had to work until the emergency condition was arrested and then reschedule the work for completion.  Id.  "Urgent" calls were those that "will not immediately endanger personnel or threaten property" but "could lead to more serious adverse effects."[10]  Id. ¶ C.5.1.2.  The response time for urgent calls did not require the immediacy as that for emergency calls but generally required a response on the same or next day and did not require continuous work until completion.  Id.  The contract defined

---

[9] The contract provided further detail with regard to emergency service calls:

> Typical Emergency Service Calls include overflowing drains, roof leaks, broken water and/or frozen water pipes, electrical power outages, electrical defects which may cause fire or shock, gas leaks, loss of heat when the exterior temperature falls below 40° F, loss of air conditioning when the exterior temperature rises above 90° F, or loss of heat or air conditioning in quarters of occupants that have a documented medical requirement for maintaining stable temperature levels.

GFOQ contract ¶ C.5.1.1.

[10] The contract provided further detail with regard to urgent service calls:

> Typical Urgent Service Calls included clogged tubs and toilets, inoperable water heaters, ranges, ovens, refrigerators, broken windows during cold weather, loss of heat when the exterior temperature falls between 40° F and 50° F[, or] loss of air conditioning when the exterior temperature rises between 85° F and 90° F.

GFOQ contract ¶ C.5.1.2.

11

"routine" calls as those involving work not otherwise classified as emergency or urgent. Id. ¶ C.5.1.3.  The response and completion time for routine calls was five days.  Id.

The contract provided that routine and urgent service calls were those calls where the work, as estimated by the government, would cost $2,000 or less.  Id. ¶ C.5.1.6.  The contract provided that payment for those calls would be based on the government's estimated cost.  Id. ¶ C.5.1.6.  Specifically, the contract provided that:

> the Government's estimated cost will be calculated using the current R.S. Means, or other commercially available estimating systems to determine labor hours required, the Contractor's marked up hourly rate (determined from the offered price for this line item divided by the workload cumulative labor-hour estimate, including the agreed variance) and the lowest available material prices.

Id.  The contract required TRG to respond to all service calls "regardless of whether the cumulative labor-hours or materials exceed the estimated workload."  Id. ¶¶ C.5.1.8.1,  C.5.1.9.2.  Under the contract, TRG would be entitled to payment beyond $15,000 per month if the cumulative hours for 3 months exceeded workload estimates. The same principle applied to emergency calls, which were not limited to a $2,000 threshold.  GFOQ contract ¶ C.5.1.9.  The contract provided that the Army would compensate TRG for those portions of each emergency call exceeding the $2,000 threshold by issuing an additional, discrete work order for the excess.  Id.  The estimated cost, including labor hours, for emergency calls was determined in the same fashion as for urgent and routine calls using R.S. Means estimates or estimates from another commercially available estimating system.  Id.

12

### 2.     Data collection and maintenance requirements

The contract contained several provisions relating to developing, maintaining and providing records related to the contract work.  For instance, the contract provided that the "historical number and scope of service calls and [sic] by month of the year are maintained within the GFOQ office and shall be made available to Contractor for review upon request."  GFOQ contract ¶ C.5.1.8.  It is not disputed that despite requests from TRG, the GFOQ never provided these data. The contract also required TRG to document all work including time started and completed.  C.5.1.7. and C.5.1.9.1.

### 3.     The contract's variance and adjustment provisions for work exceeding estimated workload

As noted, the contract provided a mechanism by which TRG could seek adjustments to compensation beyond the monthly $15,000 FFP for service calls. Specifically, the Army and TRG "agreed that the Contractor will be compensated for that portion of actual Routine and Urgent service call workload which exceeds the cumulative figures for the three (3) month period."  GFOQ contract ¶ C.5.1.8.1.  TRG was to measure charged labor hours in 15 minute increments.  Id. ¶¶ C.5.1.8.1; C.5.1.9.2.  The parties included a formula by which the additional compensation would be determined during contract performance:

> **Labor-hours—Exceeding the 5% Variation Limitation.**  These hours will be determined from the completed work authorization data submitted by the Contractor as described by paragraph C.5.1.7 herein. . . .  Once the adjusted actual cumulative labor-hours are determined, the estimated cumulative labor hours above will be adjusted upward by five (5%) percent. This result will be subtracted from the adjusted actual cumulative labor hours and the remaining hours will be the basis for additional compensation.  The remaining hours will be multiplied by the Contractor's

13

> marked up hourly rate, as described in the example below to determine the compensation to be provided [to] the Contractor for the increased workload.

Id. ¶ C.5.1.8.2.  The contract provided the following example to guide the parties in

determining possible overage compensation for routine and urgent service calls:

> Example.  The adjustment and calculations will be done as follows:

| | |
|---|---|
| The workload estimated for 3 months. | 535.5 labor hours |
| (Average number of calls per month x average labor hours per call x number of months x 1.05) = (85 x 2.0 x 3 x 1.05) = 535.5 labor hours | |
| Actual hours after adjustments by the Government: | 672.5 labor hours |
| Excess hours (Actual labor hours – estimated labor hours) | **137.0** |
| The Contractor offered $15,000 per month to perform service Calls. | |
| The Contractor's marked up labor costs (which includes all [d]irect costs, indirect costs, G&A and profit) | |
| (Contractor's offered price – cost of materials) ($15,000 - $2,295) | $12,705 |
| Marked up hourly labor rate: (12,705) / (85 x 2) | **$74.74** |
| (Marked up labor cost) / (Ave. no. of calls per month x Average labor hours per call) | |
| The **137** excess hours are multiplied by **$74.74** to yield **$10,239.38** compensation for all costs (except materials) and profits for the excess workload. | |
| The 5% variance is not used in calculating either the materials Portion of the offered price or the marked up labor portion of the Offered price in order to yield higher hourly rates and thus higher compensation for the contractor. | |

Id. ¶ C.5.1.8.2 (emphasis added to provide clarity).  Adjustments to compensation for emergency calls would be calculated in the same manner as for urgent and routine calls described above with the exception that all work above the $2,000 threshold for which TRG would be compensated with indefinite quantity orders would be excluded from the computation.  Id. ¶ C.5.1.9.2.  Finally, the contract provided that "compensation for service calls would be consolidated" and provided the following formula to calculate billable overage:

> Total Routine Hours + Total Urgent Hours + Total Emergency Hours + 5% = Contract Hours.
>
> Total Hours Worked – Contract Hours = Billable Overage.
>
> Refer to Paragraphs C.5.1.8.2 and C.5.1.8.3 for calculation of labor hours and material costs.

Id. ¶ C.5.1.9.3.

### D.    Service call overage and renegotiation meetings

Soon after the contract was awarded, TRG began to experience a service call volume greater than what it had anticipated based on the oral estimate of 50 service calls a month provided by the Army.  Further, TRG noted that it was being asked to take on the responsibility of maintaining four additional units that were not on the initial list of 49 units provided to it when the contract was awarded.

TRG arranged for a meeting with the CDCC and the EMO on February 9, 2005 to discuss, among other items, the call volume it was experiencing.  At the meeting, TRG noted that it was losing money on the service calls and that it remained unaware of the "historical data for GFOQ during the development of the contract."  GFOQ contract

15

Renegotiation Meeting Minutes 1, Feb. 9, 2005 ("Feb. 9 Minutes"), Def.'s Appx. 141.  It also noted that since the beginning of the contract period, TRG only received one "true" emergency call and that while most of the calls had been routine, TRG responded as if they were urgent.  Id.  TRG's meeting minutes noted that "[T]RG would need to keep a close account of all firm-fixed dollars spent to include all salaries, vehicles, and other overages so that when it hits the $15,000, any amount over will have a claim processed to recoup the money."  Feb. 9 Minutes 3, Def.'s Appx. 144.

Following the February 9, 2005 meeting, TRG submitted a revised CLIN pricing proposal to Mr. Campbell proposing a service call price increase for the FFP unit price from $15,000 monthly to $102,675 monthly for a total CLIN price of $1,269,063.  TRG Line Item Proposal, Def.'s Appx. 148.  TRG noted that the government's inability to provide estimates, coupled with its "best guess" for the number of service calls, caused TRG to provide "a rather severe under estimation in the workload and material requirements for this particular CLIN."  Id.  There is no evidence that the Army officially reviewed or came to a formal decision on TRG's proposal but Mr. Campbell, CDCC's division chief of contract administration, later called the plaintiff's proposed pricing for service calls "astronomical."  Campbell Dep. 60, Pl.'s Appx. 3043.

TRG and the Army held a second contract negotiation meeting on April 19, 2005.  TRG's notes from the meeting indicate, under a heading titled "CDCC Change Answers," that the Army would "control the service desk so the service calls do not exceed the contract requirements established when estimating $15,000."  GFOQ contract Renegotiation Meeting Minutes 1, Apr. 19, 2005 ("Apr. 19 Minutes"), Def.'s Appx. 156

The notes further indicated an agreement to remedy the service call overage: "Although triage of service calls will be done by EMO, there will be fair dealing with The Ravens Group as it concerns types of service calls received and use of outside vendors when the service calls exceed the 50 calls for the month." Id. On May 2, 2005, several weeks after the April 19, 2005 meeting, TRG and the CDCC executed bilateral modification P00003 to the contract, which removed funding for custodial service for contractor-occupied office spaces. The contract modification did not reflect the changes to the service call requirement discussed at the meeting.

On June 15, 2005, the Army sent TRG a letter notifying it that the GFOQ contract was scheduled to expire on August 15, 2005. Notification Letter, Def.'s Appx. 159. Subsequent to the notification letter, on August 12, 2005, TRG and the Army executed a bilateral modification, P00004, extending the contract for six months to February 14, 2006. Contract Modification P0004 1, Def.'s Appx. 98. The contract provided the following release:

> In consideration of the modification (s) agreed to herein as complete equitable adjustments for the Contractor's acceptance of six month extension of services required for GFOQ proposal (s) for adjustment, the Contractor hereby releases the Government from any and all liability under this contract for further equitable adjustments attributable to such facts or circumstances giving rise to the proposal (s) for adjustment.

Id. 2, Def.'s Appx. 99.

### E.      TRG's claim before the contracting officer and final decision

On September 29, 2006, TRG submitted a claim and request for a contracting officer's ("CO") final decision, seeking $1,488,616.80 plus interest in connection to a

range of issues associated with the GFOQ contract.  GFOQ Contracting Officer Claim 1, Def.'s Appx. 170.  TRG stated that it answered an average of 93 service calls per month—far more than the 50 it was quoted prior to contract formation.  Moreover, the claim stated that TRG was told it could expect to respond to one or two emergency calls per year but actually responded to 10 per month in addition to 13 urgent service calls on a monthly basis.  Id. at 6, Def.'s Appx. 175.  TRG stated that it had relied on the estimates when it had submitted its bid and had been harmed by the increased workload.  Additionally, TRG claimed that the government required it to perform work on more than 49 housing units as provided for in the initial maintenance list.

In its claim, TRG noted that it had previously submitted a request for equitable adjustment on May 10, 2006 but had received no response from the Army.  Among its claims, TRG alleged that the Army provided it misleading estimates and breached the implied duty of good faith and fair dealing by failing to provide historical workload data after contract formation.  It further alleged that the Army constructively changed the contract by requiring TRG to respond to more service calls, forcing it to purchase more supplies and equipment while doubling its workforce.

By letter dated December 21, 2006, the CO, Mr. Campbell, issued his final decision, agreeing to pay $53,966.77 to TRG for claims relating to garbage disposal, mulching, and snow removal.  December 2006 Final Decision Letter, Def.'s Appx. 183.  The CDCC agreed to pay an additional $5,718.09 for a separate claim.  Id.  Mr. Campbell rejected the rest of TRG's claims.  He noted that there was no mention of the 50 service call estimate in the contract.  Mr. Campbell further pointed out that the claim was

18

"lacking of documentation in accordance with (IAW) C.5.1.7 in support to [sic] alleged overage on Service Call Overage and Service Call Response Overage."  December 2006 Final Decision Letter, Def.'s Appx. 183.  The letter also stated that TRG was not entitled to compensation for purchases of additional equipment or any increases in workforce because it was an FFP contract.  TRG filed the instant case on October 29, 2007.

### F.    Defense Contract Audit Agency audit and TRG's expert damages calculations

At the request of the Army, the Defense Contract Audit Agency ("DCAA") in a report, dated May 9, 2011, audited TRG's claim.  The report noted that during its examination of TRG's claims, "the contractor was unable to provide adequate, verifiable supporting documentation for the claimed costs."  DCAA Report 2, Def.'s Appx. 189. TRG calculated its claims for additional service calls over the 50 calls per month by assigning a value of $300 per routine call.  TRG claimed this amount by dividing the value of the monthly CLIN ($15,000) by the number of calls provided in the oral estimate (50).  TRG did not provide the auditors with the number of hours associated with each service call.  TRG did not maintain any labor hour records, so it instead used the $300 per call estimate.  TRG then marked up the value of the routine calls by 25% and 50% to calculate the cost of each urgent and emergency call over the one to two call threshold at $375 and $450 respectively.  Because TRG did not have any evidence of the exact hours spent on each call, the DCAA questioned TRG's claims in their entirety.

With regard to the service call overage, the audit found that TRG did not provide "adequate supporting documentation" for the overage as required by paragraph C.5.1.7 of

the contract.  DCAA Report 4, Def.'s Appx. 191.  The audit further concluded that no

adjustments could be made under paragraph C.5.1.8.1 since the contractor did not

maintain adequate data necessary to determine overages.  Id.  Specifically, the audit noted

that the service logs kept by TRG did not include a start/stop time, actual hours

expended, or the name of TRG's employees who performed the work.  Id. 6.  The audit

also took exception to the basis of calculation for call overages, concluding that the 50

call estimate was not included in the contract itself and that there was no basis for the

markup calculations for urgent and emergency calls.  Id. 7.

TRG responded to the audit in February 2012 with its own expert, Kenneth

Bricker, who in his affidavit concluded that TRG's calculations regarding excess service

calls and for increased personnel costs associated with meeting the service call increase

were reasonable and supported.  Specifically, Mr. Bricker supported TRG's claim that

regardless of hours spent on each call, it was reasonable to assume an average cost of

$300 a call used to establish the $15,000 price and to multiply that number by the alleged

388 additional calls for an unpaid amount for routine calls at $116,400.  Mr. Bricker then

applied a modified formula with a 25% per call markup to calculate the amount owed for

126 urgent calls in the amount of $47,250 and a 50% per call markup to calculate the

amount for 44 emergency calls in the amount of $19,800.  In addition, Mr. Bricker

calculated costs of $354,896 for increased personnel relating to TRG having to hire

additional employees and subcontractors to respond to the increased service calls.

This motion for summary judgment followed.

## II.     Standard of Review

In considering a motion for summary judgment, the court's role is to determine whether there exists a genuine issue of material fact for trial, and not "to weigh the evidence and determine the truth of the matter."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a); see also DIRECTV Gr., Inc. v. United States, 670 F.3d 1370, 1374-75 (Fed. Cir. 2012).  A material fact is one that "might affect the outcome of the suit," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In reviewing the facts, "all justifiable inferences are to be drawn" in favor of the party opposing summary judgment.  Id. at 255.

Once the movant has shown that no genuine issue of material fact exists, the party opposing summary judgment must demonstrate that such an issue does, in fact, exist.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  To establish a genuine issue of material fact, a party "must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient."  Radar Indus., Inc. v. Cleveland Die & Mfg. Co., 424 F. App'x 931, 936 (Fed. Cir. 2011) (quoting SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1116 (Fed. Cir. 1985)) (internal quotation omitted).  Where there is doubt as to the existence of a genuine issue of material fact, that doubt must be resolved in favor of the nonmovant.  Unigene Labs., Inc. v. Apotex, Inc., 655 F.3d 1352,

1360 (Fed. Cir. 2011) (citing Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc., 520 F.3d

1358, 1360-61 (Fed. Cir. 2008)).

## III.   Discussion

### A.   Claims associated with negligent or misleading estimates

The primary focus of the government's motion for summary judgment revolves

around whether the Army breached the contract by providing TRG with an estimate of 50

calls per month before TRG prepared its bid.  It is recognized in this court that while

government estimates are not guaranteed, bidders are ordinarily entitled to rely on

estimates as representing honest and informed conclusions when preparing their bids.

Hi-Shear Tech. Corp. v. United States, 53 Fed. Cl. 420, 429 (2002) (citing Medart, Inc. v.

Austin, 967 F.2d 579, 581 (Fed. Cir. 1992)).[11]  In this regard, the Court of Claims has

stated:

> Intrinsically, the estimate made in such circumstances must be the product
> of such relevant underlying information as is available to the author of the
> invitation.  If the bidder were not entitled to so regard it, its inclusion in the
> invitation would be surplusage at best or deception at worst.  Assuming that
> the bidder acts reasonably, he is entitled to rely on Government estimates as
> representing honest and informed conclusions.

Womack v. United States, 389 F.2d 793, 801 (Ct. Cl. 1968) (footnote and citation

omitted).  Accordingly, the government "is not free to carelessly guess at its needs."

---

[11] While the parties also disagree as to whether the GFOQ contract can properly be classified as a
requirements contract or an IDIQ contract, that issue as well as any others related to contract
interpretation are left for resolution later in this litigation.  For now, it is enough that the parties
agree that the service call portion represents firm fixed pricing, Def.'s Suppl. Brief 2, and that the
government might be liable for a breach of contract if the government gave misleading or
negligent estimates to the contractor.  See Engineered Demolition, Inc. v. United States, 70 Fed.
Cl. 580, 591-93 (2006) (holding that the government can be liable for breach for providing
negligent estimates on a non-requirements FFP contract).  Nonetheless, the government does not
concede that that the 50 call estimate was actually part of or incorporated into the contract.

Medart, 967 F.2d at 581.  While the risk of variance generally rests with the contractor, the government may nevertheless be liable for breach where the contractor can show by a preponderance of evidence that the government (1) failed to prepare an estimate in good faith, (2) prepared an estimate negligently, or (3) failed to use reasonable care.  Rumsfeld v. Applied Cos., 325 F.3d 1328, 1335 (Fed. Cir. 2003); Clearwater Forest Indus. v. United States, 650 F.2d 233, 239 (Ct. Cl. 1981).

The three standards tend to overlap and generally involve an inquiry into what efforts the government took in locating and integrating relevant information into the estimate formulation.  The good faith standard, for instance, "requires [the government] to seek the most current information available, and either reformulate its estimate when warranted by the information available, or to notify offerors of situations or factors likely to affect the estimate."  Datalect Computer Servs., Ltd. v. United States, 40 Fed. Cl. 28, 35 (1997) (citations omitted) rev'd in part on other grounds 215 F.3d 1344 (Fed. Cir. 1999).  Similarly, to prove negligence or that the government failed to use reasonable care in preparing the estimates, the contractor must show that there was information that the government "could have, or should have" considered in determining its estimate.  Educators Assocs., Inc. v. United States, 41 Fed. Cl. 811, 818 (1998).  A failure to consider such information could rise to the level of negligence regardless of the extent of impact of the information on the estimate.  Hi-Shear Tech., 53 Fed. Cl. at 430.  Whether information is "reasonably available" depends on the particular facts and circumstances surrounding the preparation of the estimate.  Id.  The government is generally not obliged to search for or create additional information in formulating an estimate.  Medart, 967

F.2d at 582.  Nonetheless, merely disclosing to the bidders everything known—or not known—at the time the estimate is made does not insulate the government from potential liability where it fails to inquire about potentially relevant and readily available information.  Womack, 389 F.2d at 800.  In this regard, one of the "common threads in the cases where courts have found estimates to be unreasonable" is when the agency "fail[s] to take reasonable efforts to confirm doubtful estimates."  Fed. Gr., Inc. v. United States, 67 Fed. Cl. 87, 98 (2005).

> **1. Disputed issues of fact preclude summary judgment on whether the estimates were negligent or misleading**

Tested by these standards, the court finds that disputed issues of fact preclude summary judgment as to whether the Army provided a negligent or misleading estimate to TRG when it told TRG that it could expect 50 service calls each month.  The government argues that its estimates were not negligently prepared or misleading because the undisputed evidence shows that no data were available to make accurate estimates and TRG was aware of their general unavailability.  The plaintiff argues that the government's claims that TRG knew that 50 calls per month constituted nothing more than an uninformed guess and that historical service call data or other data did not exist are not "credible."  Pl.'s Opp. 27.  TRG points first to a provision in the contract that states: "The historical number and scope of service calls and [sic] by month of the year are maintained within the GFOQ office and shall be made available to Contractor for review upon request."  GFOQ contract ¶ C.5.1.8.  TRG next argues, based on the testimony of Ms. Spellman, that the EMO should have had these data because, as she

explained, the EMO closely watched "every penny" spent on GFOQ housing and generally tracks expenditures on associated housing maintenance.  Pl.'s Resp. 5 (citing Spellman Dep. 47-48, Pl.'s Appx. 3458-59).  Similarly, Gen. Ballard recalls from his time as a resident living in GFOQ at Fort McNair that records were kept for all maintenance calls.

The plaintiff further asserts that even if it were true that the government no longer had historical data for service calls at Fort McNair and Fort Meyer, the Army was still negligent by providing the 50 call estimate without endeavoring to confirm the estimate with alternative sources of information.  TRG argues that data from Fort Belvoir and Fort Meade—two other forts in the National Capital Region—were potential sources of relevant information that should have been consulted or at least considered to calculate an estimate.  TRG notes that Mr. Campbell testified that he did not attempt to conduct any further investigation to determine whether the 50 call per month estimate provided by Ms. Spellman was accurate even though he knew it was not supported by any data.  Finally, TRG asserts that it had no reason to believe that the provided estimate was not rooted in some sort of data and represented nothing more than mere guesswork.

The government argues that these facts do not give rise to a material dispute because, it contends, the plaintiff has not produced any relevant evidence to show that data regarding service calls were reasonably available at any other military installation.  The government further argues that TRG helped prepare the PWS and thus "knew" that the Army did not have any data.  In such circumstances, the government argues, TRG could not have been misled and assumed the risk of variance in calls by relying on the

information.  Finally, the government argues that the contract provisions providing for modifications for variances of 5% above the estimated workload demonstrate that TRG could not rely on the 50 call estimate.  In essence, the government argues, TRG cannot pursue a claim for breach where the contract provided for an acceptable variance and adjustments beyond that variance.

The court finds that TRG has provided sufficient evidence to defeat the government's motion for summary judgment regarding the oral estimates provided to TRG during the bid process.  In particular, the court finds that the plaintiff has presented evidence to show that it had no reason to know that the 50 call number was wholly fabricated.  See Ballard Dep. 22-26, 34, Pl.'s Appx. 2811-15, 2933 (indicating TRG's belief that the government based its estimate of service calls on something other than an uninformed guess and that some set of data was utilized).  In addition, there is disputed evidence regarding the availability of potentially relevant historical records from other installations.  Ms. Clark-Evans testified that almost every military installation maintains a separate office or branch to service GFOQ housing, suggesting a wide availability of potentially relevant service call records.  Clark-Evans Dep. 10, Pl.'s Appx. 2731.  Ms. Clark-Evans's and Ms. Spellman's extensive experience working with GFOQ housing further suggests that the Army could have, at the very least, sought the records with reasonable effort.  In such circumstances, the government is not entitled to summary judgment as to the reasonableness of its estimates.

### 2. The contract's variance and equitable adjustment provisions do not foreclose TRG's claim for breach based on misleading or negligent estimates

The court also rejects the government's argument that TRG is barred from recovering any damages based on the contract's variance and equitable adjustment clause. The court finds that the contract's variance and equitable adjustment clause served only to protect the government from unforeseen circumstances at the time of contract formation. Womack, 389 F.2d at 801. It did not, however, excuse the government if it provided a misleading or negligent estimate to plaintiff. Id.; see also Chem. Tech., Inc. v. United States, 645 F.2d 934, 948 (Ct. Cl. 1981) ("[T]he Government cannot provide inaccurate data in this manner and then be allowed to bar an equitable recovery by arguing that the resulting damages . . . fall within the Volume Variation clause."). The Federal Circuit has made plain, moreover, that such provisions for equitable adjustments do not necessarily bar other measures of damages in cases where the court finds a breach. Hi-Shear Tech. Corp. v. United States, 356 F.3d 1372, 1381-82 (Fed. Cir. 2004). Instead, the issues of injury and damages remain. Id. The court holds, therefore, that the government cannot successfully use the contract's variance and equitable adjustment provision to preclude the plaintiff from the opportunity to present the merits of its breach of contract case.[12]

---

[12] This is not to say that the plaintiff is absolved from proving injury and damages, but only that the contract's variance clause does not apply if TRG can establish a breach.

**B.      The government is entitled to summary judgment on TRG's claim regarding its service of 49 units**

TRG also claims that the government breached the contract by requiring it to perform work on four housing units that were not included on the list provided at the time of contract formation.  TRG contends that it "remained responsible for maintenance for the 49 units on the original list as well as [4] additional units" without receiving additional compensation.  Pl.'s Resp. 8.

The government argues that there is no evidence to support TRG's contention that TRG performed work on any more than 49 GFOQ units.  The government asserts that TRG's own daily status reports establish that TRG performed work on no more than 49 units.  The government concedes that the daily status reports include three units that were not identified on the government's original list: MY24AU,[13] MY25B, and MY26B.  The reports further demonstrate, however, that TRG did not perform work on three housing units that were on the original list: MY22A, MY22B, and MN09.  As a result, the undisputed facts demonstrate that TRG did not perform work on more units than agreed upon by the parties in the contract's scope of work.

In view of the foregoing undisputed facts, the court agrees with the government that TRG has failed to show that there is a genuine issue of fact as to whether it performed work on more than 49 housing units.  To the contrary, as noted above, TRG's own daily housing reports indicate that TRG serviced only 49 units.  In such

---

[13] The list refers to individual housing units located at Fort Myer with an "MY" prefix and units located at Fort McNair with an "MN" prefix.

circumstances, the government is entitled to summary judgment on TRG's claim that is entitled to additional compensation for performing services for more than 49 units.

### C.     TRG cannot rely on the jury verdict method to establish damages

The government also seeks summary judgment barring TRG from using the "jury verdict" method for calculating damages in the event that the plaintiff establishes a breach of contract.  The jury verdict method is an approach to approximating damages based on the entire record.  Grumman Aerospace Corp. v. Wynne, 497 F.3d 1350, 1358 (Fed. Cir. 2007) (citing Raytheon Co. v. White, 305 F.3d 1354, 1367 (Fed. Cir. 2002)).  It is disfavored, however, and serves as a method for determining damages only when more exact methods are inapplicable—particularly where quantitative data are unavailable. Grumman, 497 F.3d at 1358; see also Dawco Constr., Inc. v. United States, 930 F.2d 872, 881 (Fed. Cir. 1991) ("[T]he contractor bears the burden of establishing that no more reliable method is available than the 'guesstimate' of the 'jury verdict method,' i.e., a method that would more precisely calculate the cost for the extra work.") (emphasis in original) (citation omitted).  In order to adopt the jury verdict method for determining damages, the court must find that (1) clear proof of injury exists, (2) there is no more reliable method for computing damages, and (3) the evidence is sufficient for a court to make a fair and reasonable approximation of the damages.  Grumman, 497 F.3d at 1358 (citing Dawco, 930 F.2d at 880).

The government's motion requires the court to resolve (1) whether TRG has demonstrated the clear proof of injury necessary to use the jury verdict method and (2) whether there is a more reliable method for computing damages.  The government argues

that the plaintiff's reliance on the jury verdict approach is fundamentally flawed because it ignores the import of the $15,000 monthly payment guaranteed under the contract and the contract's provisions on overage compensation.  The government argues that even if the $15,000 was estimated based on 50 service calls per month, the plaintiff fails to recognize that the number of calls estimated served merely as a proxy for calculating the number of labor hours to be spent on service calls.  Therefore, according to the government, the plaintiff can only show an injury if it can demonstrate that it incurred labor costs over and above the $15,000 a month threshold provided for under the contract based upon expended labor hours.  Because the plaintiff did not keep records, the government continues, TRG cannot show that it incurred more than $15,000 worth of labor hours in any given month—or on average over any given three-month period—and thus it cannot establish an injury in connection with any breach.  The government asserts, moreover, that the court cannot simply rest a finding of "clear proof of injury" by assuming that each and every service call resulted in $300 or more of labor charges.  For this same reason, the government argues that the plaintiff's reliance on the jury verdict method is not a reliable approach for calculating damages.

TRG contends, in response, that the alleged misleading estimate and the resulting number of calls beyond that estimate are inherently "clear proof of injury" because TRG was not contractually required to keep labor hour records and that to the extent it was required to keep labor hours, the government waived such requirements through its course of dealing.  Pl.'s Resp. 35-36.  TRG asserts that without records noting the labor

hour spent per call, the jury method presented by its expert, Mr. Bricker, is a reliable basis for both finding and awarding damages.

>    **1.    TRG does not show clear proof of injury justifying use of the jury verdict method**

The court agrees with the government that TRG cannot rely on the jury verdict method to establish damages in this case.  It is elemental that in order to recover for breach of contract, a party must allege and establish (1) a valid contact between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach.  Cent. Exploration New Orleans, LLC v. United States, 110 Fed. Cl. 148, 163 (2013) (quotations removed) (citing San Carlos Irr. and Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989)).  That is, even if breach is established, the plaintiff is limited only to nominal damages and may not recover more without separately establishing that it has actually in fact been injured by the breach.  24 Williston on Contracts § 64:8 (4th ed.).  Before the court may determine the proper quantum of damages to which the plaintiff may be entitled, the plaintiff must first demonstrate that the breach caused an economic injury.  See id. § 64:9 ("[I]t is now well established that the uncertainty that prevents recovery is uncertainty as to the fact of damage and not as to its amount.");  see also D'Andrea Bros. LLC v. United States, 109 Fed. Cl. 243, 264 (2013);  Mega Constr. Co. v. United States, 29 Fed. Cl. 396, 424 n.15 (1993).

The court agrees with the government that TRG's response to service calls above the 50 call oral estimate does not alone establish economic injury.  TRG improperly

assumes that any service call beyond the oral estimate of 50 calls necessarily resulted in an economic injury compensable by an award of damages.  Rather, to establish an injury in this case, the plaintiff must show that it incurred labor hours as a result of those calls above the 50 call monthly estimate requiring compensation in excess of the monthly $15,000 FFP payment.  This approach corrects the central fallacy of the plaintiff's argument that "routine service calls were priced at $300 each."  Pl.'s Reply Suppl. Brief 9.  The plaintiff's assumption that the government agreed to a fee of $300 per service call by simply dividing  $15,000 by 50 calls is wholly unsupported by the contract.

Specifically, the contract measured overage costs beyond the agreed upon $15,000 FFP primarily as a function of labor hours expended, and not the number of service calls performed.  See, e.g., GFOQ contract ¶¶ C.5.1.8.1, C.5.1.8.2 (determining overage compensation in reference to overage hours and not by number of service calls).  The contract provided that TRG could claim compensation for excess hours above the government estimate if the amount of remuneration based upon hours worked exceeded the $15,000 FFP monthly payment taking into account the 5% variation clause over a three-month period.  Id. ¶¶ C.5.1.8.1, C.5.1.8.2, C.5.1.9.2, C.5.1.9.3.  The contract required TRG to demonstrate that those additional hours were justified when compared to the government estimate of hours based on R.S. Means or other commercially available estimating systems.  Id. ¶¶ C.5.1.9.1, C.5.1.9.3.

The court holds that under the terms of this contract, the plaintiff must show that it incurred labor hours above the $15,000 guaranteed each month in order to demonstrate

injury.[14]  Under the plaintiff's theory of the case, the plaintiff would be injured and

entitled to damages for each marginal service call beyond the 50 call estimate without

any regard to the $15,000 monthly FFP.  The number of service calls, however, was not

the basis for compensation under the contract and injury would only exist, therefore, to

the extent that the extra calls resulted in labor hours compensable beyond $15,000.[15]

GFOQ contract, Def.'s Appx. 14 (listing the FFP unit price for service calls as months

rather than calls).  Under its theory of recovery, TRG would eschew all burden of risk

associated with FFP contracts and conceivably be entitled to compensation—without

regard to actual costs incurred—even if it answered only 51 calls in a month and even if

all of those calls resulted in less than $15,000 in total labor costs for that month.  Dalton

v. Cessna Aircraft Co., 98 F.3d 1298, 1305 (Fed. Cir. 1996) (noting that contractors in

FFP contracts typically carry the burden of risk that cost of performance will be higher

than the price of the contract).  This view is not supportable.  Unless the additional 388

---

[14] In this connection, the court recognizes that there could be great variability of the average labor required among the various types of service calls performed by TRG.  For instance, if R.S. Means or other commercially available estimating system were to determine that the average labor hours required for all calls was only 15 minutes, TRG may not have been injured as the total cost of compensation would likely not have exceed the $15,000 paid by the Army each month.  Conversely, if R.S. Means or other commercially available estimating system demonstrates that the average call required many labor hours, it is conceivable that compensation frequently exceeded the $15,000 threshold.

[15] TRG explicitly recognizes, despite its argument, that the number of service calls does not form the basis for compensation under the contract. Pl.'s Reply to Suppl. Brief 6 n.3 ("The Ravens Group does not contend that the estimates provided by the Army were contractual in nature."). Rather, the plaintiff acknowledges that the service calls estimate merely served as a basis for estimating the monthly FFP of $15,000.  Id.  As stated, it is undisputed that the parties agreed that the FFP CLIN unit cost for service calls was measured in months and not on a per call basis. GFOQ contract, Def.'s Appx. 14.  On these facts, there is no foundation for the plaintiff's contention that "routine calls were priced at $300 each."  Pl.'s Reply to Suppl. Brief 9.

calls identified by TRG gave rise to a sum of labor hours requiring compensation beyond the FFP $15,000 paid by the government each month, TRG cannot establish an injury as a basis for awarding damages.[16]  The plaintiff, therefore, must establish some means of demonstrating that the number of excess calls resulted in labor hours requiring compensation beyond the $15,000 provided for under the contract.

### 2.   Sufficient records exist to reasonably compute damages precluding use of the jury verdict method

The court further holds that, assuming TRG can show that the government breached the contract and that the breach resulted in economic injury, it cannot rely on the jury verdict method to calculate damages because there appears to be sufficient information to adequately reconstruct the labor hours TRG spent on service calls.  The evidence presented to the court and highlighted by TRG, Pl.'s Resp. 37, consists of daily work sheets recording the number of service calls, the type of service call, and the type of work performed by TRG for each call during the period of the contract.  Pl.'s Appx. 10-50.  Also before the court are TRG's financial statements and general ledgers for the entire period of contract performance.  Id. 51-701, 718-1711, 1715-2704.  Given these records and the contract's provisions cited above, the court finds that the plaintiff fails to

---

[16] The court does not find, as the government argues, that injury, assuming proof of breach, can only be established by reference to plaintiff's actual labor hours—hours that the parties do not dispute were not recorded on a per call basis.  Under the approach discussed above, TRG might be able to establish injury by demonstrating that the number of monthly labor hours spent on service calls—as calculated by R.S. Means or other commercially available estimating systems and based upon the daily work sheets—required compensation above and beyond the monthly $15,000 FFP without regard to the 5% variance clause.  Additionally, the court recognizes that TRG may have incurred other additional costs, such as material costs for example, as a result of the increased workload.

demonstrate that there is not a more reliable method for establishing damages.  See

Dawco, 930 F.2d at 880 (holding that "reasonable computation" of damages from "actual

figures" is favored over the jury verdict method).  The court therefore agrees with the

government that TRG cannot ignore the available data and rely on Mr. Bricker's report,

which is based on an assumed $300 per routine service call charge with percentages

added for their non-routine calls as proof of damages.

**IV.     Conclusion**

For the foregoing reasons, the government's motion for summary judgment is

**GRANTED-in-PART** and **DENIED-in-PART**.  Counts IV and V of the plaintiff's

complaint are **DISMISSED**.  The parties shall file a joint status report detailing proposed

next steps in the litigation by **September 9, 2013**.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge